LAW OFFICES OF BRONZE & TANG, P.C.
BankPacific Building, Suite 201
825 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-2001
Facsimile No.: (671) 647-7671

RICHARD A. PIPES, ESQ.
LAW OFFICES OF RICHARD A. PIPES
Orlean Pacific Plaza, Suite 201
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-1222
Facsimile No.: (671) 646-2203

Attorneys for Plaintiff

**FILED**
DISTRICT COURT OF GUAM

AUG 2 9 2005

**MARY L.M. MORAN
CLERK OF COURT**

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| ANTHONY J. ADA, | ) | CIVIL CASE NO. CV00-00012 |
| | ) | |
| Plaintiff, | ) | **REPLY MEMORANDUM OF** |
| | ) | **POINTS AND AUTHORITIES** |
| v. | ) | **IN SUPPORT OF MOTION FOR** |
| | ) | **ORDER GRANTING LEAVE TO** |
| SHELL GUAM, INC., et al., | ) | **FILE THIRD AMENDED** |
| | ) | **COMPLAINT** |
| Defendants. | ) | |
| | ) | |

ORIGINAL

# TABLE OF CONTENTS

Page

I.  ADA HAS SHOWN GOOD CAUSE UNDER RULE 16(b) ........................................ 2

II.  THERE IS NO BAD FAITH ON ADA'S PART ............................................................ 6

III.  THERE IS NO UNDUE DELAY BY ADA .................................................................... 7

IV.  THERE IS NO PREJUDICE TO SHELL ........................................................................ 8

V.  THE PROPOSED AMENDED COMPLAINT IS NOT FUTILE ............................. 10

VI.  THE COURT MUST CONSIDER THAT DENIAL OF MOTION WOULD

LEAD TO FILING OF SECOND ACTION .................................................................. 18

VII.  CONCLUSION ................................................................................................................. 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Chevron U.S.A., Inc. v. El-Khoury, 2002 U.S. Dist. LEXIS 20400* .............................................. 6

*Datastrip Int'l Ltd. v. Intacta Technologies, Inc., 253 F. Supp. 2d 1308, 1318 (N.D. Ga. 2003)* 19

*Eubanks Brothers v. Texaco Refining and Marketing Inc., 764 F. Supp. 1142, 1144 (S.D. Tex.*

*1990)* .............................................................................................................................................. 3

*Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227 (1962)* ......................................................... 6

*Ivan F. Boesky Securities Litigation, 882 F. Supp. 1371 (S.D.N.Y. 1995)* ........................................ 10

*Johnson v. Mammoth Recreations, Inc., 975 F.2d 604 (9th Cir. 1992)* .................................................. 2, 3-5, 8

*Nicholson v. The Prudential Insurance Company of America, 235 F. Supp. 2d 22 (D. Me. 2003)* ...... 10

*Nobles v. Rural Community Insurance Services, 303 F. Supp. 2d 1279, 1289 (M.D. Ala. 2004)* ..... 9

*RCS Enterprises, Inc., et al. v. Shell Guam, Inc., et al., Civil Case Nos. CV1442-99, CV1548-99* 3

*Saxholm As v. Dynal, Inc., 938 F. Supp. 120 (E.D.N.Y. 1996)* ...................................................... 10, 19

*Smithkline Beecham Corp. v. Geneva Pharmaceuticals, Inc., 287 F. Supp. 576, 581 (E.D. Pa. 2002)* 10

*U.S. v. Pend Orielle Public Util. Dist. No. 1, 926 F.2d 1502, 1511 (9th Cir. 1991)* ....................... 8

**Statutes and Rules**

15 U.S.C. §§ 2801 et seq ............................................................................................................... 2, 5

FRCP Rule 12(b)(6) ...................................................................................................................... 11, 18

FRCP Rule 16(b) ........................................................................................................................... 2

Ninth Circuit Court of Appeals, Circuit Rule 36-3 ................................................................. 6

**Other Authority**

*Black's Law Dictionary (6th ed. 1990)* .......................................................................................... 6

*Moore's Fed. Prac. 3D §15.15[3]* ................................................................................................. 10

LAW OFFICES OF BRONZE & TANG, P.C.
BankPacific Building, Suite 201
825 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-2001
Facsimile No.: (671) 647-7671

RICHARD A. PIPES, ESQ.
LAW OFFICES OF RICHARD A. PIPES
Orlean Pacific Plaza, Suite 201
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-1222
Facsimile No.: (671) 646-2203

Attorneys for Plaintiff

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| ANTHONY J. ADA, | ) | CIVIL CASE NO. CV00-00012 |
| | ) | |
| Plaintiff, | ) | **REPLY MEMORANDUM OF** |
| | ) | **POINTS AND AUTHORITIES** |
| v. | ) | **IN SUPPORT OF MOTION FOR** |
| | ) | **ORDER GRANTING LEAVE TO** |
| SHELL GUAM, INC., et al., | ) | **FILE THIRD AMENDED** |
| | ) | **COMPLAINT** |
| Defendants. | ) | |
| | ) | |

Plaintiff Anthony J. Ada ("Ada") has filed a Motion for Order Granting Leave to File Third

Amended Complaint ("Motion"). On August 24, 2005, this Court filed an Order Granting Ex Parte

Application which required Defendant Shell Guam, Inc. ("Shell") to file any opposition to the Motion

by noon on August 26, 2005, and required Ada to file any reply on or before August 29, 2005, at 8:00

a.m. Shell filed an Opposition ("Opposition") to the Motion on August 26, 2005, with supporting

Declarations. This memorandum constitutes Ada's Reply in support of the Motion and should be read

in conjunction with the Declarations of Anthony J. Ada and Richard A. Pipes concurrently filed herein,

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 2 of 19 pages

the same being incorporated herein by this reference.

## I. ADA HAS SHOWN GOOD CAUSE UNDER RULE 16(b).

Shell claims that Ada is not entitled to amend his complaint because he has not been "diligent"
in that he purportedly has not explained why a breach of contract claim could not have been asserted
earlier and the Motion is untimely because the deadline for motions to amend has "passed". *Opposition
at 2-6.*[1] Shell relies heavily upon the decision of the Court in *Johnson v. Mammoth Recreations, Inc., 975 F.2d
604 (9th Cir. 1992)*, for its argument that a movant must show that he has been "diligent" in addressing
any issues that come up that may require an amendment of the complaint on file with the Court and
for defining what circumstances show that a party has not been diligent. *See, Opposition at 3-4* (extensive
quote), *5, 7.*

One of the pivotal issues in this case is whether the agreements between the parties and their
conduct amounts to a franchise and franchise relationship under the Petroleum Marketing Practices
Act ("PMPA"), 15 U.S.C. §§ 2801 et seq. It is undisputed that the operating agreements between the
parties provide, in several forms, that the relationship between the parties is a "FRANCHISE UNDER
THE PETROLEUM MARKETING PRACTICES ACT". *See, Second Amended Complaint, filed herein on
May 10, 2002.* The PMPA has a preemption provision which has been interpreted to preempt any state
law claims related in any way to an alleged termination or nonrenewal of a petroleum franchise. *See,
15 U.S.C. § 2806; Eubanks Brothers v. Texaco Refining and Marketing Inc., 764 F. Supp. 1142, 1144 (S.D. Tex.*

---

[1]

Whether the deadline to file motions to amend the complaint has passed is not entirely clear. The Sixth Amended Scheduling
Order ("SASO") filed April 29, 2005, does not mention such a deadline. The Fifth Amended Scheduling Order ("FASO") filed
November 16, 2004, provides, in essence, that motions to add claims or parties must show "good cause" in order to be granted, but
it may have been supplanted by the SASO which provides no deadline. Since Shell's counsel drafted the SASO, any ambiguity
in it should be interpreted against Shell under the doctrine of *contra preferentum.* In any event, Ada believes he has shown "good
cause" entitling him to have the scheduling order and complaint amended.

