LAW OFFICES OF BRONZE & TANG, P.C.
BankPacific Building, Suite 201
825 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-2001
Facsimile No.: (671) 647-7671

RICHARD A. PIPES, ESQ.
LAW OFFICES OF RICHARD A. PIPES
Orlean Pacific Plaza, Suite 201
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-1222
Facsimile No.: (671) 646-2203

Attorneys for Plaintiff

FILED
DISTRICT COURT OF GUAM
AUG 2 9 2005
MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| ANTHONY J. ADA,<br><br>        Plaintiff,<br><br>v.<br><br>SHELL GUAM, INC.,<br><br>        Defendant. | CIVIL CASE NO. CV00-00012<br><br>**DECLARATION OF**<br>**ANTHONY J. ADA** |

I, ANTHONY J. ADA, do hereby declare as follows:

1. I am over the age of eighteen years and competent to make this Declaration. I have personal knowledge of the matters stated herein and would be competent to testify thereto if called as a witness to these proceedings. I am the Plaintiff in this matter.

2. When I entered into my agreement with Shell, I understood that I was going to run my own business and, with Shell as the franchisor, my business startup would be successful under Shell's expertise and guidance. Through discussions of the business plan, Shell relayed to me that I would have

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Declaration of Anthony J. Ada
Page 2 of 8 pages

four profit centers as I took over the operations of Shell Mangilao. Immediately, in March, 1993, I would take over a convenience store (1), a tire shop (2) and I would get a commission on fuel sales (3). In April, 1993, my fourth profit center, a car wash (4), was to be installed. I was offered a one-year trial franchise with a three-year renewal option.

3. The fuel sales profit center was set up on a cents-per-gallon ("CPG") arrangement and I understood that this was the norm for all the gas stations. Shell top management was aware of my income streams and financial goals and computed the CPG to show me an income stream attractive enough for me to decide to move forward with a relationship with Shell instead of choosing other career options. Shell made it clear to me that the CPG would be adjusted as necessary in order to provide me with an adequate income and I relied on this. Shell also told me that they were seeking a long-term relationship.

4. Shell wrote in my contract that I was an independent businessman. However, Shell would maintain control of my earnings from fuel sales by controlling the flow of funds. In September, 1993 after reviewing my operational costs, Shell increased my CPG from $0.18 to $0.21. This built my trust in Shell top management that they would ensure I was making an income in line with the goals we had discussed and was consistent with earlier representations made to me by Shell. Six months later, in March, 1994, Shell renewed my contract. Shell was very satisfied with the relationship and increased my three-year renewal to five years. Also, Shell top management told me that I could make $100,000.00 per year in this business and they would support me through promotions and other activities.

5. In January, 1995, after Shell Mangilao concluded a vehicle give-away promotion, Shell top management met with me and offered me another station, Shell Barrigada. The dealer, Mr. Manuel Paulino, had been terminated by Shell. From May,1994 to May,1997, Shell made arrangements with the

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Declaration of Anthony J. Ada
Page 3 of 8 pages

Government of Guam ("GSA") to provide fuel to its fleet of buses and vehicles. Shell then unilaterally committed my stations and unilaterally told me that it would pay me only $0.065 cents-per-gallon for GSA fuel. Even though I voiced my concern and objections with the CPG on this arrangement, Shell ignored my concerns and made no adjustments. The impact of the GSA contract impacted me negatively. I lost many of my customers because of the traffic jams that the government vehicles caused. My $0.21 CPG transactions were largely replaced by $0.065 CPG transactions and my average gallonage dropped to 60,000 gallons per month at Shell Barrigada. This also affected negatively Shell Mangilao.

6. My gallonage was further eroded in 1995 when a Shell fuel delivery contaminated my tanks at Shell Barrigada by introducing an absorbent pad during the drop. The absorbent pad clogged a foot valve and caused three of my total six lanes to stop pumping. This problem was not resolved for eight weeks and occurred during the opening of the Maite Mobil station. Shell top management did not adjust my CPG for its mistake and also did not support me with any promotions to mitigate my losing customers to the more convenient Mobil station upstream from me. In early 1996 Shell started assuring me that they had a KDR (Knock Down and Rebuild) plan for Shell Barrigada and assured me that the new station would be the "flagship station" for the network. Keeping in mind the long-term relationship Shell had promised, this information persuaded me to bear the hardships my family and I were experiencing in expectation of brighter days ahead.

