JACQUES A. BRONZE, ESQ.
LAW OFFICES OF BRONZE & TANG, P.C.
BankPacific Building, Suite 201
825 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-2001
Facsimile No.: (671) 647-7671

RICHARD A. PIPES, ESQ.
LAW OFFICES OF RICHARD A. PIPES
Orlean Pacific Plaza, Suite 201
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-1222
Facsimile No.: (671) 646-2203

**FILED**
DISTRICT COURT OF GUAM

SEP - 1 2005

MARY L.M. MORAN
CLERK OF COURT

Attorneys for Plaintiff

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| ANTHONY J. ADA, | ) | CIVIL CASE NO. CV00-00012 |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF** |
| | ) | **RICHARD A. PIPES** |
| v. | ) | |
| | ) | |
| SHELL GUAM, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, RICHARD A. PIPES, do hereby declare as follows:

1.      I am over the age of eighteen years and competent to make this Declaration. I have personal knowledge of the matters stated herein and would be competent to testify thereto if called as a witness to these proceedings. I am co-counsel for Plaintiff Anthony J. Ada ("Ada") and am an attorney admitted to practice before the District Court of Guam. I make this Declaration in support of Ada's Motion for Summary Judgment ("Motion").

**ORIGINAL**

Anthony J. Ada v. Shell Guam, Inc., et al.-Civil Case No. CV00-00012
Declaration of Richard A. Pipes
Page 2 of 2 pages

2.      Attached hereto are true and correct copies of the Deposition Transcript of Shell

Guam, Inc., through designated representative Philip Stalker, Volumes 1 & 2, July 27, 2005, as

Exhibit "A" and Exhibit 37, as Exhibit "B", as referenced in the Memorandum of Points and

Authorities in Support of the Motion filed concurrently herein.

3.      Attached hereto as Exhibit "C" are true and correct copies of the Deposition

Transcript of Shell Guam, Inc., through designated representative James Hammond, Volume

1, June 29, 2005, as referenced in the Memorandum of Points and Authorities in Support of the

Motion filed concurrently herein.

4.      Attached hereto as Exhibit "D" is a true and correct copy of the Decision and

Order of the Court filed May 4, 2000, which relates to the granting of the Preliminary Injunction

filed herein March 17, 2000.

I declare under penalty of perjury under the laws of the United States and Guam that the

foregoing is true and correct.

Executed this _____1st_____ day of September, 2005.


_____
RICHARD A. PIPES

RAP/nsh

# EXHIBIT "A"

| | |
|---|---|
| ANTHONY J. ADA, | )CIVIL CASE NO. CV00-00012 |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| SHELL GUAM, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

TRANSCRIPTION OF

DEPOSITION OF

# PHILIP STALKER
designated representative for
# SHELL GUAM, INC.

June 30, 2005
Volume 1

ORIGINAL

PREPARED BY:     George B. Castro
                 **DEPO RESOURCES**
                 #49 Anacoco Lane, Nimitz Hill Estates
                 Piti, Guam 96925
                 671-688-DEPO • Fax: 671-472-3094

EXHIBIT A

1    Q    Okay.  Any other factual basis for this

2  Sixth Affirmative Defense?

3    A    No.

4    Q    Now, referring to the -- going to the

5  Ninth Affirmative Defense, which indicates

6  that:  If the PMPA does apply that Shell's

7  termination of the agreements complied with the

8  PMPA.

9        Now, Mr. Hammond testified that the

10  termination letter from Mr. Keller -- maybe we

11  can pull that out.

12    A    I remember the letter.

13    Q    Okay.  I think Mr. Hammond testified

14  that that letter did not comply with the

15  requirements of the PMPA.

16    A    I agree.

17    Q    Would you agree with that?

18    A    I agree.

19    Q    I'm not sure if we've got anything

20  left, but let's go on to the Sixteenth

21  Affirmative Defense.  We talked with Mr.

22  Hammond, tried to talk a little bit with Mr.

23  Keller about it, and then I don't think we go

24  too far.

25        But I was trying to understand that

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 196 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 22nd day of July, 2005.

_____
GEORGE B. CASTRO

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| ANTHONY J. ADA, | ) CIVIL CASE NO. CV00-00012 |
| Plaintiff, | ) |
| vs. | ) |
| SHELL GUAM, INC., et al., | ) |
| Defendants. | ) |

TRANSCRIPTION OF

DEPOSITION OF

# PHILIP STALKER

designated representative for

# SHELL GUAM, INC.
Volume 2

July 27, 2005

# ORIGINAL

PREPARED BY:     George B. Castro
**DEPO RESOURCES**
#49 Anacoco Lane, Nimitz Hill Estates
Piti, Guam 96925
671-688-DEPO • Fax: 671-472-3094

1  we were doing. There was similar legislation

2  in other civilized parts of the world, I mean

3  Australia being one of those. There's

4  protection for dealers, I personally hadn't

5  come across that in my work history before.

6  Other folks who came in later, understood that,

7  so that's all about I can say about that.

8      Q  When Shell started operating here, as

9  you indicated, Shell was operating through

10  dealer stations and Shell at least understood

11  that that relationship was regulated and

12  defined by the PMPA.

13      A  I guess we did. I personally, wasn't

14  involved. I'm sure the attorneys were, I think

15  the earliest dealer agreements had PMPA

16  language on them. I think or I presume so.

17      Q  Let me hand you what's been marked as

18  Exhibit 37 and ask you to take a look at that

19  for me.

20      (Plaintiff's Exhibit Number 37 was

21  previously marked for identification)

22      A  Okay.

23      Q  Have you ever seen this document

24  before?

25      A  I think I have, yes.

1    Q    This appears to be a dealer agreement
2    between Shell and J.P. Torres for the operation
3    of a station here on Guam.   I'm not sure, is
4    this the Tumon station?    It says Lot 513-2-3,
5    Dededo.
6    A    Hard to know, but yes probably.    I
7    think Tom Torres did run the Tumon station.
8    Q    And --
9    A    Yeah, probably.
10    Q    Okay.    I believe this agreement was
11    entered into, during the time that you were
12    working at Shell?
13    A    Yes.    Interesting, I don't remember it,
14    but yes, yeah.
15    Q    I note at the top that there's a
16    paragraph in capital letters that describes the
17    agreement being under the PMPA.
18    A    Yes.
19    Q    We've had an opportunity to look at the
20    other agreements in this case for Mr. Ada,
21    would you agree that this language at the top
22    of this agreement, Exhibit 37, is substantially
23    the same as that that appears in Mr. Ada's
24    agreements?
25    A    Yes, I agree.

1    Q    Is it fair to say that at the time that
2  this agreement, Exhibit 37, was entered into
3  that Shell had some knowledge of PMPA?
4    A    Yes.
5    Q    Do you have any idea who would have
6  prepared this agreement back in 1989?
7    A    Our first attorney here was Harry
8  Boertzel and I think Zamsky took over directly
9  over from him when Harry started to move off
10  island.  So, I don't know for sure, but either
11  Harry or Zamsky depending on when that handover
12  was.
13    Q    Okay.  It would have been prepared by
14  counsel for Shell?
15    A    Yes.
16    Q    I assume that this type of agreement
17  would have been forwarded to Shell Management
18  for review, before it was signed?
19    A    Yes.
20    Q    And who would have been reviewing this
21  agreement then?
22    A    I recognize the initial on the bottom
23  of the page as being Rob Naysure (phonetic),
24  who was the finance and administration manager
25  in those days.  While he probably would not

1  have normally signed this agreement in his own

2  right, but I guess maybe the boss or the

3  general manager was away at the time or

4  something.  Rob Naysure (phonetic) is the

5  signature on the signature line.  He was

6  possibly holding delegating authorities for the

7  general manager.

8      Q  Okay.  Comparing Exhibit 37 with

9  Exhibit 33 and it looks like the PMPA language

10  at the top of the agreements is substantially

11  the same, would you agree with that?

12      A  Substantially, yes.

13      Q  Are there any material differences that

14  you can see?

15      A  Well, again --

16      Q  The ones in bold, but --

17      A  Well, and one says, "Agent" and the

18  other says, "Dealer."

19      Q  No, I'm just talking about the

20  paragraph at the top.

21      A  Yeah, the paragraph at the top of 33 --

22      Q  Right.

23      A  -- says, "Relationship of the

24  conclusion of the initial term by notifying

25  agent," there's another reference to agent

1  there possibly. I can't say it right now. The
2  original agreement says, "The initial term by
3  notifying dealer," so, substantially saying
4  yes, but I mean to the point of this case I
5  think there's a material difference.

6      Q   Okay. Now at the time, I think we've
7  discussed this, but the agreement in 33 that
8  was prepared by Mr. Zamsky's office?

9      A   Yes, I believe so.

10     Q   And that would have been forwarded to
11 Shell Management for review?

12     A   Yes.

13     Q   And at this time do you know who that
14 would have been that would have reviewed this?

15     A   On this agreement, (perusing document)
16 actually one more, it would have been Peter
17 Short.

18     Q   Okay. Now, when we look at this
19 Exhibit 33, when it indicates that this
20 agreement is a trial franchise under the PMPA,
21 from what Shell has testified, I understand
22 that that statement is not correct.

23     A   We now understand that to be incorrect,
24 yes.

25     Q   So at the time that this agreement was

1 was appropriate for that relationship. We now
2 understand that that is not true.

3 　　Q　Exhibit 33 says that -- at the top,
4 that the agreement is a trial franchise under
5 the PMPA, at the time that was presented to Mr.
6 Ada and signed by Shell, what did Shell
7 understand that to mean?

8 　　A　I think Shell was of the opinion that
9 any relationship at a retail location would be
10 appropriately documented as a trial franchise.
11 The initial period with a new relationship in a
12 retail outlet would be documented with a trial
13 franchise language. I don't think the term
14 "Franchise" in Shell's mind, the local Shell
15 people here at the time, was equated with the
16 term that we now call "Dealer" versus the term
17 that we call "Agent." So, we're attempting to
18 comply with what we thought was the
19 requirements of the PMPA and we didn't do a
20 very good job of that.

21 　　Q　Now when this agreement was presented
22 to Mr. Ada, he didn't have any input on the
23 agreement, I assume?

24 　　A　Probably not.

25 　　Q　Did Shell understand that Mr. Ada was

1  relying upon Shell to prepare the agreement?

2      A   Yes.

3      Q   Shell Guam had been in operations for

4  how long at the time this agreement was signed?

5      A   I think we started here around -- I

6  know there was some earlier testimony, but I

7  think we started in '88, '89, like that.

