**CIVILLE & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÁTÑA, GUAM 96910
TELEPHONE: (671) 472-8868
FACSIMILE: (671) 477-2511

*Attorneys for Shell Guam, Inc.*



FILED
DISTRICT COURT OF GUAM

SEP - 1 2005

MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| ANTHONY J. ADA, | ) CASE NO. CV00-00012 |
| Plaintiff, | ) |
| vs. | ) |
| SHELL GUAM, INC., | ) |
| Defendant. | ) |
| ————————————— | ) **DECLARATION OF G. PATRICK** |
| SHELL GUAM, INC., | ) **CIVILLE IN SUPPORT OF SHELL** |
| | ) **GUAM, INC.'S MOTION FOR** |
| Counterclaim | ) **SUMMARY JUDGMENT** |
| Plaintiff, | ) |
| vs. | ) |
| ANTHONY J. ADA, | ) |
| Counterclaim | ) |
| Defendant. | ) |

I, **G. PATRICK CIVILLE**, state as follows:

1.    I am one of the attorneys representing Shell Guam, Inc. ("Shell") in this lawsuit. This declaration is based upon matters within my own knowledge, and if called upon to testify, I will testify as set forth herein.

2.    Attached hereto are true and correct copies of the following exhibits in support of the Motion For Summary Judgment:

ORIGINAL

| Exhibit A: | Pages 43-46, 50–52, 57, 63, 68, 94-96, 111-114, 119-122, 124-125, and 132 of the Deposition Transcript of Anthony Ada taken on July 7, 2005 |
| --- | --- |
| Exhibit B: | Page 101 of the Deposition Transcript of Anthony Ada taken on July 18, 2005 |
| Exhibit C: | Pages 123-131 of the Deposition Transcript of Phillip Stalker taken on June 30, 2005 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of September, 2005.

By: _____
    G. PATRICK CIVILLE

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

DISTRICT COURT OF GUAM


ANTHONY J. ADA,         )    CIVIL CASE NO. CV00-00012
                          )
         Plaintiff,  )
                          )
      vs.           )    **⬜ COPY**
                          )
SHELL GUAM, INC., et al.,  )
                          )
         Defendant.  )


## DEPOSITION OF ANTHONY ADA

Taken on Behalf of the Defendant


BE IT REMEMBERED That, pursuant to the Guam

Rules of Civil Procedure, the deposition of ANTHONY ADA was

taken before Veronica A. Flores, Certified Shorthand

Reporter, on Thursday, the 7th day of July 2005, at 9:50 a.m.

in the offices of Civille & Tang, 330 Hernan Cortez Avenue,

Suite 200, Hagatna, Guam.

Veronica A. Flores, CSR-RPR
Certified Shorthand Reporter
Tel: (671) 734.1041 * Fax: (671) 734.1045
E-mail: floresroni@hotmail.com

Case 1:00-cv-00012   Document 154   Filed 09/01/2005   Page 4 of 23

1    this is what a contract looks like.  But, no, I didn't -- I

2    knew this is what was going to end up, you know, because that

3    --

4        Q.    Sure.

5        A.    Yeah.

6        Q.    Let me go back in time a little bit in your

7    experience at the bank, particularly at Bank of Hawaii; had

8    you been involved in transactions that had written contracts?

9        A.    No.

10       Q.    Did any of your job duties at the bank require you

11   to review files that had contracts in them?

12       A.    In audit, there is -- the credit officers are the

13   ones that set up the -- in giving out a loan.  And there are

14   people that I had, there's a procedure that says this folder

15   has to have this document form so and so, one, two, three

16   four.  So they go through and they look for the document and

17   title, but we did not get involved in going through the

18   narratives or what was written down.

19       Q.    Let's have a look at Exhibit D-3 and did you have

20   any input into the creation of this document?  Had you told

21   Randy Sager, "Well, look here's some of the things I want to

22   have in the agreement"?

23       A.    No, sir.

24       Q.    All right.  So Shell did all the work on the

25   contract?

1      A.    Yes, sir.

2      Q.    All right.  The first thing, and you know, this is

3   language that is on the first page is -- you see that it's

4   captioned an Agency Sales Agreement.  Correct?

5      A.    Correct.

6      Q.    Did that mean anything to you at the time?  The term

7   Agency Sales Agreement?

8      A.    No.  That was the title.

9      Q.    All right.  And there's language, there's a

10  paragraph of language above that in all capital letters?

11     A.    Yes.

12     Q.    Would you agree with your wife's testimony yesterday

13  that at that time when you saw this, that you did not know

14  what the Petroleum Marketing Practices Act was?

15     A.    No, I did not.

16     Q.    The language that it is a "trial franchise," did

17  that have any meaning to you at the time?

18     A.    Franchise, the word franchise.

19     Q.    You had heard that word and had some idea what a

20  franchise was?

21     A.    Yes.

22     Q.    Would it be fair to say you didn't have any idea

23  what a franchise was under the PMPA?

24     A.    I didn't know -- I just knew franchise.

25     Q.    And did you know franchise just because that's a

1  term you were familiar with generally or because that's a

2  term that Randy Sager or Peter Short had used with you?

3      A.   Nothing with Randy or Peter.  Prior to seeing this

4  thing here, I had a Business Opportunity magazine that I

5  bought at a store, franchise, you go in there and talk about

6  franchises and making hot dogs and Ben and Jerry's, that's

7  what I knew.