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 3 of 19 pages

*1990).* Thus, there is at least an issue as to whether any state law claims, including breach of contract claims, that are in any way connected to the alleged termination of a PMPA franchise are preempted by the PMPA. The Superior Court of Guam in another case involving Shell, and counsel for the parties in this case, has specifically concluded that breach of contract claims arising out of claims for alleged wrongful termination of a PMPA franchise are preempted by the PMPA. *RCS Enterprises, Inc., et al. v. Shell Guam, Inc., et al., Civil Case Nos. CV1442-99 and CV1548-99, Decision and Order, at 8-9, filed March 11, 2003, a true copy of which is attached hereto as Exhibit "A".*[2] Based upon these authorities, it was not unreasonable for Ada to believe that his breach of contract claims were possibly preempted by the PMPA.

Even more compelling, however, are the holdings in the *Johnson* case, *supra,* and the circumstances under which the appeals court found that the litigant had not been "diligent". Johnson was injured by a ski lift and he filed suit against Mammoth Recreations, Inc. ("MRI"), a holding company which owned a majority of the stock in Mammoth Mountain Ski Area, Inc. ("MMSAI"), the entity which actually owned and operated the ski resort. *Id. at 606.* The complaint did not name MMSAI as a defendant despite the fact that Johnson alleged that the ski resort had been negligently operated and maintained. *Id.* In its answer, MRI denied that it owned or controlled the ski resort but Johnson failed to note it. *Id.* The litigation proceeded and a Scheduling Order was entered that provided a cut-off date for joining additional parties six months later. *Id.* MRI responded to an interrogatory within the amendment cutoff date and again informed Johnson that MRI neither owned nor operated the ski resort and that the ski lift in question was inspected by employees of MMSAI. *Id.*

---

2

The Decision and Order in the *RCS* case was issued in March, 2003, three months **before** the last stated deadline for filing motions to amend pleadings. *See, Third Amended Scheduling Order, filed April 17, 2003.*

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 4 of 19 pages

*at 606-7.* Shortly thereafter, and months before the amendment cutoff date, MRI counsel sent a letter to Johnson's attorneys advising them that MRI was not the proper defendant in the case and asked whether they would be willing to stipulate to dismiss MRI from the action and substitute MMSAI in its place. *Id. at 607.* Johnson's attorneys did not respond to the letter. *Id.*[3] Four months after the amendment cutoff date MRI moved for summary judgment and Johnson then filed a motion to amend his complaint. *Id.* The trial court denied Johnson's motion to amend and granted MRI's motion finding that the complaint failed to allege any theory under which MRI might be liable. *Id.*

The appeals court held that parties seeking to amend their complaint after the deadline in a scheduling order must show good cause and that the "focus of the inquiry is upon the moving party's reasons for seeking modification". *Id. at 609.* The Court found that Johnson had failed to demonstrate good cause for his motion to amend because he had been twice advised before the amendment cutoff date that MRI did not own or operate the ski resort and that his theory of liability would fail if the complaint was not amended.. *Id.* Additionally, the Court found that prior to the cutoff date counsel for MRI had offered to substitute the "proper defendant" to cure the defect but such offer was ignored by Johnson. *Id.* The Court held that failure "to heed clear and repeated signals that not all the necessary parties had been named in the complaint does not constitute diligence." *Id.*

Additionally, the Court confirmed that each party has an affirmative duty to be candid with the court and the other parties and to allege at the pretrial conference all factual and legal bases upon which the party wishes to litigate the case. *Id. at 609-610.* The Court found that MRI honored this obligation and had been candid with Johnson by pointing out that he may wish to name additional parties. *Id. at*

---

3

Johnson's attorneys claimed that they never received the letter but the trial court found otherwise and the appeals court affirmed this finding..

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 5 of 19 pages

*610.* The Court concluded that because Johnson failed to heed the warnings he had been repeatedly given about naming the proper defendant, and failed to act upon such warnings, he failed to "establish 'good cause' for modifying the pretrial scheduling order". *Id.* In this case, the facts are vastly different.

Ada disclosed experts and served expert damages reports upon Shell on January 10 and July 7, 2005. *Declaration of Richard A. Pipes* ("Pipes Decl."), *filed concurrently herein under seal.* Those reports make it abundantly clear that Ada intends upon pursuing claims for damages related to Shell's breaches of the applicable operating agreements and the other agreements between the parties for the operation of the stations. *Id.* Arguably, breach of contract claims arising under or related to the attempted termination of a PMPA franchise may be preempted by the PMPA itself and must be brought as a claim for damages under the PMPA. *Id.* Shell has never indicated to Ada, either orally or in writing, that Ada may not pursue the damages identified in the expert reports because a separate breach of contract action was not in Ada's complaint. *Id.* To the contrary, Shell's attorneys have deposed Ada on several occasions concerning the damages claimed in the reports and have indicated that Shell will depose Ada's expert on damages in the near future. *Id.* Ada and his counsel first learned that Shell may claim that Ada cannot claim the damages described in his expert reports not from Shell, but from information that came to Ada during a settlement conference before this Court on August 5, 2005. *Id.* Upon learning this information, Ada immediately requested that Shell stipulate to the limited amendment requested in the Motion by letters to Shell's counsel dated August 12 and 13, 2005. *Id.* By letter of August 18, 2005, counsel for Shell indicated that Shell would not agree to stipulate to the filing of an amended complaint. *Id.* Two working days later, on August 23, 2005, Ada filed his Motion with this Court. *Id.* Given the circumstances described above, Ada has clearly been diligent and shown good cause to justify modification of the scheduling order and amendment of his complaint. Further,

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 6 of 19 pages

Shell has not acted candidly with Ada or this Court, even though it had an affirmative duty to do so.

## II. THERE IS NO BAD FAITH ON ADA'S PART.

Without citation to any relevant caselaw or other authority, Shell argues that Ada is seeking to

amend his complaint in bad faith because "Ada is asserting claims he knows are specious". *Opposition*

*at 7-8.*[4] In essence, Shell is arguing that Ada is acting in bad faith because he purportedly knows that

the claims in the proposed complaint are futile.