7. In February, 1996, Shell unilaterally determined to change my cents-per-gallon commission on fuel to a fixed amount. The fixed amount offered by Shell effectively paid me more than what I was making with the GSA fuel commissions so I did not resist the change. In the ensuing months, Shell unilaterally made seven (7) changes to the fixed amount; each change resulting from a

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Declaration of Anthony J. Ada
Page 4 of 8 pages

review of my operating expenses. And each time, Shell no longer was computing the amounts to meet my financial goals but was making cuts to the amount of fuel commissions I was getting. By November, 1997, the fixed amount came to rest at $16,852 for Shell Barrigada and $16,443 for Shell Mangilao. These amounts were lean and although Shell said that there was a $1,500.00 management fee built into these amounts, the other expense lines frequently consumed the fee. Shell also notified me that these fixed amounts should be referred to as expense reimbursements and not income.

8. In October, 1996, the KDR was started at Shell Barrigada. Shell made some attempts to persuade customers to continue patronizing the station by giving away small toys and coupons called "fun packs" but this effort did not work and my average gallons dropped to 48,000 gallons per month. In November, 1996, a key Shell executive, Jim Arenovski, called a meeting with me to discuss the re-opening of Shell Barrigada after the KDR. This meeting quickly turned sour when he informed me that I was not going to run the new station and he would take care of removing me voluntarily or through legal means. I ended the meeting with Mr. Arenovski and requested a meeting with his boss, Norm King. Norm King was the signatory to the renewal of my Shell Barrigada franchise just months earlier. When I asked Norm King who would run the station if it was not me, he responded that it would be Jim Arenovski. Later it would become clear that Mr. Arenovski was orchestrating the implementation of a "single-agent concept" which would have all Shell stations being operated by one "agent". On November 20, 1997, Arenovski wrote a memo stating that on February 1, 1998, Shell would unilaterally be reverting back tocommission based payment process based on a cents per gallon rate. However, this unilateral statement did not come to fruition because Arenovski was preparing to leave Shell and start a company that Shell had promised to give my stations to. The fixed reimbursements from Shell have been static since 1997. This reimbursement does not take into account any discount or loyalty program

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Declaration of Anthony J. Ada
Page 5 of 8 pages

expenses and Shell is fully aware of this. The damages I have incurred by reason of Shell's conduct in this area have been described by Roger Slater in his damages reports.

9. The Citibank discount program, the Lucky-7 program and the Shell-Serve program are fuel driven programs that Shell implemented in 2000, 2002 and 2004, respectively. Although Shell says that the programs are voluntary, Shell exerted a lot of pressure and made it clear that the program would have difficulty working if less than all operators participated. I felt compelled to join. To date, each program is tracked manually and is labor intensive. The consolidation of each station and the inputting of information require an additional four man-hours per day.

10. The Citibank discount program was presented to the operators as a three-month promotion. After the three-month promotion, Shell opted to continue the program without any automation. Shell key managers required me to log each transaction manually with information such as Date, Card Number, Reference Number, Gallons Sold, Price Per Gallon, Pump Price, Price charged to Card holder, and Discount amount. I had objected to Shell that this manual activity was labor intensive and my single bookkeeper was already too occupied with our daily work but to no avail. I asked Shell if some of the information could be eliminated and was told "no". I later determined that Shell allowed the other operators to provide less information and get reimbursed. Also, I determined that logging in card numbers was not allowed.

11. I decided to determine how the other operators got reimbursed for the Citibank discounts that they give to customers. Delta Management and John Lee have been allowed to deduct the discounts from their fuel remittance on a daily basis. RCS Enterprises, Inc., an operator that is also suing Shell, is still required to log the discounts and bill Shell for reimbursement. In a recent operator meeting, I again voiced my concern that Citibank must be made to automate the discounting process

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Declaration of Anthony J. Ada
Page 6 of 8 pages

as this same bank has done in other regions. On Friday, August 26, 2005, I learned that Shell finally approached Citibank about this. Even though I do not make any income from the sale of fuel, Shell requires me give the discount up front and bill Shell later. Shell does not allow me to deduct these discounts from my fuel remittance thus, I have already paid for the fuel and Shell is enjoying use of my funds until they get a billing from me.