8      Q   Okay, so Shell Guam had been in

9  operation for approximately four or five years?

10      A   Yes.

11      Q   Shell Guam is affiliated with the Royal

12  Dutch Shell Company?

13      A   Yes.

14      Q   In one way or another?

15      A   Yes.

16      Q   Which is a large multinational

17  corporation?

18      A   Yes.

19      Q   Which has significant experience in the

20  fuel and petroleum industry?

21      A   Yes.

22      Q   Would it be fair to say that Mr. Ada

23  reasonably relied upon Shell to prepare an

24  agreement that was appropriate for their

25  relationship?

1    A   Yes.

2    Q   Would it also be fair to say that Mr.

3  Ada expected that Shell Guam would have some

4  specialized knowledge, with respect to the

5  petroleum fuel industry?

6    A   Yes.

7    Q   And he would rely upon Shell's

8  knowledge in that area, in preparing this

9  agreement?

10    A   Yes.

11    Q   Shell never intended on allowing Mr.

12  Ada to draft these agreements; did they?

13    A   No.

14    Q   When Shell entered into and signed the

15  Exhibit 33 agreement with Mr. Ada, did Shell

16  expect Mr. Ada to rely upon the agreement and

17  act in compliance with it?

18    A   Yes.

19    Q   Did Shell understand that at the time

20  that this agreement was signed, Exhibit 33,

21  that the terms and conditions in the agreement

22  would influence Mr. Ada's decision about

23  whether or not to sign the agreement?

24    A   Yes.

25    Q   Is it fair to say that this agreement

1    is a commercial document?

2        A    Does    that    have    a    special    meaning?

3    Commercial document?

4        Q    Or a commercial contract?

5        A    Yes.

6            MR. CIVILLE:  I don't think so.

7        A    Okay.

8            MR. CIVILLE:  Well, --

9            MR.  PIPES:  Actually, it's not a trick

10   question.

11           MR. CIVILLE:  Yeah.

12       A    Yeah.

13           MR.  PIPES:  I'm just trying to get to

14   the  point  to  this,  something  that's  normally

15   used in commerce and business.

16       A    Yeah.

17   BY MR.  PIPES:

18       Q    We've  already  marked  as  Exhibits  in

19   this  case  the  subsequent  agreements  that  Shell

20   has  had  with  Mr. Ada  and  we  don't  need  to  pull

21   those  out  and  look  at  them  again,  but  the

22   language  regarding  the  PMPA  in  one  form  or

23   another,  appears  at  the  top  of  each  of  those

24   following  agreements.  We  think  there  are  three

25   other  agreements.  Before  any  of  those

1  agreements were signed, did Shell ever indicate

2  to Mr. Ada, before he signed those agreements

3  that the PMPA statement at the top was

4  incorrect?

5      A    No.

6      Q    Did Shell, at any time, before one of

7  the other agreements was signed, did Shell ever

8  indicate to Mr. Ada that it did not intend that

9  portion of the agreement to be effective?

10     A    No.

11     Q    At that time that Exhibit 33 and the

12 other agreements were presented to Mr. Ada for

13 signing, did Shell understand that the PMPA

14 provided protections for dealers?

15     A    Yeah.

16     Q    It's my understanding that Shell's

17 position is that notwithstanding the language

18 in these agreements that Mr. Ada is not

19 entitled to rely upon the protections of the

20 PMPA.

21         MR. CIVILLE:   Objection, to the extent

22 you're asking for Shell's legal position.  Our

23 position is that the PMPA is not applicable to

24 this agreement because Mr. Ada is not a

25 dealership agreement.

BY MR. PIPES:

Q   Okay.   I'm just asking from a Shell laymen point-of-view.   Are you saying Mr. Ada, notwithstanding this language, is not entitled to rely upon the PMPA?

A   Yes.

Q   When Exhibit 33 was presented to Mr. Ada for signing; did Shell understand that Mr. Ada would regard the agreement as important, the terms of the agreement, as important in deciding whether or not to sign it?

A   I'm not sure.   If you're asking me what we thought Mr. Ada was thinking, I'm not sure I can say.

Q   Did you understand that he would feel that these terms of the agreements were important, in deciding on whether or not to sign it.

A   Yes.

Q   Is it Shell's position that at the time that Exhibit 33 was presented to Mr. Ada and he signed it; is it Shell's claim that Mr. Ada knew that the PMPA statement up here was incorrect?

A   No.

1    Q    Okay.    So to correlate, would be that
2  Mr. Ada did not know that the PMPA statement
3  was not correct?

4    A    I agree.    He did not know that it was
5  incorrect.    To my best belief here.

6    Q    All right.    The questions that I've
7  just asked you, with respect to Exhibit 33
8  about the application and the understanding of
9  the PMPA and those sort of things; were those
10  answers be the same for the subsequent four
11  agreements as well?

12    A    Yes.

13    Q    Other than the name of the management
14  person that might have reviewed it prior to the
15  time it was delivered to Mr. Ada?

16    A    Yes.

17    Q    And Mr. Zamsky would've been preparing
18  all these other agreements?

19    A    I think so, yeah.

20    Q    Now let's see if we can pick up where
21  we were the last time.    I believe we were
22  discussing affirmative defenses.

23    MR. CIVILLE:    No.    I think you'd gone
24  through those and you were on -- I can tell you
25  where you left off, you were on the Lucky 7

1    A    Better for him if they don't.

2    Q    If    they    don't    redeem    it    for

3 merchandise.

4    A    In the store, yeah. He's in a position

5 to direct that. If somebody buys gas, comes

6 in, wants to redeem the card, they redeem that

7 on the gas, so buy something out of the store.

8 I'm not suggesting they do that, and in any

9 event, the whole issue of the $1.75 versus the

10 5.25 is negotiable. In my mind, negotiable.

11    Q    Are you suggesting that under the Lucky

12 7 program that Mr. Ada has the option of when

13 people come in with a Lucky 7 card and they

14 want to buy a six pack of Budweiser that he can

15 say, "No, you're going to buy that, go out

16 there and use the card on gas." Does he have

17 that option?

18    A    I wouldn't like to think that he would

19 do that or I'm not suggesting he does that, but

20 if somebody buys twenty bucks worth of gas and

21 they're going to pick up a case of Bud, I mean

22 it's as good as cash. He's free to put it on

23 the fuel or on the store. Typically, I think

24 it probably wouldn't work like that. Somebody

25 would give me twenty bucks of gas and then I'll

REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 193 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 17th day of August, 2005.

_____
George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# EXHIBIT "B"

## DEALER LEASE AND SALES AGREEMENT

THIS AGREEMENT IS A TRIAL FRANCHISE UNDER THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.C.C. 2801 ET SEQ. THE INITIAL TERM OF THIS FRANCHISE IS FOR A PERIOD OF NOT MORE THAN ONE YEAR BEGINNING 8/7 , 1989 AND ENDING 8/7 , 1990. SHELL MAY FAIL TO RENEW THE FRANCHISE RELATIONSHIP AT THE CONCLUSION OF THE INITIAL TERM BY NOTIFYING DEALER, IN ACCORDANCE WITH THE PROVISIONS OF 2804 OF THE PMPA, OF SHELL'S INTENTION NOT TO RENEW THE FRANCHISE RELATIONSHIP. THE PROVISIONS OF 2802 OF THE PMPA, LIMITING THE RIGHT OF A FRANCHISOR TO FAIL TO RENEW A FRANCHISE RELATIONSHIP ARE NOT APPLICABLE TO THIS TRIAL FRANCHISE.

### PREAMBLE

This agreement is made this 8th day of Aug. , 1989, between SHELL GUAM, INC., a Guam corporation, whose address is 2nd Floor, Hi-Tech Building, 545 West Marine Drive, Anigua, Guam 96910 ("Shell") and J.P. TORRES ENTERPRISES, INC. having a place of business at Dededo, Guam, whose mailing address is 162 Archbishop Felixberto C. Flores St. Agana, Guam 96910 ("Dealer").

### RECITALS

WHEREAS, Dealer desires to lease the premises hereinafter described and to buy petroleum products, as hereinafter defined from Shell for resale at the premises; and

WHEREAS, Shell is willing to lease the premises and to supply petroleum products on the terms and conditions hereinafter set forth, NOW, THEREFORE,

For and in consideration of the above recitals, the covenants and agreements hereinafter set forth or for other good and valuable consideration, the receipt of which is hereby acknowledged by both parties, it is agreed that:

### ARTICLE I
### SUBLEASE

1.   PREMISES: Shell hereby rents and subleases to Dealer the following described property, together with the buildings and fixtures described in Exhibit "A" hereto (collectively said "premises") for use as an oil and gasoline service station pursuant to the term of this agreement:

A portion of Lot 5138-2-3 New, Municipality of Dededo, having a frontage to Marine Drive of approximately two hundred fifteen feet.

Shell shall place Dealer in possession of the premises at the beginning of and for the term stated in Article IV 1, infra.

EXHIBIT b

2.   RENT: Dealer shall pay to Shell, during the term of this agreement, monthly in advance on the first day of each month, free from all claims, demands, deductions or set offs against Shell of any kind or character whatsoever and without notice or demand monthly rent in the sum of $5,185-00.

000385

(37)

Rental payments shall be paid to Shell at its above mentioned address or such other address as may be from time to time designated in writing by Lessor. All monthly payments not paid within ten (10) days of when due shall accrue interest at the rate of eighteen percent (18%) per annum until paid.

3. **USE:** The premises shall be used for operation of the motor fuel dispensing and associated facilities existing on the effective date of this Lease or thereafter completed or installed by Shell or with Shell's written consent. Authorized use shall include the retail sale of petroleum products and carry-out automotive accessories, but excludes any automotive repairs or services except such incidental services as are normally provided to vehicles receiving motor fuel while at the motor fuel dispensing driveway area (such as checking oil and coolant levels and cleaning windshields). Authorized use shall also include the operation of any convenience store, food mart, car wash or other non-gasoline facility on the Premises according to standards established by Shell for such facility. Dealer may not use underground tanks, associated product lines or motor fuel dispensing equipment provided by Shell in the sale or dispensing of non-Shell motor fuel. If, with Shell's prior written consent, the Premises are used for any purpose in addition to the use provided for in this Lease and any related agreements between Shell and Dealer, Shell may charge a reasonable additional rent as compensation for such use.