8      Q.   Okay.  It also has language about Shell may -- I'm

9  sorry, this paragraph we're looking at on the first page in

10 all capital letters, "Shell may fail to renew the franchise

11 relationship at the conclusion of the initial term - it has

12 additional language - by notifying agents in accordance with

13 the provisions of 2804 of the PMPA."  When you first got the

14 contract, did this language mean anything to you?

15     A.   I didn't dissect the paragraph.  I didn't go through

16 it like that.

17     Q.   Would it be fair to say it looked like "legalese"?

18     A.   It's a contract so, yes.

19     Q.   Okay.  Were there parts of the agreement that you

20 did pay more attention to?

21     A.   No.

22     Q.   Let's go through a little bit.  If you look at the

23 preamble, it indicates that, on the first page, the last word

24 actually in that paragraph, is that you would be referred to

25 as the agent?

1        A.    Uh-huh.

2        Q.    At this point, did you understand that there was a

3    difference between an agent and a dealer?

4        A.    No.

5        Q.    In the recitals, it provides that -- the first

6    recital says that, "Agent desires to sell on behalf of Shell

7    the motor fuel products supplied by Shell."

8        A.    (Witness nodded head.)  Yes.

9        Q.    Did you understand that Shell would be supplying the

10   fuel but that you would not be buying it from Shell?

11       A.    When I was reading it back then, I didn't pay

12   attention to those details.

13       Q.    Okay.  Or when it talks in the next clause there,

14   "to sell lubricating oils purchased from Shell," that

15   distinction between having Shell supply something and

16   actually buying something from Shell, that wasn't something

17   you were focused on at the time?

18       A.    I wasn't focused on that.  I knew we were going to

19   be selling.

20       Q.    On the word agent - and let me back up one step on

21   this - what was your understanding what that meant when it

22   said you would be the agent?

23       A.    Agent -- to tell you the truth, my only familiarity

24   with agent was like, you know, agent from the Secret Service

25   kind of thing, agent.

1   didn't value the -- when it came in, I didn't say how much is

2   that.

3       Q.   Is that because you weren't charged for it?

4       A.   Yeah.  It was happening and they were delivering it.

5       Q.   And as time went on, when you're in --

6            MR. PIPES:  Are you talking about when he was at

7   the Mangilao station with Teodosio?

8            MR. CIVILLE:  I was just going to clear that up.

9   BY MR. CIVILLE: (CONTINUING)

10      Q.   Even after you started operating the station, when a

11  tanker came up and delivered fuel, you were not charged for

12  that when the driver came up; is that correct?

13      A.   At the term COD, cash when delivered or cash on

14  delivery, I knew it wasn't COD.

15      Q.   In fact, you were not given an invoice; am I

16  correct?  You did not receive an invoice from Shell saying,

17  we've just given you 3,000 gallons of fuel, you owe us --

18      A.   I believe there was an invoice, blue-colored

19  invoice.

20      Q.   Was that for fuel deliveries?

21      A.   Yes, that's a document that we -- The process was

22  very strict: Tanker comes in, we check if the tanker is fuel,

23  we dip, we take a dip, we tell the driver to drop it down, we

24  take a dip and we subtract what we -- a reading before and a

25  reading after to come to the gallons and compare it.

1      Q.   And that would give you an accurate reading of how

2   much fuel had been delivered to the station?

3      A.   Not accurate.  When they deliver the gallons, it

4   might say 1500 gallons but sometimes we'll find like 1493 or

5   1450; like that.

6      Q.   I want to go back into that later on to find out if

7   that happened that you brought that to Shell's attention, if

8   the fuel reading wasn't accurate.

9      A.   Yes.

10      Q.   Going back to the invoice, what you described as an

11   invoice, the tanker driver gives you a document when he

12   delivers fuel; is that correct?

13      A.   Yes.

14      Q.   And that document would show the number of gallons

15   that he's saying he delivered?

16      A.   Yes.

17      Q.   All right.  That document, am I correct, does not

18   show an amount due to Shell for the fuel that was delivered?

19      A.   No.

20      Q.   But if Shell delivers lubricants, lubricating oils

21   to you, brake fluid, power steering fluid, you get a document

22   that also shows what was delivered?

23      A.   The document was the same.

24      Q.   And that shows an amount due?

25      A.   It show's an amount.

1    Q.   Going through the Document D-3 again, which I think

2   we've referred to sometimes as the first Mangilao agreement,

3   on Page 3, Paragraph 5, and I believe you've already answered

4   this, but it says that you were required to charge at the

5   pump the price that was set by Shell; is that correct?

6    A.   Yes.

7    Q.   And that was never in question, was it?  In your

8   talks with Shell, that you had to charge -- that Shell set

9   the pump price?

10    A.   No, no.  I didn't challenge it; no.

11    Q.   Okay.  Well in fact, not only didn't you challenge

12   it but here you agreed to charge whatever price Shell set for

13   the fuel?

14    A.   Yeah, I'm sorry.

15    Q.   Is that right?

16    A.   Yes.  I'm trying to interpret your question.

17    Q.   Okay.  Going on in that same Paragraph, 5A 1, there

18   is a sentence that sets out the payment that you would

19   receive from the sale of the gasoline.  It started out as 18

20   cents per gallon for the first 100,000; 15 cents for the next

21   30,000 gallons; and 10 cents over that on a monthly basis.