As the Supreme Court stated in Foman v. Davis, *371 U.S. 178, 83 S.Ct. 227 (1962):*

> "Rule 15 (a) declares that leave to amend 'shall be freely given when
> justice so requires'; this mandate is to be heeded. See generally, 3
> Moore, Federal Practice (2d ed. 1948), §§ 15.08, 15.10. If the underlying
> facts or circumstances relied upon by a plaintiff may be a proper
> subject of relief, he. ought to be afforded an opportunity to test his
> claim on the merits. In the absence of any apparent or declared reason
> - such as undue delay, bad faith or dilatory motive on the part of the
> movant, repeated failure to cure deficiencies by amendments previously
> allowed, undue prejudice to the opposing party by virtue of allowance
> of the amendment, futility of amendment, etc. - the leave sought
> should, as the rules require, be 'freely given.'"

Since the Supreme Court joined the "bad faith" and "dilatory motive" concepts into one factor for the

trial court to consider, they must be interpreted together. Shell does not argue that Ada has any

"dilatory motive" or has intentionally delayed his attempt to amend the complaint for tactical or other

reasons. Similarly, "bad faith" implies actual or constructive fraud not prompted by an innocent

mistake as to one's rights, but by some interested or sinister motive. *Black's Law Dictionary (6ᵗʰ ed. 1990),*

---

4

Shell does cite the unpublished District Court Opinion in *Chevron U.S.A., Inc. v. El-Khoury, 2002 U.S. Dist. LEXIS 20400.* The Court of Appeals for this Circuit prohibits citation of any unpublished opinions of the Circuit Court, except for limited reasons not applicable to this case. *Ninth Circuit Court of Appeals, Circuit Rule 36-3.* While not specifically prohibited, citation by Shell to an unpublished opinion from a District Court must be seriously questioned.

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 7 of 19 pages

*at 139.* Shell has simply failed to allege or show any such conduct on Ada's part which supports a finding of bad faith. What Shell is really arguing is that a portion of Ada's proposed complaint is futile, an argument which is addressed below.

## III. THERE IS NO UNDUE DELAY BY ADA.

Shell argues that the Motion should be denied Ada should have sought to amend his complaint earlier. *Opposition at 8-9.* While there has been some delay in the progress of this case, the scheduling deadlines were suspended or continued for a significant periods of time to await decisions of the Court on important matters and because of the illness or medical concerns of counsel for both parties. *See, Stipulation and Order Taking Case Off Calendar, filed October 29, 2001; Third Amended Scheduling Order, filed April 17, 2003* (Ada's counsel medical emergency); *Fourth Amended Scheduling Order, filed April 30, 2004* (parties awaiting decision on pending motion which could effect scope of discovery); *Fifth Amended Scheduling Order, filed November 16, 2004* (protracted discovery dispute between parties stalled discovery); *Sixth Amended Scheduling Order, filed April 29, 2005* (extended scheduling deadlines because of surgery to Shell's counsel).

Just as importantly, the parties have agreed to amend, informally, the latest scheduling order by allowing discovery to take place after the cut-off date and have extended by stipulation and order the deadline for filing discovery and dispositive motions. *Pipes Decl.; Order Extending Motion Cutoff Date, filed August 25, 2005.* Specifically, Shell has taken depositions of Ada's sisters on August 19, 2005, and has indicated an intent to depose Ada's expert witness on damages, Mr. Slater, at some time in the near future and witnesses Rene Silvestre and others at some time in the near future. Shell has agreed that Ada can also take additional depositions in the future of its attorney, Steve Zamsky, and Shell

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 8 of 19 pages

management employees Darrel de la Paz and Jeanette Suzuki. . *Pipes Decl.*

As discussed above, Ada disclosed experts and served expert damages reports upon Shell on January 10 and July 7, 2005. Those reports make it abundantly clear that Ada intends upon pursuing claims for damages related to Shell's breaches of the applicable operating agreements and the other agreements between the parties for the operation of the stations as early as January, 2005. Also, as admitted by Shell, a large portion of Ada's breach of contract claims arose since the filing of the complaint in this case and as late as January, 2004, and continue to this date. *Opposition, 8; Ada Decl.*

As also discussed above, Ada and his counsel first learned that Shell may claim that Ada cannot claim the damages described in his expert reports not from Shell, but from information that came to Ada during a settlement conference before this Court on August 5, 2005. Upon learning this information, Ada immediately took steps to get a stipulation from Shell to file an amended complaint, and when Shell refused, Ada immediately filed his Motion and sought ex parte relief to shorten the time. Under the circumstances described above, there is no undue delay attributable to Ada in this case. Further, had Shell and its counsel been candid with Ada and this Court, in accordance with its affirmative duty as specified in *Johnson v. Mammoth Recreations, Inc., supra*, the issues brought in the Motion would have been resolved long ago.

Finally, just because there has been some delay, this factor alone does not support the denial of the Motion. *U.S. v. Pend Orielle Public Util. Dist. No. 1, 926 F.2d 1502, 1511 (9th Cir. 1991)* (it was an abuse of discretion when only factor considered by the court was delay).

## IV. THERE IS NO PREJUDICE TO SHELL.

Shell argues that if the Motion is granted it will be prejudiced because it has not taken discovery

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 9 of 19 pages

from Ada on the claims identified in Mr. Slater's reports, it "may want to assert counterclaims", and it "would need an opportunity to file an appropriate motion for summary judgment". *Opposition at 9-11*. The burden is on the party who claims prejudice, if an opposing party is allowed to amend its pleading, to show prejudice. *Nobles v. Rural Community Insurance Services, 303 F. Supp. 2d 1279, 1289 (M.D. Ala. 2004)*.

Shell's assertion that it has only taken limited discovery from Ada on the damages issues is, at the least, disingenuous. Shell has deposed Ada extensively on the damages issues. *Pipes Decl.* Shell has interrogated Ada on the commissions paid per gallon on gas sales, the expense reimbursement plan, the Shell Serve promotional program, Mr. Slater's reports, the Citibank Vise promotional program, and the Lucky 7 promotional program. *Id.* Shell was even permitted to depose Ada more than twice as long as permitted by Rule 26 because of an agreement among counsel. *Id.*

Shell implies that it could not conduct full discovery into the matters contained in Mr. Salter's supplemental damages report because it was not received until July 7. However, what Shell fails to advise this Court is that it **agreed** to the date for the production of the supplemental report. *Pipes Decl.* In fact, up to this point, counsel for both parties have been willing to informally extend deadlines and permit discovery outside of the dates imposed in the scheduling order. *Id.* Again, Shell is being less than candid and it is inappropriate for Shell to claim that it is prejudiced when it has agreed to several extensions of the discovery and motion cutoff dates for its own benefit. Shell has not carried its burden to prove prejudice that would be cause by granting the Motion and the possible prejudice to Ada in not granting the Motion could be substantial.