12. Additional costs of running the Citibank discount program come from merchant discount fees and transaction fees applied by my bank. Shell has responded that I should shop for better deals with other banks and is refusing to reimburse me for these out-of-pocket costs. The expense reimbursement I receive has a small amount for merchant discount fees arrived at eight years ago when my merchant activity was small. The Citibank discount program has stimulated huge activity in credit card transactions and related fees. Shell has known about these increases through the reports I submit to Shell on a monthly basis, particularly my Consolidated Cash Sheet report which computes rent, GRT and breakdown by form of payment. I have been damaged by Shell's operation of the Citibank discount program as described in Mr. Slater's reports.

13. The Lucky-7 program is a fuel driven loyalty program implemented in 2002. Shell requires each station to honor a completed Lucky-7 card at the point of transaction and give the redeeming customer $7.00 of fuel or merchandise. I accumulate the cards and submit them to Shell on a monthly basis. Shell on the average takes an additional two to four weeks to process my billing and, thus, Shell is floating on my funds. I already pay Shell for the fuel pumped through the daily remittance process. On reimbursement, Shell deducts $1.75 or 25% from the $7.00. Almost all of the Lucky-7 cards are used for additional fuel purchases thus I am funding Shell to promote its program and do not get any benefit from it. Shell states that I get a benefit from increased traffic in my stores but Shell is

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Declaration of Anthony J. Ada
Page 7 of 8 pages

incorrect. With the numerous price increases Shell has implemented to the public for gas, the motorist is using every cent it can get to pay for fuel and my convenience store sales have not shown the percentage increase that would support their claim. Shell cites increased costs to justify price increases but fails to recognize that much of the increase is borne by me at the station level.

14. On the rare occasion that a Lucky-7 card is spent in the convenience store, such a sale hurts me even more. Shell is paid on my gross sales at the rate of 15%, or $1.05 on a sale of $7.00. Shell deducts 25%, or $1.75, and I pay 4% GRT or $0.28 for a total of $3.08. With the average margin at 35%, my cost-of-goods is $4.55. Thus, I have lost $0.63 cents in this type of transaction, as well. I have been damaged by Shell's operation of the Lucky 7 program as described in Mr. Slater's reports.

15. The Shell-Serve program was implemented by Shell in February, 2004 and called for me to hire two additional staff per station. Each Shell-Serve attendant is scheduled to work 6.5 hours per day for six days or 685 man-hours per month. Shell agreed to reimburse me at minimum wage, which amounts to $3,528 per month. Adding the employer's contribution for FICA of $280 per month, the total basic cost for Shell Serve is $3,808.00 per month. These costs are certain and the minimum expense for me on even a good month. When a Shell-Serve employee does not show up for work or terminates, my costs increase when I have to utilize my regular staff who are being paid at a higher rate, plus any overtime incurred. Shell is fully aware that the monthly expense reimbursement that was computed back in 1997 does not cover these additional costs. By not reimbursing me for these additional costs, I have not been able to give my staff the normal wage increases above minimum wage. Lack of giving increments to staff for their performance is negatively affecting employee morale and has affected my ability to retain good employees just because Shell refuses to pay for anything other than minimum wage. I have been damaged by Shell's operation of the Shell Serve program as described

Anthony J. Ada v. Shell Guam, Inc., et al
Civil Case No. 00-00012
Declaration of Anthony J. Ada
Page 8 of 8 pages

in Mr. Slater's reports.

16. Shell is intentionally harming me by requiring me to absorb the costs of its promotional programs for the sale of gas while at the same time Shell refuses to compensate me for the sale of the gas, at an enormous personal cost. Even though I have sent Shell billings in the exact same format that Shell Harmon is submitting theirs, I am not getting any reimbursement while Shell Harmon does.

17. Shell has maintained that I agreed to participate in the programs but I felt that I had no choice to do so because Shell told me that the programs should be implemented system wide in order to be effective. Being in a vastly superior bargaining position, Shell knew full well that it had control of the flow of funds and they had me at their mercy. Shell is using the lack of a purported "profit and loss" report to justify withholding the money they owe to me, but Shell already has the information from me which is given through the other reports that I am required to provide Shell. In the years covering 2000 to 2004, Shell Mangilao's fuel sales were $9,223,564.92 and Shell Barrigada's fuel sales were $6,810,227.13. My two stations have generated a total of $16,033,792.05 in fuel sales which I have remitted to Shell on a timely basis.

I declare under penalty of perjury under the laws of the United States and Guam that the foregoing is true and correct.

Executed this 28 day of August, 2005.

_____
ANTHONY J. ADA

RAP/nsh