4. **ALTERATIONS:**

a. Subject to the remaining provisions of this paragraph, Shell shall have the right from time to time, without liability to Dealer, to make alterations to the premises. Shell's right to make such alterations shall include, but not be limited to, modernization, reconstruction or remodeling of or adding to any buildings, equipment or other facilities on the premises, and may involve the complete demolishing and rebuilding of any and all such facilities. If any such alteration will cause a substantial disruption or change in Dealer's business, Shell will provide Dealer with ninety (90) days advance notice of the terms of its proposal to make the alteration, and during the period of such alteration work Shell shall reduce or suspend the rent payable hereunder as full compensation for the restrictions in use of the premises resulting from such work. shell shall exercise due diligence to complete all such alteration work in an expeditious manner, but Shell shall not be liable to Dealer for any loss of profit or other loss resulting from the conduct of the work or any completion delay except for an adjustment or rent as provided above. Upon completion of such alteration work, the rent hereunder will be appropriately adjusted if a change in the rental value of the premises has resulted therefrom.

b. Dealer shall not make any alterations to the premises, including removal or disablement of leak detectors or other environmental control device, without Shell's prior written consent, which consent shall not be unreasonably withheld. Any such alteration to which Shell may give its consent shall be made in accordance with plans and specifications and by a contractor approved by Shell, which approval shall not be unreasonably withheld. Except as otherwise agreed in writing by Shell at any termination

DLSA: GUAM: 1988/7

or expiration of this agreement any alteration made by Dealer shall, at Shell's election, become a part of the premises and the property of Shell or Shell may require Dealer within thirty (30) days before or after termination or expiration to remove such alteration and restore the premises to their condition existing prior to such alteration.

5.  **MAINTENANCE AND REPAIRS:**

a.  Subject to the following provisions of this paragraph 5, Dealer shall at all times maintain the premises (including adjacent sidewalks and driveways, easements and all landscaped areas) and Lessee's own property and equipment thereon in good condition and repair, and keep the same (including the rest rooms) neat, clean, safe and orderly. To those ends and always promptly as needed, Dealer shall perform the maintenance to Shell's property (or any of Dealer's property) which is specified in Exhibit "B" hereto, including any such maintenance as may be required by law unless Shell is expressly required by the same or other law to bear the cost thereof. Shell shall perform all other maintenance to Shell's property which Shell deems necessary or desirable (having due regard to the remaining term of this agreement and Shell's future plans for the premises), provided that Dealer promptly give Shell a written statement of each such maintenance which Dealer deems necessary. As to any maintenance specified in Exhibit "B" which Dealer fails to perform, or as to any such other maintenance concerning which Dealer fails to give Shell the above-required written statement, or which is necessitated, either party or solely, by any negligent or otherwise wrongful act or omission of Dealer or Dealer's employees, agents or contractors: Shell may perform the same and charge to Dealer Shell's actual cost thereof, or in lieu of performing the same, may charge to Dealer what would have been the reasonable cost thereof. If the premises are made substantially unfit for the intended use hereunder by any cause, either Shell or Dealer may terminate this agreement by giving the other notice (or advance notice if and as required by law) within sixty (60) days after such unfitness commences. Shell may enter the premises at any time for the purposes of inspecting the same (including the pump meters), gauging and testing tanks, performing maintenance and making alterations. The termination or expiration of this agreement shall not relieve Dealer of any obligation for maintenance theretofore accrued.

b.  Within ten (10) days after the effective date of this agreement, Dealer may provide Shell a written statement of any maintenance for which Shell or any previous lessee (other than Dealer herein or any third party through whom Dealer claims an interest hereunder) may be responsible, and the preceding provisions of this paragraph 5 shall apply to such maintenance. Dealer shall be responsible for any maintenance required on such effective date regarding which Dealer fails to give Shell a written statement as above provided, and Shell shall be relieved of all responsibility therefor.

c.  To assure early detection of any leak in the underground motor fuel storage system at the premises, Dealer shall maintain methodical daily inventory control, including daily reconciliation of physical inventory readings with sales records and delivery receipts, in accordance with Shell's procedures and applicable law. Dealer shall give Shell immediate telephone notification (promptly confirmed by written notice) of any suspected product loss, of any claim or threatened claim by a third party related to a product loss or alleged loss, or of any newly discovered material fact relating to any

matter previously reported pursuant hereto. Without limitation of the
foregoing, Dealer shall provide such notification to Shell of any inventory
discrepancies for a single product (losses or gains) in excess of: (a) 300
gallons for a single day, (b) 150 gallons per day for three (3) consecutive
days (all losses or all gains) or (c) one-half of one percent (1/2 of 1%) of
all sales for any thirty (30) day period. In accordance with Shell's
procedures, Dealer shall periodically provide Shell a written certification
that Lessee has complied with the foregoing provisions of this paragraph 5(c).
Lessee shall retain for a period of at least one (1) year and make available
to Shell for inspection and audit, at all reasonable times, Dealer's records
and procedures maintained pursuant to this paragraph 5(c). If lessee refuses
or fails to perform in a proper and timely manner lessee's obligations under
this paragraph 5(c), Shell may, at its option and without limitation of any
other rights or remedies available to it under this agreement or otherwise,
(a) retain the services of a qualified independent third party to inspect and
audit Dealer's performance as frequently as necessary, at the sole cost of
Dealer, until such deficiencies are cured or (b) terminate or not renew this
agreement and any related agreements constituting a franchise between Shell
and Dealer.

6. **WASTE:** Dealer will not make or suffer any strip or waste or
improper or offensive use of the premises and shall not use or cause or permit
to be used any part of the premises for any unlawful conduct or purpose.

7. **UTILITIES:**

a. All applications and connections for necessary utility services
on the premises shall be made in the name of Dealer only, and Dealer shall be
solely liable and shall directly pay for all utility charges as they become
due, including without limitation those for sewer, water, gas, electricity,
refuse collection, telephone services, or any other utilities or services or
any connections or meters therefor, whether assessed to or payable to Shell or
Dealer.

b. Water and Power are immediately available on the property or
within 100 feet of the premises.

8. **DESTRUCTION OF PREMISES:** If all or a substantial part of the
premises shall be damaged or destroyed by any cause other than Shell during
the term of this agreement, Shell may elect to terminate this agreement
pursuant to the provisions of Article IV 2(a)(3)(VII). However, in the event
Shell thereafter rebuilds the premises and operates it under a franchise,
Shell shall, within a reasonable period of time, grant to Dealer a right of
first refusal of the franchise, under which such premises are to be operated.
In the alternative, Shell may elect to repair and restore the premises in
which event Dealer shall not be entitled to abatement of rent as is further
set forth in Article I (12), _infra_.

9. **CONDEMNATION:** If at any time during the term hereof the whole of
the premises shall be taken for any public or quasipublic use, under any
statute, or by right of eminent domain, then, in such event, when possession
of the premises shall have been taken thereunder by the condemning authority,
the term hereby granted, and all right of Dealer hereunder, shall immediately
cease and terminate, and the rent shall be ratably abated as of the date such

termination and any excess rental therefor paid by Dealer to Shell shall be promptly refunded by Shell. In such event, all compensation and damages awarded for the taking of the demised premises or any portion thereof shall belong to and be sole property of Shell, except Dealer shall be entitled to interpose and prosecute in any condemnation proceedings a claim for the value of its leasehold interest in premises, or on account of any loss of business opportunity or goodwill, if recoverable, or on account of any cost or loss Dealer may sustain in the removal of Dealer's fixtures, equipment, and furnishing. If only a part of the premises shall be so taken or condemned, the award shall be distributed in the same manner, and this agreement shall not cease and terminate but shall, as to the portion of the premises not taken or condemned, continue in full force and effect, except that the rental shall be, as of the date of such taking, reduced ratably in proportion to the extent the premises is so condemned and taken; provided, however, in the event such partial condemnation or taking shall decrease the premises or the improvements thereon to an extent materially affecting Dealer's use of the premises and the improvements thereon and the business of Dealer conducted in connection therewith, then, Dealer may elect to cancel and terminate this agreement as of the date possession of that part of the premises so condemned shall have been taken, which election shall be made within thirty (30) days from the date of such taking of possession by giving written notice to Shell. In the event this agreement is cancelled and terminated by Dealer as herein provided, the rent shall be ratably abated as of the date of such cancellation and termination and any excess rental theretofore paid by Dealer to Shell shall be refunded by Shell.

10. **ACCESS TO PREMISES; SIGNS POSTED BY SHELL:** Dealer shall permit Shell or its agents to enter the premises at all reasonable hours to inspect the premises, to perform the alterations, maintenance and repairs described in Article I 3 and 4, supra, and also to show the premises to prospective buyers. At any time within two (2) months prior to expiration of the term, Shell may show the premises to persons wishing to rent the premises. Dealer shall, within one (1) month prior to expiration of the term, permit the usual notices of "For Rent" and "For Sale" to be placed on the premises and to remain thereon without hindrance and molestation.

11. **LIABILITY OF SHELL:** Dealer shall be in exclusive control and possession of the premises, and Shell shall not be liable for any injury or damages to any property or to any person on or about the premises nor for any injury or damage to any property of Dealer. The provisions herein permitting Shell to enter and inspect the premises are made to insure that Dealer is in compliance with the terms and conditions hereof. Shell shall not be liable to Dealer for any entry on the premises for inspection purposes.

12. **RENT ABATEMENT:** No abatement, diminution, or reduction of rent shall be claimed or allowed to Dealer or any person claiming under him under any circumstances, whether for inconvenience, discomfort, interruption of business or otherwise, arising from the making of alterations, improvements, or repairs to the premises, because of any governmental laws arising from and during the restoration of the premises after the destruction or damage thereof by fire, or other cause or the taking or condemnation of a portion only of the premises except as provided in Article I (9)AND I (4), supra.

13. **SURRENDER OF POSSESSION:** Dealer shall, except as otherwise provided

in this agreement, on the last day of the term or extended term, as the case may be, or on earlier termination and forfeiture of this agreement, peaceably and quietly surrender and deliver the demised premises to Shell free of subtenancies, including at Shell's option all buildings, structures, fences, walls, additions, and improvements upon the premises, by whomsoever made, except moveable trade fixtures all in good condition and repair. Any trade fixtures or personal property not used in connection with the operation of the demised premises and belonging to Dealer, if not removed at the termination or default, and if Shell shall so elect, shall be deemed abandoned and become the property of Shell without any payment or offset therefor. However, Shell may remove such fixtures or property from the demised premises and store them at the risk and expense of Dealer, if Shell shall so elect. Dealer shall repair and restore to Shell's satisfaction all damages to the demised premises caused by the removal of equipment, trade fixtures, and personal property. This provision shall survive the expiration and termination of this agreement.