22   Was that an amount that was consistent with the business plan

23   Randy Sager had showed you?

24    A.   I'm going to say I trusted it to be correct.  I

25   didn't pull out a calculator and start, you know, checking

1    correct?

2        A.    Yes.

3        Q.    In fact, if you look on Page 4 of the document in

4    front of you, D-3, the very last line, it says, "Shell will

5    pay for gross receipts tax due on the sale of its motor

6    fuel."  Very last line on Page 4.

7        A.    Yes.

8        Q.    And that's been the practice?  That's the way things

9    have played out, Shell pays the GRT on its motor fuel sales?

10       A.    We're talking GRT?

11       Q.    GRT.

12       A.    The cents per gallon, I gotta pay GRT on that.

13       Q.    Okay.  Because that's a payment to you?

14       A.    (Witness nodded head.)  Yeah.

15       Q.    Well, let me make sure I understand that.  If you

16   sell a hundred dollars of fuel at the pump and get a hundred

17   dollars cash, you have to remit to Shell $100?

18       A.    $100.

19       Q.    Right?

20       A.    Right.

21       Q.    And that's supposed to be done on a daily basis?

22       A.    Yes.

23       Q.    Then at the end of the month, or more often, we'll

24   talk about that, you will tell Shell, "I sold X number of

25   gallons?"

1        A.    And to me, yes.

2        Q.    So you were in agreement with Shell on that?

3        A.    Yes, sir.

4        Q.    All right.  10-D said that Shell -- I'm sorry, that

5    you would provide your attendants with approved Shell

6    uniforms.  Is that how it worked out?  Did you provide the

7    uniforms or did it end up that Shell provided the uniforms?

8        A.    I provided the uniforms.

9        Q.    Has that been true throughout your relationship with

10   Shell?

11       A.    From back then to today?

12       Q.    Right.

13       A.    I believe sometime in 2000, sometime in 2000, Shell

14   started to just go ahead and order the uniforms but still

15   bill me for my cost of it.  I don't think it was a full cost.

16       Q.    If you go to Page 10, Paragraph 15, there's an

17   extensive section on termination and nonrenewal.

18       A.    Yes.

19       Q.    Now, at the time that you received the draft of this

20   document, did you read this section?

21       A.    I'm aware of the section.  I read the section.  It

22   didn't bother me.  I wasn't going to do anything bad for

23   Shell.

24       Q.    What did you understand when you first read this to

25   be Shell's right with respect to terminating you or not

1    Q.   Mr. Ada, when we left, we were still on Exhibit D-3,
2    the first Mangilao agreement.

3    A.   Yes.

4    Q.   After you had a chance to look at the draft
5    agreement, did you have a talk with somebody at Shell to tell
6    them that you were ready to go ahead and sign the agreement?

7    A.   I'm pretty sure that's what happened next.  I don't
8    recall calling somebody to say I'm ready to sign.

9    Q.   Do you recall what your next meeting was with Shell
10   after you had received the draft agreement?

11   A.   Probably to finalize the agreement.  I can't think
12   of any other -- I mean, I didn't have any question as to the
13   content.  So after the draft, the next logical step to me,
14   because of my -- I can't recall clearly, would be to get
15   ready to sign it.

16   Q.   Did you have an attorney review the contract before
17   you signed it?

18   A.   No, sir.

19   Q.   Did you show the contract to anybody whose opinion
20   you respected and ask them to look it over?

21   A.   No, sir.

22   Q.   When you met to sign the agreement, who was present
23   for that meeting?

24   A.   I think I just went to the office and signed it with
25   -- inside Peter Short's office, and it was just him and I.

 1  like Mangilao?

 2      A.   21 cents a gallon just like in Mangilao, yes.

 3      Q.   This Exhibit D-6, the first Barrigada agreement has

 4  the same -- or not quite exactly the same, but very similar

 5  language in the top paragraph all in capital letters?

 6      A.   Yes, sir.

 7      Q.   By this time, did you have any knowledge about the

 8  Petroleum Marketing Practices Act?

 9      A.   No, sir.

10      Q.   Did you have any discussion with anyone at Shell

11  regarding the meaning of this first paragraph?

12      A.   No, sir.

13      Q.   Did you pay any more attention to this first

14  paragraph in all capital letters on this agreement than you

15  had the first two agreements you signed?

16      A.   It set interim, franchise.  I would have gone

17  through it to read the items to -- any more attention as to

18  the rest, I still regarded it as this is a very, very

19  important document, and that again, it's important to Shell

20  and they're trusting me with it.

21          I've done, as with Mangilao arrangement, it's almost

22  like they're -- not almost, but by offering me another

23  agreement, I've been assured that I've been complying with

24  all of the criteria, all of the items that are contained with

25  it, and --

1    Q.   Okay.   Let me just make sure I'm clear on this.

2    With the first two Mangilao agreements, when I asked you

3    about this particular language on the first page of each of

4    the agreements that's in all capital letters, my

5    understanding was that you didn't know what the PMPA was?

6    A.   The PMPA.

7    Q.   Is that correct?

8    A.   That's correct.

9    Q.   And that the meaning of this particular paragraph,

10   you didn't really understand what it meant; am I correct on

11   that?