//

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 10 of 19 pages

## V. THE PROPOSED AMENDED COMPLAINT IS NOT FUTILE.

Shell argues that because the proposed breach of contract count in the proposed complaint will be defeated in a motion for summary judgment the Motion should be denied. *Opposition at 11-18.* Shell is misleading the Court as to the correct standard to be applied when assessing the futility factor under the *Foman* case.

Courts are inclined to allow leave to amend if it is possible for the plaintiff to state a valid legal claim. *Moore's Fed. Prac. 3D §15.15[3].* When leave to amend is sought before discovery is complete and neither party has moved for summary judgment, a proposed amendment may be found futile only if it sets forth no scenario which, if proven, would entitle the movant to relief against the nonmovant on some cognizable theory. *Nicholson v. The Prudential Insurance Company of America, 235 F. Supp. 2d 22 (D. Me. 2003).* Futility is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6) and leave to amend should not be denied based on futility unless the proposed amended complaint would fail to state a claim upon which relief can be granted. When reviewing a claim of futility, the court assumes the truth of all the complaint's factual allegations. *Smithkline Beecham Corp. v. Geneva Pharmaceuticals, Inc., 287 F. Supp. 576, 581 (E.D. Pa. 2002); Saxholm As v. Dynal, Inc., 938 F. Supp. 120 (E.D.N.Y. 1996)* (a proposed claim is futile only if it is clearly frivolous or legall insufficient on its face; if the proposed claim sets forth facts and circumstances which may entitle plaintiff to relief, then futility is not a proper basis on which to deny amendment); *Ivan F. Boesky Securities Litigation, 882 F. Supp. 1371 (S.D.N.Y. 1995)* (leave to amend is properly denied on grounds of futility only if a proposed amendment is clearly frivolous or legally insufficient on its face; otherwise, the substantive merits of a claim or defense should not be considered on a motion to amend).

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 11 of 19 pages

Shell has improperly tried to turn the Motion into one for summary judgment when that is not the proper standard. It is important to note that Shell does not argue that the proposed complaint is subject to dismissal under Rule 12(b)(6). Instead, Shell incorrectly provides a lengthy factual recitation in support of its argument that the proposed breach of contract claim cannot withstand summary judgment. In any event, Ada will address the specific areas cited by Shell.

**Fuel Commissions.** When Ada entered into his agreement with Shell, he understood that he was going to run his own business and,with Shell as the franchisor, his business startup would be successful under Shell's expertise and guidance. *Declaration of Anthony J. Ada* ("Ada Decl."), *concurrently filed herein.* Through discussions of the business plan, Shell relayed to Ada that he would have four profit centers as he took over the operations of Shell Mangilao. Immediately, in March, 1993, Ada would take over a convenience store (1), a tire shop (2) and Ada would get a commission on fuel sales (3). In April ,1993, Ada's fourth profit center, a car wash (4), was to be installed. Ada was offered a one-year trial franchise with a three-year renewal option. *Id.*

The fuel sales profit center was set up on a cents-per-gallon ("CPG") arrangement and Ada understood that this was the norm for all the gas stations. Shell top management was aware of Ada's income streams and financial goals and computed the CPG to show Ada an income stream attractive enough for Ada to decide to move forward with a relationship with Shell instead of choosing his other career options. Shell made it clear to Ada that the CPG would be adjusted as necessary in order to provide Ada with an adequate income and Ada relied on this. Shell also told Ada that they were seeking a long-term relationship. *Id.*

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 12 of 19 pages

Shell wrote in Ada's contract that he was an independent businessman. However, Shell would maintain control of Ada's earnings from fuel sales by controlling the flow of funds. In September, 1993 after reviewing Ada's operational costs, Shell increased Ada's CPG from $0.18 to $0.21. This built Ada's trust in Shell top management that they would ensure Ada was making an income in line with the goals they had discussed and was consistent with earlier representations made to Ada by Shell.. Six months later, in March, 1994, Shell renewed Ada's contract. Shell was very satisfied with the relationship and increased Ada's three-year renewal to five years. Also, Shell top management told Ada that he could make $100,000.00 per year in this business and they would support Ada through promotions and other activities. *Id.*

In January, 1995, after Shell Mangilao concluded a vehicle give-away promotion, Shell top management met with Ada and offered him another station, Shell Barrigada. The dealer, Mr. Manuel Paulino, had been terminated by Shell. From May,1994 to May,1997, Shell made arrangements with the Government of Guam ("GSA") to provide fuel to its fleet of buses and vehicles. Shell then unilaterally committed Ada's stations and unilaterally told Ada that it would pay him only $0.065 cents-per-gallon for GSA fuel. Even though Ada voiced his concern and objections with the CPG on this arrangement, Shell ignored Ada's concerns and made no adjustments. The impact of the GSA contract impacted Ada negatively. Ada lost many of his customers because of the traffic jams that the government vehicles caused. Ada's $0.21 CPG transactions were largely replaced by $0.065 CPG transactions and Ada's average gallonage dropped to 60,000 gallons per month at Shell Barrigada. This also affected negatively Shell Mangilao. *Id.*

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 13 of 19 pages

Ada's gallonage was further eroded in 1995 when a Shell fuel delivery contaminated Ada's tanks at Shell Barrigada by introducing an absorbent pad during the drop. The absorbent pad clogged a foot valve and caused three of Ada's total six lanes to stop pumping. This problem was not resolved for eight weeks and occurred during the opening of the Maite Mobil station. Shell top management did not adjust Ada's CPG for its mistake and also did not support Ada with any promotions to mitigate his losing customers to the more convenient Mobil station upstream from Ada. *Id.* In early 1996 Shell started assuring Ada that they had a KDR (Knock Down and Rebuild) plan for Shell Barrigada and assured Ada that the new station would be the "flagship station" for the network. Keeping in mind the long-term relationship Shell had promised, this information persuaded Ada to bear the hardships his family and he were experiencing in expectation of brighter days ahead. *Id.*

In February, 1996, Shell unilaterally determined to change Ada's cents-per-gallon commission on fuel to a fixed amount. The fixed amount offered by Shell effectively paid Ada more than what Ada was making with the GSA fuel commissions so Ada did not resist the change. In the ensuing months, Shell unilaterally made seven (7) changes to the fixed amount; each change resulting from a review of Ada's operating expenses. And each time, Shell no longer was computing the amounts to meet Ada's financial goals but was making cuts to the amount of fuel commissions Ada was getting. By November, 1997, the fixed amount came to rest at $16,852.00 for Shell Barrigada and $16,443 for Shell Mangilao. These amounts were lean and although Shell said that there was a $1,500.00 management fee built into these amounts, the other expense lines frequently consumed the fee. Shell also notified Ada that these fixed amounts should be referred to as expense reimbursements and not income. *Id.*