14. **MEMORANDUM OF LEASE:** At the request of either party, the other party will execute, acknowledge, and deliver to the party requesting the same a short form or memorandum of this sublease in form for recording.

### ARTICLE II
### DEALER SALES

1. **DEFINITIONS:** In this agreement, where the context permits:

a. "identifications" means the trademarks, brand names and color schemes which Shell does now or may hereafter own or regularly employ in connection with petroleum and other products which are manufactured and/or sold by Shell.

b. "lubricating oils" means crankcase and all other lubricating oils and greases now and hereafter supplied or distributed to Dealer by or on behalf of Shell.

c. "motor fuels" means gasoline of any grade and automotive diesel fuel now and hereafter supplied or distributed to Dealer by or on behalf of Shell.

d. "year" means the period of twelve months beginning on the commencement of the term and each successive period of twelve months thereafter.

e. "petroleum products" means those products described in subparagraphs (b) and (c) above.

2. **PURPOSE:** Shell's identifications have come to represent to the motoring public the manufacture and sale of quality petroleum and automotive products. The standards and requirements established for Dealer in this agreement are for the purpose of preserving and continuing the consuming motoring public's confidence in and acceptance of Shell's products, to the benefit of such consumers, Shell, Dealer and all other authorized Shell dealers. Dealer, who desires to operate a Shell automobile service station or motor fuel dispensing station as an independent businessman, recognizes the

need for Dealer's compliance with such standards and requirements to prevent detriment and injury to such consumers and Shell, as well as to Dealer and such other dealers.

3. **PETROLEUM PRODUCTS:** Subject to subparagraph (b) and (c) below:

a. Shell shall sell and deliver to Dealer at the premises and Dealer shall buy and promptly receive from Shell for sale from the premises, the petroleum products handled in its service station on the premises.

b. During each month, Dealer shall purchase at least one-twelfth (1/12) of the annual minimum volumes plus or minus twenty-five percent (25%) set forth in Exhibit "C" unless the said volumes are unavailable for delivery by Shell for the reasons described in paragraph 10 of this Article II.

c. During this agreement, Shell shall not be obligated to sell and deliver to Dealer for sale from the premises more than the respective volumes of petroleum products set forth in Exhibit "C" as maximum volumes.

d. Dealer shall buy from Shell sufficient quantities of petroleum products to insure adequate and prompt supply of said products to customers who require the same to be supplied to them.

e. Dealer further agrees to keep each of its underground tanks on the premises into which motor fuels are delivered stocked to at least fifty percent (50%) of their full capacity.

f. Dealer agrees to maintain in a prominent location on the premises a reasonable display of lubricating oils.

g. Dealer shall not mix, combine or adulterate any Shell petroleum product with any non-Shell product. Dealer shall not offer for sale any petroleum product which it knows or reasonably suspects is contaminated, adulterated or incorrectly labeled.

h. Nothing in this agreement shall be construed as a grant of any exclusive territory to Dealer for the marketing of any Shell products, or as a restriction upon the right of Shell to market its products to any purchasers in any area.

4. **PRICE:**

a. The price for petroleum products delivered under this agreement shall, with respect to each of the products, be Shell's wholesale list price for dealers currently in effect on the date of delivery for the type and grade delivered.

b. Any tax, duty, charge, levy or fee now or hereafter assessed or imposed on any petroleum products sold and delivered under this agreement, whether on or in respect of the sale or on or in respect of the delivery or on or in respect of the use of the same and whether or not the tax, duty, charge, levy or fee is required to be paid and/or collected by Shell shall be paid by the Dealer (including, as the case may be, reimbursed to Shell) in addition to the prices payable to Shell pursuant to subparagraph (a) above except to the

extent (if any) to which to amount of the tax, duty, charge, levy or fee is expressly included in the price.

    c. All prices are subject to change from time to time by Shell. The terms of payments, with respect to each delivery of petroleum products made hereunder, shall be cash in U.S. dollars on delivery unless credit terms have previously been agreed upon in writing between Shell and the Dealer under separate agreement. Shell may alter or revoke credit terms in its sole discretion at any time and without prior notice to Dealer.

    5.   <u>DELIVERIES</u>:

    a. Deliveries of petroleum products may be made by and on behalf of Shell and by such means of transport and in such tanks and/or other containers as Shell may elect.

    b. Shell shall not be obligated to make any delivery of motor fuels in any quantity smaller than the load of a road tanker as Shell may select. All orders for petroleum products shall be made by Dealer on that basis.

    c. Shell shall use its good faith efforts to make delivery with sufficient promptness to insure that Dealer does not run out of petroleum products. However, Shell shall not be under any liability whatsoever to Dealer with respect to Dealer running out of any of said products:

    (1) if Dealer does not give adequate notice to Shell that it is likely to run out of any of the petroleum products which it shall specify; or

    (2) if, after Dealer has given notice, Shell offers to make delivery within a reasonable period of time under the circumstances and Dealer does not accept the offer; or

    (3) if the cause for Dealer running out of products is substantially caused by any of the events or circumstances described in paragraph 10 of this Article II, <u>infra</u>.

    6.   <u>IDENTIFICATIONS</u>:

    a. Dealer shall use the identifications, which Shell may change from time to time at its sole discretion, to identify and advertise Shell's petroleum products. Dealer shall not use such identifications for any other purpose or in any matter which may confuse or deceive the public.

    b. Dealer shall not without Shell's prior written consent sell, display for sale or offer for sale any petroleum products under or in association with any trademark, brand name or color scheme other than those comprised in Shell's identifications.

    c. Dealer shall not sell, display for sale or offer for sale under or in association with the identifications any petroleum products which are not delivered under this agreement.

Dealer shall maintain and protect the identifications with respect to all goods and shall not do or permit to be done anything that might prejudice or affect the identifications or any of Shell's rights arising thereunder. All advertising, including color schemes of the petroleum products, shall be subject to Shell's prior written approval. If Dealer should cease to purchase petroleum products under this agreement or if this agreement terminates for any reason, then Dealer shall, at Shell's request, immediately and completely discontinue the use of the identifications at the premises. Dealer acknowledges and recognizes that injunctive relief is essential for the adequate remedy of any violation by Dealer of provisions by this paragraph.

e. All signs and other advertising devices furnished by Shell to Dealer, including without limitation, Shell's emblems, pecten, name logotype, colors and color balance shall remain Shell's property (whether or not affixed to the premises) and shall be used solely in connection with the sale, display for sale or offering for sale of petroleum products delivered under this agreement or of services associated therewith and shall be immediately returned to Shell or where painted on the premises covered up, upon the termination or nonrenewal of this agreement.

7. <u>STANDARDS OF OPERATION AND APPEARANCE</u>: Dealer agrees that it shall:

a. <u>Merchandising-Hours</u>. Dealer shall diligently and efficiently merchandise and promote such Petroleum Products as may be purchased by Dealer hereunder under Shell's identifications so as to maintain the good reputation and public acceptance thereof, and, to assure that end, shall keep Dealer's station open for sale of motor fuel and fully illuminated at least __16__ hours each day of the year from __6:00__ a.m. to __10:00__ p.m. Such hours of operation shall be subject to adjustment if and as required by law. In merchandising products and services, Dealer shall give due consideration to the full use of Shell's latest merchandising planning guidelines provided to Dealer from time to time. Dealer shall personally and actively manage the business conducted at Dealer's station to assure good faith compliance with this subparagraph 7(a) and other provisions of this agreement. Dealer shall during all operational hours, have on the premises an employee authorized to act on his behalf in the event of his absence from the premises and shall nominate such key employee to Shell in writing in accordance with Article IV (12)(f).

b. <u>Service Work</u>. If Dealer is authorized by Shell to engage in the business of automotive repairs and service work, all such work performed by Dealer and Dealer's employees shall be done in a workmanlike manner utilizing only first-class new materials and parts except when the customer specifically authorizes rebuilt or used materials or parts.

c. <u>Staffing</u>. Dealer shall maintain an adequate and competent staff of employees, considering both the volume and nature of the business activity, to fulfill efficiently Dealer's obligations hereunder. Dealer shall have the responsibility to train Dealer's employees.

d. <u>Customer Complaints</u>. Dealer shall conduct Dealer's operations in a professional and business-like manner in order to avoid customer complaints and business-like manner in order to avoid customer complaints received (including written responses when appropriate) and take

immediate action to correct or satisfactorily resolve each legitimate customer complaint.

e. <u>Maintenance-Housekeeping</u>. Except as Shell may expressly have responsibility therefore under any separate agreement, Dealer shall at all times maintain Dealer's station (including adjacent sidewalks and driveways, easements and all landscaped areas) and Dealer's own property and equipment thereat in good condition and repair, and keep the same (including rest rooms) neat, clean, safe and orderly.

f. <u>Vehicles - Other Mobile Equipment</u>. The premises at Dealer's station shall be kept clear of vehicles, other mobile equipment and obstructions which may restrict traffic flow, endanger customer safety or detract from appearance. Dealer's station may not be used for the selling, leasing, parking or storing of motor vehicles, trailers, boats or other mobile equipment.

g. <u>Uniforms</u>. Dealer and Dealer's employees shall neatly wear clean uniforms of a type and style approved by Shell.

h. <u>Lighting</u>. Dealer shall use and maintain all lighting fixtures provided by Shell including, without limitation, internally illuminated canopy fascia (where provided), identification signs, and ingress and egress directional signs in order to provide full visibility of Dealer's station, including enclosed areas, at night while open for operation.

i. <u>Signs</u>. Dealer shall have the right to display in a neat and orderly manner at Dealer's station, but not affixed to the exterior of any building or the pole support(s) for the main identification sign(s), such briefly worded and professional looking signs as are necessary to identify the products and services offered and their price, but shall not display or use any other signs, posters, flags, pennants or other advertising devices without Shell's prior written approval, which shall not be unreasonably withheld.

j. <u>Vending and Displays</u>. Before installing or replacing any vending machine or display equipment for merchandising sundry convenience items at Dealer's station, Dealer shall obtain Shell's prior written approval, which shall not be reasonably withheld, as to its size, kind, appearance and placement. Video or other game machines and the sale of alcoholic beverages are prohibited. Dealer shall not display or offer merchandise or paraphernalia which is morally offensive or distasteful to the general public.

k. <u>Loitering</u>. Dealer shall keep Dealer's station free from loitering by persons who at the time have no proper business purposes thereon.