12   A.   It talked about a franchise and --

13   Q.   And other than knowing that it talked about a

14   franchise, did you understood what was said in this paragraph

15   at the time you signed it?

16   A.   No.

17   Q.   You accepted it as just being part of the contract,

18   is that --

19   A.   Yeah, and it's also reminding me that -- you know,

20   the term franchise and you're the franchisee, still you need

21   to abide by those things that the franchiser have determined

22   already that this is way -- this is why we're successful and

23   as big and as --

24   Q.   Okay.   So you thought if Shell had set it up this

25   way, this must --

1    A.    Yes, sir.

2    Q.    You were going to just accept that and figured it

3    was probably the way to go?

4    A.    I really trusted Shell.

5    Q.    Okay.  Did you start operating the Barrigada station

6    right away?

7    A.    Yes, sir.  Right away after January, February 1st.

8    Q.    Right.  Okay.  And that first Barrigada agreement

9    lasted for one year.  Up until the end of the first Barrigada

10   agreement, did you have discussions with Shell about any

11   aspects of say, your compensation, C-store sales, about the

12   commission on gasoline sales?

13   A.    For the entire year, 1995?

14   Q.    Yeah.

15   A.    The beginning was good.  Barrigada was pumping high-

16   90s, middle-to-high 90s gas.  No questions.

17            MR. PIPES:  You mean 90,000?

18            THE WITNESS:  90,000.  92,000, 93.  It was a

19   strong station.  In --

20   BY MR. CIVILLE: (CONTINUING)

21   Q.    I'm sorry.  This was before Mobil built down by the

22   -- on the -- I'm not sure what that intersection is called

23   but down at the --

24   A.    Toto-Canada Road, yeah.

25   Q.    Toto-Canada Road?

1      Q.    That's the next couple documents we'll get to.  Up
2  until this point, up until the time you signed the second, if
3  you go a few pages, Page 14, this is your signature?
4      A.    Yes, sir.
5      Q.    And there's a new person at Guam; I guess,
6  Norm King?
7      A.    Yes, sir.
8      Q.    It sounds like your first year in Barrigada, there
9  were some problems?
10      A.    (Witness nodded head.)  Yes.
11      Q.    But when it came time to renew this agreement, did
12  you want to renew it?
13      A.    Yeah.
14      Q.    Did you have any discussions with Shell about
15  renewing it?
16      A.    It's up for renewal.  Yeah, the first Barrigada
17  agreement is up and we have the renewal for you.  There was
18  no question to me as to -- they didn't come and say, would
19  you like to renew.  They were saying we have a renewal for
20  you.
21      Q.    Did they send the document up to you, D7, or did you
22  go down to sign it, down to Shell's office?
23      A.    I honestly can't recall if I went down to sign it.
24      Q.    Did you have a meeting with Norm King when you
25  signed it?

1      A.   No.  No.

2      Q.   Was there any negotiation that went into this

3  contract?  Did you tell Shell, "Well, I want some different

4  terms," or, "I want something changed"?

5      A.   No negotiation.

6      Q.   On the first page, you have the letters again at the

7  top of the page in capital letters --

8      A.   (Witness nodded head.)

9      Q.   The paragraph at the top of the page in capital

10  letters which talks about the Petroleum Marketing Practices

11  Act?

12      A.   Yes.

13      Q.   Did you know anything more about the PMPA at this

14  point than you had with the earlier agreements that you

15  signed?

16      A.   No.

17      Q.   Okay.  Did you give this particular paragraph any

18  more thought than you had given it with the first three

19  agreements you signed?

20      A.   Along with the first three agreements, this

21  particular paragraph, as far as honing in on it, I just

22  viewed the entire document as an important document to

23  continue having the relationship and everything about it was

24  important.

25      Q.   If you go back into Page 9, it has the termination

1  and nonrenewal paragraph; same as in the earlier documents.

2  Did you give this paragraph any particular attention when you

3  signed this document?

4      A.   As to reminding me of what I must continue to do, I

5  did pay attention to what it said.

6      Q.   When you signed these four agreements, the two

7  Mangilao and now the two Barrigada agreements, what was your

8  understanding in terms of how the contracts could be

9  terminated?

10      A.   (No response.)

11      Q.   Did you feel that if you were unhappy, you could

12  quit?

13      A.   No.  Again, going back as far as to Peter Short,

14  right, they told me we're looking for a long-term

15  relationship.  So I wasn't looking to -- for ways to get out

16  of the contract.  Those so called mishaps or goings-on, I

17  view them as part of this process towards building myself up.

18      Q.   I don't want you to misunderstand my question.  I'm

19  not suggesting that you signed these agreements with the

20  intention of quitting.  I'm just asking you, did you give any

21  thought to, well, if I don't like this, can I just quit?

22      A.   I felt that this agreement -- Are you asking if I

23  felt that this is a one-way agreement?

24      Q.   No, no.  I'm going to ask you both about whether you

25  thought you could quit and did you think that Shell could

1   fire you, basically, or terminate the agreement if it wasn't
2   happy?

3       A.   Quit -- if I could quit -- in the agreement, I
4   understood that there are these -- on the termination
5   paragraph, there are these criteria in here that would create
6   the condition for quitting.

7       Q.   Also, if you look on Page 10 at the very bottom,
8   Nonrenewal, the first sentence says that "neither party is
9   obligated to renew this agreement." Was it your
10  understanding that you did not, at the end of - and this
11  language is in all four of the documents we've looked at - is
12  it your understanding that at the end of an agreement, if you
13  wanted not to renew, you had the option not to renew?