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 14 of 19 pages

In October, 1996, the KDR was started at Shell Barrigada. Shell made some attempts to persuade customers to continue patronizing ther station by giving away small toys and coupons called "fun packs" but this effort did not work and Ada's average gallons dropped to 48,000 gallons per month. In November, 1996, a key Shell executive, Jim Arenovski, called a meeting with Ada to discuss the re-opening of Shell Barrigada after the KDR. This meeting quickly turned sour when he informed Ada that Ada was not going to run the new station and he would take care of removing Ada voluntarily or through legal means. Ada ended the meeting with Mr. Arenovski and requested a meeting with his boss, Norm King. Norm King was the signatory to the renewal of Ada's Shell Barrigada franchise just months earlier. When Ada asked the King who would run the station if it was not Ada, he responded that it would be Jim Arenovski. Later it would become clear that Mr. Arenovski was orchestrating the implementation of a "single-agent concept" which would have all Shell stations being operated by one "agent". *Id.* On November 20, 1997, Arenovski wrote a memo stating that on February 1, 1998, Shell would unilaterally be reverting back tocommission based payment process based on a cents per gallon rate. However, this unilateral statement did not come to fruition because Arenovski was preparing to leave Shell and start a company that Shell had promised to give Ada's stations to. The fixed reimbursements from Shell have been static since 1997. This reimbursement does not take into account any discount or loyalty program expenses and Shell is fully aware of this. The damages Ada has incurred by reason of Shell's conduct in this area have been described by Roger Slater in his damages reports. *Id.*

**Citibank Discount Program**. The Citibank discount program, the Lucky-7 program and the Shell-Serve program are fuel driven programs that Shell implemented in 2000, 2002 and 2004, respectively. Although Shell says that the programs are voluntary, Shell exerted a lot of pressure and

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 15 of 19 pages

made it clear that the program would have difficulty working if less than all operators participated. Ada felt compelled to join. To date, each program is tracked manually and is labor intensive. The consolidation of each station and the inputting of information require an additional four man-hours per day. *Id.*

The Citibank discount program was presented to the operators as a three-month promotion. After the three-month promotion, Shell opted to continue the program without any automation. Shell key managers required Ada to log each transaction manually with information such as Date, Card Number, Reference Number, Gallons Sold, Price Per Gallon, Pump Price, Price charged to Card holder, and Discount amount. Ada had objected to Shell that this manual activity was labor intensive and his single bookkeeper was already too occupied with our daily work but to no avail. Ada asked Shell if some of the information could be eliminated and was told "no". Ada later determined that Shell allowed the other operators to provide less information and get reimbursed. Also, Ada determined that logging in card numbers was not allowed. *Id.*

Ada decided to determine how the other operators got reimbursed for the Citibank discounts that they give to customers. Delta Management and John Lee have been allowed to deduct the discounts from their fuel remittance on a daily basis. RCS Enterprises, Inc., an operator that is also suing Shell, is still required to log the discounts and bill Shell for reimbursement. In a recent operator meeting, Ada again voiced his concern that Citibank must be made to automate the discounting process as this same bank has done in other regions. On Friday, August 26, 2005, Ada learned that Shell finally approached Citibank about this. *Id.* Even though Ada does not make any income from the sale of fuel, Shell requires him give the discount up front and bill Shell later. Shell does not allow Adae to deduct

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 16 of 19 pages

these discounts from his fuel remittance thus, he has already paid for the fuel and Shell is enjoying use of Ada's funds until they get a billing from Ada. *Id.*

Additional costs of running the Citibank discount program come from merchant discount fees and transaction fees applied by Ada's bank. Shell has responded that Ada should shop for better deals with other banks and is refusing to reimburse him for these out-of-pocket costs. The expense reimbursement Ada receives has a small amount for merchant discount fees arrived at eight years ago when Ada's merchant activity was small. The Citibank discount program has stimulated huge activity in credit card transactions and related fees. Shell has known about these increases through the reports Ada submits to Shell on a monthly basis, particularly Ada's Consolidated Cash Sheet report which computes rent, GRT and breakdown by form of payment. Ada has been damaged by Shell's operation of the Citibank discount program as described in Mr. Slater's reports. *Id.*

**Lucky 7 Program.** The Lucky-7 program is a fuel driven loyalty program implemented in 2002. Shell requires each station to honor a completed Lucky-7 card at the point of transaction and give the redeeming customer $7.00 of fuel or merchandise. Ada accumulates the cards and submits them to Shell on a monthly basis. Shell on the average takes an additional two to four weeks to process Ada's billing and, thus, Shell is floating on Ada's funds. Ada already pays Shell for the fuel pumped through the daily remittance process. On reimbursement, Shell deducts $1.75 or 25% from the $7.00. Almost all of the Lucky-7 cards are used for additional fuel purchases thus Ada is funding Shell to promote its program and does not get any benefit from it. Shell states that Ada gets a benefit from increased traffic in his stores but Shell is incorrect. With the numerous price increases Shell has implemented to the public for gas, the motorist is using every cent it can get to pay for fuel and my

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 17 of 19 pages

convenience store sales has not shown the percentage increase that would support their claim. Shell

cites increased costs to justify price increases but fails to recognize that much of the increase is borne

by Ada at the station level. *Id.*

On the rare occasion that a Lucky-7 card is spent in the convenience store, such a sale hurts

Ada even more. Shell is paid on Ada's gross sales at the rate of 15%, or $1.05 on a sale of $7.00. Shell

deducts 25%, or $1.75, and I pay 4% GRT or $0.28 for a total of $3.08. With the average margin at

35%, Ada's cost-of-goods is $4.55. Thus, Ada has lost $0.63 cents in this type of transaction, as well.

Ada has been damaged by Shell's operation of the Lucky 7 program as described in Mr. Slater's reports.

*Id.*

**Shell Serve Program.** The Shell-Serve program was implemented by Shell in February, 2004

and called for Ada to hire two additional staff per station. Each Shell-Serve attendant is scheduled to

work 6.5 hours per day for six days or 685 man-hours per month. Shell agreed to reimburse me at

minimum wage, which amounts to $3,528 per month. Adding the employer's contribution for FICA

of $280 per month, the total basic cost for Shell Serve is $3,808.00 per month. These costs are certain

and the minimum expense for Ada on even a good month. When a Shell-Serve employee does not

show up for work or terminates, Ada's costs increase when he has to utilize his regular staff who are

being paid at a higher rate, plus any overtime incurred. Shell is fully aware that the monthly expense

reimbursement that was computed back in 1997 does not cover these additional costs. By not

reimbursing Ada for these additional costs, Ada has not been able to give his staff the normal wage

increases above minimum wage. Lack of giving increments to staff for their performance is negatively

affecting employee morale and has affected Ada's ability to retain good employees just because Shell

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 18 of 19 pages

refuses to pay for anything other than minimum wage. Ada has been damaged by Shell's operation of
the Shell Serve program as described in Mr. Slater's reports. *Id.*