8. <u>CREDIT CARDS</u>: If and so long as Shell elects to accept specified credit cards, credit identifications, or other transaction authorization cards in Guam, and Dealer elects to honor them for purchases of authorized products and services at Dealer's station, Dealer shall so honor such cards and identifications for all authorized products and services sold at or from Dealer's station, and account for all such transactions, in strict compliance with the terms and conditions appearing thereon and with the provisions of this paragraph 8 and Shell's "Shellcard Sales Guide" ("Guide") furnished to Dealer, or in any revision made by Shell and furnished to Dealer. Shell shall

accept from Dealer all authorized invoices or transactions based on such cards or identifications, and, at Shell's option, shall pay the amount of such invoice or transaction to Dealer by check, credit such amount to Dealer's bank account by electronic funds transfer ("EFT") or set off such amount against Dealer's account with Shell, in each case after deducting any service charge to Dealer by Shell on such credit sales in effect under the Guide as then currently revised. For each such invoice or transaction, or portion thereof, which is not authorized, which is for any reason disputed by the customer, or which is otherwise subject to chargeback under the Guide, Shell may either charge such invoice or amount to Dealer's account with Shell or require Dealer to make immediate refund to Shell of such invoice or amount, including refund by draft or EFT initiated by Shell, without deduction for any service charge previously earned thereon by Shell. If Dealer fails to comply with the provisions of this paragraph 8 or the Guide, Shell may, at its option and without limitation of any other rights or remedies available to it under this Agreement or otherwise, limit or cancel Dealer's right to participate in Shell's credit card program.

9. CLAIMS, RELEASE:

a. Shell shall have no liability to Dealer for any defect (patent or latent) in quality or shortage in quantity, of any petroleum products delivered unless Dealer gives Shell written notice of Dealer's claim within:

1. One (1) day after delivery for shortages in quantity of products; or

2. Two (2) days after delivery for quality deficiencies, and further provides Shell with reasonable opportunity to inspect the products and take test samples.

b. Any other claim by Dealer of any kind, based on or arising out of this agreement or otherwise, shall be waived and barred unless Shell is given notice within ninety (90) days after the event, action or inaction to which such claim relates. Any claim by Dealer shall be waived and barred unless asserted by the commencement of an action within twelve (12) months after the event, action or inaction to which such claim relates. In no event shall Shell be liable for prospective profits or special, indirect, or consequential damages. The provisions of this paragraph 9 shall survive any termination of this agreement, however arising.

c. Shell shall have the right but not the obligation to offset any indebtedness owed by Shell to Dealer against any indebtedness owed Dealer to Shell, whether arising from the sale of goods or products under this agreement or from any other business transaction between Shell and Dealer.

10. FORCE MAJEURE: Shell shall not be liable for loss, damage or demurrage due to any delay or failure in performance:

a. Because of compliance with any action, order, request or control of any governmental authority or person purporting to act therefor; or

b. When the supply of products or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by

Shell is interrupted, unavailable or inadequate because of wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, weather conditions or for any other cause which Shell determines is beyond its reasonable control when acting in good faith and in the ordinary course of business, whether or not similar to any of the foregoing. Shell shall not be required to remove any such cause or replace the affected source of supply or facility if it shall involve additional expense or a departure from its normal practices. If, for any cause whatsoever, there is, or Shell believes in its reasonable opinion there may be, a shortage of supplies, for whatever reason, so that Shell is or may be unable to meet the demands of all of its customers, Shell may allocate to and among its retail dealers such quantities of product as Shell determines in the exercise of its ordinary business judgment it has available for distribution to that class of trade, provided that Shell's plan of allocation shall not unreasonably discriminate between Dealer and other retail dealers. Shell shall not be required to make up any deliveries or quantities omitted pursuant to the provisions of this paragraph, including, but not limited to, deliveries or quantities omitted pursuant to Shell's right to allocate products among its retail dealers, nor shall Shell be liable for any damages or loss in connection with such omitted deliveries or quantities. In all instances in this paragraph wherein a decision or determination is referred to, such decision or determination shall be made in Shell's sole and absolute discretion when acting in the ordinary course of business.

## ARTICLE III
## EQUIPMENT

1. Shell hereby leases to Dealer the equipment described in Exhibit "D" for the fees set out therein which shall be paid without demand or notice on the first of each month and without deduction or setoff of any kind whatsoever. Dealer shall use the equipment only for the business purposes set forth in this agreement. The fact that Shell may elect to charge no rent for a particular unit of equipment and thereby loan said unit to Dealer shall not in any manner affect Dealer's duties and obligations to Shell with regard to said unit under this agreement. Dealer shall pay for and provide all electric power, gasoline and lubricants consumed by and required for each unit of equipment. The parties by mutual agreement may hereafter add additional equipment to Exhibit D which shall accrue fees in the amount established by Shell.

2. Dealer hereby acknowledges receipt of the equipment which has been installed in good order and condition and further acknowledges that the equipment is and will remain the property of Shell.

3. Dealer shall not make any alterations, additions, attachments, repairs or adjustments to the equipment (including any change in the color scheme or decoration thereof) without Shell's prior consent except that Dealer may at any time change the price adjusting mechanism of any motor fuel pump included in the equipment.

4. Dealer shall at all times keep the equipment in good condition and appearance, inherent faults and fair wear and tear excepted, and shall be

Case 1:00-cv-00012 Document 151-2 Filed 09/04/2008 Page 44 of 30

responsible to Shell for all damage to, defects in, deterioration, loss or theft of the equipment (all or each of which events are hereinafter referred to as "damage"). Dealer shall promptly notify Shell of any damage to or defect in the equipment.

5. Shell, at its expense, shall maintain the equipment in good operational order and shall repair all fair wear and tear on the equipment. Shell shall repair all damage to the equipment or, at its option, replace damaged equipment at Dealer's expense and Dealer shall immediately reimburse Shell upon invoice of all expenses and costs incident to such repair or replacement. Dealer agrees that Shell shall not be liable to Dealer for any liability, claim, loss, damage or expense of any kind or nature caused, directly or indirectly, by any unit or any inadequacy thereof for any purpose, or any deficiency or defect therein, or the use or maintenance thereof, or any repairs, servicing or adjustments thereto, or any delay in providing or failure to provide any thereof, or any interruption or loss of service or use thereof, or any loss of business, or any damage whatsoever and howsoever caused.

6. At the termination or nonrenewal of this agreement Dealer forthwith shall return the equipment to Shell failing which Shell, in addition to any other rights which it may have against the Dealer, shall be entitled to enter upon the premises at any time to sever and remove therefrom such equipment at Dealer's risk and expense and without any liability to make good any damage reasonably occasioned to the premises in such removal.

7. Dealer shall expressly exclude the equipment from any sale or lease or other disposal of the premises and shall return the equipment to Shell (unless otherwise directed in writing by Shell) forthwith upon demand by Shell, but in any event before yielding up possession of the premises.

8. Dealer will not use, operate or store any equipment leased hereunder improperly, carelessly or in violation of this agreement, or of any applicable regulatory laws and bodies whatsoever, or the instructions therefrom furnished by Shell; nor use or operate any equipment other than in a manner and for the use contemplated by the manufacturer thereof; nor let or use the same for hire other than to the extent and in the manner similar property has heretofore been let or used for hire in the regular and ordinary course of Dealer's business; nor, without the prior written consent of Shell sublease or let any equipment (it being understood that written consent in one instance will not constitute a waiver of any of the terms of this agreement), or permit anyone other than its authorized agents or employees to operate the same, or permit any unit to be subject to any lien, charge or encumbrance whatsoever, or remove any unit from premises of installation.

Should the equipment include computer or other electronic equipment then Dealer at all times shall ensure that such equipment is operated:

(1) only by Dealer or his employees (except in the case of equipment provided specifically for use by Dealer's invitees);

(2) in accordance with procedures notified from time to time by Shell; and

(3) for purposes approved by Shell; and further shall that no additional equipment shall be used in conjunction with such equ-. without Shell's prior consent.

## ARTICLE IV
### GENERAL PROVISIONS

1. **TERM:**

a. This agreement shall be binding from execution and shall be in effect for a period of not more than one (1) year beginning _____, ____ and ending _____, ____, but may be terminated by Shell as provided in the succeeding articles hereof.

b. Neither Shell nor Dealer shall have any obligation to renew this agreement or continue their relationship established hereunder beyond the term provided in subparagraph (a) above. As a condition for any renewal of this agreement, Dealer will provide Shell a certification of the integrity (leak free condition) of Dealer's underground storage system based on actual test results.

2. **TERMINATION AND NONRENEWAL:**

a. _Termination._ Subject to any limitations imposed by law, Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Dealer for any one or more of the following grounds:

(1) failure by Dealer to comply with any provision of this agreement, which provision is both reasonable and of material significance to the relationship hereunder;

(2) failure by Dealer to exert good faith efforts to carry out the provisions of this agreement;

(3) occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this agreement is reasonable, including events such as:

(i) fraud or criminal misconduct by Dealer relevant to the operation of the Dealer's station;

(ii) declaration of bankruptcy or judicial determinatio of insolvency of Dealer;

(iii) continuing severe physical or mental disability Dealer of at least three (3) months' duration which renders Dealer unable provide for the continued proper operation of the Dealer's station;

(iv) if Dealer leases Dealer's station from Shell, loss Shell's right to grant possession of Dealer's station through expiration of underlying lease;

(v) condemnation or other taking, in whole or in part, of the Dealer's station pursuant to the power of eminent domain;

(vi) loss of Shell's right to grant the right to use Shell's identifications;

(vii) destruction (other than by Shell) of all or a substantial part of the Dealer's station;

(viii) failure by Dealer to pay to Shell in a timely manner when due all sums to which Shell is legally entitled;

(ix) failure by Dealer to operate Dealer's station for the sale of motor fuel for seven (7) consecutive days, or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(x) willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Dealer;

(xi) knowing failure of Dealer to comply with federal, state or local laws or regulations relevant to the operation of Dealer's station;

(xii) conviction of Dealer of any felony involving moral turpitude; and

(xiii) death of Dealer;

(4) a determination is made by Shell in good faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the Territory of Guam; and

(5) any other ground for which termination is provided for in this agreement or in any related agreements constituting a franchise between Shell and Dealer, or is otherwise allowed by the PMPA or other applicable law.

b. **Termination Prior to Effective Date**. If, after execution but prior to the effective date of this agreement, Shell has grounds to terminate or not renew any then existing Dealer Agreement between Shell and Dealer pertaining to Dealer's station, or to terminate this agreement as if it were then in its term, Shell may terminate this agreement, as well as any such then existing Dealer Agreement, based on such grounds.