14          MR. PIPES:  I'll object to the question.  I
15  think it's really -- you're asking for a legal conclusion
16  from him as to whether or not they have the right to
17  terminate the agreement.

18  BY MR. CIVILLE: (CONTINUING)

19      Q.   Let me say -- I'm not really asking -- let me
20  rephrase.  I'm not asking you now about termination.  When
21  the contract came up at the expiration date of the contract,
22  did you feel that you had the right not, if you chose to,
23  that you did not have to renew the contract if you didn't
24  want to?

25          MR. PIPES:  Same objection.  I think that's

1    Q.   D-8 and D-9 are the documents you referred to

2  earlier that have the -- you go off the cents per gallon and

3  go to a flat fee; is that correct?

4    A.   That's correct.

5         MR. CIVILLE:  Why don't we take a break here,

6  and then we'll talk about these.

7                   (Recess taken.)

8                   (Back on the record.)

9  BY MR. CIVILLE: (CONTINUING)

10   Q.   Mr. Ada, when we left off, we were looking at

11 Exhibits D-8 and D-9.

12   A.   Yes.

13   Q.   As you think about it, is it your recollection that

14 D-7, the second Barrigada agreement, D-8 and D-9, the

15 Amendments to Agency Sale Agreement, were all signed on the

16 same day?

17   A.   Yes, sir.

18   Q.   Do you recall, was that done at Shell's office?

19   A.   Yes.

20   Q.   It seems that the purpose of the amendments was to

21 change from a cents-per-gallon payment to an arrangement

22 where Shell would give you certain amount as reimbursement of

23 expenses plus $1500 a month as management fees and that was

24 for both -- you had an agreement for each station; is that

25 right?

1    A.   Yes, sir.

2    Q.   Agreement for each station?

3    A.   (Witness nodded head.)

4    Q.   What were the circumstances that led up to this

5  agreement?  Was there unhappiness on your part about the

6  cents-per-gallon commission?

7    A.   This is Mangilao, right?  Barrigada is the focal

8  point because of those problems.

9    Q.   Okay.  So that's D-8; is that right?

10   A.   D-8.

11   Q.   All right.

12   A.   '95, Mobil opening up and GSA.  It wasn't looking

13 good because I was making "X" amount of gallons and they

14 weren't all at 21 cents per gallon.

15   Q.   I'm sorry.  You had both lower totals, your total

16 volume was down, and then with the GSA contract --

17   A.   Down.

18   Q.   On those gallons, you made even less?

19   A.   Right.

20   Q.   Okay.

21   A.   So if you look -- if we go back to the gallons, and

22 I believe Norm averaged it out or somebody he instructed

23 averaged it out, if you look at the gallons that were being

24 pumped through the station, just actual gallons, and you

25 multiply it times 21 cents, you come very close to 15,673.

1  If we go back to the gallons, right, and you multiply

2  everything at 21 cents, the GSA, the stuff, it will come

3  close to 15,673. So --

4      Q.   Okay.  If you look at the third page of either

5  Exhibit D-8 or D-9, it has a schedule, and we're going to go

6  through those numbers in a moment, but let me see if you can

7  set the stage a little bit about why this change was made.

8  The performance at the Barrigada station, in terms of the

9  money you were receiving, was less than what you were hoping

10 for; is that correct?

11     A.   Yeah, yeah, because not all of it was being paid at

12 21 cents.

13     Q.   And plus overall volumes were down?

14     A.   Volumes were down.

15     Q.   And you talked to Shell about this, I assume?

16     A.   Yes.

17     Q.   Who would you have talked to?

18     A.   Mark.

19     Q.   And out of those discussions, someone came up with

20 the idea for reimbursing you for your expenses plus giving

21 you a flat management fee; is that correct?

22     A.   This was shown to me, yes.

23     Q.   Okay.

24     A.   And from there, I could see what the breakdown is.

25 Yes.

1      Q.   Okay.  So this was a proposal made to you by Shell?

2      A.   Yes.

3      Q.   All right.  Let's go to the third page of Exhibit

4   D-8.  It's called Schedule A.  It has several columns but two

5   of the columns have -- one column for Barrigada and one for

6   Mangilao; is that correct?

7      A.   That's correct.

8      Q.   And then as you go down the document, you have a

9   list of entries and an explanation of what those entries are

10  for, such as staff costs, $9,901 at Barrigada?

11     A.   (Witness nodded head.)

12     Q.   And 10,960 at Mangilao; is that correct?

13     A.   That's correct.

14     Q.   Schedule A, is this a document that you helped Shell

15  come up with or -- Let me back up.  Is this a document that

16  you produced or did Shell produce this document?

17     A.   Shell produced this document.

18     Q.   And did they work with you to come up with the

19  numbers on staff cost, assistant manager cost, and other

20  expenses?

21     A.   No.

22     Q.   Do you know where those numbers came from?

23     A.   They're aware because, again, they needed my numbers

24  on staff.

25     Q.   Had you given them some document that showed these

1   that you were paying when you were on a 21-cents-per-gallon

2   model?