Shell is intentionally harming Ada by requiring him to absorb the costs of its promotional
programs for the sale of gas while at the same time Shell refuses to compensate Ada for the sale of the
gas, at an enormous personal cost. Even though Ada has sent Shell billings in the exact same format
that Shell Harmon is submitting theirs, Ada is not getting any reimbursement while Shell Harmon does.
*Id.*

Shell has maintained that Ada agreed to participate in the programs but Ada felt that he had
no choice to do so because Shell told Ada that the programs should be implemented system wide in
order to be effective. Being in a vastly superior bargaining position, Shell knew full well that it had
control of the flow of funds and they had Ada at their mercy. Shell is using the lack of a purported
"profit and loss" report to justify withholding the money they owe to Ada, but Shell already has the
information from me which is given through the other reports that Ada is required to provide Shell.
In the years covering 2000 to 2004, Shell Mangilao's fuel sales were $9,223,564.92 and Shell Barrigada's
fuel sales were $6,810,227.13. My two stations have generated a total of $16,033,792.05 in fuel sales
which I have remitted to Shell on a timely basis. *Id.*

As shown above, Ada's claims are not futile, are not frivolous, and are legally sufficient.
Ada's claims would not be subject to dismissal under Rule 12(b)(6) and summary judgment.

## VI.  COURT MUST CONSIDER THAT DENIAL OF MOTION WOULD LEAD TO FILING OF SECOND ACTION.

An important factor to consider when deciding a motion for leave to amend is whether denying

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Reply Memorandum of Points and Authorities in Support of Motion
for Order Granting Leave to File Third Amended Complaint
Page 19 of 19 pages

leave is likely to lead to the initiation of a second action which encompasses substantially the same factual and legal questions as the initial proceeding. *Saxholm As v. Dynal, Inc.*, 938 F. Supp. 120 (E.D.N.Y. 1996); *Datastript Int'l Ltd. v. Intacta Technologies, Inc.*, 253 F. Supp. 2d 1308, 1318 (N.D. Ga. 2003). In the event that Ada's Motion is denied, Ada will file a second action, out of an abundance of caution, against Shell which will encompass substantially the same factual and legal questions in this proceeding. This is another reason why the Court must grant the Motion.

## VII. CONCLUSION.

For the reasons stated herein and in Ada's opening memorandum and supporting papers, the Court should grant the Motion and amend the Scheduling Order to the extent necessary. Shell should be ordered to answer the Amended Complaint within ten (10) days of service.

Dated this **29** day of August, 2005.

LAW OFFICES OF RICHARD A. PIPES
Attorneys for Plaintiff

By: _____
RICHARD A. PIPES

RAP/nsh

# EXHIBIT "A"

RCS ENTERPRISES, INC.,               )     CONSOLIDATED CASES
RENATO C. SILVESTRE, and             )     CIVIL CASE NO.  CV1442-99
STEPHANIE L. SILVESTRE,              )     CIVIL CASE NO.  CV1548-99
                                     )
          Plaintiffs,                )
                                     )
     vs.                             )
                                     )     **DECISION AND ORDER**
MARIANA ACQUISITION                  )
CORPORATION and SHELL GUAM, INC.,    )
                                     )
          Defendants.                )
_____)

## INTRODUCTION

This matter came before the HONORABLE MICHAEL J. BORDALLO on the 24th day of October, 2001, on Defendants Motion for Partial Summary Judgement and Plaintiffs Motion for Summary Judgement on Defendants counterclaim. Richard A. Pipes represented the Plaintiffs, RCS Enterprises, Inc., Renato T. and Stephanie Silvestre. The Defendants, Shell Guam, Inc. and Mariana Acquisition Corporation, were represented by Steven Zamsky. The Court now issues the following Decision and Order.

## BACKGROUND

This action arises out of a termination of a petroleum franchise, known as the Shell Harmon Service Station, a retailer of motor fuels and lubricants under a trademark that is owned and controlled by the Defendant, Shell Guam, Inc. ("Shell").

On June 22, 1999, RCS Enterprises Inc., Renato T. and Stephanie Silvestre (collectively "RCS") filed a complaint against Shell for operation and possession of the Shell Harmon Service Station. On September 12, 2000, RCS filed its first amended complaint. In addition to its claims pursuant to the Petroleum Marketing Practices Act, RCS also claims fraudulent inducement, tortuous interference with prospective contractual or business relations, breach of contract, unfair competition, and violation of the Deceptive Trade Practices Act; claims for which RCS is requesting punitive and exemplary damages.

On October 13, 2000, RCS filed a motion for summary judgement on Shell's counterclaim. RCS argues that its attempt to transfer certain real property in order to avoid recognizing a gain on

**EXHIBIT A**

3   the sale of real property does not amount to a sale that would trigger Shell's alleged right of first

4   refusal. RCS also argues that Shell's alleged right of first refusal is a restraint on alienation and is

5   void as against public policy.

6         On February 9, 2001, Shell filed a motion for partial summary judgement on counts IV

7   through VIII arguing that the statute of limitations has run barring RCS's claims and that RCS has

8   failed to allege sufficient facts to support its other claims.

9         On February 28, 2001, Shell filed an opposition to RCS's motion for summary judgment on

10   Shells' counterclaim.

11         On March 16, 2001, RCS filed its reply to Shell's opposition to RCS's motion for summary

12   judgement on Shell's counterclaim.

13         On July 18, 2001, RCS filed an opposition to Shell's motion for partial summary judgement

14   on counts IV through VIII of RCS's claim.

15         On July 25, 2001, Shell filed a reply to RCS's opposition to Shell's motion for partial

16   summary judgement.

17   **DISCUSSION**

18         Summary judgment should be granted when no material facts are in dispute and movant is

19   entitled to judgment as a matter of law. Iizuka Corporation v. Kawasho International (Guam), Inc.,

20   1997 Guam 10, (January 28, 1997). The burden is always on the moving party and the court must

21   review the facts in a light most favorable to the non-moving party. Id. If the movant can

22   demonstrate that there exists no genuine issue of material fact, the non-movant cannot merely rely

23   on the averments contained in the complaint, but must produce significant probative evidence

24   tending to support the complaint. Id. To grant summary judgment, there must not be a "genuine

25   issue." There is a genuine issue, if there is "sufficient evidence" which establishes a factual dispute

26   requiring resolution by a fact-finder. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809

27   F.2d 626, 630 ( 9th Cir. 1987). However, the dispute must be as to a "material fact." Id. Whether

28   a fact is material is determined by looking to the governing substantive law; if the fact may affect

- 2 -

the outcome, it is material. <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986).