c. **Nonrenewal**. Subject to paragraph Article IV 1 (b) and any limitations imposed by law, Shell may, at it option, fail to renew this agreement or any franchise relationship existing with respect thereto upon notice (or advance notice if and as required by law) to Dealer for;

(1) any one or more of the grounds specified in Article IV 2 (a)(1) through (5); and

(2) any other ground for which nonrenewal is provided for in this agreement or in any related agreements constituting the franchise between Shell and Dealer or is otherwise allowed by the PMPA or other applicable law.

d. __Acts Attributable to Dealer__. In determining whether a ground for termination or nonrenewal exists under this paragraph 2: (1) the acts or omissions of Dealer's employees, agents and contractors shall be deemed to be the acts or omissions of Dealer; (2) if Dealer is composed of more than one person, the acts or omissions of each such person shall be deemed to be the acts or omissions of Dealer; (3) or if Dealer is a partnership or corporation, the acts or omissions of each partner and/or director, officer or shareholder, as the case may be, shall be deemed to be the acts or omissions of Dealer.

e. __Other Remedies__. Any termination under the foregoing provisions of this paragraph 2 shall be without limitation of any other rights or remedies available to Shell under this agreement or otherwise. All sums due by Dealer to Shell under the provisions of this agreement shall be payable by Dealer to Shell as provided herein, and shall bear interest at the rate of ten percent (10%) per annum (or lesser maximum rate permitted by law) from the date due until paid. If Dealer defaults in payment of any indebtedness to Shell, in addition to the rights provided above, Shell shall have the right immediately to suspend deliveries hereunder and to apply any sums which Shell may hold for Dealer's account under this agreement to the payment of such indebtedness, without relieving Dealer of any obligations otherwise existing to replace the sums so applied. Either party's right to require strict performance of the other's obligations hereunder shall not be affected by any previous waiver, forbearance, course of dealing, or trade custom or usage.

3. __INSURANCE:__

a. Dealer shall obtain, renew and keep current during the term of this agreement at its expense the following insurance coverage:

(1) Insurance against loss or damage by fire, typhoons and such other risks as are now or hereafter included in a Standard Extended Coverage Endorsement in common use for commercial structures on Guam, including vandalism and malicious mischief, on all alterations, additions, and improvements on the premises. Such insurance coverage shall be in an amount, as near as practicable, to the full replacement cost of all improvements and additions on the premises, with deduction for depreciation. If at any time there is a dispute as to the amount of such required insurance which cannot be resolved by agreement within thirty (30) days, Shell may, not more often than once every twelve (12) months, request the carrier of the insurance then in force to determine the full insurable value of all improvements and additions on the premises, and the resulting determination shall be conclusive between the parties for the purposes of this paragraph;

(2) Comprehensive general liability insurance, including coverage for contractual liability, and vehicles operated in the course of Dealer's business with limits for any one occurrence of not less that $100,000.00 (individual) and $300,000.00 (group) for personal injury and $100,000.00 for property damage;

(3) Property insurance on the equipment described in Article III for its full replacement value;

(4) ~~Garagekeeper's legal liability insurance with limits of not less than $50,000.00;~~

(5) Workmen's compensation as required to insure Dealer's liability under applicable statutory law;

(6) Plate glass insurance sufficient to replace all plate glass in the premises in the event of loss;

(7) Fire legal liability insurance;

(8) Such other insurance and amounts that may from time to time be required by Shell against insurable hazards as are commonly insured against for service stations.

b. Shell shall be named as an additional insured on all such policies. All policies shall be written by reputable insurance companies authorized to engage in the insurance business within the Territory of Guam. Dealer shall pay all premiums and assessments charged for such policies when due. In case of insurance against damage to the premises by fire or other casualty, the insurance policy shall provide that the loss, if any, shall be adjusted with and payable to Shell. Each such policy shall have a provision that requires that Shell shall be given thirty (30) days written notice before any termination, cancellation or material change shall become effective. In the event that any such policy is terminated or cancelled, Dealer shall promptly, prior to the termination date of such policy, procure a new or substitute policy containing the same or additional coverage, such policy to afford coverage concurrent with the termination of the cancelled or terminated policy. Certificates of insurance evidencing policies required hereunder shall be provided to Shell within fifteen (15) days of the effective date of the policy.

c. The failure of Dealer to (1) obtain any of the required insurance coverage, or (2) to pay all premium and assessments when due, or (3) to comply with all terms and conditions of such policy or the directions of the insurance carrier or its rating bureau or the National Fire Protection Association, or (4) to obtain new or substitute policies as herein provided shall be a default hereunder. Shell, at its option, may obtain same, or otherwise cure said default at Dealer's sole cost and expense, and Dealer shall immediately pay to Shell upon demand any expenses incurred by Shell hereunder.

4. INDEMNIFICATION:

a. Dealer shall defend, indemnify and hold Shell, its successors and assigns, harmless from and against any fines, penalties, charges or expenses, including attorneys' fees and court costs, imposed on or incurred by Shell, for violations of any laws, ordinances or regulations, arising, directly or indirectly, from any act or omission, whether negligent or otherwise, of Dealer or its agents, contractors, servants, employees, invitees or others.

b. Dealer hereby assumes entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of Dealer or otherwise, and to all property arising, directly or indirectly out of or from the business or businesses and/or the use, occupancy, operation and maintenance of the

premises (including adjacent sidewalks, drives and curbs) by Dealer or any of its agents, servants, contractors, employees, invitees or others. Except to the extent, if any, expressly prohibited by statute should any claims for such damage or injury (including death resulting therefrom) be made or asserted, whether or not such claims are based upon Shell's alleged active or passive negligence or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of Shell, Dealer agrees to indemnify and save harmless Shell, its officers, agents, servants and employees from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage or injury, including legal fees and disbursements, which Shell, it officers, agents, servants or employees may directly or indirectly sustain, suffer or incur as a result thereof and Dealer agrees to and does hereby assume, on behalf of shell, its officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against Shell, its officers, agents, servants or employees upon or by reason of such claims which defense shall at Shell's election be made by counsel of Shell's choice and according to such fee requirements as said counsel shall customarily require, and to pay on behalf of Shell, its officers, agents, servants and employees, upon demand the amount of any judgement that may be entered against Shell, its officers, agents, servants or employees in any such action.

c. Within 24 hours after any occurence which may result in such injury, death, damage or loss, or such fine, penalty or assessment, Dealer shall report the same to Shell by telephone and Shell promptly thereafter confirm the same by notice including all circumstances thereof known to Dealer or Dealer's employees.

d. In the event that any such claims, loss, cost, expense, liability, damage or injury arise or are made, asserted or threatened against Shell, its officers, agents, servants or employees, Shell shall have the right to require Dealer to furnish a surety bond satisfactory to Shell guaranteeing such protection, which bond shall be furnished by Dealer within five (5) days after written demand has been made therefor.

5. LIENS: Dealer shall at all times keep and maintain this agreement, the premises and the equipment, free and clear of any and all liens, charges, attachments and encumbrances of any nature whatsoever arising out of or in any manner attributed to any act or omission of Dealer; provided, however, that Dealer may, in good faith, contest the validity of any lien, but notwithstanding any such contest, if any lien so contested shall be reduced to final judgment and such judgment or such process as may be issued of the enforcement thereof is not promptly stayed or is so stayed and said stay thereafter expires, then, and in such event, Dealer shall forthwith entirely pay and discharge such judgment. In the event that Dealer shall fail to pay any such lien, charge, attachment, encumbrance or judgment as herein provided, Shell may pay the same, together with any interest, penalties, fines and costs accrued thereon or imposed in connection therewith, and Dealer will repay to Shell, on demand, the full amounts so paid by Shell plus interest thereon at the rate of eighteen percent (18%) per annum until paid.

6. NOTICES: Except as otherwise expressly specified herein, any notice to be given hereunder by either party to the other shall be deemed sufficiently given in writing and delivered either in person or enclosed in

an envelope properly stamped and addressed to the party at the add_____ set
forth in this section, and deposited in the United States mail. Either party
may change its address by giving fifteen (15) days prior written notice to the
other party. Such address until further notice shall be:

Shell:    Shell Guam, Inc.
Second Floor, Hi-Tech Building
545 West Marine Drive
Anigua, Guam 96910
Facsimile No. (671) 477-4353

Dealer:   J.P. Torres Enterprises, Inc.

162 Archbishop Felixberto C. Flores St.

Agana, Guam 96910

7.   **AMENDMENT AND WAIVER:**

a. Neither the agreement nor any provision hereof may
be changed, waived, altered, amended, or discharged orally, but only by an
instrument in writing signed by the party against whom enforcement of the
change, waiver, alteration, amendment or discharge is sought.

b. Failure by either party to object to any failure of performance
by the other party of any provision of the agreement shall not constitute a
waiver of, or estoppel against, the right of such party to require such
performance by the other. Nor shall any such failure to object constitute a
waiver or estoppel with respect to any succeeding failure of performance.

8.   **COST AND EXPENSES:** Dealer will pay to Shell on demand all costs and
expenses, including attorneys' fees and cost of suit, reasonably incurred by
Shell in enforcing any of the covenants and agreements herein contained
(including this provision), in remedying any breach by Dealer of its
covenants, in recovering possession of the premises, in collecting any
delinquent rent, or other charges payable by Dealer hereunder, or in
connection with any litigation commenced by or against Dealer (other than
condemnation proceedings) to which Shell, without any fault on Shell's part,
shall be made a party. This provision shall survive the termination of this
agreement and shall be in addition to all other rights and remedies which
Shell shall have in law and equity as a consequence of Dealer's breach of this
agreement.

000404

9.   **RELATIONSHIP OF SHELL AND DEALER:** Dealer is in business independent
of Shell and nothing in this agreement shall be deemed as creating any right
in Shell to exercise any control over, or to direct in any respect the conduct
or management of Dealer's business, subject only to Dealer's performance of
the obligations imposed under this agreement, neither Dealer nor any person

performing work at the premises for, or on behalf of Dealer, shall be deemed an employee or agent of Shell.

10.  **SEVERABILITY:** If any provision of this agreement is rendered invalid or of doubtful validity because of (a) a judicial decision with respect to the same provision in another agreement, (b) a judicial decision with respect to an analogous provision in franchise agreement, (c) an official opinion or statement of any federal or territorial official of regulatory agency, or (d) law; the parties shall modify this agreement by deleting such provision and by negotiating in good faith a modification of the provision that retains insofar as possible the removed provision.