3       A.   Yes, plus more.

4       Q.   What else were you paying that's not shown in here?

5       A.   Well, for example, if you look down under total

6   expenses and then it says less power, phone and water, I was

7   paying that, and so to -- it's backed out.  It's backed out

8   of the -- you see electricity, telephone, and water up there

9   and then you add those three in, at the bottom they back it

10  back out.  So --

11      Q.   Were there other expenses you were paying that

12  aren't reflected here?

13      A.   I used to pay everything; maintenance for the fire

14  extinguishers, this one here, the utilities.  Everything else

15  that's listed here.

16      Q.   Okay.  Under the agreement that's reflected in the

17  amendments in D-8 and D-9, Shell was going to give you a

18  certain amount of money each month to reimburse you for these

19  costs; is that correct?

20      A.   Yes.

21      Q.   And they were also going to pay you $1,500 a month

22  for each station as a management fee?

23      A.   Yes.

24      Q.   So if we look in the column under Barrigada, if you

25  take that down, you'll see the -- of course you'll see the

1   expenses that you would be reimbursed for, the management

2   fee, and that gave a total of $16,910.  Correct?

3       A.   Yes.

4       Q.   Now, subtracted out of there was power, phone, and

5   water?

6       A.   Yes.

7       Q.   And those were going to be paid directly by Shell.

8   Correct?

9       A.   They would take over paying for it, yes.

10      Q.   So those were billed directly to Shell, or you just

11  sent the bill to Shell when it came in?

12      A.   The billings were coming to my address, and I

13  believe around this time, I did like an address change of the

14  utilities so the bills would continue by going over to them.

15      Q.   So you did not have to pay those utility expenses

16  then?

17      A.   Power, phone, water.  Power, phone, and water.

18      Q.   Is that correct though, you did not have to pay?

19      A.   I did not have to pay.

20      Q.   So that left a total reimbursement for Barrigada of

21  $15,673.

22      A.   Yes.

23      Q.   Below that, it says at 21 cents per gallon?

24      A.   Yes.

25      Q.   And it shows that you'd be paid $13,650?

1    A.    (No response.)

2    Q.    Or did you, at the time you signed this, talk to

3  Shell?

4    A.    No.

5    Q.    Okay.  Now, also on the flat-fee reimbursement basis

6  that you went to in D-8 and D-9, that did not depend on the

7  number of gallons you sold; am I correct?

8    A.    Uhm --

9    Q.    In other words, if you sold 10,000 gallons or 14,000

10  gallons, you were going to get the -- for Barrigada, 15,673;

11  and for Mangilao, 16,593?

12    A.    It's gonna fix it at one flat level whether I pump

13  10 gallons or whether I pump 20 gallons.

14    Q.    Okay.  Below those numbers we've just been talking

15  about, it says percentage of gross store sales and you have

16  1 percent, and 2 percent; do you see that?

17    A.    Yes.

18    Q.    And under the 1 percent, it shows 65,000 for

19  Barrigada and 75,000 for Mangilao?

20    A.    In gallons, yes.  This is what made it sweet.

21    Q.    Wait.  In gallons or that's dollars?

22    A.    Gallons.  That's gallons.  This is how -- May I?

23    Q.    Sure, please.

24    A.    Okay.  Tony, this is what we want to do for you,

25  right, and here it is.  And so you're thinking -- all of a

# REPORTER'S CERTIFICATE

DISTRICT COURT OF GUAM      )

      I, Veronica A. Flores, Certified Shorthand Reporter, hereby certify that Anthony Ada personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 155, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

      Witness my hand at Barrigada, Guam, this 2nd day of August 2005.


_____
Veronica A. Flores, CSR-RPR

# EXHIBIT B

# UNITED STATES DISTRICT COURT

## DISTRICT OF GUAM

| | | |
|---|---|---|
| ANTHONY J. ADA, | ) | Case No. CV00-00012 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ☐ **COPY** |
| | ) | |
| SHELL GUAM, INC., et al., | ) | |
| | ) | |
| Defendant. | ) | |

## DEPOSITION OF ANTHONY J. ADA

Taken on Behalf of the Defendant

BE IT REMEMBERED That, pursuant to the Federal
Rules of Civil Procedure, the deposition of **ANTHONY J. ADA**
was taken before Cecille A. Flores, a Certified Shorthand
Reporter, on Monday, the 18th day of July 2005, at 9:00 a.m.
in the offices of Civille & Tang, Suite 200, 330 Hernan
Cortez Avenue, Hagatna, Guam.

Flores Court Reporting
Suite 2E, Jugo Building
618 Route 8
Barrigada, Guam 96913
Case 1:00-cv-00012    Document 154-2    Filed 09/01/2005    Page 8 of 23
Tel: (671) 734-1041 * Fax: (671) 734-1045

1    A    That's my understanding.

2    Q    And you maintain your position as operator all the

3    way through until the present day?

4    A    Yes.

5    Q    At the time that your lawyer got the restraining

6    order for you, you were still under the reimbursement plus

7    management fee model; is that correct?  For both stations?

8    A    Yes.

9    Q    That has remained in place also up to the present

10   day?

11   A    Yes.

12   Q    Has that been modified in any way?

13   A    The amount given to me?

14   Q    Yes.

15   A    It has not been modified.

16   Q    Is Shell current in its payments to you under the

17   reimbursement agreement?

18   A    Under that reimbursement agreement, yes.

19   Q    Is there any other reimbursement agreement that

20   they're not current under?