## I.    PLAINTIFFS MOTION FOR SUMMARY JUDGEMENT ON COUNTERCLAIM

On or about March 30, 1988, Plaintiff RCS Enterprises, Inc. ("RCS") and Mariana

Acquisition Corporation ("MAC") entered into a Lease Agreement ("Lease") for the property in

which the Harmon Shell Gas Station is now located. The Lease was for a term of 10 years expiring

on February 28, 1998 unless sooner terminated or extended. On September 8, 1988, MAC assigned

all its rights, title and interest to Shell Guam Inc. ("Shell"). Pursuant to Article XIX of the Lease

Shell acquired a right of first refusal in the event that RCS decided to sell the Harmon property.

Article XIX: Sale of Fee provides that:

> In the event Lessor, or Lessor's assigns or transferees desire to dispose, assign or sell
> any interest in and to the Premises in fee or otherwise, except by mortgage, they shall
> first offer same in writing to Lessee who shall have ninety (90) days within which to
> purchase the same upon the terms offered by Lessor. If Lessee does not exercise this
> option to purchase on or before the expiration of said ninety (90) day period, the
> interest may be so transferred to any person. In the event Lessor shall from time to
> time change the terms of the offering, Lessee shall have the first opportunity to
> purchase upon the terms of the new offering.  The condition contained in this
> paragraph shall be a covenant running with the land, and shall be expressly stated in
> any document assigning or conveying the land hereby leased or any part thereof to
> permitted assigns or grantees, which document shall be recorded.

On September 28, 1988, RCS executed a warranty deed in favor of Wellcon, Inc. ("Wellcon")

transferring ownership of the Harmon property for the sum of ten dollars ($10.00). Wellcon then

executed a quitclaim deed transferring ownership to Renato C. and Stephanie L. Silvestre

("Silvestres") for the sum of one dollar ($1.00).

In support of its motion for summary judgment, RCS argues that a preemptive right of first

refusal is an unreasonable restraint on alienation. RCS cites to 21 G.C.A. §62104 for the proposition

that all restraints on alienation in Guam are void and illegal except for those restraints authorized by

21 G.C.A. §62104. However, that section only applies to parental division of property, which clearly

is not the case here.

21 G.C.A. §1254 states that conditions restraining alienation, when repugnant to the interest

- 3 -

created, are void. In interpreting the same or similar statute, courts weigh several factors to determine whether a restraint is void. Those factors include 1) the type of price set; 2) whether the restraint is limited in duration; and 3) the intent of the parties contracting for the pre-emptive right or whether the pre-emptive right serves a legitimate and useful purpose. Urquhart v. Teller, 288 Mont. 497, 504, 958 P.2d 714, 718 (Mo. 1998), Meridian Bowling Lanes, Inc. v. Meridian Athletic Association, 105 Idaho 509, 511, 670 P.2d 1294, 1296 (Idaho 1983), Lawson v. Redmoor Corp., 37 Wash.App. 351, 354, 679 P.2d 972, 974 (Wash.App. 1984).

A right of first refusal is void for unreasonableness if the price is fixed and greatly disproportionate to the market value of the property. Urquhart, at 504 (Mo. 1998). Here, the lease does not bind the parties to a set price. Instead the parties are free to negotiate an acceptable price based on the market value of the Harmon property in the event RCS wished to sell. The right to a 'first refusal' of certain property is not made unenforceable by the mere fact that no price is fixed in the agreement at which the owner must offer the property before selling to any other person. Meridian Bowling Lanes, at 512 (Idaho 1983). Thus, the pre-emptive right to purchase the Harmon property without a fixed price does not make the restraint unreasonable.

Secondly, a pre-emptive right for an indefinite period of time is an unreasonable restraint on alienation. Lawson, at 354 (Wash.App. 1984). Pursuant to the lease, Shell's right of first refusal does not extend indefinitely into the future. The lease specifically states that it will expire on February 28, 1998 unless the parties have agreed to sooner terminate or extend the lease. Therefore, the restraint is not unreasonable for indefiniteness.

Lastly, if it appears that the particular restraint is primarily for the purpose of restraining the alienability of the property, it will weigh heavily against the validity of the restraint. Urquhart, at 504 (Mo. 1998). The evidence does not suggest nor does RCS allege that Shell intended to restrain RCS from transferring the Harmon property to any other person other than Shell but rather that Shell would be able to purchase the land on which the Harmon Shell Service Station is located in the event that RCS intended to sell. In fact, Article XIX of the Lease Agreement is titled "Sale of Fee" further

- 4 -

indicating that the parties intended to ensure that in the event RCS decided to sale its interest in the Harmon property, RCS would first offer Shell the opportunity to purchase the property. RCS does not allege that it was somehow coerced or forced into giving Shell a right of first refusal. It is apparent from the record that both parties were willing participants and mutually agreed that granting Shell a right of first refusal would facilitate the negotiations for the lease of the Harmon property. By granting Shell a right of first refusal, RCS would get the benefit of leasing the property and Shell would be assured that if RCS decided to sale the property Shell would then have the first opportunity to purchase the property. If the circumstances suggest that the restraint was freely entered into by mutual consent as a normal incident of an equal bargaining relationship in order to promote the original transfer of the property then the restraint will not be unreasonable. Id. Thus, the Court finds that the pre-emptive right in this case is not an unreasonable restraint on alienation.

The privilege of first refusal merely requires the owner, when and if he desires to sell the property, to offer it to the lessee, for the same price for which he is 'willing to sell to another.' Kroehnke v. Zimmerman, 171 Colo. 365, 368, 467 P.2d 265, 266 (Colo. 1970). The Court must now determine whether the transfer of the Harmon property subject to the right of first refusal was the equivalent of a sale of that property triggering Shell's right of first refusal. In Kroehnke, the Court held that the transfer of title by the individual owners to a corporation in which the grantors own all of the stock did not constitute a sale within the contemplation of the parties. Id.

RCS argues that even if Shell did have a valid right of first refusal, no 'sale' occurred which would permit Shell to exercise its pre-emptive right. However, Shell argues that the transfer of the Harmon property was an attempt by RCS to defer the gain to be recognized on the sale of other property owned by RCS amounted to a sale of the Harmon property thus, triggering Shells' right of first refusal. However, the evidence indicates that RCS did not offer the property for sale nor was there a third party offer to purchase the Harmon property. In fact, both parties agree that RCS simply transferred property owned by it to its majority shareholders in an effort to avoid recognizing gain on the sale of other property. Where the circumstances do not suggest 'arms' length dealing between

- 5 -

an owner willing to sell and a buyer willing to buy, which customarily characterizes a sale in the open market, it cannot be said that a sale has occurred within the meaning of the lease. Isaacson v. First Security Bank of Utah, 95 Idaho 452, 454, 511 P.2d 269, 271 (Idaho 1973). The evidence before the Court reveals that RCS, a family owned corporation transferred property to Wellcon, another wholly owned corporation which then transferred the property to the Silvestres, the sole owners of RCS in order to defer gain recognition on the sale of some other property owned by RCS. There is no evidence RCS intended to sell its property on the open market. Likewise, there is no evidence RCS was being forced to sell it property and attempted to sell to a "friendly" company. Thus, the Court finds that no 'sale' resulted from the transfer of the Harmon property from RCS to the Silvestres.