11.  **ASSIGNMENT ENCUMBRANCES:**

a.  **General.** This agreement is personal to Dealer. Except as otherwise provided in this paragraph 11 or by law, Dealer shall not assign or encumber any of Dealer's interest in this agreement, or assign any claim against Shell arising directly or indirectly out of or in connection with this agreement, or permit any other arrangement having similar effect of such an assignment or encumbrance, either voluntarily, involuntarily or by operation of law, without Shell's prior written consent, which consent shall not be unreasonably withheld. Each request for Shell's consent to any assignment or encumbrance shall be submitted in the manner specified for notices in paragraph 6 of this Article IV, and Shell shall have sixty (60) days (or any lesser period specified by law) following its receipt of all qualification information reasonably requested by it in which to grant or withhold its consent in writing. No consent to any assignment or encumbrance shall constitute a waiver of the provisions of this paragraph as to any such future transaction. Any assignment or encumbrance made without Shell's prior written consent or otherwise in violation of this agreement shall be null and void.

b.  **Particular Acts.** Without limitation, each of the following acts shall be considered an assignment subject to subparagraph (a) above;

(1)  The transfer of Dealer's interest in this agreement upon death, whether by will or operation of law.

(2)  Dealer becomes bankrupt or insolvent, makes an assignment for the benefit of creditors or institutes a proceeding under the Bankruptcy Code; provided that, in any of the foregoing cases, Dealer or other affected party shall have sixty (60) days in which to have an involuntary proceeding dismissed.

(3)  A writ of attachment or execution is levied on this agreement and not removed by Dealer within thirty (30) days.

(4)  In any proceeding or action to which Dealer is a party, a receiver is appointed with authority to take over Dealer's interest in this agreement and such receiver is not removed within sixty (60) days.

(5)  If Dealer is partnership, a withdrawal or any change of interest (voluntary, involuntary or by operation of law) of any partner, or

the dissolution of the partnership.

(6) If Dealer is a corporation, any dissolution, merger, consolidation or other reorganization, or other arrangement having similar effect, or the sale or transfer by Dealer or any shareholder of ten percent (10%) or more of the voting shares of the capital stock of Dealer or of any lesser interest which cumulatively vests ten percent (10%) or more of such voting shares in the transferee.

(7) If Dealer is composed of more than one (1) person, any change of interest (voluntary or involuntary or by operation of law) of any such person.

c. <u>Shell's First Refusal Right</u>. Dealer may not sell, transfer or assign any of Dealer's interest in this agreement without first offering in writing to sell, transfer or assign the same to Shell on terms and conditions which are the same as those of the proposed sale, transfer or assignment to the third party. If Shell declines or does not accept the offer within thirty (30) days from its receipt thereof, Dealer may make proposed sale, transfer or assignment to such third party if Shell gives its consent thereto as provided in subparagraph (a) hereof, but not at a lower price or on more favorable terms than those so offered to Shell. If such sale, transfer or assignment to suchthird party is not consumated within four (4) months from Shell's receipt of the foregoing offer to it, Dealer shall re-offer the interest to Shell in accordance with the foregoing provisions. If Dealer is a partnership or corporation, the provisions of this subparagraph (c) shall be deemed to apply to any assignment described in subparagraphs (b)(5) or (b)(6), as the case may be.

d. <u>Assignment by Shell</u>. Shell shall have the right to sell, transfer or assign its interest in this agreement. Following any assignment of this agreement by Shell, Shell's assignee shall be substituted for Shell with respect to the rights and obligations of Shell provided herein.

12. <u>MISCELLANEOUS</u>:

a. Any attempt to assign this agreement by Dealer without Shell's prior written consent shall constitute a default of this agreement and any such attempted assignment shall be null and void. Unless otherwise prohibited by law, Shell reserves the right to require any proposed assignee acceptable to Shell, to enter into a trial franchise as one of the conditions of Shell's consent to any assignment.

b. This agreement, including documents incorporated herein, contains the entire agreement covering the subject matter, and supersedes any prior supply agreement between the parties relating to the premises.

c. The descriptive heading of the several sections and subsections in this agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

d. This agreement is made under, and shall be governed and construed in accordance with the laws of the United States and regulations of the Territory of Guam.

e.  Dealer hereby waives trial by jury in action arising out of or in connection with this agreement.

f.  Dealer shall deliver to Shell a written statement signed by Dealer giving names of all employees and agents who are authorized to act on behalf of Dealer and any communication signed on behalf of Dealer by such employee or agent shall bind Dealer. Dealer shall be responsible for notifying Shell immediately and in writing of any change in the name or names so submitted.

IN WITNESS WHEREOF, the parties have executed this agreement the day and year first above written.

SHELL:

SHELL GUAM, INC.

By: _____

Name: ROBERT KNEESHAW

Title: FINANCE & ADMINISTRATION MANAGER

DEALER:

J.P. TORRES ENTERPRISES, INC.

By: _____

Name: JESUS Q. TORRES

Title: PRESIDENT AND CEO

EXHIBIT "A"

## IMPROVEMENTS

Gasoline filling station, constructed of Radva Thermastructure, concrete block, and concrete, comprising sales/showroom area, associated offices, restrooms, staff areas and storerooms. Attached canopy constructed of concrete. Pavement areas constructed of concrete and asphalt concrete, sundry landscaped areas.

Equipment as noted in Exhibit "D", attached.

# EXHIBIT "B"
## LESSEE'S MAINTENANCE OBLIGATIONS

**A.** Yard

    1. Maintain all elements within planter areas as necessary to retain a healthy and attractive appearance. Items include, but are not limited to, all live and artificial plantings (shrubs, grass, flowers, trees, etc.), decorative rock, bark and entire sprinkler system.

    2. Regularly remove weeds, leaves, debris and litter from the Premises (including rain gutters and downspouts and adjacent sidewalks, driveways and easements).

**B.** Lighting

Maintain all lamps and bulbs, ballasts, ballast wiring, starters and sockets in the interior of building. Excludes total fixture replacement.

**C.** Plumbing

    1. Clear clogged toilets, sinks, building lube bay drains and on-property sewer lines. Clean oil separators and catch basins.

    2. Maintain all flush mechanisms and faucets.

    3. Empty septic tanks as necessary.

**D.** Air Conditioning

Provide regular inspections and service for A/C systems (to include: tighten belts, lubricate bearings, add air conditioner refrigerant) and replace air filters. Maintain any window air conditioner units in entirety.

**E.** Glasswork

Replace all window and door glass, whenever scratched, cracked or broken from whatever cause. Includes bullet-resistant glass or plastic.

**F.** Floors

Restore floors to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear.

**G.** Painting

During the period between scheduled complete repainting by Shell, wash and paint all curbs, yard and building equipment, interior/exterior walls, doors, ceilings and shelving as necessary. Paint to be furnished by Shell; all other painting materials by Lessee.

H. **Tanks**

1. Check daily for leakage and water using water-finding paste. Maintain daily inventory control as specified in paragraph 5 (c) of Article I. (Failure by Lessee to monitor tanks daily for contaminants and product loss may expose Lessee to responsibility for lost product and payment of Shell's cleanup or repair costs, or both).

2. Empty waste oil tank, using legally acceptable method of disposal. Obtain and pay for necessary regulatory permits for proper disposal, and maintain document records as required by law.

3. Keep fill and access boxes clear of water and debris.

I. **Pumps/Dispensers**

1. Lubricate any gasoline suction pumps in use (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.

2. Maintain gasoline hoses, clamps, retractor cable, nozzles, swivels and colored scuff guards, including any associated with a vapor recovery system; check daily for visible leaks.

3. Maintain air and water hoses, nozzles, couplings and air chucks.

J. **Air Compressor**

Drain water daily. Add/change oil, replace air filters and lubricate bearings per manufacturer's specifications.

K. **C-Store/Food Mart and Related Equipment (if located on Premises)**

1. Maintain Shell-owned cooler/freezer doors and refrigeration units (walk-in and freestanding), gondolas and all other Shell-owned C-store/food mart related equipment, including lamps, ballasts, fuses and glass therein.

2. Keep all food handling equipment and food preparation areas clean, sanitary and in compliance with applicable codes and laws.

3. Keep all equipment drain lines clean and clear.

L. **Car Wash Equipment (if located on Premises)**

Maintain all elements of Shell-owned car wash equipment, including any optional or add-on equipment systems with control and connection hardware, and all elements of any water reclaim system. This excludes complete equipment package replacements.

M. OTHER EQUIPMENT

    1.    Maintain all Lessee-owned equipment.

    2.    Maintain and replace if lost, stolen or damaged all fire protection equipment provided by Shell.

N. MISCELLANEOUS

    1.    Maintain all building locks, keys, door closers and latches.

    2.    Maintain all elements of overhead doors, excluding total door replacement.

    3.    Reset circuit breakers, replace electrical fuses.

    4.    Take all necessary pest control measures.

EXHIBIT "C"

MINIMUM VOLUMES PER ANNUM: (GALLONS)

    i.   Motor Gasoline                  1,039,500

    ii.   Automotive Diesel Fuel         31,500

    iii.   Lubricating Oils              3,450


MAXIMUM VOLUMES PER ANNUM: (GALLONS)

    i.   Motor Gasoline                  1,732,000

    ii.   Automotive Diesel Fuel         52,500

    iii.   Lubricating Oils              5,750

EXHIBIT "D"

## SCHEDULE OF EQUIPMENT

| ITEM OF EQUIPMENT | UNIT MONTHLY RENT |
|---|---|
| 1.  3 x 8000 gallon fiberglass underground tank | : $   -0- |
| 2.  1 x 4000 gallon fiberglass underground tank | : $   -0- |
| 3.  2 x E.P. Draffin Mobile Oil stands | : $   -0- |
| 4.  Station Identification and Price sign | : $   -0- |
| 5.  Product Identification signs (3) | : $   -0- |
| 6.  Ingress/Egress Directional signs (2) | : $   -0- |
| 7.  Shell Shop Over door sign | : $   -0- |
| 8.  3 x bucket/towel dispenser | : $   -0- |
| 9.  3 x Gilbarco Salesmaker II Multiproduct Dispensers | : $   -0- |
| 10.  1 x Gilbarco Highline III Single Hose Diesel Pump | : $   -0- |
| 11.  1 x Compressor:  Cambell Hausfield 5 H.P. | : $   -0- |
| 12.  1 x Emergency Generator:  Caterpillar 3114T | : $   -0- |
| 13.  1 x 3 door Refrigerator | : $   -0- |
| 14. | : $ |
| 15. | : $ |
| 16. | : $ |
| 17. | : $ |
| 18. | : $ |
| 19. | : $ |
| 20. | : $ |

TOTAL MONTHLY RENT   : $

# EXHIBIT "C"

IN THE DISTRICT COURT OF GUAM

ANTHONY J. ADA,          ) CIVIL CASE NO. CV00-00012
                               )
        Plaintiff,     )
                               )
    vs.                )
                               )
SHELL GUAM, INC., et al.,  )
                               )
        Defendants.    )
_____)

TRANSCRIPTION OF

DEPOSITION OF

**JAMES HAMMOND**
**designated representative for**
**SHELL GUAM, INC.**

June 29, 2005
Volume 1

ORIGINAL

EXHIBIT C

PREPARED BY:    George B. Castro
                      **DEPO RESOURCES**
                      #49 Anacoco Lane, Nimitz Hill Estates
                      Piti, Guam 96915
                      671-688-DEPO • Fax: 671-472-3094

1     Q   The reason I wanted to bring to your

2 attention this letter is that you indicate here

3 that, you know, Shell acted in good faith as

4 permitted under PMPA.