21   A    Well, the promotions that Shell has implemented

22   since 2000.

23   Q    You feel they owe you some money for those

24   promotions; is that right?

25   A    Yes.

# REPORTER'S CERTIFICATE

I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **ANTHONY J. ADA** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 186, both inclusive, constitutes a fuel, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

Witness my hand at Barrigada, Guam this 15th day of August 2005.

Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# EXHIBIT C

IN THE DISTRICT COURT OF GUAM

| ANTHONY J. ADA, | )CIVIL CASE NO. CV00-00012 |
|---|---|
| Plaintiff, | ) |
| vs. | ) |
| SHELL GUAM, INC., et al., | ) |
| Defendants. | ) |

TRANSCRIPTION OF

DEPOSITION OF

# PHILIP STALKER
designated representative for
# SHELL GUAM, INC.

June 30, 2005
Volume 1

**COPY**

PREPARED BY:   George B. Castro
               **DEPO RESOURCES**
               #49 Anacoco Lane, Nimitz Hill Estates
               Piti, Guam 96925
               671-688-DEPO • Fax: 671-472-3094

1 Franchise; another point it just says
2 Franchise.

3     A     Yes.

4     Q     That this agreement constitutes a
5 franchise under the PMPA. Now, that being the
6 case, why is it Shell's position that it was
7 clear from the agreements that that type of
8 relationship would result?

9     A     From -- the structure of the -- the
10 physical structure of the relationship as
11 defined in the rest of the agreement, the
12 entire body of the agreement, sets up a
13 relationship that is not covered by PMPA.

14         Even the initial paragraphs, I'm not
15 clear whether all of them without reviewing,
16 but -- talk about -- mention the word Agent in
17 the offending, can I say, offending paragraph
18 on the top of the page there.

19         The discussions that Shell people,
20 Shell staff at that time had with Mr. Ada,
21 clearly lined out the nature of the agency
22 agreement, and we were -- we are firmly of the
23 opinion that Mr. Ada understood the deal that
24 we were presenting to him, notwithstanding that
25 language on the top of the first page.

1    Q   Okay.  Now, what action -- I mean, as
2  you say, you know that -- Shell knows that Mr.
3  Ada clearly understood that to be the case,
4  that there was -- it was not a PMPA
5  relationship.  Why does Shell feel that way?
6  What facts do you have that lead you to the
7  conclusion that Mr. Ada knew that --
8  notwithstanding what it said at the top of each
9  of those agreements, it was an agency
10  relationship?

11    A   (lengthy pause)  It's our belief that
12  Mr. Ada was in a position to know clearly the
13  difference between dealers, which he was able
14  to be familiar with, I think was familiar with,
15  the model where the dealer buys gas and resells
16  it, and the distinct difference between that
17  model and the agency model that was being
18  presented to him.

19        (lengthy pause)  That's it.

20    Q   Okay.  Did Shell representatives ever
21  sit down with Mr. Ada and say: Look, I know
22  what it says at the top of these agreements
23  here, but you're not a dealer.  This is an
24  agency relationship.  Did that type of
25  discussion ever take place?

1    A    Not    to    my    knowledge,    and    not

2  surprisingly,  because  the  Shell  staff  engaged

3  at  the  time  thought  that  there  was  an  agency

4  relationship.  So,  that  would  be  like  saying  --

5  it  never  came  up.    I  mean,  Mr.  Ada  never

6  asserted  that  he  was  a  dealer,  or  even  when  he

7  had  the  opportunity  did  he  assert  that  he  was

8  entitled  to  protection  under  the  PMPA.    That

9  didn't  come  up.

10      So,    had    a    Shell    staff    had    that

11  discussion  with  Mr.  Ada,  I'd  be  arguing  an

12  entirely  different  position  here,  I  mean  --

13    Q    So  that  kind  of  discussion  never  took

14  place?

15    A    I  don't  believe  it  did.

16    Q    Okay.    And  the  offending  language,  as

17  you've  called  it,  at  the  top  of  each  of  these

18  agreements,  how  did  that  get  --  I  mean,  it's

19  agreed  that  Shell  prepared  these  documents  --

20    A    Yes.

21    Q    --  the  operating  agreements  that  we're

22  talking  about  here.    And  I  assume  that  someone

23  at  the  time  that  these  were  being  prepared  --

24  are  you  able  to  tell  us  with  any  specificity

25  which  persons  prepared  the  various  agreements?

1    A    The very first one, with reasonable
2    certainty, was prepared with by Mr. Zamsky.
3    Now, we got into a key-tapping question a while
4    ago.    Now, who actually wrote the documents,
5    and -- with -- in consultation with counsel
6    that document was produced.

7         I think how the offending language got
8    on the top of the agreement was that this
9    agency model was new to Guam.    To my knowledge,
10   none of our competitors were using it.    So, a
11   theoretical business model was grafted out of
12   Australia, for people's experience in other
13   markets, let's say.    And we attempted to write
14   an agency agreement here that would achieve
15   that model, or put a contractual basis under
16   that model.

17        I'm reasonably sure that since    --
18   reasonably clear to me that what happened was,
19   that language copied off the old dealer
20   agreements because the agency agreements mimic
21   the dealer agreements to a large extent.