## II.     DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGEMENT ON COUNTS IV THROUGH IX

Shell Guam, Inc. ("Shell"), and Mariana Acquisition Corporation ("MAC") move this Court for partial summary judgment on counts IV through IX of RCS Enterprises, Inc, ("RCS"), Renato C. Silvestre and Stephanie L. Silvestre ("Silvestres") first amended complaint. RCS and the Silvestres' (collectively "RCS") fourth cause of action asserted a claim for Fraudulent Inducement, the fifth for Tortuous Interference with Prospective Contractual Relations, the sixth for Breach of Contract, the seventh for Breach of Duty of Good Faith and Fair Dealing, the eight for Unfair Competition, and the ninth for Violation of Deceptive Trade Practices - Consumer Protection Act.

Shell argues that Counts V through IX of the amended complaint relate to the termination of the franchise agreement and are preempted by the Petroleum Marketing Practices Act ("PMPA"). The PMPA has two main objectives. The first is to protect petroleum marketing franchisees against arbitrary or discriminatory terminations or nonrenewals of their service station franchises. Nick Arbabian v. BP America, 898 F.Supp. 703, 707 (N.D.Cal. 1995). The second is to provide "'adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.'" Id. To ensure nationwide uniformity,

- 6 -

Congress explicitly included a preemption provision in the PMPA, which provides:

> To the extent that any provision of the PMPA applies to the termination ... of any franchise, or to the nonrenewal ... of any franchise relationship, no state ... may adopt, enforce or continue in effect any provision of any law or regulation (including any remedy or penalty applicable to any violation thereof) with respect to termination ... of any such franchise or to the nonrenewal ... of any such franchise relationship unless such provision of such law or regulation is the same as the applicable provision of the PMPA.

15 U.S.C. § 2806(a). With regard to the provision, the Ninth Circuit has stated: "In enacting the PMPA, Congress attempted to provide national uniformity of petroleum franchise termination law. The purpose of uniformity would be frustrated if the PMPA was not given its preemptory intent. Accordingly, we find the PMPA preempts all inconsistent state law." Arbabian, at 707.

The Ninth Circuit has adopted a more restrictive preemption view regarding the preemption provision's reach. Id. at 708. The restrictive preemption view is that the PMPA preempts only those state laws that purport to regulate the grounds for, procedures for, and notification requirements of termination of franchises and nonrenewals of franchise relationships. Id. In accordance with the Ninth Circuit's authority, this Court applies the restrictive preemption view in determining whether RCSs' fraud, tortuous interference, breach of contract, breach of duty of good faith and fair dealing, unfair competition, and violation of the deceptive trade practices - consumer protection act claims are preempted by the PMPA.

**1. Count IV**

On March 4, 1994, RCS and Shell agreed to a Reinstatement Extension Agreement ("Extension Agreement") that extended their original Dealer Agreement to February 28, 1999. RCS alleges that Shell made certain representations to support and promote RCS' operation of the Shell Harmon Service. RCS also claims that Shell made certain representations that if, for any reason, the Dealer Agreement was terminated, then Shell's ground lease of the land on which the Shell Harmon Service was located would also terminate. It is undisputed that these representations were not included in the Extension Agreement. RCS claims that had it known that these representations were not included in the Extension Agreement it would not have agreed to extend the Dealer Agreement.

- 7 -

The Ninth Circuit has held that actions involving the formation of contracts do not implicate the grounds for, procedures for or notification requirements of termination and nonrenewal under the PMPA because the relationship that the PMPA governs has not been formed at that stage. William T. Pride v. Exxon Corporation, 911 F.2d 251, 258 (9th Cir. 1990). Thus, the PMPA would not preempt the general common law rule that contracts entered into by fraud are unenforceable. Id.

However, 7 G.C.A. §11305 provides a three year statute of limitations for an action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake. 7 G.C.A. §11305. In this case, by as late as March 4, 1994, RCS had knowledge of the fact that the representations allegedly made by Shell were not included in the Extension Agreement. Therefore, RCS had until March 4, 1997 to file its claim for fraudulent inducement. Thus, the Court finds that RCS is barred from bringing its claim for fraudulent inducement pursuant to 7 G.C.A. §11305.

### 2. Counts V through IX

In this case, RCS alleges in counts V through IX that Shell engaged in discriminatory pricing, failing to act in good faith in setting its price for fuel, breached its duty of good faith and fair dealing, engaged in unfair competition and violated the Deceptive Trade Practice - Consumer Protection Act all with the intent to terminate its Dealer Agreement with RCS or to force RCS out of business so that Shell may continue to operate the Shell Harmon Service Station as an agent of Shell. In assessing the effect of the PMPA on these claims, this Court looks to the preemption mandate of the PMPA. Courts from numerous jurisdictions have consistently interpreted this provision to preempt any state law claims related to an alleged wrongful termination or nonrenewal of a petroleum franchise. Eubanks Brothers v. Texaco Refining and Marketing Inc., 764 F.Supp. 1142, 1144 (S.D. Tex. 1990). The PMPA preempts a state law action when the action arises out of the franchise termination or is an incident of the termination. Id. In this case, RCSs' claims of discriminatory conduct, breach of contract, unfair competition, violations of the deceptive trade practice - consumer protection act and breach of the duty of good faith and fair dealing arises out of RCSs' claims for



- 8 -

wrongful termination of the Dealer Agreement. The right of a petroleum franchisor to terminate or refuse to renew a franchise agreement is regulated and restricted by the Petroleum Marketing Practices Act ("PMPA"); termination or nonrenewal may take place only for reasons specified in the PMPA and then only in compliance with the Act's strict notice requirements. Mohammed v. Chevron U.S.A. Inc., 738 F.Supp 1383, 1385 (M.D.Fla. 1990). Therefore, the Court finds that these claims pertain to the procedures for and grounds for terminating a franchise, and are preempted by the PMPA.

## CONCLUSION

Based on the foregoing, the Court GRANTS Plaintiffs' Motion for Summary Judgment on Defendants' counterclaim. The Court finds that no 'sale' resulted from the transfer of the Harmon property from RCS to the Silvestres that would trigger Defendants' right of first refusal..

The Court GRANTS Defendants' motion for summary judgment on Count IV of Plaintiffs' complaint for fraudulent inducement pursuant to 7 G.C.A § 11305. The Court finds that Plaintiffs' fifth through ninth causes of action are preempted by the PMPA and therefore grants Defendant's motion for summary judgment on those counts. The Court notes this resolution does not dispose of the instant action as Plaintiffs first through third causes of action are still pending.

SO ORDERED this 11th day of March, 2003.

Honorable Michael J. Bordallo
Judge, Superior Court of Guam

I do hereby certify that this foregoing is a full, true and correct copy of the original on file in the office of the Clerk of the Superior Court of Guam

MAR 11 2003

Deputy Clerk Superior Court of Guam

- 9 -