5     Looking at Exhibit 10, can you tell me

6 whether or not -- if Mr. Ada was a franchisee

7 under the PMPA, does this letter in Exhibit 10,

8 this termination letter, does that meet the

9 requirements specified under the PMPA, for

10 termination of a franchise relationship?

11     A   Well, based on the steps we went

12 through with notification for Rene, it does

13 not.

14     Q   Okay. And is that what you're

15 referring to in the defense here, when you say:

16 If it's determined that Shell failed to comply

17 with requirements of 2802 and 2804 -- are those

18 the requirements that you're referring to in

19 this defense about the termination

20 requirements? And the grounds that are

21 necessary for terminating a franchisee?

22     I'm trying not to give you legal

23 questions, but I don't have much choice.

24     A   I know. And I've looked at these, but

25 I can't remember what they specifically mean,

# REPORTER'S CERTIFICATE

I, George B. Castro, Court Reporter, do hereby certify the foregoing 174 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 26th day of July, 2005.

_____
GEORGE B. CASTRO

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# EXHIBIT "D"

RECEIVED
Law Office of
C: sar C. Cabot, P, C.
Date: _5.9.00_
Time: _9:45 a.m >_
Initials: _TL_

**IN THE SUPERIOR COURT**

**OF GUAM**

MAY 4  3 17 PM '00

ALFRED
CIVIL CASE NO. CV0282-00

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ANTHONY J. ADA,                                    )
                                                   )
                Plaintiff,                          )
                                                   )
        vs.                                        )
                                                   )
SHELL GUAM, INC., and                              )
DOES I through XX, Inclusive,                      )
                                                   )
                Defendants.                         )
_____)

**DECISION AND ORDER**

## INTRODUCTION

This matter came before the HONORABLE MICHAEL J. BORDALLO on the 29th day of February 2000, on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. Richard A. Pipes represented the Plaintiff, Anthony J. Ada. The Defendant, Shell Guam ("Shell") and Mariana Acquisition Corporation ("MAC") was represented by Steven Zamsky. The Court now issues the following Decision and Order.

## BACKGROUND

On February 23, 1993, Shell and Anthony J. Ada ("Ada") entered into a written franchise agreement which allowed the Plaintiff to use in connection with the sale of motor fuels and lubricants a trademark that is owned and controlled by Shell at Shell Service Station in Mangilao. The franchise agreement was for a term of one year, ending on February 28, 1994. On March 1, 1994, Shell and the Plaintiff entered into a written franchise agreement for a term of five years, ending on February 28, 1999, for the operation of the Shell Service Station in Mangilao. The franchise agreements conspicuously stated that the Petroleum Marketing Products Act ("PMPA") applied to the relationship. On March 18, 1999, Shell and Ada executed an amendment to the franchise agreement. In the amendment, the parties agreed that Ada would continue to operate the facility until February 29, 2000.

On February 1, 1995, Shell and Ada entered into a written franchise agreement to operate the Shell Service Station in Barrigada for a term of one year, ending January 31, 1996. On February 1, 1996, Shell and Ada entered into a written franchise agreement to operate the Shell Service Station



in Barrigada for a term of three years, ending January 31, 2001. The franchise agreements conspicuously stated that the Petroleum Marketing Products Act ("PMPA") applied to the relationship. On March 18, 1999, Shell and Ada executed an amendment to the franchise agreement. In the amendment, the parties agreed that Ada would no longer operate the Mangilao facility as of February 29, 2000.

On December 10, 1999, Shell's regional marketing manager, Fred Keller gave notice to Ada that the franchise agreement was expired as of February 28, 2000, and that Shell was exercising its option not to renew the franchise agreement. On February 23, 2000, the Plaintiffs' filed their complaint for Declaratory Judgment, Unlawful Termination of Petroleum Franchise, Exemplary Damages, Preliminary and Permanent Injunctions, and Damages against Shell. Count two of the complaint alleges that Shell has attempted to unlawfully terminate the franchise agreement in violation of the Petroleum Marketing Practices Act. 15 U.S.C. §2801 et. seq. On February 25, 2000, the Court granted the Plaintiff a temporary restraining order, which expired on March 9, 2000. On February 29, 2000, the Court granted the Plaintiff's motion for preliminary injunction. The Court now issues its written Decision and Order.

## DISCUSSION

The Plaintiff moves this Court to issue a preliminary injunction alleging that the PMPA applies to its relationship with Shell, and that Shell has intentionally and willfully failed to comply with the termination and non-renewal provisions of the PMPA. The Plaintiff contends that its relationship with Shell constitutes a franchise, which would bring the parties contract within the protections of the PMPA. The Plaintiff further argues that the plain language of the contract between the parties expressly states that the PMPA is applicable to their relationship. The Defendant, however, alleges that the PMPA does not apply because the relationship between the parties is that of principal and agent, and that the parties amended the agreement to exclude the conspicuous statement expressly bringing the contract within the PMPA provisions.

- 2 -

15 U.S.C. §2801(1)(A) and (1)(B) define "franchise" to mean:

> . . . any contract (i) between a refiner and a distributor, (ii) between a refiner and a retailer, (iii) between a distributor and another distributor, or (iv) between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

> . . . The term "franchise" includes (i) any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy; (ii) any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner. . .

However, this Court need not even reach the determination of the nature of the Plaintiff and Defendant's relationship, because the contracts between the parties clearly define the franchisor to franchisee relationship as being within the protections of the PMPA. Only where the contract provision is contrary to the PMPA should the Court enforce the protections of the PMPA. Farm Stores, Inc. v. Texaco, Inc., 763 F2d 1335 (11th Cir. 1985)(contract exclusion defining relationship as outside the scope of PMPA upheld because the relationship was not the type Congress intended to protect.) Because the parties agreed to bring the relationship within the PMPA, the Court finds that the PMPA requirements applies to the agreement.

Franchisees may obtain preliminary injunctive relief if (1) they establish that the franchise has been terminated and that "there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation," and (2) the court determines that, on balance, the hardships imposed upon the franchisor by issuance of preliminary injunctive relief are less than the hardships that would be imposed upon the franchisee in the absence of such relief. *15 U.S.C. §2805(b)(2)(A) and (B)*. The test for the issuance of a preliminary injunction under the PMPA is more liberal than that in the general run of cases. Once a franchisee establishes that he will incur the greater hardship, he need only show "a reasonable chance of success on the merits." Khorenian v. Union Oil Co. of

- 3 -

California, 761 F.2d 533 (9th Cir. 1985). In contrast to Rule 65 of the Rules of Civil Procedure, the PMPA does not require the franchisee to make a showing of irreparable harm. More importantly, nor does the PMPA require a plaintiff to show the likelihood of success on the merits as he would be required under Rule 65. The Act provides that once the franchisee establishes that the franchise relationship has been terminated or that it has not been renewed, the franchisor "shall bear the burden of going forward with evidence to establish as an affirmative defense that such termination or non-renewal was permitted" under one of the statutorily enumerated grounds. *15 U.S.C. § 2805(c)*. Reading section 2805 as a whole, a franchisee is entitled to a preliminary injunction if the balance of hardship tips in his favor and there is a "reasonable chance" that the franchisor will be unable to prove that the termination was permissible under the Act. In short, in order to rebut the franchisor's showing, the franchisee need show only the existence of "sufficiently serious questions" as to the propriety of the termination under the Act to present a "fair ground" for litigation. Upon a finding that a party is entitled to a preliminary injunction, the Court may require the party to post a bond. *15 U.S.C. § 2805(b)(3)*.

The Plaintiff alleges that Shell did not comply with the requirements for notification of termination and non-renewal. The PMPA requires that prior to termination of any franchise or nonrenewal of any franchise relationship, the franchisor is required to notify the franchisee not less than 90 days prior to the date on which the termination or nonrenewal takes effect. 15 U.S.C. §2804(a). 15 U.S.C. §2804(c) requires that notification be in writing; posted by certified mail or personally delivered to the franchisee; and contain a statement of intention to terminate the franchise or not to renew the franchise relationship, together with the reasons therefor; the date on which such termination or nonrenewal takes effect; and the summary statement prepared by the Secretary of Energy under the provisions of 15 U.S.C. §2804(d).

On December 10, 1999, Shell gave notice to Ada of its intent to terminate the franchise. No reason for termination was given, other than Shell is exercising its option not to renew the agreement. The notice was effective on February 28, 2000, eighty days from the notice of termination. The

- 4 -

service stations and convenience stores attached to the stations are operated by the Plaintiff, and are treated as a family operated business. Plaintiff has no other significant source of income. The Plaintiff has operated and purchased inventory for the convenience stores located within the service station. Relinquishment of the service station would result in lost income and lost inventory. The Court finds that there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation; whether there exists a franchisor to franchisee relationship, and whether the franchisor complied with the required notice of termination. Additionally, the Court finds that the hardships tip in favor of the Plaintiff. Therefore, the Court grants the Plaintiff's motion for preliminary injunction; no bond will be required for the issuance of the preliminary injunction.

## CONCLUSION

Based on the foregoing, the Court finds that Anthony Ada has met the evidentiary burden set out by the Petroleum Marketing Products Act. Furthermore, the Court finds that there exists a sufficiently serious question for litigation on the issue of whether Shell is entitled to terminate and/or fail to renew the franchise. Therefore, the Court GRANTS the Plaintiff's Motion for Preliminary Injunction; no bond will be required for the issuance of the preliminary injunction.

SO ORDERED this 4th day of May, 2000

Honorable Michael J. Bordallo
Judge, Superior Court of Guam

- 5 -