22   Q    Uh-huh.

23   A    And the language is appropriate for a
24   dealer setting up a franchise.    I think the
25   language got onto the agreement in the first

1 iteration, and just survived. In ignorance,
2 partially because these non-U.S. folks, without
3 experience in the U.S. market, with an
4 understanding that there was this thing out
5 there called PMPA, which kind of looked like
6 something they might have been familiar with
7 from their own markets, but without -- without
8 clear and specific knowledge of its
9 requirements, I think they took the document
10 that was presented and said: That must have to
11 be there. And just went forward from there.

12      Now, the language changes a little bit
13 as they go forward. At that point, I can't say
14 who prepared those documents, whether it was
15 prepared with counsel or whether word
16 processors had overtaken us and we'd saved a
17 fee. That could have happened.

18      We've done a fair bit of searching,
19 trying to establish how exactly what happened
20 there, but -- I can't be more specific than
21 that.

22      Q   So the initial agreement, which would
23 be from Mangilao in 1993 --

24      A   That's Mr. Ada's first agreement, but
25 this language actually occurred prior to that;

1  Teodosio's agencies. The Saipan agencies had
2  similar language.

3  Q Okay. So, the language that we're
4  talking about at the top paragraph that refers
5  to the PMPA and this being a franchise of one
6  sort or another, that wasn't limited just to
7  Mr. Ada's agreements?

8  A No, it wasn't.

9  Q And in fact it was on Mr. Teodosio's
10 agreements?

11 A Yes.

12 Q Language similar to that is also on
13 some of your dealer arrangements, isn't it?

14 A Yes. But interestingly, this language
15 on Mr. Ada's agreements has been modified from
16 the dealer language. Specifically, it opts out
17 of certain subsections of the PMPA.

18 Q Well, it attempts to.

19 A It attempts to. Which, I think
20 supports my theory that it was a failed attempt
21 to start with a dealer agreement and construct
22 an agency relationship for the first time. I
23 mean, there was no attempt to work through.
24 And in that process this language was thought
25 to be required.

1      Q   And I think you indicated that at least

2  the first agreement, Tony's Mangilao first

3  agreement, that more than likely came from Mr.

4  Zamsky's office?

5      A   I believe that's true.   I believe

6  that's the case, yes.

7      Q   So, I mean, he was the one that would

8  have looked through, prepared it, and said:

9  Here, this is appropriate?

10     A   Not handling the negotiation on our

11  side, but presumably that happened; yes.   I

12  mean, he clearly didn't do it on his own.   He

13  did it in consultation with somebody from

14  Shell; yes.

15     Q   Okay.   And I assume this is something

16  that Mr. Pido and Mr. Sager are going to be

17  able to talk with me more about?

18     A   Sager, yes.

19     Q   Okay.   Now, just to understand the

20  structure of Shell in these types of

21  situations, if you get Zamsky to draft it, I

22  assume it comes to some -- one of the

23  management personnel in Shell, for them to look

24  it over.

25     A   Yes.

1    Q    And in Mr. Ada's case, for the first

2    Mangilao agreement, who would that have gone

3    to?

4    A    I think Randy Sager will tell you that

5    he handled that.

6    Q    Okay.

7    A    At least he was involved.    I think

8    probably Peter Short did some redlining, and

9    then Randy took it back to Zamsky or something,

10    but Randy will talk on it.

11    Q    Okay.    Now, correct me if I'm wrong,

12    but it sounds to me like what you're saying is

13    that this is a mistake, to have put this

14    language on the top there?

15    A    In hindsight, we now understand that

16    language does not belong on an agency

17    agreement.

18    Q    Would it be fair to say that a person,

19    a reasonable person, reading these agreements,

20    say the Mangilao first agreement, would at

21    least be unsure of whether or not it

22    established a franchise relationship under the

23    PMPA?    Or whether it established an agency

24    relationship?

25    A    If that was -- in isolation, if that

1  was all that person had to go on, simply
2  reading the document, then perhaps.

3          But the PMPA is pretty complex.  I
4  mean, you have to dig into it pretty deep to
5  understand the difference, as far as the PMPA
6  is concerned, between a franchise and a non-
7  franchise relationship.

8          If you -- I think the rest of the
9  document describes the nature of the
10 relationship with respect to the fuel sales,
11 who owns the fuel, how the commission rate will
12 be calculated, and who owns the shop, the dry
13 stock, and so forth -- I think, considering all
14 the other discussions that Mr. Ada was involved
15 with --

16         And I suspect -- no, I can't say that.
17 Then -- he may have been as confused about its
18 propriety as we were.

19 Q    Okay.  Now, I think you indicated in
20 your earlier testimony that some of the people
21 that were working on these agreements at the
22 time were unfamiliar with the PMPA.

23 A    Correct.

24 Q    And perhaps didn't completely
25 understand it themselves.

# CERTIFICATE OF WITNESS

I, **Philip Stalker**, the deponent herein, do hereby certify that I have read, or had read to me, the foregoing typewritten pages 1 through 197 inclusive. My changes thereof, if any, have been noted on a separate sheet of paper, which I have signed, and which I understand will be appended to and made a part of this deposition. I certify that the same is now a true and correct transcript of my testimony.

_____

**Philip Stalker**

(Dated) _8/17/05_

REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 196 pages to be a true and correct transcript of the audio recording made by a Notary Public Officer of Depo Resources in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 22nd day of July, 2005.

# COPY

_____

**GEORGE B. CASTRO**

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094