**CIVILLE & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868
FACSIMILE: (671) 477-2511

*Attorneys for Shell Guam, Inc.*



## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| ANTHONY J. ADA, | ) | CASE NO. CV00-00012 |
| Plaintiff, | ) | |
| vs. | ) | |
| SHELL GUAM, INC., | ) | |
| Defendant. | ) | |
| | ) | **DECLARATION OF PHILIP** |
| SHELL GUAM, INC., | ) | **STALKER IN SUPPORT OF SHELL'S** |
| | ) | **MOTION FOR SUMMARY** |
| Counterclaim Plaintiff, | ) | **JUDGMENT** |
| vs. | ) | |
| ANTHONY J. ADA, | ) | |
| Counterclaim Defendant. | ) | |

I, **PHILIP W. STALKER**, state as follows:

1.     I make this declaration based upon my personal knowledge of the facts stated herein.

2.     I am the President and Finance Director of Shell Guam, Inc. ("Shell").

3.     This declaration is based upon my personal knowledge or information I learned from a review of Shell documents kept and maintained in the regular course of Shell's business.

4.     In 1993 Shell entered into an Agency Sales Agreement with the plaintiff Anthony Ada ("Ada"), under which Ada became an agent-operator of Shell's station in Mangilao, Guam. This

Agreement was for one year and was renewed in 1995 for a period of five years. In 1995 Shell also entered into a separate Agency Sales Agreement with Ada for Ada to be an agent-operate for the Shell station in Barrigada, Guam. The Barrigada Agreement was for a one year period, and was thereafter renewed for a period of five years. True and correct copies of the two Mangilao and two Barrigada Agency Agreements are attached hereto as **Exhibits 1(a)-(d).**

5.      The two service stations were built by Shell, paid for by Shell and Shell installed and owns all tanks, pumps, and equipment at the stations relating to the sale of fuel.

6.      Shell delivers fuel to the stations, but does not sell the fuel to Ada. Title to the fuel always remains with Shell, until the fuel is sold to the public at the station fuel pump. The fuel is carried on Shell's books as Shell fuel inventory, and when it is transferred from the storage facility in Agat ("tank farm") to the stations Ada operates, the transfer is denoted as a transfer of inventory from one Shell location, i.e. the tank farm, to another Shell location, i.e. Shell's underground tanks at the Barrigada and Mangilao stations.

7.      Shell sets the pump price for the fuel at the stations Ada operates. Ada does not, have any control over the pump price of the fuel. Ada collects the money from the fuel sales and remits the money, in full, to Shell on a daily basis, although there is usually a three day lag time in the remittance.

8.      Initially Ada was paid a cents per gallon commission of fuel sales and he kept his convenience store proceeds, except for 15% of gross store sales which he paid to Shell as rent. Under this cents-per-gallon model, Ada paid most of the operating expenses for the stations. During the time that Ada was on the cents-per-gallon model, he was initially paid a fuel commission .18 cents per gallon, which was later raised to .21 cents per gallon. The commission was based on what Shell believed Ada would need to be paid in order to provide him with a target income when coupled with

his anticipated earnings from the convenience stores. The fuel commissions were never linked to the pump price of the fuel.

9.      Ada complained to Shell that he was not meeting his earning targets and that in March 1, 1996 Shell and Ada entered into a Amendment to Agency Sales Agreement for each station under which Ada switched to a "reimbursement model."   True and accurate copies of the Amendment to Agency Sales Agreements are attached hereto as **Exhibits 2(a) and (b).**   Under the reimbursement model, Shell agreed to pay Ada a monthly management fee to operate the stations and to reimburse him for an agreed upon list of monthly operating expenses, which were attached to Amendment to Agency Sales Agreements as Sheet 1.

10.      As part of the reimbursement model, Shell agreed to pay the utilities (power and water) on the stations, and those utilities were then billed and paid directly by Shell.

11.      Ada has been on the reimbursement model since March 1996, and Shell has been reimbursing his operational expenses, as set forth in Sheet 1 to Exhibits 2(a)&(b) since that time. Shell has been directly paying the power and water utility expenses on the stations since that time

12.      Under the reimbursement model, under which Ada has been paid since March 1996, Ada`s commission on the sale of fuel is not dependent on the amount of fuel he sells, or the price of the fuel. Under the earlier cents-per-gallon commission, Ada's income would fluctuate depending on the volume of fuel sold, but was not dependent on the sales price.

13.      Over the years , Shell has had dealer operators, and still has one such dealer operator today. I am familiar with the dealer operator model.   Unlike Ada, a dealer operator must buy fuel for his station, he must pay for the fuel on delivery (or sometimes before the next delivery of fuel), when the dealer receives a load of fuel, and he is given an invoice which states the amount he must pay Shell for the fuel (regardless of pump price and regardless of when and whether the fuels sells).

Unlike Agent operators like Ada, once a dealer buys fuel, the fuel belongs to the dealer. The dealer sets the price he chooses for the fuel and Shell has no control over that decision. Dealers are also required to pay all operational costs of their stations. Unlike Ada, dealers must pay Shell rent for the entire station and not just, as in Ada's case, the convenience store.

14.     Beginning in 1996, Ada's performance as an operator began to deteriorate and Shell became dissatisfied. In early 1999 Shell sought to end the relationship. In January 1999, Jim Hammond, a Shell representative, met with Ada and discussed that the Mangilao agency agreement was going to expire in February 1999, and that Shell was only willing to renew it for a period of six months. Mr. Hammond and Ada discussed how Shell and Ada could amicably part ways. Among other things, Ada said that he didn't want to be perceived as a failure in the community, and that he wanted time make the transition to a new job. *Ada gave* Shell several options of how their relationship could be brought to a close. Among other things, Ada suggested that the Mangilao agreement could be extended two years so that it terminated at the same time as Barrigada agreement. He also suggested that Shell could buy him out, or that Shell could extend the Mangilao agreement one year and shorten Barrigada agreement one year so that the two agreements would terminate at the same time. A handwritten summary of Ada's concerns and suggested solutions made by Mr. Hammond contemporaneously with his meeting with Ada, and are attached as **Exhibit 3.**

15.     Shell accepted Ada's suggestion to extend the Mangilao agreement and shorten the Barrigada agreement by one year each. An agreement captioned Amendment of Agency dated march 18, 1999 was drafted by Shell and signed by Ada on March 25, 1999, reflecting the parties' agreement that the Mangilao agreement would be extended and the Barrigada agreement would be shortened so that the two agreements, and Shell's relationship with Ada, would terminate

simultaneously in February 29, 2000. A true and accurate copy of the Amendment of Agency Agreement is attached hereto as **Exhibit 4.**

16.     In November, 1999 Ada unexpectedly notified Shell that he wanted to renew the agreements on the stations. A true and accurate copy of Ada's 11/22/99 letter is attached as **Exhibit 5.** On December 12, 1999 Shell responded that it was not going to renew the agreements. A true and accurate copy of the 12/10/99 letter from Shell to Ada is attached as **Exhibit 6**.

17.     Instead of surrendering possession of the stations on February 29, 2005, as agreed to in the Amendment of Agency Agreement, Ada filed the lawsuit now before the Court and obtained a Preliminary Injunction prohibiting Shell from terminating the agency agreements.

18.     As part of the reimbursement model, Shell agreed to pay the utilities (power and water) on the stations, and those utilities were then billed and paid directly by Shell.

19.     Ada has been on the reimbursement model since March 1996, and Shell has been reimbursing his operational expenses, as set forth in Sheet 1 to Exhibits 2(a)&(b) since that time. Shell has been directly paying the power and water utility expenses on the stations since that time.

20.     At all times since entering into the Agency Sales Agreements, Ada has been in possession of the stations and has been compensated in accordance with the Agency Sales Agreements and amendments thereto. Shell is current in its payments to Shell under the Amendment to Agency Sales Agreement.

21.     The only risk Ada takes with respect to the sale of fuel is liability for excess losses "of stock." See, Agency Agreements § 5(a)(5). Shell has never assessed a excess stock loss against Mr. Ada.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of September, 2005.

By:_____

**PHILIP W. STALKER**

# EXHIBIT 1a

THIS AGREEMENT IS A TRIAL FRANCHISE UNDER THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.C.C. 2801 ET SEQ. THE INITIAL TERM OF THIS FRANCHISE IS FOR A PERIOD OF NOT MORE THAN ONE YEAR BEGINNING MARCH 1, 1993 AND ENDING FEBRUARY 28, 1994. SHELL MAY FAIL TO RENEW THE FRANCHISE RELATIONSHIP AT THE CONCLUSION OF THE INITIAL TERM BY NOTIFYING AGENT, IN ACCORDANCE WITH THE PROVISIONS OF 2804 OF THE PMPA, OF SHELL'S INTENTION NOT TO RENEW THE FRANCHISE RELATIONSHIP. THE PROVISIONS OF 2802 OF THE PMPA, LIMITING THE RIGHT OF A FRANCHISOR TO FAIL TO RENEW A FRANCHISE RELATIONSHIP ARE NOT APPLICABLE TO THIS TRIAL FRANCHISE.

## AGENCY SALES AGREEMENT

### PREAMBLE

THIS AGENCY SALES AGREEMENT is made this 23rd day of Feb , 1993, by and between SHELL GUAM, INC., a Guam corporation, whose mailing address is 2nd Floor, Hi-Tech Building, 545 West Marine Drive, Anigua, Guam 96910, hereinafter referred to as "Shell", and Anthony J. Ada having a place of business at Shell Mangilao Lot No. 5370-2-3-1-NEW whose mailing address is P.O Box 4478 Agana, Guam 96910 hereinafter referred to as "Agent".

### RECITALS

WHEREAS, Agent desires to sell on behalf of Shell the motor fuel products supplied by Shell and to sell the lubricating oils purchased from Shell and to operate the service station and convenience store at Shell's retail site located at Lot No. 5370-2-3-1-NEW (Certificate of Title No. 22688), Mangilao, Guam, (the "premises"); and

WHEREAS, Shell is willing to supply products to Agent on the terms and conditions hereinafter set forth and to allow Agent to operate its retail site, NOW THEREFORE,

### AGREEMENT

For and in consideration of the above recitals, the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt of which is hereby acknowledged by both parties, it is agreed that:

EXHIBIT. A

DEFENDANT'S DEPOSITION EXHIBIT
D-3

1.   **DEFINITIONS.**   In this Agreement, where the context permits:

a.   "identifications" means the trademarks, brand names and color schemes which Shell does now or may hereafter own or regularly employ in connection with petroleum and other products which are manufactured and/or sold by Shell.

b.   "lubricating oils" means crankcase and all other lubricating oils and greases now and hereafter supplied or distributed to Agent by or on behalf of Shell.

c.   "motor fuels" means gasoline of any grade and motor diesel fuel now and hereafter supplied to Agent by or on behalf of Shell.

d.   "year" means the period of twelve (12) months beginning on the commencement of the term and each successive period of twelve (12) months thereafter.

e.   "petroleum products" means those products described in subparagraphs (b) and (c) above.

2.   **GRANT OF LICENSE.**   Shell does hereby grant unto Agent a license to enter, use and occupy the premises and to use the equipment provided by Shell thereat during the term for the purpose of conducting the business to be conducted by Agent on the premises, namely the operations of Shell's service station and convenience store.  This grant of license shall not crate in the Agent's favor any tenancy or rights in the nature of a tenancy and, without limiting the generality of the foregoing, the license shall not confer on the Agent any right to exclude from the premises any of Shell's employees, agents, or any person authorized by Shell to enter the premises.

3.   **CONVENIENCE STORE.**  Agent shall operate the convenience store for the sale of products related to petroleum products to be sold hereunder, and such item or items of merchandise as Agent may decide to sell.  Agent shall maintain an adequate stock level of the items it intends to sell from the convenience store so that adequate supplies are on hand to effectively service the customers of the store.  Agent shall operate the store as an independent contractor and shall acquire, from Agent's own funds, the inventory therein.  The Agent shall comply with the reasonable directions of Shell to Agent with respect to, among other things, staffing, accounting and control procedures, product range, inventory levels, and marketing and merchandising technics and assistance.

4.   **DELIVERY OF PETROLEUM PRODUCTS.**

a.   Shell shall deliver to Agent at the premises and Agent shall receive from Shell for sale from the premises on behalf of Shell as its Agent, the motor fuel handled in Shell's service station on the premises.

- 2 -

b.    Agent shall cause sufficient quantities of petroleum products to be delivered to insure adequate and prompt supply of said products to customers who require the same to be supplied to them.

c.    Agent further agrees to keep each of the underground tanks on the premises into which motor fuels are delivered stocked to a least fifty (50%) percent of their full capacity.

d.    As to lubricating oils, Agent agrees to purchase from Shell and maintain in a prominent location on the premises a reasonable display and selection of lubricating oils.

e.    Agent shall not mix, combine or adulterate any Shell petroleum product with any non-Shell product. Agent shall not offer for sale any petroleum product which it knows or reasonably suspects is contaminated, adulterated or incorrectly labeled.

## 5.    PRICE, QUANTITY & PAYMENT.

a.    The following shall apply to sales of motor fuel:

(1)    Agent shall charge from price to price for the motor fuel as Shell determines from time to time. Agent shall be entitled to payment of the sum of eighteen cents ($.18) per gallon of each gallon sold for the first 100,000 gallons per month, fifteen cents ($.15) per gallon of each gallon sold for the next 30,000 gallons per month, and ten cents ($.10) per gallon of each gallon sold per month in excess thereof.

(2)    In the case of Shell Card holders, Agent shall accept such card, in accordance with Shell Card Guidelines. The volumes so sold shall be included in paragraph 5(a)(1) above.

(3)    In the event Agent elects to accept other credit cards, Agent may do so. In the event Agent desires to provide credit terms to other customers, it may also do so, provided Shell may direct Agent to discontinue such credit terms to a customer or customers if Shell, in its discretion, determines that such accounts are detrimental to the sound operation of the service station. All credit risks for either of such types of credit shall be borne by Agent. Agent shall include with the daily remittance, as provided below, the retail price of such motor fuel, and with the monthly remittance the percentage of the gross proceeds of sales of other products.

(4)    The quantity sold by Agent, upon which payments to it shall be based, shall be determined by reading the meters at all pumps located on the premises from

- 3 -

time to time. Shell shall cause the pump calibration to be examined consistent with its standard policies.

(5)     Agent shall keep and maintain records of the deliveries to it by Shell and shall daily, in accordance with directions from Shell, dip the fuel tanks and keep records of the results thereof. Agent shall daily reconcile the stock, sales to customers, remittances to Shell, and quantities delivered by Shell. If the reconciliation indicates sales in excess of metered sales, the volume determined in paragraph (4) above shall be adjusted upward to such amount. In the event of stock losses in excess of .5% in the case of gasoline and .25% in the case of diesel, of the volume sold during any period, Agent shall pay to Shell such excess loss at the time weighted sales price set by Shell during the period in question, less eighteen cents ($.18) per gallon, upon the receipt of the billing therefore by Shell. Shell shall have the right to access those records from time to time. Agent shall deliver the reconciliations and meter readings for each month to Shell by the end of the fifth day after the end of that month.

(6)     Following the end of each month, Shell shall advise Agent of the quantities sold during the previous month, and shall pay Agent at the above rate therewith. Agent shall remit to Shell not less often than four times times weekly an amount equal to the retail price of the metered quantities sold, less Shell Card sales.

b.     Agent shall pay to Shell seventeen percent (17%) of its gross sales of other petroleum products, equipment, sundries, food, and all other items sold on the premises. Agent shall provide Shell with a statement of the gross proceeds of such sales and make payment to Shell for Shell's percentage thereof within seven (7) days following the end of each month.

c.     Agent shall purchase from Shell such amounts of lubricant as it may require, from time to time. The price therefore shall be Shell's wholesale list price for the type and grade of lubricant, in effect at the time of purchase. Agent shall be invoiced at the end of each month for its purchases during the previous month. payment therefore shall be due and payable in full within twenty (20) days from the end of each month.

d.     On the fifteenth (15th) day following the end of each quarter after commencement of operation, Agent shall submit an unaudited income statement and balance sheet to Shell.

e.     Agent shall operate the station sixteen (16) hours a day, seven (7) days a week, holidays included, unless Shell shall notify Agent in writing of different operating hours.

f.     Any tax, duty, charge, levy or fee now or hereafter assessed or imposed on any products sold or delivered under this Agreement, whether on or in respect of the sale or on or in respect of the delivery or on or in respect of the use of the same and whether or not the tax, duty, charge, levy or fee is required to be paid and/or collected shall be paid by Agent. Shell will pay the Gross Receipts Tax (GRT) due on the sale of its motor fuel.

- 4 -

6. **DELIVERIES.**

      a.     Deliveries of motor fuels may be made by and on behalf of Shell and by such means of transport and in such tanks and/or other containers as Shell may elect.

      b.     Shell shall not be obligated to make any delivery of motor fuels in any quantity smaller than the load of a road tanker as Shell may select. All orders for the petroleum products shall be made by Agent on that basis.

      c.     Shell shall use its good faith efforts to make delivery with sufficient promptness to insure that Agent does not run out of petroleum products. However, Shell shall not be under any liability whatsoever to Agent with respect to Agent running out of any of said products:

         (1)     if Agent does not give twenty four (24) hour notice to Shell that it is likely to run out of any of the petroleum products which it shall specify; or

         (2)     if, after Agent has given notice, Shell offers to make delivery within a reasonable period of time under the circumstances and Agent does not accept the offer; or

         (3)     if the cause for Agent running out of products is substantially caused by any of the events or circumstances described in paragraph 12, _infra_.

7.    **FUEL TANKS AND OTHER PROPERTY.**    The fuel tanks, pipes, hoses, pumps, building, improvements and equipment shall remain the property of Shell and Shell shall provide such major repair and maintenance as may be necessary. Agent shall promptly notify Shell of any required major repair or maintenance of which it becomes aware. Shell; shall repair or replace any such property as it may from time to time desire. Agent shall provide the routine maintenance as is required in the attached Schedule 1.

8.    **TERM.**    The term of this Agreement shall be for a period beginning on the above date and ending on last day of the 1st year.

9.    **IDENTIFICATIONS.**

      a.     Agent shall use the identifications, which Shell may change from time to time at its sole discretion, to identify and advertise Shell's petroleum products. Agent

- 5 -

shall not use such identifications for any other purpose or in any matter which may confuse or deceive the public.

   b.   Agent shall not sell, display for sale or offer for sale under or in association with the identifications any motor fuels which are not delivered under this Agreement.

   c.   In the connection with its business on and from the premises, Agent shall maintain and protect the identifications with respect to all <u>gods</u> and shall not do or permit to be done anything that might prejudice or affect the identifications or any of Shell's rights arising thereunder. All advertising, including color schemes of the petroleum products, shall be subject to Shell's prior written approval. If Agent should cease to purchase petroleum products under this Agreement or if this Agreement terminates for any reason, then Agent shall, at Shell's request, immediately and completely discontinue the use of the identifications at the premises and vacate the same. Agent acknowledges and recognizes that injunctive relief is essential for the adequate remedy of any violation by Agent of provisions by this paragraph.

   d.   All signs and other advertising devices furnished by Shell at the service station, shall remain Shell's property (whether or not affixed to the premises) and shall be used solely in connection with the sale, display for sale or offering for sale of petroleum products delivered under this Agreement or of services associated therewith and shall be immediately returned to Shell on demand.

10. <u>CUSTOMER SERVICE</u>.   Agent agrees that it shall:

   a.   Render prompt, fair, courteous and efficient service to its customers;

   b.   Promptly investigate all customer complaints, and make such adjustments which are reasonable and appropriate;

   c.   Maintain the premises in a manner which will foster customer acceptance of the petroleum products sold hereunder; provide qualified attendants who render prompt, courteous, and full driveway service to customers and assist self-service customers as may be required;

   d.   Provide attendants with Shell approved uniforms and require attendants to maintain a neat and orderly appearance; and

   e.   Not employ or permit any illegal, unethical, deceptive, or unfair practices in the conduct of its business.

- 6 -



11.   **CLAIMS, RELEASE.**   Shell shall have no liability to Agent for any defect (patent or latent) in quality or shortage in quantity, of any petroleum products delivered unless Agent gives Shell written notice of Agent's claim within:

a.   Two (2) days after delivery for shortages in quantity of motor fuels ; or

b.   Two (2) days after delivery for quality deficiencies of motor fuels, and further provides Shell; with reasonable opportunity to inspect the products and take test samples.

Any other claim by Agent of any kind, based on or arising out of this Agreement or otherwise, shall be waived and barred unless Shell is given notice within ninety (90) days after the event, action, or inaction to which such claim relates. Any claim by Agent shall be waived and barred unless asserted by the commencement of an action within twelve (12) months after the event, action or inaction to which such claim relates. In no event shall Shell be liable for prospective profits or special, indirect, or consequential damages. The provisions of this paragraph 8 shall survive any termination of this Agreement, however arising.

12.   **FORCE MAJEURE.**   Shell shall not be liable for loss or damage due to any delay or failure in performance:

a.   Because of compliance with any action, order, request or control of an governmental authority or person purporting to act therefore; or

b.   When the supply of products or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by Shell is interrupted, unavailable or inadequate because of wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, weather conditions or for any other cause which Shell determines is beyond its reasonable control when acting in good faith and in the ordinary course of business, whether or not similar to any of the foregoing. Shell shall not be required to remove any such cause or replace the affected source of supply or facility if it shall involve additional expense or a departure from its normal practices. If, for any cause whatsoever, there is, or Shell believes in its reasonable opinion there may be, a shortage of supplies, for whatever reason, so that Shell is or may be unable to meet the demands of all of its customers, Shell may allocate to and among its retail agents, distributors, and customers such quantities of product as Shell determines in the exercise of its ordinary business judgment it has available for distribution to that class of trade, provided that Shell's plan of allocation shall not unreasonably discriminate between Agent and other retail agents, distributors and customers. Shell shall not be required to make any deliveries or quantities omitted pursuant to the provisions of this paragraph, including but not limited to, deliveries or quantities omitted pursuant to Shell's right to allocate products among its retail agents, nor shall Shell be liable for any damages or loss in connection with such omitted deliveries or quantities. In all instances in this paragraph wherein a decision or determination is referred to, such decision or determination shall be made in Shell's sole and absolute discretion when acting in the ordinary course of business.

- 7 -

13. **INDEMNIFICATION**.

a. Each party shall defend, indemnify and hold the other, and the successors and assigns of each, harmless from and against any fines, penalties, charges or expenses, including attorneys fees and court costs, imposed on or incurred by a party, for violations of any laws, ordinances or regulations, arising, directly or indirectly, from any act or omission, whether negligent or otherwise, of a party or its agents, contractors, servants, employees, invitees or others.

b. Agent hereby assumes the entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of Agent or otherwise, and to all property arising, directly or indirectly, from Agent's business or businesses and/or the use, occupancy, operation and maintenance of the premises (including adjacent sidewalks, drives and curbs) by Agent or any of its agents, servants, contractors, employees, invitees or others.

c. In the event that any such claims, loss, cost, expense, liability, damage or injury arise or are made, asserted or threatened against Shell, its officers, agents, servants or employees, Shell shall have the right to require Agent to furnish a surety bond satisfactory to Shell guaranteeing such protection, which bond or other evidence of financial responsibility shall be furnished by Agent within five (5) days after written demand has been made therefore.

14. **INSURANCE**. Agent shall obtain, renew and keep current during the term of this agreement the following insurance coverage:

a. General liability insurance and insurance on Agent's vehicles operated in the course of Agent's business with limits for any one occurrence of not less than $500,000.00 for personal injury and $300,000.00 for damage to property of others;

b. Workmen's compensation as required to insure Agent's liability under applicable statutory law;

c. Such other insurance coverage as Shell may from time to time require;

d. Agent shall procure and maintain, at its own expense, fire insurance with extended coverage endorsements in the amount of not less than Three Hundred Thousand and 00/100 Dollars ($300,000.00) for property damage arising from any use of the premises and any improvements located or placed thereon (except underground storage tanks). All insurance required or carried by Agent on any of the premises shall be for the protection of Shell and Agent against the risks and liabilities in connection with the premises. In the event that any item or part of the premises, or improvements thereon shall require repair, rebuilding, or replacement resulting from such a loss or damage. Agent shall promptly give notice thereof to Shell and, shall, upon demand, either compensate Shell for such loss or damage, or rebuild. replace or repair the item or items f the premises or improvement thereon so lost or damages as Shell may

- 8 -



elect. In the event that Shell shall direct Agent to effect any repair, rebuilding or replacement which it is required to effect pursuant to this Article, Shell shall direct the payment to Agent of so much of the proceeds of any insurance carried by Agent and made available to Shell on account of loss of or damage to any item or part of the premises as may be necessary to enable Agent to effect such repair, rebuilding or replacement. In the event that Shell shall elect not to require Agent to repair, rebuild or replace any item or part of the premises or improvements thereon so lost or damaged, Agent shall promptly pay to Shell out of any insurance proceeds collected by Agent such portion thereof as may be allocable to loss of or damage to the premises, or improvements thereon or if such proceeds have been paid to Shell, Shell shall retain the same.

      e.    Shell shall be named as an additional named insured on all such policies. All policies shall be written by reputable insurance companies authorized to engage in the insurance business within Guam. Agent shall pay all premiums and assessments charged for such policies when due. Each such policy shall have a provision that requires that Shell shall be given thirty (30) days written notice before any termination, cancellation, non-renewal, or material change shall become effective. In the event that any such policy is terminated r cancelled, Agent shall promptly, prior to the termination date of such policy, procure a new or substitute policy containing the same or additional coverage, such policy to afford coverage concurrent with the termination of the cancelled or terminated policy. Certificates of insurance evidencing policies required hereunder shall be provided Shell within fifteen (15) days prior to the effective date of the policy.

      f.    The failure of Agent to (1) obtain any of the required insurance coverage, or (2) to pay all premium and assessments when due, or (3) to comply with all terms and conditions of such policy or the directions of such policy or the directions of the insurance carrier or its rating bureau or the National Fire Protection Association, or (4) to obtain new or substitute policies as herein provided shall be a default hereunder. Shell, at its option, may obtain same, or otherwise cure said default at Agent's sole cost and expense, and Agent shall mediately pay to Shell upon demand any expenses incurred by Shell hereunder.

- 9 -

## 15. TERMINATION AND NON-RENEWAL.

a. <u>Termination</u>. Subject to any limitations imposed by law, Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Agent for any one or more of the following grounds:

(1) Failure by Agent to comply with any provision of this Agreement, which provisions are both reasonable and of material significance to the relationship hereunder;

(2) Failure by Agent to exert good faith efforts to carry out the provisions of this Agreement;

(3) Occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this Agreement is reasonable, including such as:

(i) Fraud or criminal misconduct by Agent relevant to the operation of Shell's service station;

(ii) Declaration of bankruptcy or judicial determination of insolvency of the Agent;

(iii) Continuing severe physical or mental disability of Agent of at least three (3) months duration which renders Agent unable to provide for the continued proper operation of the premises;

(iv) Loss of Shell's rights to grant the right to use the trademark which is the subject of this Agreement, unless such loss was due to trademark abuse, violation of Federal or Guam law, or other fault or negligence of Shell, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by Shell;

(v) Destruction (other than by Shell) of all or a substantial part of the premises;

(vi) Failure by Agent to pay to Shell in a timely manner when due all sums to which Shell is legally entitled;

(vii) Failure by Agent to operate the premises for two (2) consecutive days (or such longer period of time as is reasonably necessary if the closure is due to a typhoon), or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(viii) Willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Agent;

- 10 -



(ix) Knowing failure of Agent to comply with Federal of Guam laws r regulations relevant to the operation of the premises;

(x) Conviction of Agent of any felony involving moral turpitude; and

(xi) Death of Agent.

(4) A determination is made by Shell in god faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the Territory of Guam; and

(5) Any other ground for which termination is provided for in this Agreement or in any related agreements constituting a franchise between Shell and Agent, or is otherwise allowed by the PMPA or other applicable law.

b. <u>Non-Renewal.</u> Neither party is obligated to renew this Agreement. In the event Shell determines not to renew this Agreement or any franchise relationship existing with respect thereto, it may do so upon notice to Agent (as required by law);

c. <u>Acts Attributable to Agent</u>. In determining whether a ground for termination exists under this paragraph 15: (1) the acts or omissions of Agent's employees, agents and contractors shall be deemed to be the acts or omissions of Agent; (2) if Agent is composed of more than one person, the acts or omissions of each such person shall be deemed to be the acts or omissions of Agent; or (3) if Agent is a partnership or corporation, the acts or omissions of each partner or director, officer or shareholder, as the case may be, shall be deemed to be the acts or omissions of Agent.

d. <u>Other Remedies</u>. Any termination under the foregoing provisions of this paragraph 2 shall be without limitation of any other rights or remedies available to Shell under this Agreement or otherwise. All sums due by Agent to Shell under the provisions of this Agreement shall be payable by Agent as provided herein, and shall be payable by Agent to Shell as provided herein, and shall bear interest at the rate of ten (10%) percent per month (or lesser maximum rate permitted by law) from the date due until paid. Shell may, by written notice to Agent, reduce the rate of interest. If Agent defaults in payment of any indebtedness to Shell, in addition to the rights provided above, Shell shall haver the right to immediately to suspend deliveries hereunder and to apply any sums which Shell may hold for Agent's account under this Agreement to the payment of such indebtedness, without relieving the Agent of any obligations otherwise existing to pay, repay or replace the sums so applied. Either party's right to require strict performance of the other's obligations hereunder shall not be affected by any previous waiver, forbearance, course of dealing, or trade custom or usage.

16. <u>REPRESENTATIONS AND ASSURANCE</u>. Shell has entered into this Agreement in reliance on Agent's personal qualifications and representations to Shell of Agent's

- 11 -

desire to operate a retail service station selling Shell branded products, and that it will conduct its business so as to maintain or enhance the public acceptance the identifications and other Shell branded agents. Agent acknowledges that its conduct will impact these areas so long as Agent holds itself out to the public as a branded agent. Agent agrees to use its best efforts to promote the sale of petroleum products to conduct its business so as to meet or exceed Shell's high standards of retailing, appearance, customer service and product quality, and to refrain from conduct which will detract from the value of the identifications or which would tend to lower the public acceptance of Shell's branded agents. The obligations assumed by Agent herein are the very essence of this Agreement, and Agent's failure or refusal to comply therewith shall be grounds for termination of this Agreement and the relationship between the parties.

17. **RELATIONSHIP OF SHELL AND AGENT**. Agent is in business independent of Shell, and nothing in this Agreement shall; be deemed as creating any right in Shell to exercise any control over, or to direct in any respect, the conduct or management of Agent's business, subject only to Agent's performance of the obligations imposed under this Agreement. Neither Agent nor any person performing work at the premises for, or on behalf of Agent, shall be deemed an employee or agent of Shell (except as herein provided with respect to Agent).

18. **SEVERABILITY**. If any provision of this Agreement is rendered invalid or of doubtful validity because of (a) a judicial decision with respect to the same provisions in another agreement, (b) a judicial decision with respect to an analogous provisions in a franchise agreement, (c) an official opinion or statement of any federal or territorial official or regulatory agency, or (d) law, the parties shall modify this Agreement by deleting such provision and by negotiating in good faith a modification of the provision that retains insofar as possible the removed provision.

19. **ATTORNEYS FEES**. If any legal action, suit or other proceeding is brought for the enforcement of this Agreement, or because of any alleged dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys fees and Court costs incurred in the action, suit or proceeding, in addition to any other remedy or relief to which it may be entitled.

20. **NOTICES**. Except as otherwise expressly specified herein, any notice to be given hereunder by either party to the other shall be deemed sufficiently given if in writing and delivered either in person or enclosed in an envelope properly stamped and address and addressed to the party at the address set forth in this section, and deposited in the United State mail. Either party may change its address by giving fifteen (15) days prior written notice to the party. Such address until further notice shall be:

> Shell: Shell Guam, Inc.
> Second Floor, Hi-Tech Building
> 545 West Marine Drive
> Anigua, Guam 96910

- 12 -

## 21. AMENDMENT AND WAIVER:

a. Neither the agreement nor any provision hereof may be changed, waived, altered, amended, or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, alteration, amendment or discharge is sought.

b. Failure by either party to object to any failure of performance by the other party of any provision of the agreement shall not constitute a waiver of, or estoppel against, the right of such party to require such performance by the other. Nor shall any such failure to object constitute a waiver or estoppel with respect to any succeeding failure of performance.

## 22. MISCELLANEOUS:

a. Any attempt to assign this agreement, directly or indirectly, by agent without Shell's prior written consent shall constitute a default of this agreement and any such attempted assignment shall be null and void.

b. Agent warrants to Shell that Agent has made full disclosure to Shell of all persons having an interest in Agent and its operation under this agreement.

c. This agreement, including documents incorporated herein, contains the entire agreement covering the subject matter, and supersedes any prior agreement between the parties relating to the premises.

d. The descriptive headings of the several sections and subsections in this agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

e. This agreement is made under, and shall be governed and construed in accordance with, the laws, statutes and regulations of Guam.

- 13 -

IN WITNESS WHEREOF, the parties have executed this agreement the day and year first above written.

SHELL:

SHELL GUAM, INC.

By: _____  2/23/93

PETER SHORT,
Marketing Manager

AGENT:

_____  3-33-9

ANTHONY J. ADA

D/Z0144

- 14 -

# SCHEDULE 1
## LESSEE'S MAINTENANCE OBLIGATIONS

A. <u>Yard</u>

    1. Maintain all elements within planter area as necessary to retain a healthy and attractive appearance. Items include, but are not limited to, all live and artificial plantings (shrubs, grass, flowers, trees, etc.), decorative rock, bark and entire sprinkler system.

    2. Regularly remove weeds, leaves, debris and litter from the premises (including rain gutters and downspouts and adjacent sidewalks, driveways and easements).

B. <u>Lighting</u>

Replace all lamps and bulbs, ballasts, ballast wiring, starters and sockets in the interior of building to maintain fixture lighting at all times. Excludes total fixture replacement.

C. <u>Plumbing</u>

    1. Clear clogged toilets, sinks, building lube bay drains and on-property sewer lines. Clean oil separators and catch basins.

    2. Maintain all flush mechanisms and faucets, sinks.

    3. Empty septic tanks as necessary.

D. <u>Air Conditioning</u>

Provide regular inspections and service for A/C systems (to include: tighten belts, lubricate bearings, add air conditioner units in entirety.

E. <u>Glasswork/Doors</u>

Replace all window and door glass, whenever scratched cracked or broken from whatever cause, including bullet-resistance glass or plastic. Maintain, repair or replace all doors and door frame assemblies to keep in operating order.



F. Floors

Floors shall be washed daily and must maintain a clean and neat appearance. Professional cleaning services may be mandated by Shell should floor cleanliness and appearance not be acceptable to Shell. Floors shall be restored to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear.

G. Painting

During the period between scheduled complete repainting by Shell, wash and paint all curbs, yard and building equipment, interior/exterior walls, doors, ceilings and shelving as necessary. Paint to be furnished by Shell; all other painting material by Lessee.

H. Tanks

1. Keep fill and access boxes clear of water and debris.

I. Pumps/Dispensers

1. Lubricate any gasoline suction pumps in use (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.

2. Inspect and clean on a daily basis gasoline hoses, clamps, swivels and colored scuff guards, including any associated with a vapor recovery system, air and water hoses, nozzles, couplings and air chucks and report immediately to Shell any damage, defect or leaks in any such equipment.

J. Air Compressor

Drain water daily. Add/change oil, replace air filters and lubricate bearings per manufacturer's specifications.

K. C-Store/Food Mart and Related Equipment (if located on premises)

1. Maintain Shell-owned cooler/freezer doors and refrigeration units (walk-in and freestanding), gondolas and all other Shell-owned C-store/food mart related equipment, including lamps, ballasts, fuses and glass therein.

2. Keep all food handling equipment and food preparation areas clean sanitary and in compliance with applicable codes and laws.

3. Keep all equipment drain lines clean and clear.

- 2 -

L. Other Equipment

    1.    Maintain all Agent-owned equipment.

    2.    Maintain and replace if lost, stolen or damaged all fire protection equipment provided by Shell.

M. Miscellaneous

    1.    Maintain all building locks, keys, door closets and latches.

    2.    Maintain all elements of overhead doors, excluding total door replacement, unless damaged by negligence.

    3.    Reset circuit breakers, replace electrical fuses.

    4.    Take all necessary pest control measures.

D/Z0144A

- 3 -

F. Floors

Floors shall be washed daily and must maintain a clean and neat appearance. Professional cleaning services may be mandated by Shell should floor cleanliness and appearance not be acceptable to Shell. Floors shall be restored to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear.

G. Painting

During the period between scheduled complete repainting by Shell, the Agent will wash and paint all curbs, yard and building equipment, interior/exterior walls, doors, ceilings and shelving as necessary. Paint and all other painting material supplied by Lessee.

H. Tanks

1. Keep fill and access boxes clear of water and debris.

I. Pumps/Dispensers

1. Lubricate any gasoline suction pumps in use (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.
2. Inspect and clean on a daily basis gasoline hoses, clamps, swivels and colored scuff guards, including any associated with a vapor recovery system, air and water hoses, nozzles, couplings and air chucks and report immediately to Shell any damage, defect or leaks in any such equipment.

J. Air Compressor

Drain water daily. Add/change oil, replace air filters and lubricate bearings per manufacturer's specifications.

K. C-Store/Food Mart and Related Equipment (if located on premises)

1. Maintain Shell-owned cooler/freezer doors and refrigeration units (walk-in and freestanding), gondolas and all other Shell-owned C-store/food mart related equipment, including lamps, ballasts, fuses and glass therein.
2. Keep all food handling equipment and food preparation areas clean sanitary and in compliance with applicable codes and laws.
3. Keep all equipment drain lines clean and clear.

- 2 -



# AMENDMENT #002

Reference to page 3, paragraph 5:a.1 of the Agency Sales Agreement between Shell Guam Inc. and Anthony J. Ada dated 23 February 1993. The following change is made to the Commission payment structure.

"Agent shall be entitled to payment of the sum of twenty-one cents ($.210) per gallon on each gallon sold."

"Agent shall pay Shell a retail commission percentage of 15% on the gross retail sales."

Effective date:    5 April 1993

Date: _____

SHELL:
SHELL GUAM, INC.
By: _____
    PETER SHORT
    Marketing Manager

Date: _9-9-93_____

AGENT:

_____
ANTHONY J. ADA

A:RM(I)\AMDMT

# EXHIBIT 1b

THIS AGREEMENT IS A TRIAL FRANCHISE UNDER THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"). 15 U.C.C. 2801 ET SEQ. THE INITIAL TERM OF THIS FRANCHISE IS FOR A PERIOD OF NOT MORE THAN FIVE YEARS BEGINNING MARCH 1, 1994 AND ENDING FEBRUARY 28, 1999. SHELL MAY FAIL TO RENEW THE FRANCHISE RELATIONSHIP AT THE CONCLUSION OF THE INITIAL TERM BY NOTIFYING AGENT, IN ACCORDANCE WITH THE PROVISIONS OF 2804 OF THE PMPA, OF SHELL'S INTENTION NOT TO RENEW THE FRANCHISE RELATIONSHIP. THE PROVISIONS OF 2802 OF THE PMPA, LIMITING THE RIGHT OF A FRANCHISOR TO FAIL TO RENEW A FRANCHISE RELATIONSHIP ARE NOT APPLICABLE TO THIS TRIAL FRANCHISE.

## AGENCY SALES AGREEMENT

### PREAMBLE

THIS AGENCY SALES AGREEMENT is made this __1st__ day of ____March____, 1994, by and between SHELL GUAM, INC., a Guam corporation, whose mailing address is Suite 102, Capitol Plaza, 120 Father Duenas Avenue, Agana, Guam 96910, hereinafter referred to as "Shell", and Anthony J. Ada having a place of business at Lot No. 5370-2-3-1-NEW whose mailing address is P.O. Box 4478, Agana, Guam 96910, hereinafter referred to as "Agent".

### RECITALS

WHEREAS, Agent desires to sell on behalf of Shell the motor fuel products supplied by Shell and to sell the lubricating oils purchased from Shell and to operate the service station and convenience store at Shell's retail site located at Lot No. 5370-2-3-1-NEW (Certificate of Title No. 22688), Mangilao, Guam, (the "premises"); and

WHEREAS, Shell is willing to supply products to Agent on the terms and conditions hereinafter set forth and to allow Agent to operate its retail site. NOW THEREFORE,

### AGREEMENT

For and in consideration of the above recitals, the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt of which is hereby acknowledged by both parties, it is agreed that:

DEFENDANT'S DEPOSITION EXHIBIT

D-5

EXHIBIT. B

1. DEFINITIONS. In this Agreement, where the context permits:

   a.     "identifications" means the trademarks, brand names and color schemes which Shell does now or may hereafter own or regularly employ in connection with petroleum and other products which are manufactured and/or sold by Shell.

   b.     "lubricating oils" means crankcase and all other lubricating oils and greases now and hereafter supplied or distributed to Agent by or on behalf of Shell.

   c.     "motor fuels" means gasoline of any grade and motor diesel fuel now and hereafter supplied to Agent by or on behalf of Shell.

   d.     "year" means the period of twelve (12) months beginning on the commencement of the term and each successive period of twelve (12) months thereafter.

   e.     "petroleum products" means those products described in subparagraphs (b) and (c) above.

2.     GRANT OF LICENSE. Shell does hereby grant unto Agent a license to enter, use and occupy the premises and to use the equipment provided by Shell thereat during the term for the purpose of conducting the business to be conducted by Agent on the premises, namely the operations of Shell's service station and convenience store. This grant of license shall not crate in the Agent's favor any tenancy or rights in the nature of a tenancy and, without limiting the generality of the foregoing, the license shall not confer on the Agent any right to exclude from the premises any of Shell's employees, agents, or any person authorized by Shell to enter the premises.

3.     CONVENIENCE STORE. Agent shall operate the convenience store for the sale of products related to petroleum products to be sold hereunder, and such item or items of merchandise as Agent may decide to sell. Agent shall maintain an adequate stock level of the items it intends to sell from the convenience store so that adequate supplies are on hand to effectively service the customers of the store. Agent shall operate the store as an independent contractor and shall acquire, from Agent's own funds, the inventory therein. The Agent shall comply with the reasonable directions of Shell to Agent with respect to, among other things, staffing, accounting and control procedures, product range, inventory levels, and marketing and merchandising technigues and assistance.

4.     **DELIVERY OF PETROLEUM PRODUCTS.**

   a.     Shell shall deliver to Agent at the premises and Agent shall receive from Shell for sale from the premises on behalf of Shell as its Agent, the motor fuel handled in Shell's service station on the premises.

- 2 -

b.     Agent shall cause sufficient quantities of petroleum products to be delivered to insure adequate and prompt supply of said products to customers who require the same to be supplied to them.

c.     Agent further agrees to keep each of the underground tanks on the premises into which motor fuels are delivered stocked to a least fifty (50%) percent of their full capacity.

d.     As to lubricating oils, Agent agrees to purchase from Shell and maintain in a prominent location on the premises a reasonable display and selection of lubricating oils.

e.     Agent shall not mix, combine or adulterate any Shell petroleum product with any non-Shell product. Agent shall not offer for sale any petroleum product which it knows or reasonably suspects is contaminated, adulterated or incorrectly labeled.

## 5.    PRICE, QUANTITY & PAYMENT.

a.     The following shall apply to sales of motor fuel:

(1)     Agent shall charge from price to price for the motor fuel as Shell determines from time to time. Agent shall be entitled to payment of the sum of twenty-one cents ($.21) per gallon of each gallon sold.

(2)     In the case of Shell Card holders, Agent shall accept such card, in accordance with Shell Card Guidelines. The volumes so sold shall be included in paragraph 5(a)(1) above.

(3)     In the event Agent elects to accept other credit cards, Agent may do so. In the event Agent desires to provide credit terms to other customers, it may also do so, provided Shell may direct Agent to discontinue such credit terms to a customer or customers if Shell, in its discretion, determines that such accounts are detrimental to the sound operation of the service station. All credit risks for either of such types of credit shall be borne by Agent. Agent shall include with the daily remittance, as provided below, the retail price of such motor fuel, and with the monthly remittance the percentage of the gross proceeds of sales of other products.

(4)     The quantity sold by Agent, upon which payments to it shall be based, shall be determined by reading the meters at all pumps located on the premises from time to time. Shell shall cause the pump calibration to be examined consistent with its standard policies.

- 3 -

(5)     Agent shall keep and maintain records of the deliveries to it by Shell and shall daily, in accordance with directions from Shell, dip the fuel tanks and keep records of the results thereof.  Agent shall daily reconcile the stock, sales to customers, remittances to Shell, and quantities delivered by Shell.  If the reconciliation indicates sales in excess of metered sales, the volume determined in paragraph (4) above shall be adjusted upward to such amount.  In the event of stock losses in excess of .5% in the case of gasoline and .25% in the case of diesel, of the volume sold during any period, Agent shall pay to Shell such excess loss at the time weighted sales price set by Shell during the period in question, less twenty-one cents ($.21) per gallon, upon the receipt of the billing therefore by Shell.  Shell shall have the right to access those records from time to time.  Agent shall deliver the reconciliations and meter readings for each month to Shell by the end of the fifth day after the end of that month.

(6)     Following the end of each month, Shell shall advise Agent of the quantities sold during the previous month, and shall pay Agent at the above rate therewith. Agent shall remit to Shell not less often than daily an amount equal to the retail price of the metered quantities sold, less Shell Card sales.

b.     Agent shall pay to Shell fifteen percent (15%) of its gross sales of other petroleum products, equipment, sundries, food, and all other items sold on the premises.  Agent shall provide Shell with a statement of the gross proceeds of such sales and make payment to Shell for Shell's percentage thereof within seven (7) days following the end of each month.

c.     Agent shall purchase from Shell such amounts of lubricant as it may require, from time to time.  The price therefore shall be Shell's wholesale list price for the type and grade of lubricant, in effect at the time of purchase.  Agent shall be invoiced at the end of each month for its purchases during the previous month.  payment therefore shall be due and payable in full within twenty (20) days from the end of each month.

d.     On the fifteenth (15th) day following the end of each quarter after commencement of operation, Agent shall submit an unaudited income statement and balance sheet to Shell.

e.     Agent shall operate the station sixteen (16) hours a day (from 6:00 a.m. to 10:00 p.m.), seven (7) days a week, holidays included, unless Shell shall notify Agent in writing of different operating hours.

f.     Any tax, duty, charge, levy or fee now or hereafter assessed or imposed on any products sold or delivered under this Agreement, whether on or in respect of the sale or on or in respect of the del.very or on or in respect of the use of the same and whether or not the tax, duty, charge, levy or fee is required to be paid and/or collected shall be paid by Agent. Shell will pay the Gross Receipts Tax (GRT) due on the sale of its motor fuel.

- 4 -

## 6. DELIVERIES.

a. Deliveries of motor fuels may be made by and on behalf of Shell and by such means of transport and in such tanks and/or other containers as Shell may elect.

b. Shell shall not be obligated to make any delivery of motor fuels in any quantity smaller than the load of a road tanker as Shell may select. All orders for the petroleum products shall be made by Agent on that basis.

c. Shell shall use its good faith efforts to make delivery with sufficient promptness to insure that Agent does not run out of petroleum products. However, Shell shall not be under any liability whatsoever to Agent with respect to Agent running out of any of said products:

(1) if Agent does not give twenty-four (24) hour notice to Shell that it is likely to run out of any of the petroleum products which it shall specify; or

(2) if, after Agent has given notice, Shell offers to make delivery within a reasonable period of time under the circumstances and Agent does not accept the offer; or

(3) if the cause for Agent running out of products is substantially caused by any of the events or circumstances described in paragraph 12, _infra_.

7. **FUEL TANKS AND OTHER PROPERTY**. The fuel tanks, pipes, hoses, pumps, building, improvements and equipment shall remain the property of Shell and Shell shall provide such major repair and maintenance as may be necessary. Agent shall promptly notify Shell of any required major repair or maintenance of which it becomes aware. Shell; shall repair or replace any such property as it may from time to time desire. Agent shall provide the routine maintenance as is required in the attached Schedule 1.

8. **TERM**. The term of this Agreement shall be for a period beginning on the above date and ending on the last day of the fifth (5th) year.

9. **IDENTIFICATIONS**.

a. Agent shall use the identifications, which Shell may change from time to time at its sole discretion, to identify and advertise Shell's petroleum products. Agent shall not use such identifications for any other purpose or in any matter which may confuse or deceive the public.

b. Agent shall not sell, display for sale or offer for sale under or in association with the identifications any motor fuels which are not delivered under this Agreement.

- 5 -

c.   In the connection with its business on and from the premises. Agent shall maintain and protect the identifications with respect to all gods and shall not do or permit to be done anything that might prejudice or affect the identifications or any of Shell's rights arising thereunder. All advertising, including color schemes of the petroleum products. shall be subject to Shell's prior written approval. If Agent should cease to purchase petroleum products under this Agreement or if this Agreement terminates for any reason, then Agent shall, at Shell's request, immediately and completely discontinue the use of the identifications at the premises and vacate the same. Agent acknowledges and recognizes that injunctive relief is essential for the adequate remedy of any violation by Agent of provisions by. this paragraph.

d.   All signs and other advertising devices furnished by Shell at the service station, shall remain Shell's property (whether or not affixed to the premises) and shall be used solely in connection with the sale, display for sale or offering for sale of petroleum products delivered under this Agreement or of services associated therewith and shall be immediately returned to Shell on demand.

10.   **CUSTOMER SERVICE**.  Agent agrees that it shall:

a.   Render prompt, fair, courteous and efficient service to its customers;

b.   Promptly investigate all customer complaints, and make such adjustments which are reasonable and appropriate;

c.   Maintain the premises in a manner which will foster customer acceptance of the petroleum products sold hereunder; provide qualified attendants who render prompt, courteous, and full driveway service to customers and assist self-service customers as may be required;

d.   Provide attendants with Shell approved uniforms and require attendants to maintain a neat and orderly appearance; and

e.   Not employ or permit any illegal, unethical, deceptive, or unfair practices in the conduct of its business.

11.   **CLAIMS, RELEASE**.  Shell shall have no liability to Agent for any defect (patent or latent) in quality or shortage in quantity, of any petroleum products delivered unless Agent gives Shell written notice of Agent's claim within:

a.   Two (2) days after delivery for shortages in quantity of motor fuels ; or

b.   Two (2) days after delivery for quality deficiencies of motor fuels, and further provides Shell; with reasonable opportunity to inspect the products and take test samples.

- 6 -

Any other claim by Agent of any kind, based on or arising out of this Agreement or otherwise, shall be waived and barred unless Shell is given notice within ninety (90) days after the event, action, or inaction to which such claim relates. Any claim by Agent shall be waived and barred unless asserted by the commencement of an action within twelve (12) months after the event, action or inaction to which such claim relates. In no event shall Shell be liable for prospective profits or special, indirect, or consequential damages. The provisions of this paragraph 8 shall survive any termination of this Agreement, however arising.

12. **FORCE MAJEURE.** Shell shall not be liable for loss or damage due to any delay or failure in performance:

a. Because of compliance with any action, order, request or control of an governmental authority or person purporting to act therefore; or

b. When the supply of products or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by Shell is interrupted, unavailable or inadequate because of wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, weather conditions or for any other cause which Shell determines is beyond its reasonable control when acting in good faith and in the ordinary course of business, whether or not similar to any of the foregoing. Shell shall not be required to remove any such cause or replace the affected source of supply or facility if it shall involve additional expense or a departure from its normal practices. If, for any cause whatsoever, there is, or Shell believes in its reasonable opinion there may be, a shortage of supplies, for whatever reason, so that Shell is or may be unable to meet the demands of all of its customers, Shell may allocate to and among its retail agents, distributors, and customers such quantities of product as Shell determines in the exercise of its ordinary business judgment it has available for distribution to that class of trade, provided that Shell's plan of allocation shall not unreasonably discriminate between Agent and other retail agents, distributors and customers. Shell shall not be required to make any deliveries or quantities omitted pursuant to the provisions of this paragraph, including but not limited to, deliveries or quantities omitted pursuant to Shell's right to allocate products among its retail agents, nor shall Shell be liable for any damages or loss in connection with such omitted deliveries or quantities. In all instances in this paragraph wherein a decision or determination is referred to, such decision or determination shall be made in Shell's sole and absolute discretion when acting in the ordinary course of business.

13. **INDEMNIFICATION.**

a. Each party shall defend, indemnify and hold the other, and the successors and assigns of each, harmless from and against any fines, penalties, charges or expenses, including attorneys fees and court costs, imposed on or incurred by a party, for violations of any laws, ordinances or regulations, arising, directly or indirectly, from any act or omission, whether negligent or otherwise, of a party or its agents, contractors, servants, employees, invitees or others.

- 7 -

b.     Agent hereby assumes the entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of Agent or otherwise, and to all property arising, directly or indirectly, from Agent's business or businesses and/or the use, occupancy, operation and maintenance of the premises (including adjacent sidewalks, drives and curbs) by Agent or any of its agents, servants, contractors, employees, invitees or others.

c.     In the event that any such claims, loss, cost, expense, liability, damage or injury arise or are made, asserted or threatened against Shell, its officers, agents, servants or employees, Shell shall have the right to require Agent to furnish a surety bond satisfactory to Shell guaranteeing such protection, which bond or other evidence of financial responsibility shall be furnished by Agent within five (5) days after written demand has been made therefore.

14.     INSURANCE. Agent shall obtain, renew and keep current during the term of this Agreement the following insurance coverage:

a.     General liability insurance and insurance on Agent's vehicles operated in the course of Agent's business with limits for any one occurrence of not less than $500,000.00 for personal injury and $300,000.00 for damage to property of others;

b.     Workmen's compensation as required to insure Agent's liability under applicable statutory law;

c.     Such other insurance coverage as Shell may from time to time require;

d.     Agent shall procure and maintain, at its own expense, fire insurance with extended coverage endorsements in the amount of not less than $300,000.00 for property damage arising from any use of the premises and any improvements located or placed thereon (except underground storage tanks). All insurance required or carried by Agent on any of the premises shall be for the protection of Shell and Agent against the risks and liabilities in connection with the premises. In the event that any item or part of the premises, or improvements thereon shall require repair, rebuilding, or replacement resulting from such a loss or damage. Agent shall promptly give notice thereof to Shell and, shall, upon demand, either compensate Shell for such loss or damage, or rebuild, replace or repair the item or part of the premises or improvement thereon so lost or damages as Shell may elect. In the event that Shell shall direct Agent to effect any repair, rebuilding or replacement which it is required to effect pursuant to this Article, Shell shall direct the payment to Agent of so much of the proceeds of any insurance carried by Agent and made available to Shell on account of loss of or damage to any item or part of the premises as may be necessary to enable Agent to effect such repair, rebuilding or replacement. In the event that Shell shall elect not to require Agent to repair, rebuild or replace any item or part of the premises or improvements thereon so lost or damaged, Agent shall promptly pay to Shell out of any insurance proceeds collected by Agent such portion thereof as may be allocable to loss of or damage to the premises, or improvements thereon or if such proceeds have been paid to Shell, Shell shall retain the same.

- 8 -

e.     Shell shall be named as an additional named insured on all such policies. All policies shall be written by reputable insurance companies authorized to engage in the insurance business within Guam. Agent shall pay all premiums and assessments charged for such policies when due. Each such policy shall have a provision that requires that Shell shall be given thirty (30) days written notice before any termination, cancellation, non-renewal, or material change shall become effective. In the event that any such policy is terminated r cancelled, Agent shall promptly, prior to the termination date of such policy, procure a new or substitute policy containing the same or additional coverage, such policy to afford coverage concurrent with the termination of the cancelled or terminated policy. Certificates of insurance evidencing policies required hereunder shall be provided Shell within fifteen (15) days prior to the effective date of the policy.

f.     The failure of Agent to (1) obtain any of the required insurance coverage, or (2) to pay all premium and assessments when due, or (3) to comply with all terms and conditions of such policy or the directions of such policy or the directions of the insurance carrier or its rating bureau or the National Fire Protection Association, or (4) to obtain new or substitute policies as herein provided shall be a default hereunder. Shell, at its option, may obtain same, or otherwise cure said default at Agent's sole cost and expense, and Agent shall mediately pay to Shell upon demand any expenses incurred by Shell hereunder.

15.   **TERMINATION AND NON-RENEWAL.**

a.     **Termination.** Subject to any limitations imposed by law, Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Agent for any one or more of the following grounds:

(1)   Failure by Agent to comply with any provision of this Agreement , which provisions are both reasonable and of material significance to the relationship hereunder;

(2)   Failure by Agent to exert good faith efforts to carry out the provisions of this Agreement;

(3)   Occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this Agreement is reasonable, including such as:

(i)   Fraud or criminal misconduct by Agent relevant to the operation of Shell's service station;

(ii)   Declaration of bankruptcy or judicial determination of insolvency of the Agent;

(iii)   Continuing severe physical or mental disability of Agent of at least three (3) months duration which renders Agent unable to provide for the continued

- 9 -

proper operation of the premises:

                          (iv) Loss of Shell's rights to grant the right to use the trademark which is the subject of this Agreement, unless such loss was due to trademark abuse, violation of Federal or Guam law, or other fault or negligence of Shell, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by Shell;

                          (v) Destruction (other than by Shell) of all or a substantial part of the premises;

                          (vi) Failure by Agent to pay to Shell in a timely manner when due all sums to which Shell is legally entitled;

                          (vii) Failure by Agent to operate the premises for two (2) consecutive days (or such longer period of time as is reasonably necessary if the closure is due to a typhoon), or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

                          (viii) Willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Agent;

                          (ix) Knowing failure of Agent to comply with Federal of Guam laws r regulations relevant to the operation of the premises;

                          (x) Conviction of Agent of any felony involving moral turpitude; and

                          (xi) Death of Agent.

                (4)    A determination is made by Shell in god faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the Territory of Guam; and

                (5)    Any other ground for which termination is provided for in this Agreement or in any related agreements constituting a franchise between Shell and Agent, or is otherwise allowed by the PMPA or other applicable law.

        b.    <u>Non-Renewal.</u> Neither party is obligated to renew this Agreement. In the event Shell determines not to renew this Agreement or any franchise relationship existing with respect thereto, it may do so upon notice to Agent (as required by law);

        c.    <u>Acts Attributable to Agent.</u> In determining whether a ground for termination exists under this paragraph 15: (1) the acts or omissions of Agent's employees, agents and contractors shall be deemed to be the acts or omissions of Agent; (2) if Agent is

- 10 -

Case 1:00-cv-00012    Document 155-2    Filed 09/01/2005    Page 11 of 34

composed of more than one person, the acts or omissions of each such person shall be deemed to be the acts or omissions of Agent; or (3) if Agent is a partnership or corporation, the acts or omissions of each partner or director, officer or shareholder, as the case may be, shall be deemed to be the acts or omissions of Agent.

      d.   <u>Other Remedies</u>.  Any termination under the foregoing provisions of this paragraph 2 shall be without limitation of any other rights or remedies available to Shell under this Agreement or otherwise.  All sums due by Agent to Shell under the provisions of this Agreement shall be payable by Agent as provided herein, and shall be payable by Agent to Shell as provided herein, and shall bear interest at the rate of ten percent (10%) per month (or lesser maximum rate permitted by law) from the date due until paid.  Shell may, by written notice to Agent, reduce the rate of interest.  If Agent defaults in payment of any indebtedness to Shell, in addition to the rights provided above, Shell shall haver the right to immediately to suspend deliveries hereunder and to apply any sums which Shell may hold for Agent's account under this Agreement to the payment of such indebtedness, without relieving the Agent of any obligations otherwise existing to pay, repay or replace the sums so applied. Either party's right to require strict performance of the other's obligations hereunder shall not be affected by any previous waiver, forbearance, course of dealing, or trade custom or usage.

16.   **REPRESENTATIONS AND ASSURANCE**.  Shell has entered into this Agreement in reliance on Agent's personal qualifications and representations to Shell of Agent's desire to operate a retail service station selling Shell branded products, and that it will conduct its business so as to maintain or enhance the public acceptance the identifications and other Shell branded agents.  Agent acknowledges that its conduct will impact these areas so long as Agent holds itself out to the public as a branded agent.  Agent agrees to use its best efforts to promote the sale of petroleum products to conduct its business so as to meet or exceed Shell's high standards of retailing, appearance, customer service and product quality, and to refrain from conduct which will detract from the value of the identifications or which would tend to lower the public acceptance of Shell's branded agents. The obligations assumed by Agent herein are the very essence of this Agreement, and Agent's failure or refusal to comply therewith shall be grounds for termination of this Agreement and the relationship between the parties.

17.   **RELATIONSHIP OF SHELL AND AGENT**.  Agent is in business independent of Shell, and nothing in shall; be deemed as creating any right in Shell to exercise any control over, or to direct in any respect, the conduct or management of Agent's business, subject only to Agent's performance of the obligations imposed under this Agreement.  Neither Agent nor any person performing work at the premises for, or on behalf of Agent, shall be deemed an employee or agent of Shell (except as herein provided with respect to Agent).

18.   **SEVERABILITY**.  If any provision of this Agreement is rendered invalid or of doubtful validity because of (a) a judicial decision with respect to the same provisions in another agreement, (b) a judicial decision with respect to an analogous provisions in a franchise agreement, (c) an official opinion or statement of any federal or territorial official or regulatory agency, or (d) law, the parties shall modify this Agreement by deleting such provision and by

- 11 -

negotiating in good faith a modification of the provision that retains insofar as possible the removed provision.

19.    ATTORNEYS FEES.  If any legal action, suit or other proceeding is brought for the enforcement of this Agreement, or because of any alleged dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys fees and Court costs incurred in the action, suit or proceeding, in addition to any other remedy or relief to which it may be entitled.

20.    NOTICES.  Except as otherwise expressly specified herein, any notice to be given hereunder by either party to the other shall be deemed sufficiently given if in writing and delivered either in person or enclosed in an envelope properly stamped and address and addressed to the party at the address set forth in this section, and deposited in the United State mail. Either party may change its address by giving fifteen (15) days prior written notice to the party.  Such address until further notice shall be:

        Shell:        Shell Guam, Inc.
                         Suite 102, Capitol Plaza
                         120 Father Duenas Avenue
                         Agana, Guam  96910

        Agent:        Anthony J. Ada
                         P.O. Box 4478
                         Agana, Guam 96910

21.    AMENDMENT AND WAIVER:

a.    Neither the agreement nor any provision hereof may be changed, waived, altered, amended, or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, alteration, amendment or discharge is sought.

b.    Failure by either party to object to any failure of performance by the other party of any provision of the agreement shall not constitute a waiver of, or estoppel against, the right of such party to require such performance by the other.  Nor shall any such failure to object constitute a waiver or estoppel with respect to any succeeding failure of performance.

22.    MISCELLANEOUS:

a.    Any attempt to assign this Agreement, directly or indirectly, by agent without Shell's prior written consent shall constitute a default of this Agreement and any such attempted assignment shall be null and void.

- 12 -

b.     Agent warrants to Shell that Agent has made full disclosure to Shell of all persons having an interest in Agent and its operation under this Agreement.

c.     This Agreement, including documents incorporated herein, contains the entire agreement covering the subject matter, and supersedes any prior agreement between the parties relating to the premises.

d.     The descriptive headings of the several sections and subsections in this Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

e.     This Agreement is made under, and shall be governed and construed in accordance with, the laws, statutes and regulations of Guam.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

SHELL:

SHELL GUAM, INC.

By: _____

**PETER SHORT**
Marketing Manager

AGENT:

_____ 3/1/94
ANTHONY J. ADA

- 13 -

# SCHEDULE I
## LESSEE'S MAINTENANCE OBLIGATIONS

**A.  Yard**

    1.    Maintain all elements within planter area as necessary to retain a healthy and attractive appearance. Items include, but are not limited to, all live and artificial plantings (shrubs, grass, flowers, trees, etc.), decorative rock, bark and entire sprinkler system.

    2.    Regularly remove weeds, leaves, debris and litter from the premises (including rain gutters and downspouts and adjacent sidewalks, driveways and easements).

**B.  Lighting**

Replace all lamps and bulbs, ballasts, ballast wiring, starters and sockets in the interior of building to maintain fixture lighting at all times. Excludes total fixture replacement.

**C.  Plumbing**

    1.    Clear clogged toilets, sinks, building lube bay drains and on-property sewer lines. Clean oil separators and catch basins.

    2.    Maintain all flush mechanisms and faucets, sinks.

    3.    Empty septic tanks as necessary.

**D.  Air Conditioning**

Provide regular inspections and service for A/C systems (to include: tighten belts, lubricate bearings, add air conditioner units in entirety.

**E.  Glasswork/Doors**

Replace all window and door glass, whenever scratched cracked or broken from whatever cause, including bullet-resistance glass or plastic. Maintain, repair or replace all doors and door frame assemblies to keep in operating order.

F.  Floors

> Floors shall be washed daily and must maintain a clean and neat appearance. Professional cleaning services may be mandated by Shell should floor cleanliness and appearance not be acceptable to Shell. Floors shall be restored to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear.

G.  Painting

> During the period between scheduled complete repainting by Shell, the Agent will wash and paint all curbs, yard and building equipment, interior/exterior walls, doors, ceilings and shelving as necessary. Paint and all other painting material supplied by Lessee.

H.  Tanks

1.  Keep fill and access boxes clear of water and debris.

I.  Pumps/Dispensers

1.  Lubricate any gasoline suction pumps in use (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.

2.  Inspect and clean on a daily basis gasoline hoses, clamps, swivels and colored scuff guards, including any associated with a vapor recovery system, air and water hoses, nozzles, couplings and air chucks and report immediately to Shell any damage, defect or leaks in any such equipment.

J.  Air Compressor

> Drain water daily. Add/change oil, replace air filters and lubricate bearings per manufacturer's specifications.

K.  C-Store/Food Mart and Related Equipment (if located on premises)

1.  Maintain Shell-owned cooler/freezer doors and refrigeration units (walk-in and freestanding), gondolas and all other Shell-owned C-store/food mart related equipment, including lamps, ballasts, fuses and glass therein.

2.  Keep all food handling equipment and food preparation areas clean sanitary and in compliance with applicable codes and laws.

3.  Keep all equipment drain lines clean and clear.

- 15 -

L.  Other Equipment

    1.  Maintain all Agent-owned equipment.

    2.  Maintain and replace if lost, stolen or damaged all fire protection equipment provided by Shell.

M.  Miscellaneous

    1.  Maintain all building locks, keys, door closets and latches.

    2.  Maintain all elements of overhead doors, excluding total door replacement, unless damaged by negligence.

    3.  Reset circuit breakers, replace electrical fuses.

    4.  Take all necessary pest control measures.

- 16 -

# EXHIBIT 1c

THIS AGREEMENT IS AN INTERIM FRANCHISE UNDER THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.C.C. 2801 ET SEQ. THE INITIAL TERM OF THIS FRANCHISE IS FOR A PERIOD OF NOT MORE THAN THREE YEARS BEGINNING FEBRUARY 1, 1995 AND ENDING JANUARY 31, 1996. SHELL MAY FAIL TO RENEW THE FRANCHISE RELATIONSHIP AT THE CONCLUSION OF THE INITIAL TERM BY NOTIFYING AGENT, IN ACCORDANCE WITH THE PROVISIONS OF 2804 OF THE PMPA, OF SHELL'S INTENTION NOT TO RENEW THE FRANCHISE RELATIONSHIP. THE PROVISIONS OF 2802 OF THE PMPA, LIMITING THE RIGHT OF A FRANCHISOR TO FAIL TO RENEW A FRANCHISE RELATIONSHIP ARE NOT APPLICABLE TO THIS INTERIM FRANCHISE.

## AGENCY SALES AGREEMENT

### PREAMBLE

THIS AGENCY SALES AGREEMENT is made this 1st day of February, 1995, by and between SHELL GUAM, INC., a Guam corporation, whose mailing address is Suite 102, Capitol Plaza, 120 Father Duenas Avenue, Agana, Guam 96910, hereinafter referred to as "Shell", and ANTHONY J. ADA, having a place of business at a portion of Lot No. 1143, Toto, Municipality of Barrigada, Territory of Guam, Estate No. 566, Suburban, whose mailing address is 766 W Route 8, Barrigada, Guam 96925, hereinafter referred to as "Agent".

### RECITALS

WHEREAS, Agent desires to sell on behalf of Shell the motor fuel products supplied by Shell and to sell the lubricating oils purchased from Shell and to operate the service station and convenience store at Shell's retail site located at 766 W Route 8, Barrigada, Guam 96925, (the "premises"); and

WHEREAS, Shell is willing to supply products to Agent on the terms and conditions hereinafter set forth and to allow Agent to operate its retail site, NOW THEREFORE,

### AGREEMENT

For and in consideration of the above recitals, the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt of which is hereby acknowledged by both parties, it is agreed that:

1.  **DEFINITIONS.** In this Agreement, where the context permits:

EXHIBIT __C__          10083

DEFENDANT'S DEPOSITION EXHIBIT

D-6

a.    "Identifications" means the trademarks, brand names and color schemes which Shell does now or may hereafter own or regularly employ in connection with petroleum and other products which are manufactured and/or sold by Shell.

b.    "lubricating oils" means crankcase and all other lubricating oils and greases now and hereafter supplied or distributed to Agent by or on behalf of Shell.

c.    "motor fuels" means gasoline of any grade and motor diesel fuel now and hereafter supplied to Agent by or on behalf of Shell.

d.    "year" means the period of twelve (12) months beginning on the commencement of the term and each successive period of twelve (12) months thereafter.

e.    "petroleum products" means those products described in subparagraphs (b) and (c) above.

2.    <u>GRANT OF LICENSE</u>.  Shell does hereby grant unto Agent a license to enter, use and occupy the premises and to use the equipment provided by Shell thereat for the purpose of conducting the business to be conducted by Agent on the premises, namely the operations of Shell's service station and convenience store.  This grant of license shall not create in the Agent's favor any tenancy or rights in the nature of a tenancy and, without limiting the generality of the foregoing, the license shall not confer on the Agent any right to exclude from the premises any of Shell's employees, agents, or any person authorized by Shell to enter the premises.

3.    <u>CONVENIENCE STORE</u>.  Agent shall operate the convenience store for the sale of products related to petroleum products to be sold hereunder, and such item or items of merchandise as Agent may decide to sell.  Agent shall maintain an adequate stock level of the items it intends to sell from the convenience store so that adequate supplies are on hand to effectively service the customers of the store.  Agent shall operate the store as an independent contractor and shall acquire, from Agent's own funds, the inventory therein.  The Agent shall comply with the reasonable directions of Shell to Agent with respect to, among other things, staffing, accounting and control procedures, product range, inventory levels, and marketing and merchandising techniques and assistance.

4.    <u>DELIVERY OF PETROLEUM PRODUCTS</u>.

a.    Shell shall deliver to Agent at the premises and Agent shall receive from Shell for sale from the premises on behalf of Shell as its Agent, the motor fuel handled in Shell's service station on the premises.

b.    Agent shall cause sufficient quantities of petroleum products to be delivered to insure adequate and prompt supply of said products to customers who require the same to be supplied to them.

Case 1:00-cv-00012    Document 155-2    Filed 09/01/2005    Page 20 of 34

c.     Agent further agrees to keep each of the underground tanks on the premises into which motor fuels are delivered stocked to at least fifty (50%) percent of their full capacity.

d.     As to lubricating oils, Agent agrees to purchase from Shell and maintain in a prominent location on the premises a reasonable display and selection of lubricating oils.

e.     Agent shall not mix, combine or adulterate any Shell petroleum product with any non-Shell product. Agent shall not offer for sale any petroleum product which it knows or reasonably suspects is contaminated, adulterated or incorrectly labeled.

## 5.     PRICE, QUANTITY & PAYMENT.

a.     The following shall apply to sales of motor fuel:

(1)     Agent shall charge from price to price for the motor fuel as Shell determines from time to time. Agent shall be entitled to payment of the sum of twenty-one cents ($.21) per gallon for each gallon sold of gasoline and diesel.

(2)     In the case of Shell Card holders, Agent shall accept such card, in accordance with Shell Card Guidelines. The volumes so sold shall be included in paragraph 5(a)(1) above.

(3)     In the event Agent elects to accept other credit cards, Agent may do so. In the event Agent desires to provide credit terms to other customers, it may also do so, provided Shell may direct Agent to discontinue such credit terms to a customer or customers if Shell, in its discretion, determines that such accounts are detrimental to the sound operation of the service station. All credit risks for either of such types of credit shall be borne by Agent. Agent shall include with the daily remittance, as provided below, the retail price of such motor fuel, and with the monthly remittance the percentage of the gross proceeds of sales of other products.

(4)     The quantity sold by Agent, upon which payments to it shall be based, shall be determined by reading the meters at all pumps located on the premises from time to time. Shell shall cause the pump calibration to be examined consistent with its standard policies.

A:\BAR1.AGT                               - 3 -                          **10085**

(5)     Agent shall keep and maintain records of the deliveries to it by Shell and shall daily, in accordance with directions from Shell, dip the fuel tanks and keep records of the results thereof.  Agent shall daily reconcile the stock, sales to customers, remittances to Shell, and quantities delivered by Shell.  If the reconciliation indicates sales in excess of metered sales, the volume determined in paragraph (4) above shall be adjusted upward to such amount.  In the event of stock losses in excess of 0.5% in the case of gasoline and 0.25% in the case of diesel, of the volume sold during any period, Agent shall pay to Shell such excess loss at the time weighted sales price set by Shell during the period in question, less twenty-one cents ($.21) per gallon, upon the receipt of the billing therefore by Shell.  Shell shall have the right to access those records from time to time.  Agent shall deliver the reconciliations and meter readings for each month to Shell by the end of the fifth day after the end of that month.

(6)     Following the end of each month, Shell shall advise Agent of the quantities sold during the previous month, and shall pay Agent at the above rate therewith. Agent shall remit to Shell not less often than daily an amount equal to the retail price of the metered quantities sold, less Shell Card sales.

b.     Agent shall pay to Shell fifteen percent (15%) of its gross sales of other petroleum products, equipment, sundries, food, and all other items sold on the premises.  Agent shall provide Shell with a statement of the gross proceeds of such sales and make payment to Shell for Shell's percentage thereof within seven (7) days following the end of each month.

c.     Agent shall purchase from Shell such amounts of lubricant as it may require, from time to time.  The price therefore shall be Shell's wholesale list price for the type and grade of lubricant, in effect at the time of purchase.  Agent shall be invoiced at the end of each month for its purchases during the previous month.  Payment therefore shall be due and payable in full within twenty (20) days from the end of each month.

d.     On the fifteenth (15th) day following the end of each quarter after commencement of operation, Agent shall submit an unaudited income statement and balance sheet to Shell.

e.     Agent shall operate the station sixteen (16) hours a day (from 6:00 a.m. to 10:00 p.m.), seven (7) days a week, holidays included, unless Shell shall notify Agent in writing of different operating hours.

f.     Any tax, duty, charge, levy or fee now or hereafter assessed or imposed on any products sold or delivered under this Agreement, whether on or in respect of the sale or on or in respect of the delivery or on or in respect of the use of the same and whether or not the tax, duty, charge, levy or fee is required to be paid and/or collected shall be paid by Agent. Shell will pay the Gross Receipts Tax (GRT) due on the sale of its motor fuel.

**10086**

Case 1:00-cv-00012     Document 155-2     Filed 09/01/2005     Page 22 of 34

6.    **DELIVERIES.**

a.    Deliveries of motor fuels may be made by and on behalf of Shell and by such means of transport and in such tanks and/or other containers as Shell may elect.

b.    Shell shall not be obligated to make any delivery of motor fuels in any quantity smaller than the load of a road tanker as Shell may select. All orders for the petroleum products shall be made by Agent on that basis.

c.    Shell shall use its good faith efforts to make delivery with sufficient promptness to insure that Agent does not run out of petroleum products. However, Shell shall not be under any liability whatsoever to Agent with respect to Agent running out of any of said products:

(1)    if Agent does not give twenty-four (24) hour notice to Shell that it is likely to run out of any of the petroleum products which it shall specify; or

(2)    if, after Agent has given notice, Shell offers to make delivery within a reasonable period of time under the circumstances and Agent does not accept the offer; or

(3)    if the cause for Agent running out of products is substantially caused by any of the events or circumstances described in paragraph 12, infra.

7.    **FUEL TANKS AND OTHER PROPERTY.** The fuel tanks, pipes, hoses, pumps, building, improvements and equipment shall remain the property of Shell and Shell shall provide such major repair and maintenance as may be necessary. Agent shall promptly notify Shell of any required major repair or maintenance of which it becomes aware. Shell; shall repair or replace any such property as it may from time to time desire. Agent shall provide the routine maintenance as is required in the attached Schedule 1.

8.    **TERM.** The term of this Agreement shall be for a period beginning on February 1, 1995 and ending January 31, 1995 .

9.    **IDENTIFICATIONS.**

a.    Agent shall use the identifications, which Shell may change from time to time at its sole discretion, to identify and advertise Shell's petroleum products. Agent shall not use such identifications for any other purpose or in any matter which may confuse or deceive the public.

b.    Agent shall not sell, display for sale or offer for sale under or in association with the identifications any motor fuels which are not delivered under this Agreement.

10087

A:\BAR1.AGT                                 - 5 -

c.     In the connection with its business on and from the premises, Agent shall maintain and protect the identifications with respect to all gods and shall not do or permit to be done anything that might prejudice or affect the identifications or any of Shell's rights arising thereunder. All advertising, including color schemes of the petroleum products, shall be subject to Shell's prior written approval. If Agent should cease to purchase petroleum products under this Agreement or if this Agreement terminates for any reason, then Agent shall, at Shell's request, immediately and completely discontinue the use of the identifications at the premises and vacate the same. Agent acknowledges and recognizes that injunctive relief is essential for the adequate remedy of any violation by Agent of provisions by this paragraph.

d.     All signs and other advertising devices furnished by Shell at the service station, shall remain Shell's property (whether or not affixed to the premises) and shall be used solely in connection with the sale, display for sale or offering for sale of petroleum products delivered under this Agreement or of services associated therewith and shall be immediately returned to Shell on demand.

10.   **CUSTOMER SERVICE.**  Agent agrees that it shall:

a.     Render prompt, fair, courteous and efficient service to its customers;

b.     Promptly investigate all customer complaints, and make such adjustments which are reasonable and appropriate;

c.     Maintain the premises in a manner which will foster customer acceptance of the petroleum products sold hereunder; provide qualified attendants who render prompt, courteous, and full driveway service to customers and assist self-service customers as may be required;

d.     Provide attendants with Shell approved uniforms and require attendants to maintain a neat and orderly appearance; and

e.     Not employ or permit any illegal, unethical, deceptive, or unfair practices in the conduct of its business.

11.   **CLAIMS. RELEASE.**  Shell shall have no liability to Agent for any defect (patent or latent) in quality or shortage in quantity, of any petroleum products delivered unless Agent gives Shell written notice of Agent's claim within:

a.     Two (2) days after delivery for shortages in quantity of motor fuels ; or

b.     Two (2) days after delivery for quality deficiencies of motor fuels, and further provides Shell; with reasonable opportunity to inspect the products and take test samples.

A:\BAR1.AGT                          - 6 -                    **10088**

Any other claim by Agent of any kind, based on or arising out of this Agreement or otherwise, shall be waived and barred unless Shell is given notice within ninety (90) days after the event, action, or inaction to which such claim relates. Any claim by Agent shall be waived and barred unless asserted by the commencement of an action within twelve (12) months after the event, action or inaction to which such claim relates. In no event shall Shell be liable for prospective profits or special, indirect, or consequential damages. The provisions of this paragraph 8 shall survive any termination of this Agreement, however arising.

12.     **FORCE MAJEURE.**  Shell shall not be liable for loss or damage due to any delay or failure in performance:

      a.     Because of compliance with any action, order, request or control of an governmental authority or person purporting to act therefore; or

      b.     When the supply of products or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by Shell is interrupted, unavailable or inadequate because of wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, weather conditions or for any other cause which Shell determines is beyond its reasonable control when acting in good faith and in the ordinary course of business, whether or not similar to any of the foregoing. Shell shall not be required to remove any such cause or replace the affected source of supply or facility if it shall involve additional expense or a departure from its normal practices. If, for any cause whatsoever, there is, or Shell believes in its reasonable opinion there may be, a shortage of supplies, for whatever reason, so that Shell is or may be unable to meet the demands of all of its customers, Shell may allocate to and among its retail agents, distributors, and customers such quantities of product as Shell determines in the exercise of its ordinary business judgment it has available for distribution to that class of trade, provided that Shell's plan of allocation shall not unreasonably discriminate between Agent and other retail agents, distributors and customers. Shell shall not be required to make any deliveries or quantities omitted pursuant to the provisions of this paragraph, including but not limited to, deliveries or quantities omitted pursuant to Shell's right to allocate products among its retail agents, nor shall Shell be liable for any damages or loss in connection with such omitted deliveries or quantities. In all instances in this paragraph wherein a decision or determination is referred to, such decision or determination shall be made in Shell's sole and absolute discretion when acting in the ordinary course of business.

13.     **INDEMNIFICATION.**

      a.     Each party shall defend, indemnify and hold the other, and the successors and assigns of each, harmless from and against any fines, penalties, charges or expenses, including attorneys fees and court costs, imposed on or incurred by a party, for violations of any laws, ordinances or regulations, arising, directly or indirectly, from any act or omission, whether negligent or otherwise, of a party or its agents, contractors, servants, employees, invitees or others.

**10089**

Case 1:00-cv-00012     Document 155-2     Filed 09/01/2005     Page 25 of 34

b.    Agent hereby assumes the entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of Agent or otherwise, and to all property arising, directly or indirectly, from Agent's business or businesses and/or the use, occupancy, operation and maintenance of the premises (including adjacent sidewalks, drives and curbs) by Agent or any of its agents, servants, contractors, employees, invitees or others.

c.    In the event that any such claims, loss, cost, expense, liability, damage or injury arise or are made, asserted or threatened against Shell, its officers, agents, servants or employees, Shell shall have the right to require Agent to furnish a surety bond satisfactory to Shell guaranteeing such protection, which bond or other evidence of financial responsibility shall be furnished by Agent within five (5) days after written demand has been made therefore.

14.    <u>INSURANCE.</u>  Agent shall obtain, renew and keep current during the term of this Agreement the following insurance coverage:

a.    General liability insurance and insurance on Agent's vehicles operated in the course of Agent's business with limits for any one occurrence of not less than $500,000.00 for personal injury and $300,000.00 for damage to property of others;

b.    Workmen's compensation as required to insure Agent's liability under applicable statutory law;

c.    Such other insurance coverage as Shell may from time to time require;

d.    Agent shall procure and maintain, at its own expense, fire insurance with extended coverage endorsements in the amount of not less than $300,000.00 for property damage arising from any use of the premises and any improvements located or placed thereon (except underground storage tanks). All insurance required or carried by Agent on any of the premises shall be for the protection of Shell and Agent against the risks and liabilities in connection with the premises. In the event that any item or part of the premises, or improvements shall require repair, rebuilding, or replacement resulting from such a loss or damage. Agent shall promptly give notice thereof to Shell and, shall, upon demand, either compensate Shell for such loss or damage, or rebuild, replace or repair the item or part of the premises or improvement thereon so lost or damages as Shell may elect. In the event that Shell shall direct Agent to effect any repair, rebuilding or replacement which it is required to effect pursuant to this Article, Shell shall direct the payment to Agent of so much of the proceeds of any insurance carried by Agent and made available to Shell on account of loss of or damage to any item or part of the premises as may be necessary to enable Agent to effect such repair, rebuilding or replacement. In the event that Shell shall elect not to require Agent to repair, rebuild or replace any item or part of the premises or improvements thereon so lost or damaged, Agent shall promptly pay to Shell out of any insurance proceeds collected by Agent such portion thereof as may be allocable to loss of or damage to the premises, or improvements thereon or if such proceeds have been paid to Shell, Shell shall retain the same.

A:\BAR1.AGT                           - 8 -                    10090

Case 1:00-cv-00012    Document 155-2    Filed 09/01/2005    Page 26 of 34

e. Shell shall be named as an additional named insured on all such policies. All policies shall be written by reputable insurance companies authorized to engage in the insurance business within Guam. Agent shall pay all premiums and assessments charged for such policies when due. Each such policy shall have a provision that requires that Shell shall be given thirty (30) days written notice before any termination, cancellation, non-renewal, or material change shall become effective. In the event that any such policy is terminated r cancelled, Agent shall promptly, prior to the termination date of such policy, procure a new or substitute policy containing the same or additional coverage, such policy to afford coverage concurrent with the termination of the cancelled or terminated policy. Certificates of insurance evidencing policies required hereunder shall be provided Shell within fifteen (15) days prior to the effective date of the policy.

f. The failure of Agent to (1) obtain any of the required insurance coverage, or (2) to pay all premium and assessments when due, or (3) to comply with all terms and conditions of such policy or the directions of such policy or the directions of the insurance carrier or its rating bureau or the National Fire Protection Association, or (4) to obtain new or substitute policies as herein provided shall be a default hereunder. Shell, at its option, may obtain same, or otherwise cure said default at Agent's sole cost and expense, and Agent shall mediately pay to Shell upon demand any expenses incurred by Shell hereunder.

15. **TERMINATION AND NON-RENEWAL.**

a. **Termination.** Subject to any limitations imposed by law, Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Agent for any one or more of the following grounds:

(1) Failure by Agent to comply with any provision of this Agreement , which provisions are both reasonable and of material significance to the relationship hereunder;

(2) Failure by Agent to exert good faith efforts to carry out the provisions of this Agreement;

(3) Occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this Agreement is reasonable, including such as:

(i) Fraud or criminal misconduct by Agent relevant to the operation of Shell's service station;

(ii) Declaration of bankruptcy or judicial determination of insolvency of the Agent;

**10091**

Case 1:00-cv-00012    Document 155-2    Filed 09/01/2005    Page 27 of 34

(iii)     Continuing severe physical or mental disability of Agent of at least three (3) months duration which renders Agent unable to provide for the continued proper operation of the premises;

(iv)  Loss of Shell's rights to grant the right to use the trademark which is the subject of this Agreement , unless such loss was due to trademark abuse, violation of Federal or Guam law, or other fault or negligence of Shell, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by Shell;

(v)   Destruction (other than by Shell) of all or a substantial part of the premises;

(vi)  Failure by Agent to pay to Shell in a timely manner when due all sums to which Shell is legally entitled;

(vii) Failure by Agent to operate the premises for two (2) consecutive days (or such longer period of time as is reasonably necessary if the closure is due to a typhoon), or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(viii) Willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Agent;

(ix)  Knowing failure of Agent to comply with Federal of Guam laws r regulations relevant to the operation of the premises;

(x)     Conviction of Agent of any felony involving moral turpitude; and

(xi)  Death of Agent.

(4)     A determination is made by Shell in god faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in the Territory of Guam; and

(5)     Any other ground for which termination is provided for in this Agreement or in any related agreements constituting a franchise between Shell and Agent, or is otherwise allowed by the PMPA or other applicable law.

b.     Non-Renewal.  Neither party is obligated to renew this Agreement.  In the event Shell determines not to renew this Agreement or any franchise relationship existing with respect thereto, it may do so upon notice to Agent (as required by law);

**10092**

Case 1:00-cv-00012     Document 155-2     Filed 09/01/2005     Page 28 of 34

c.  **Acts Attributable to Agent.**  In determining whether a ground for termination exists under this paragraph 15: (1) the acts or omissions of Agent's employees, agents and contractors shall be deemed to be the acts or omissions of Agent; (2)  if Agent is composed of more than one person, the acts or omissions of each such person shall be deemed to be the acts or omissions of Agent; or (3) if Agent is a partnership or corporation, the acts or omissions of each partner or director, officer or shareholder, as the case may be, shall be deemed to be the acts or omissions of Agent.

d.  **Other Remedies.**  Any termination under the foregoing provisions of this paragraph 2 shall be without limitation of any other rights or remedies available to Shell under this Agreement or otherwise.  All sums due by Agent to Shell under the provisions of this Agreement shall be payable by Agent as provided herein, and shall be payable by Agent to Shell as provided herein, and shall bear interest at the rate of ten percent (10%) per month (or lesser maximum rate permitted by law) from the date due until paid.  Shell may, by written notice to Agent, reduce the rate of interest.  If Agent defaults in payment of any indebtedness to Shell, in addition to the rights provided above, Shell shall have the right to immediately to suspend deliveries hereunder and to apply any sums which Shell may hold for Agent's account under this Agreement to the payment of such indebtedness, without relieving the Agent of any obligations otherwise existing to pay, repay or replace the sums so applied. Either party's right to require strict performance of the other's obligations hereunder shall not be affected by any previous waiver, forbearance, course of dealing, or trade custom or usage.

16.  **REPRESENTATIONS AND ASSURANCE.**  Shell has entered into this Agreement in reliance on Agent's personal qualifications and representations to Shell of Agent's desire to operate a retail service station selling Shell branded products, and that it will conduct its business so as to maintain or enhance the public acceptance the identifications and other Shell branded agents.  Agent acknowledges that its conduct will impact these areas so long as Agent holds itself out to the public as a branded agent.  Agent agrees to use its best efforts to promote the sale of petroleum products to conduct its business so as to meet or exceed Shell's high standards of retailing, appearance, customer service and product quality, and to refrain from conduct which will detract from the value of the identifications or which would tend to lower the public acceptance of Shell's branded agents. The obligations assumed by Agent herein are the very essence of this Agreement, and Agent's failure or refusal to comply therewith shall be grounds for termination of this Agreement and the relationship between the parties.

17.  **RELATIONSHIP OF SHELL AND AGENT.**  Agent is in business independent of Shell, and nothing in shall; be deemed as creating any right in Shell to exercise any control over, or to direct in any respect, the conduct or management of Agent's business, subject only to Agent's performance of the obligations imposed under this Agreement.  Neither Agent nor any person performing work at the premises for, or on behalf of Agent, shall be deemed an employee or agent of Shell (except as herein provided with respect to Agent).

**10093**

Case 1:00-cv-00012    Document 155-2    Filed 09/01/2005    Page 29 of 34

18. **SEVERABILITY**. If any provision of this Agreement is rendered invalid or of doubtful validity because of (a) a judicial decision with respect to the same provisions in another agreement, (b) a judicial decision with respect to an analogous provisions in a franchise agreement, (c) an official opinion or statement of any federal or territorial official or regulatory agency, or (d) law, the parties shall modify this Agreement by deleting such provision and by negotiating in good faith a modification of the provision that retains insofar as possible the removed provision.

19. **ATTORNEYS FEES**. If any legal action, suit or other proceeding is brought for the enforcement of this Agreement, or because of any alleged dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys fees and Court costs incurred in the action, suit or proceeding, in addition to any other remedy or relief to which it may be entitled.

20. **NOTICES**. Except as otherwise expressly specified herein, any notice to be given hereunder by either party to the other shall be deemed sufficiently given if in writing and delivered either in person or enclosed in an envelope properly stamped and address and addressed to the party at the address set forth in this section, and deposited in the United State mail. Either party may change its address by giving fifteen (15) days prior written notice to the party. Such address until further notice shall be:

Shell:      Shell Guam, Inc.
           Suite 102, Capitol Plaza
           120 Father Duenas Avenue
           Agana, Guam 96910

Agent:     Anthony J. Ada
           P.O. Box 4478
           Agana, Guam 96910

21. **AMENDMENT AND WAIVER:**

     a.     Neither the agreement nor any provision hereof may be changed, waived, altered, amended, or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, alteration, amendment or discharge is sought.

     b.     Failure by either party to object to any failure of performance by the other party of any provision of the agreement shall not constitute a waiver of, or estoppel against, the right of such party to require such performance by the other. Nor shall any such failure to object constitute a waiver or estoppel with respect to any succeeding failure of performance.

**10094**

## 22. MISCELLANEOUS:

a. Any attempt to assign this Agreement, directly or indirectly, by agent without Shell's prior written consent shall constitute a default of this Agreement and any such attempted assignment shall be null and void.

b. Agent warrants to Shell that Agent has made full disclosure to Shell of all persons having an interest in Agent and its operation under this Agreement.

c. This Agreement, including documents incorporated herein, contains the entire agreement covering the subject matter, and supersedes any prior agreement between the parties relating to the premises.

d. The descriptive headings of the several sections and subsections in this Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

e. This Agreement is made under, and shall be governed and construed in accordance with, the laws, statutes and regulations of Guam.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

SHELL:

SHELL GUAM, INC.

By: _____

PAUL P. PERROT
Vice President/Marketing Manager

AGENT:

By: _____

ANTHONY J. ADA

10095

## SCHEDULE 1
## ~~EE'S MAINTENANCE OBLIGATIONS~~

**A.**

~~ments~~ within planter area as necessary to retain a healthy and ~~ce.~~ Items include, but are not limited to, all live and artificial ~~grass, flowers, trees, etc.), decorative rock, bark and entire~~

2. ~~eds,~~ leaves, debris and litter from the premises (including ~~nspouts~~ and adjacent sidewalks, driveways and easements).

**B.** Lig~~~~

Repl~~~~ ~~ballasts,~~ ballast wiring, starters and sockets in the interior of b~~~~ lighting at all times. Excludes total fixture replacement.

**C.** Plum~~~~

1. ~~building lube bay drains and on-property sewer lines.~~ ~~ch basins.~~

2. ~~ms~~ and faucets, sinks.

3. E~~~~ ~~ary.~~

**D.** Air Con~~~~

Provide regul~~~~ ~~vice~~ for A/C systems (to include: tighten belts, lubricate bea~~~~ ~~nits~~ in entirety.

**E.** Glasswork/D~~~~

Replace all windo~~~~ ~~scratched~~ cracked or broken from whatever cause, including b~~~~ ~~plastic.~~ Maintain, repair or replace all doors and door frame ass~~~~ ~~ating~~ order.

**10096**

\BAR1.AGT      - 14 -

Case 1:00-cv-00012     Document 155-2     Filed 09/01/2005     Page 32 of 34

**F. Floors**

Floors shall be washed daily and must maintain a clean and neat appearance. Professional cleaning services may be mandated by Shell should floor cleanliness and appearance not be acceptable to Shell. Floors shall be restored to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear.

**G. Painting**

During the period between scheduled complete repainting by Shell, the Agent will wash and paint all curbs, yard and building equipment, interior/exterior walls, doors, ceilings and shelving as necessary. Paint and all other painting material supplied by Lessee.

**H. Tanks**

1. Keep fill and access boxes clear of water and debris.

**I. Pumps/Dispensers**

1. Lubricate any gasoline suction pumps in use (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.

2. Inspect and clean on a daily basis gasoline hoses, clamps, swivels and colored scuff guards, including any associated with a vapor recovery system, air and water hoses, nozzles, couplings and air chucks and report immediately to Shell any damage, defect or leaks in any such equipment.

**J. Air Compressor**

Drain water daily. Add/change oil, replace air filters and lubricate bearings per manufacturer's specifications.

**K. C-Store/Food Mart and Related Equipment (if located on premises)**

1. Maintain Shell-owned cooler/freezer doors and refrigeration units (walk-in and freestanding), gondolas and all other Shell-owned C-store/food mart related equipment, including lamps, ballasts, fuses and glass therein.

2. Keep all food handling equipment and food preparation areas clean sanitary and in compliance with applicable codes and laws.

3. Keep all equipment drain lines clean and clear.

10097

Case 1:00-cv-00012    Document 155-2    Filed 09/01/2005    Page 33 of 34

## L. Other Equipment

1. Maintain all Agent-owned equipment.

2. Maintain and replace if lost, stolen or damaged all fire protection equipment provided by Shell.

## M. Miscellaneous

1. Maintain all building locks, keys, door closets and latches.

2. Maintain all elements of overhead doors, excluding total door replacement, unless damaged by negligence.

3. Reset circuit breakers, replace electrical fuses.

4. Take all necessary pest control measures.

10098

# EXHIBIT 1d

THIS AGREEMENT IS A FRANCHISE UNDER THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.C.C. 2801 ET SEQ. THE TERM OF THIS FRANCHISE IS FOR A PERIOD OF NOT MORE THAN FIVE YEARS AS STATED IN SCHEDULE 2(A). SHELL MAY FAIL TO RENEW THE FRANCHISE RELATIONSHIP AT THE CONCLUSION OF THE INITIAL TERM BY NOTIFYING AGENT, IN ACCORDANCE WITH THE PROVISIONS OF 2804 OF THE PMPA, OF SHELL'S INTENTION NOT TO RENEW THE FRANCHISE RELATIONSHIP. THE PROVISIONS OF 2802 OF THE PMPA, LIMITING THE RIGHT OF A FRANCHISOR TO FAIL TO RENEW A FRANCHISE RELATIONSHIP ARE NOT APPLICABLE TO THIS TRIAL FRANCHISE.

## AGENCY SALES AGREEMENT

### PREAMBLE

THIS AGENCY SALES AGREEMENT is made on this day which appears in Schedule 2(B) by and between SHELL GUAM, INC., a Guam corporation, whose mailing address is Capitol Plaza, Suite 102, 120 Father Duenas Avenue, Agana, Guam 96910, hereinafter referred to as "Shell", and the entity whose name appears in Schedule 2(C), whose mailing address appears in Schedule 2(D), hereinafter referred to as "Agent".

### RECITALS

WHEREAS, Agent desires to sell on behalf of Shell the motor fuel products supplied by Shell and to sell the lubricating oils purchased from Shell and to operate the service station and convenience store at Shell's retail site located at the physical location which is described in Schedule 2(E), hereinafter referred to as the "premises"; and

WHEREAS, Shell is willing to supply products to Agent on the terms and conditions hereinafter set forth and to allow Agent to operate its retail site, NOW THEREFORE,

### AGREEMENT

For and in consideration of the above recitals, the covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt of which is hereby acknowledged by both parties, it is agreed that:

1. **DEFINITIONS**. In this Agreement, where the context permits:



DEFENDANT'S DEPOSITION EXHIBIT
D-7

EXHIBIT- D

a. "identifications" means the trademarks, brand names and color schemes which Shell does now or may hereafter own or regularly employ in connection with petroleum and other products which are manufactured and/or sold by Shell.

b. "lubricating oils" means crankcase and all other lubricating oils and greases now and hereafter supplied or distributed to Agent by or on behalf of Shell.

c. "motor fuels" means gasoline of any grade and motor diesel fuel now and hereafter supplied to Agent by or on behalf of Shell.

d. "year" means the period of twelve (12) months beginning on the commencement of the term and each successive period of twelve (12) months thereafter.

e. "petroleum products" means those products described in subparagraphs (b) and (c) above.

2. **GRANT OF LICENSE.** Shell does hereby grant unto Agent a license to enter, use and occupy the premises and to use the equipment provided by Shell thereat during the term for the purpose of conducting the business to be conducted by Agent on the premises, namely the operations of Shell's service station and convenience store. This grant of license shall not create in the Agent's favor any tenancy or rights in the nature of a tenancy and, without limiting the generality of the foregoing, the license shall not confer on the Agent any right to exclude from the premises any of Shell's employees, agents, or any person authorized by Shell to enter the premises. In consideration hereof, Agent shall pay to Shell the sum which appears in Schedule 2(F) for the term stated in the same.

3. **CONVENIENCE STORE.** Agent shall operate the convenience store for the sale of products related to petroleum products to be sold hereunder, and such item or items of merchandise as Agent may decide to sell. Agent shall maintain an adequate stock level of the items it intends to sell from the convenience store so that adequate supplies are on hand to effectively service the customers of the store. Agent shall operate the store as an independent contractor and shall acquire, from Agent's own funds, the inventory therein. The Agent shall comply with the reasonable directions of Shell to Agent with respect to, among other things, staffing, accounting and control procedures, product range, inventory levels, and marketing and merchandising techniques and assistance.

4. **DELIVERY OF PETROLEUM PRODUCTS.**

a. Shell shall deliver to Agent at the premises and Agent shall receive from Shell for sale from the premises on behalf of Shell as its Agent, the motor fuel handled in Shell's service station on the premises.

2

b. Agent shall cause sufficient quantities of petroleum products to be delivered to insure adequate and prompt supply of said products to customers who require the same to be supplied to them.

c. Agent further agrees to keep each of the underground tanks on the premises into which motor fuels are delivered stocked to a least fifty (50%) percent of their full capacity.

d. As to lubricating oils, Agent agrees to purchase from Shell and maintain in a prominent location on the premises a reasonable display and selection of lubricating oils.

e. Agent shall not mix, combine or adulterate any Shell petroleum product with any non-Shell product. Agent shall not offer for sale any petroleum product which it knows or reasonably suspects is contaminated, adulterated or incorrectly labeled.

5. **PRICE, QUANTITY & PAYMENT**.

a. The following shall apply to sales of motor fuel:

(1) Agent shall charge from price to price for the motor fuel as Shell determines from time to time. Agent shall be entitled to payment of the sum of which appears in Schedule 2(G).

(2) In the case of Shell Card holders, Agent shall accept such card, in accordance with Shell Card Guidelines. The volumes so sold shall be included in paragraph 4(a)(1) above.

(3) In the event Agent elects to accept other credit cards, Agent may do so. In the event Agent desires to provide credit terms to other customers, it may also do so, provided Shell may direct Agent to discontinue such credit terms to a customer or customers if Shell, in its discretion, determines that such accounts are detrimental to the sound operation of the service station. All credit risks for either of such types of credit shall be borne by Agent. Agent shall include with the daily remittance, as provided below, the retail price of such motor fuel.

(4) The quantity sold by Agent, upon which payments to it shall be based, shall be determined by reading the meters at all pumps located on the premises from time to time. Shell shall cause the pump calibration to be examined consistent with its standard policies.

(5) Agent shall keep and maintain records of the deliveries to it by Shell and shall daily, in accordance with directions from Shell, dip the fuel tanks and keep records of the results thereof. Agent shall daily reconcile the stock, sales to customers,

3

remittances to Shell, and quantities delivered by Shell. If the reconciliation indicates sales in excess of metered sales, the volume determined in paragraph (4) above shall be adjusted upward to such amount. In the event of stock losses in excess of .5% in the case of gasoline and .25% in the case of diesel, of the volume sold during any period, Agent shall pay to Shell such excess loss at the time weighted sales price set by Shell during the period in question, less the sum of which appears in Schedule 2(H), upon the receipt of the billing therefore by Shell. Shell shall have the right to access those records from time to time. Agent shall deliver the reconciliations and meter readings for each month to Shell by the end of the fifth day after the end of that month.

(6)    Following the end of each month, Shell shall advise Agent of the quantities sold during the previous month, and shall pay Agent at the above rate therewith. Agent shall remit to Shell not less often than daily an amount equal to the retail price of the metered quantities sold, less Shell Card sales.

b.    Agent shall purchase from Shell such amounts of lubricant as it may require, from time to time. The price therefore shall be Shell's wholesale list price for the type and grade of lubricant, in effect at the time of purchase. Agent shall be invoiced at the end of each month for its purchases during the previous month. Payment therefore shall be due and payable in full within twenty (20) days from the end of each month.

c.    On the fifteenth (15th) day following the end of each quarter after commencement of operation, Agent shall submit an unaudited income statement and balance sheet to Shell.

d.    Agent shall operate the station during the hours and days which appear in Schedule 2(I), unless Shell shall notify Agent in writing of different operating hours.

e.    Any tax, duty, charge, levy or fee now or hereafter assessed or imposed on any products sold or delivered under this Agreement, whether on or in respect of the sale or on or in respect of the delivery or on or in respect of the use of the same and whether or not the tax, duty, charge, levy or fee is required to be paid and/or collected shall be paid by Agent. Shell will pay the Gross Receipts Tax (GRT) due on the sale of its motor fuel.

6.    **DELIVERIES**.

a.    Deliveries of motor fuels may be made by and on behalf of Shell and by such means of transport and in such tanks and/or other containers as Shell may elect.

b.    Shell shall not be obligated to make any delivery of motor fuels in any quantity smaller than the load of a road tanker as Shell may select. All orders for the petroleum products shall be made by Agent on that basis.

4

c.     Shell shall use its good faith efforts to make delivery with sufficient promptness to insure that Agent does not run out of petroleum products. However, Shell shall not be under any liability whatsoever to Agent with respect to Agent running out of any of said products:

(1)     if Agent does not give twenty-four (24) hour notice to Shell that it is likely to run out of any of the petroleum products which it shall specify; or

(2)     if, after Agent has given notice, Shell offers to make delivery within a reasonable period of time under the circumstances and Agent does not accept the offer; or

(3)     if the cause for Agent running out of products is substantially caused by any of the events or circumstances described in paragraph 12, infra.

7.     **FUEL TANKS AND OTHER PROPERTY**.  The fuel tanks, pipes, hoses, pumps, building, improvements and equipment shall remain the property of Shell and Shell shall provide such major repair and maintenance as may be necessary.  Agent shall promptly notify Shell of any required major repair or maintenance of which it becomes aware.  Shell shall repair or replace any such property as it may from time to time desire.  Agent shall provide the routine maintenance as is required in the attached Schedule 1.

8.     **TERM**.  The term of this Agreement shall be for the period which appears in Schedule 2(A).

9.     **IDENTIFICATIONS**.

a.     Agent shall use the identifications, which Shell may change from time to time at its sole discretion, to identify and advertise Shell's petroleum products.  Agent shall not use such identifications for any other purpose or in any matter which may confuse or deceive the public.

b.     Agent shall not sell, display for sale or offer for sale under or in association with the identifications any motor fuels which are not delivered under this Agreement.

c.     In the connection with its business on and from the premises, Agent shall maintain and protect the identifications with respect to all goods and shall not do or permit to be done anything that might prejudice or affect the identifications or any of Shell's rights arising thereunder. All advertising, including color schemes of the petroleum products, shall be subject to Shell's prior written approval. If Agent should cease to purchase petroleum products under this Agreement or if this Agreement terminates for any reason, then Agent shall, at Shell's

5

request, immediately and completely discontinue the use of the identifications at the premises and vacate the same. Agent acknowledges and recognizes that injunctive relief is essential for the adequate remedy of any violation by Agent of provisions by this paragraph.

      d.    All signs and other advertising devices furnished by Shell at the service station, shall remain Shell's property (whether or not affixed to the premises) and shall be used solely in connection with the sale, display for sale or offering for sale of petroleum products delivered under this Agreement or of services associated therewith and shall be immediately returned to Shell on demand.

10.    <u>CUSTOMER SERVICE</u>.  Agent agrees that it shall:

      a.    Render prompt, fair, courteous and efficient service to its customers;

      b.    Promptly investigate all customer complaints, and make such adjustments which are reasonable and appropriate;

      c.    Maintain the premises in a manner which will foster customer acceptance of the petroleum products sold hereunder; provide qualified attendants who render prompt, courteous, and full driveway service to customers and assist self-service customers as may be required;

      d.    Provide attendants with Shell approved uniforms and require attendants to maintain a neat and orderly appearance; and

      e.    Not employ or permit any illegal, unethical, deceptive, or unfair practices in the conduct of its business.

11.    <u>CLAIMS, RELEASE</u>.  Shell shall have no liability to Agent for any defect (patent or latent) in quality or shortage in quantity, of any petroleum products delivered unless Agent gives Shell written notice of Agent's claim within:

      a.    Two (2) days after delivery for shortages in quantity of motor fuels ; or

      b.    Two (2) days after delivery for quality deficiencies of motor fuels, and further provides Shell with reasonable opportunity to inspect the products and take test samples.

    Any other claim by Agent of any kind, based on or arising out of this Agreement or otherwise, shall be waived and barred unless Shell is given notice within ninety (90) days after the event, action, or inaction to which such claim relates.  Any claim by Agent shall be waived and barred unless asserted by the commencement of an action within twelve (12) months after the event, action or inaction to which such claim relates.  In no event shall Shell be liable for

6

prospective profits or special, indirect, or consequential damages. The provisions of this paragraph 11 shall survive any termination of this Agreement, however arising.

12. **FORCE MAJEURE**. Shell shall not be liable for loss or damage due to any delay or failure in performance:

     a. Because of compliance with any action, order, request or control of an governmental authority or person purporting to act therefore; or

     b. When the supply of products or any facility of production, manufacture, storage, transportation, distribution or delivery contemplated by Shell is interrupted, unavailable or inadequate because of wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, weather conditions or for any other cause which Shell determines is beyond its reasonable control when acting in good faith and in the ordinary course of business, whether or not similar to any of the foregoing. Shell shall not be required to remove any such cause or replace the affected source of supply or facility if it shall involve additional expense or a departure from its normal practices. If, for any cause whatsoever, there is, or Shell believes in its reasonable opinion there may be, a shortage of supplies, for whatever reason, so that Shell is or may be unable to meet the demands of all of its customers, Shell may allocate to and among its retail agents, distributors, and customers such quantities of product as Shell determines in the exercise of its ordinary business judgment it has available for distribution to that class of trade, provided that Shell's plan of allocation shall not unreasonably discriminate between Agent and other retail agents, distributors and customers. Shell shall not be required to make any deliveries or quantities omitted pursuant to the provisions of this paragraph, including but not limited to, deliveries or quantities omitted pursuant to Shell's right to allocate products among its retail agents, nor shall Shell be liable for any damages or loss in connection with such omitted deliveries or quantities. In all instances in this paragraph wherein a decision or determination is referred to, such decision or determination shall be made in Shell's sole and absolute discretion when acting in the ordinary course of business.

13. **INDEMNIFICATION**.

     a. Each party shall defend, indemnify and hold the other, and the successors and assigns of each, harmless from and against any fines, penalties, charges or expenses, including attorneys fees and court costs, imposed on or incurred by a party, for violations of any laws, ordinances or regulations, arising, directly or indirectly, from any act or omission, whether negligent or otherwise, of a party or its agents, contractors, servants, employees, invitees or others.

     b. Agent hereby assumes the entire responsibility and liability for any and all damage or injury of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of Agent or otherwise, and to all property arising, directly or

7

indirectly, from Agent's business or businesses and/or the use, occupancy, operation and maintenance of the premises (including adjacent sidewalks, drives and curbs) by Agent or any of its agents, servants, contractors, employees, invitees or others.

    c.    In the event that any such claims, loss, cost, expense, liability, damage or injury arise or are made, asserted or threatened against Shell, its officers, agents, servants or employees, Shell shall have the right to require Agent to furnish a surety bond satisfactory to Shell guaranteeing such protection, which bond or other evidence of financial responsibility shall be furnished by Agent within five (5) days after written demand has been made therefore.

    14.   **INSURANCE**.  Agent shall obtain, renew and keep current during the term of this Agreement the following insurance coverage:

    a.    General liability insurance and insurance on Agent's vehicles operated in the course of Agent's business with limits for any one occurrence of not less than **Five Hundred Thousand Dollars ($500,000.00)** for personal injury and **Three Hundred Thousand Dollars ($300,000.00)** for damage to property of others;

    b.    Workmen's compensation as required to insure Agent's liability under applicable statutory law;

    c.    Such other insurance coverage as Shell may from time to time require;

    d.    Agent shall procure and maintain, at its own expense, fire insurance with extended coverage endorsements in the amount of not less than **Three Hundred Thousand Dollars ($300,000.00)** for property damage arising from any use of the premises and any improvements located or placed thereon (except underground storage tanks). All insurance required or carried by Agent on any of the premises shall be for the protection of Shell and Agent against the risks and liabilities in connection with the premises. In the event that any item or part of the premises, or improvements thereon shall require repair, rebuilding, or replacement resulting from such a loss or damage. Agent shall promptly give notice thereof to Shell and, shall, upon demand, either compensate Shell for such loss or damage, or rebuild, replace or repair the item or part of the premises or improvement thereon so lost or damages as Shell may elect. In the event that Shell shall direct Agent to effect any repair, rebuilding or replacement which it is required to effect pursuant to this Article, Shell shall direct the payment to Agent of so much of the proceeds of any insurance carried by Agent and made available to Shell on account of loss of or damage to any item or part of the premises as may be necessary to enable Agent to effect such repair, rebuilding or replacement. In the event that Shell shall elect not to require Agent to repair, rebuild or replace any item or part of the premises or improvements thereon so lost or damaged, Agent shall promptly pay to Shell out of any insurance proceeds collected by Agent such portion thereof as may be allocable to loss of or damage to the premises, or improvements thereon or if such proceeds have been paid to Shell, Shell shall retain the same.

8

e. Shell shall be named as an additional named insured on all such policies. All policies shall be written by reputable insurance companies authorized to engage in the insurance business within the Guam. Agent shall pay all premiums and assessments charged for such policies when due. Each such policy shall have a provision that requires that Shell shall be given thirty (30) days written notice before any termination, cancellation, non-renewal, or material change shall become effective. In the event that any such policy is terminated or cancelled, Agent shall promptly, prior to the termination date of such policy, procure a new or substitute policy containing the same or additional coverage, such policy to afford coverage concurrent with the termination of the cancelled or terminated policy. Certificates of insurance evidencing policies required hereunder shall be provided Shell within fifteen (15) days prior to the effective date of the policy.

f. The failure of Agent to (1) obtain any of the required insurance coverage, or (2) to pay all premium and assessments when due, or (3) to comply with all terms and conditions of such policy or the directions of such policy or the directions of the insurance carrier or its rating bureau or the National Fire Protection Association, or (4) to obtain new or substitute policies as herein provided shall be a default hereunder. Shell, at its option, may obtain same, or otherwise cure said default at Agent's sole cost and expense, and Agent shall immediately pay to Shell upon demand any expenses incurred by Shell hereunder.

15. TERMINATION AND NON-RENEWAL.

a. Termination. Subject to any limitations imposed by law, Shell may, at its option, terminate this Agreement upon notice (or advance notice if and as required by law) to Agent for any one or more of the following grounds:

(1) Failure by Agent to comply with any provision of this Agreement , which provisions are both reasonable and of material significance to the relationship hereunder;

(2) Failure by Agent to exert good faith efforts to carry out the provisions of this Agreement;

(3) Occurrence of an event which is relevant to the relationship hereunder and as a result of which termination of this Agreement is reasonable, including such as:

(i) Fraud or criminal misconduct by Agent relevant to the operation of Shell's service station;

(ii) Declaration of bankruptcy or judicial determination of insolvency of the Agent;

9

(iii)   Continuing severe physical or mental disability of Agent of at least three (3) months duration which renders Agent unable to provide for the continued proper operation of the premises;

(iv)   Loss of Shell's rights to grant the right to use the trademark which is the subject of this Agreement , unless such loss was due to trademark abuse, violation of Federal or Guam law, or other fault or negligence of Shell, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by Shell;

(v)   Destruction (other than by Shell) of all or a substantial part of the premises;

(vi)   Failure by Agent to pay to Shell in a timely manner when due all sums to which Shell is legally entitled;

(vii)   Failure by Agent to operate the premises for two (2) consecutive days (or such longer period of time as is reasonably necessary if the closure is due to a typhoon), or such lesser period which under the facts and circumstances constitutes an unreasonable period of time;

(viii)   Willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by Agent;

(ix)   Knowing failure of Agent to comply with Federal or Guam laws or regulations relevant to the operation of the premises;

(x)   Conviction   of   Agent   of any felony involving moral turpitude; and

(xi)   Death of Agent.

(4)   A determination is made by Shell in good faith and in the normal course of business to withdraw from marketing of motor fuel through retail outlets in Guam; and

(5)   Any other ground for which termination is provided for in this Agreement or in any related agreements constituting a franchise between Shell and Agent, or is otherwise allowed by the PMPA or other applicable law.

b.   Non-Renewal.   Neither party is obligated to renew this Agreement. In the event Shell determines not to renew this Agreement or any franchise relationship existing with respect thereto, it may do so upon notice to Agent (as required by law);

10

c. **Acts Attributable to Agent**. In determining whether a ground for termination exists under this paragraph 15: (1) the acts or omissions of Agent's employees, agents and contractors shall be deemed to be the acts or omissions of Agent; (2) if Agent is composed of more than one person, the acts or omissions of each such person shall be deemed to be the acts or omissions of Agent; or (3) if Agent is a partnership or corporation, the acts or omissions of each partner or director, officer or shareholder, as the case may be, shall be deemed to be the acts or omissions of Agent.

d. **Other Remedies**. Any termination under the foregoing provisions of this paragraph 15 shall be without limitation of any other rights or remedies available to Shell under this Agreement or otherwise. All sums due by Agent to Shell under the provisions of this Agreement shall be payable by Agent as provided herein, and shall be payable by Agent to Shell as provided herein, and shall bear interest at the rate of ten percent (10%) per month (or lesser maximum rate permitted by law) from the date due until paid. Shell may, by written notice to Agent, reduce the rate of interest. If Agent defaults in payment of any indebtedness to Shell, in addition to the rights provided above, Shell shall have the right to immediately suspend deliveries hereunder and to apply any sums which Shell may hold for Agent's account under this Agreement to the payment of such indebtedness, without relieving the Agent of any obligations otherwise existing to pay, repay or replace the sums so applied. Either party's right to require strict performance of the other's obligations hereunder shall not be affected by any previous waiver, forbearance, course of dealing, or trade custom or usage.

16. **REPRESENTATIONS AND ASSURANCE**. Shell has entered into this Agreement in reliance on Agent's personal qualifications and representations to Shell of Agent's desire to operate a retail service station selling Shell branded products, and that it will conduct its business so as to maintain or enhance the public acceptance the identifications and other Shell branded agents. Agent acknowledges that its conduct will impact these areas so long as Agent holds itself out to the public as a branded agent. Agent agrees to use its best efforts to promote the sale of petroleum products to conduct its business so as to meet or exceed Shell's high standards of retailing, appearance, customer service and product quality, and to refrain from conduct which will detract from the value of the identifications or which would tend to lower the public acceptance of Shell's branded agents. The obligations assumed by Agent herein are the very essence of this Agreement, and Agent's failure or refusal to comply therewith shall be grounds for termination of this Agreement and the relationship between the parties.

17. **RELATIONSHIP OF SHELL AND AGENT**. Agent is in business independent of Shell, and nothing in shall; be deemed as creating any right in Shell to exercise any control over, or to direct in any respect, the conduct or management of Agent's business, subject only to Agent's performance of the obligations imposed under this Agreement. Neither Agent nor any person performing work at the premises for, or on behalf of Agent, shall be deemed an employee or agent of Shell (except as herein provided with respect to Agent).

11

18.   **SEVERABILITY**.  If any provision of this Agreement is rendered invalid or of doubtful validity because of (a) a judicial decision with respect to the same provisions in another agreement, (b) a judicial decision with respect to an analogous provisions in a franchise agreement, (c) an official opinion or statement of any federal or territorial official or regulatory agency, or (d) law, the parties shall modify this Agreement by deleting such provision and by negotiating in good faith a modification of the provision that retains insofar as possible the removed provision.

19.   **ATTORNEYS FEES**.  If any legal action, suit or other proceeding is brought for the enforcement of this Agreement, or because of any alleged dispute, breach or default in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys fees and Court costs incurred in the action, suit or proceeding, in addition to any other remedy or relief to which it may be entitled.

20.   **NOTICES**.  Except as otherwise expressly specified herein, any notice to be given hereunder by either party to the other shall be deemed sufficiently given if in writing and delivered either in person or enclosed in an envelope properly stamped and address and addressed to the party at the address set forth in this section, and deposited in the United States mail.  Either party may change its address by giving fifteen (15) days prior written notice to the party.  Such address until further notice shall be:

Shell:      SHELL GUAM, INC.
            Capitol Plaza, Suite 102
            120 Father Duenas Avenue
            Agana, Guam 96910

Agent:      see Schedule 2(D).

21.   **AMENDMENT AND WAIVER**:

**a.**      Neither the agreement nor any provision hereof may be changed, waived, altered, amended, or discharged orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, alteration, amendment or discharge is sought.

**b.**      Failure by either party to object to any failure of performance by the other party of any provision of the agreement shall not constitute a waiver of, or estoppel against, the right of such party to require such performance by the other.  Nor shall any such failure to object constitute a waiver or estoppel with respect to any succeeding failure of performance.

22.   **MISCELLANEOUS**:

12

a.   Any attempt to assign this Agreement, directly or indirectly, by without Shell's prior written consent shall constitute a default of this Agreement and any such attempted assignment shall be null and void.

b.   Agent warrants to Shell that Agent has made full disclosure to Shell of all persons having an interest in Agent and its operation under this Agreement.

c.   This Agreement, including documents incorporated herein, contains the entire agreement covering the subject matter, and supersedes any prior agreement between the parties relating to the premises.

d.   The descriptive headings of the several sections and subsections in this Agreement are inserted for convenience only and shall not be deemed to affect the meaning or construction of any provision hereof.

e.   This Agreement is made under, and shall be governed and construed in accordance with, the laws, statutes and regulations of Guam.

13

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

SHELL:

SHELL GUAM, INC.

By: _____

Name: NORMAN J. KING
Title: Marketing Manager

AGENT:

By: _____ 3/13/96

Name: ANTHONY J. ADA
Title:        President

14

# SCHEDULE 1
## AGENT'S MAINTENANCE OBLIGATIONS

### A.  Yard

1.  Maintain all elements within planter area as necessary to retain a healthy and attractive appearance. Items include, but are not limited to, all live and artificial plantings (shrubs, grass, flowers, trees, etc.), decorative rock, bark and entire sprinkler system.

2.  Regularly remove weeds, leaves, debris and litter from the premises (including rain gutters and downspouts and adjacent sidewalks, driveways and easements).

### B.  Lighting

Replace all lamps and bulbs, ballasts, ballast wiring, starters and sockets in the interior of building to maintain fixture lighting at all times. Excludes total fixture replacement.

### C.  Plumbing

1.  Clear clogged toilets, sinks, building lube bay drains and on-property sewer lines. Clean oil separators and catch basins.

2.  Maintain all flush mechanisms and faucets, sinks.

3.  Empty septic tanks as necessary.

### D.  Air Conditioning

Provide regular inspections and service for A/C systems (to include:  tighten belts, lubricate bearings, add air conditioner units in entirety.

### E.  Glasswork/Doors

Replace all window and door glass, whenever scratched, cracked or broken from whatever cause, including bullet-resistant glass or plastic. Maintain, repair or replace all doors and door frame assemblies to keep in operating order.

15

F. Floors

Floors shall be washed daily and must maintain a clean and neat appearance. Professional cleaning services may be mandated by Shell should floor cleanliness and appearance not be acceptable to Shell. Floors shall be restored to original condition upon removal of equipment installed by or at request of Lessee, subject to normal wear and tear.

G. Painting

During the period between scheduled complete repainting by Shell, the Agent will wash and paint all curbs, yard and building equipment, interior/exterior walls, doors, ceilings and shelving as necessary. Paint and all other painting material supplied by Lessee.

H. Tanks

1. Keep fill and access boxes clear of water and debris.

I. Pumps/Dispensers

1. Lubricate any gasoline suction pumps in use (where motor and pump are contained in dispenser housing). Lubricate suction pump weekly or per manufacturer's recommendations.

2. Inspect and clean on a daily basis gasoline hoses, clamps, swivels and colored scuff guards, including any associated with a vapor recovery system, air and water hoses, nozzles, couplings and air chucks and report immediately to Shell any damage, defect or leaks in any such equipment.

J. Air Compressor

Drain water daily. Add/change oil, replace air filters and lubricate bearings per manufacturer's specifications.

K. C-Store/Food Mart and Related Equipment (if located on premises)

1. Maintain Shell-owned cooler/freezer doors and refrigeration units (walk-in and freestanding), gondolas and all other Shell-owned C-store/food mart related equipment, including lamps, ballasts, fuses and glass therein.

2. Keep all food handling equipment and food preparation areas clean sanitary and in compliance with applicable codes and laws.

16

3.     Keep all equipment drain lines clean and clear.

L.   Other Equipment

1.     Maintain all Agent-owned equipment.

2.     Maintain and replace if lost, stolen or damaged all fire protection equipment provided by Shell.

M.   Miscellaneous

1.     Maintain all building locks, keys, door closets and latches.

2.     Maintain all elements of overhead doors, excluding total door replacement, unless damaged by negligence.

3.     Reset circuit breakers, replace electrical fuses.

4.     Take all necessary pest control measures.

N.   Buildings

1.     Maintain all aspects in a useable viable condition.  This includes but is not limited to:

- lights
- toilets
- windows
- flooring/roofing
- paintwork
- doors/locks
- electric systems

17

# SCHEDULE 2
## AGENT INFORMATION

A. **Trial Franchise Period**

Beginning:  1 February 1996          Ending:    31 January 2001

B. **Date of Agreement**

Date: 1 Februry 1996

C. **Name of Agent**

Anthony J. Ada

D. **Agent's Mailing Address**

P.O. Box 4478
Agana, Guam  96910

E. **Location of Premises**

Lot No. 1143, Toto, Municipality of Barrigada, Territory of Guam, Estate No. 566, Suburban

F. **Rent**

Agent shall pay to Shell fifteen percent (15%) of its gross sales of other petroleum products, equipment, sundries, food, and all other items sold on the premises.

G. **Agent's Entitlement From Shell for Non-Shell Card Volumes Sold**

Twenty-one ($0.21) per gallon for each gallon sold.

H. **Agent's payment to Shell for Excessive Losses**

Twenty-one cents ($0.21) per gallon for each gallon beyond the acceptable limits.

I. **Station's Hours and Days of Operation**

Sixteen (16) hours a day from (6:00 a.m. to 10:00 p.m.),
Seven (7) days a week, Holidays included.

c:\data\word\files\trans\agent\barigant8.doc

18

# EXHIBIT 2a

# AMENDMENT TO AGENCY SALES AGREEMENT

This amendment to Agency Sales Agreement is made the 1st day of March , 1996, in Guam, by and between Anthony Ada, Agent for Shell Mangilao and SHELL GUAM, INC. a Guam corporation and is an amendment to that certain Agency Sales Agreement between the parties dated March 1, 1994 for the Mangilao service station.

Items subject to amendment in the Agency Sales Agreement as noted below;

1)   Item "5.a. 1.", page 3  is hereby amended to the amount of $0.00 cents per gallon for a period of 3 months to be re-evaluated at that time.

    a)   Shell agrees to pay agent **$15,093.00** per month  for reimbursement of  expenses per month for a three month period ending June 30, 1996.

    b)   Shell agrees to pay the agent a **$1,500** per month management fee for proper operation of the service for a three month period ending June 30, 1996.

2)   In reference to Section 5 Item "d". An unaudited income statement and balance sheet to Shell is amended to be due each **month** on the 15th day of the following month.

**10274**


DEFENDANT'S DEPOSITION
EXHIBIT
D-9

**HIGHLY CONFIDENTIAL**

Except as expressively amended hereby, the terms and provisions of said Agency Lease Agreement dates March 1, 1994 by and between the parties hereto shall remain in full force and effect.

**SHELL:**

**SHELL GUAM, INC.**

By_____
Name:       NORMAN KING
Title:       Marketing Manager

**AGENT:**

By_____ 3/13/96
Name:       ANTHONY J. ADA
Title:       Agent - Shell Mangilao

**10275**

**HIGHLY CONFIDENTIAL**

# SCHEDULE "A"

| | | Barrigada | Mangilao | |
|---|---|---|---|---|
| Staff Costs | | $ 9,901.00 | $ 10,960.00 | |
| Assistant Manager | | $ 1,288.00 | $ 1,288.00 | |
| Accountant | | $ 703.00 | $ 703.00 | |
| Bank FeesLoans/Interest | | $ 40.00 | $ 40.00 | |
| Card Fees | | $ 235.00 | $ 180.00 | |
| Insurance (Contract) | | $ 750.00 | $ 750.00 | |
| Security | | $ 60.00 | $ 60.00 | |
| Licenses | | $ 40.00 | $ 40.00 | |
| Utilities: Electricity | (as needed) | $ 1,100.00 | $ 650.00 | |
| Utilities: Telephone | | $ 170.00 | $ 170.00 | |
| Utilities: Water | | $ 29.00 | $ 29.00 | |
| Uniforms | | $ - | $ - | |
| Stationary | (as needed) | $ 150.00 | $ 150.00 | |
| Maintenence | | $ 75.00 | $ 75.00 | |
| Gardening | | $ - | $ - | |
| Trash | | $ 95.00 | $ 95.00 | |
| Cleaning | | $ 50.00 | $ 50.00 | |
| Advertising | | $ 100.00 | $ 100.00 | |
| Tax (4%GRT) | | $ 624.00 | $ 540.00 | |
| Mngt Fee | | $ 1,500.00 | $ 1,500.00 | |
| TOTAL EXPENSES | | $ 16,910.00 | $ 17,380.00 | $ 34,290.00 |
| Less Power/Phone/Water | | $ 1,237.00 | $ 787.00 | |
| Remibursement | | $ 15,673.00 | $ 16,593.00 | |
| @ $0.21 CPG | | $ 13,650.00 | $ 15,750.00 | $ 29,400.00 |
| Variance | | $ (3,260.00) | $ (1,630.00) | $ (4,890.00) |
| cpg | | $ 0.2602 | $ 0.23 | $ 0.245 |
| % of Gross Store Sales | | | | |
| | 1% | 65,000 | 75,000 | 140,000 |
| | 2% | 70,000 | 79,000 | |
| Store Incentive | 2% | 16,700 | 16,700 | |
| | 4% | 17,000 | 17,000 | |
| Payments to Shell | Gross of Store | 15% | 15% | |
| | Rental Fee | | | |
| | Service Fee | | | |
| | Promo Fee | | | |

**HIGHLY CONFIDENTIAL**

Case 1:00-cv-00012   Document 155-3   Filed 09/01/2005   Page 23 of 36

# EXHIBIT 2b

# AMENDMENT TO AGENCY SALES AGREEMENT

This amendment to Agency Sales Agreement is made the 1st day of March, 1996, in Guam, by and between Anthony Ada, Agent for Shell Barrigada and SHELL GUAM, INC. a Guam corporation and is an amendment to that certain Agency Sales Agreement between the parties dated February 1, 1995 for the Barrigada service station.

Items subject to amendment in the Agency Sales Agreement as noted below;

1)     Item "5.a. 1.", page 3 is hereby amended to the amount of $0.00 cents per gallon for a period of 3 months to be re-evaluated at that time.

     a)     Shell agrees to pay agent **$14,173.00** per month for reimbursement of expenses per month for a three month period ending June 30, 1996.

     b)     Shell agrees to pay the agent a **$1,500** per month management fee for proper operation of the service for a three month period ending June 30, 1996.

2)     In reference to Section 5 Item "d". An unaudited income statement and balance sheet to Shell is amended to be due each **month** on the 15th day of the following month.

**10270**

DEFENDANT'S DEPOSITION EXHIBIT
D-8

HIGHLY
CONFIDENTIAL

Except as expressively amended hereby, the terms and provisions of said Agency Lease Agreement dates February 1, 1995 by and between the parties hereto shall remain in full force and effect.

**SHELL:**

**SHELL GUAM, INC.**

By_____
Name:     NORMAN KING
Title:     Marketing Manager

**AGENT:**

By_____
Name:     ANTHONY J. ADA
Title:     Agent - Shell Mangilao

**10271**

HIGHLY
CONFIDENTIAL

# SCHEDULE "A"

| | | Barrigada | | Mangilao | | | |
|---|---|---|---|---|---|---|---|
| Staff Costs | | $ | 9,901.00 | $ | 10,960.00 | | |
| Assistant Manager | | $ | 1,288.00 | $ | 1,288.00 | | |
| Accountant | | $ | 703.00 | $ | 703.00 | | |
| Bank FeesLoans/Interest | | $ | 40.00 | $ | 40.00 | | |
| Card Fees | | $ | 235.00 | $ | 180.00 | | |
| Insurance (Contract) | | $ | 750.00 | $ | 750.00 | | |
| Security | | $ | 60.00 | $ | 60.00 | | |
| Licenses | | $ | 40.00 | $ | 40.00 | | |
| Utilities: Electricity | (as needed) | $ | 1,100.00 | $ | 650.00 | | |
| Utilities: Telephone | | $ | 170.00 | $ | 170.00 | | |
| Utilities: Water | | $ | 29.00 | $ | 29.00 | | |
| Uniforms | | $ | - | $ | - | | |
| Stationary | (as needed) | $ | 150.00 | $ | 150.00 | | |
| Maintenence | | $ | 75.00 | $ | 75.00 | | |
| Gardening | | $ | - | $ | - | | |
| Trash | | $ | 95.00 | $ | 95.00 | | |
| Cleaning | | $ | 50.00 | $ | 50.00 | | |
| Advertising | | $ | 100.00 | $ | 100.00 | | |
| Tax (4%GRT) | | $ | 624.00 | $ | 540.00 | | |
| Mngt Fee | | $ | 1,500.00 | $ | 1,500.00 | | |
| TOTAL EXPENSES | | $ | 16,910.00 | $ | 17,380.00 | $ | 34,290.00 |
| Less Power/Phone/Water | | $ | 1,237.00 | $ | 787.00 | | |
| Remibursement | | $ | 15,673.00 | $ | 16,593.00 | | |
| @ $0.21 CPG | | $ | 13,650.00 | $ | 15,750.00 | $ | 29,400.00 |
| Variance | | $ | (3,260.00) | $ | (1,630.00) | $ | (4,890.00) |
| cpg | | $ | 0.2602 | $ | 0.23 | $ | 0.245 |
| % of Gross Store Sales | | | | | | | |
| | 1% | | 65,000 | | 75,000 | | 140,000 |
| | 2% | | 70,000 | | 79,000 | | |
| Store Incentive | 2% | | 16,700 | | 16,700 | | |
| | 4% | | 17,000 | | 17,000 | | |
| Payments to Shell | Gross of Store | | 15% | | 15% | | |
| | Rental Fee | | | | | | |
| | Service Fee | | | | | | |
| | Promo Fee | | | | | | |

HIGHLY CONFIDENTIAL

# EXHIBIT 3

# FACSIMILE



| ☐ CONFIDENTIAL | ☐ URGENT | ☐ ROUTINE | ☐ PLEASE REPLY |
|---|---|---|---|

Total Pages Including Cover Sheet 1

Shell Guam, Inc.
Shell Co. (Pacific Islands), Ltd.

Suite 100
643 Chalan San Antonio
Tamuning, Guam 96911

*Corporate:*
Telephone (671) 647-0093
Facsimile (671) 646-4363
*Operations/Engineering:*
Telephone (671) 646-2200
Facsimile (671) 565-3900
*Dispatch:*
Telephone (671) 477-2546
Facsimile (671) 477-3300

Shell Marianas
Caller Box PPP-1009
Box 10008
Saipan, MP 96950

Telephone (670) 323-0847
Facsimile (670) 322-0764

Shell Facsimile Sheet3.doc

**Date:** Monday, 01 March 1999

**From:** Jim Hammond-MRR Shell

**To:** Ken Smuin-GM cc: Steve Zamsky    **Fax** 472-1584

**SUBJECT:** Tony Ada meeting 2/23/99 re Extension Agreement

Tony's concerns are:

1. his face in the community, doesn't want to be perceived as Romeo is now

2. concern for his employees

3. continuity of his income, his daughter goes to college next year

4. time to plan a new career path

5. disruption of a planned summer event, his children are in a cultural dance group traveling this August.

Tony's proposals he would like Shell to consider are:

1. extend Mangilao to end at the time Barrigada does Feb 2001

2. reduce Barrigada by 1 year, and extend Mangilao 1 year, instead of 6 months, so they both end 1 year from now, Feb 2000

3. end Mangilao in 6 months and also Barrigada in 6 months with some compensation for ending Barrigada early, from Shell or whoever takes over

MRR recommends:

extend Tony 1 more year obtaining both stations Feb 2000 conditional upon:

daily payments, cleaning up the tire business in the back room, Subway test site moves in per preliminary discussions with Earnest and Tony, ending the warehouse format of the store

because:

Delta is not ready to take this in 6 months as long as JA/SH are rotating back and forth between Saipan pending receipt of further sites on Saipan, and do not devote themselves actively to a C store sales development plan to drive that business.

Regards, Jim hammond

10031



DEFENDANT'S DEPOSITION
EXHIBIT

D-12

Important
This facsimile is b
for the named ad
only. It may cont
confidential or pri
information. If yc
the addressee yc
not copy, distribi
this information.
Please contact t
promptly and ret
facsimile to the
address. Posta
be refunded.

# EXHIBIT 4

# AMENDMENT OF AGENCY

THIS AMENDMENT OF AGENCY is made as of _18 March_, 1999 by and between **SHELL GUAM, INC., a Guam corporation (hereinafter "Shell")**, whose address is Suite 100, 643 Chalan San Antonio, Tamuning, Guam USA 96911 and **ANTHONY J. ADA (hereinafter "Agent")**, whose address is Post Office Box 4478, Hagatna, Guam USA 96932.

## R E C I T A L S

WHEREAS, the parties had between them an Agency Sales Agreement effective for Mangilao March 1, 1994 and February 1, 1996 for Barrigada;

WHEREAS, the Mangilao Agency Sales Agreement expired on February 28, 1999; and the Barrigada Agreement expires on January 31, 2001; and

WHEREAS, the parties wish to extend Agent's performance of services for Shell as herein provided at Mangilao until February 29, 2000 and terminate the Agency at Barrigada on February 29, 2000;

NOW THEREFORE, it is hereby agreed as follows:

1. Agent shall continue to act as Shell's Agent for Shell's retail site located at Lot No. 5370-2-3-1-NEW, Mangilao, Guam (Certificate of Title No. 22688) until February 29, 2000.

2. Agent shall cease to act as Shell's agent for Shell's retail site located at Lot No. 1143, Toto, Barrigada on February 29, 2000.

//

DEFENDANT'S DEPOSITION EXHIBIT
D-11

3. Agent may discontinue acting as such provided that he gives written notice to Shell at least thirty (30) days in advance.

4. During this term, the provisions of Section 1 through 7, 9 through 14, and 16 through 22 (except Shell's address in Section 20 is as set forth above) of the March 1994 Agreement shall apply.

Dated this _18th_ day of _March_, 1999.

SHELL GUAM, INC.
a Guam corporation

By: _____
Name: _K.J. Smvin_
Title: _President._

AGENT:

By: _____
ANTHONY J. ADA

Z8(004.670)\DOCS\1147

Case 1:00-cv-00012    Document 155-3    Filed 09/01/2005    Page 32 of 36

# EXHIBIT 5

CONFIDENTIAL

November 22, 1999

**Mr. Darrel P. Dela Paz, Regional Manager**
SHELL GUAM, INC.
643 Chalan San Antonio, Ste. 100
Tamuning, Guam 96911

Reference: Shell Mangilao and Shell Barrigada Service Stations
**SUBJECT: LETTER OF INTEREST TO CONTINUE AGENT CONTRACT**

Dear Darrel,

The contracts for both Shell Mangilao and Shell Barrigada will come due on February 29, 2000. In this connection, I am writing to formalize our conversation that I am still very much interested in continuing these contracts.

best regards,

Anthony C. Ada
Shell Mangilao / Shell Barrigada
480 South Route No. 10
Mangilao, GUAM 96926

DEFENDANT'S DEPOSITION
EXHIBIT
_D-41_

**10279**

CONFIDENTIAL

# EXHIBIT 6



# Shell Guam, Inc.



Shell Guam, Inc.
Shell Co. (Pacific Islands), Ltd.

Suite 100
643 Chalan San Antonio
Tamuning, Guam 96911

*Corporate:*
Telephone    (671) 647-0000
Facsimile    (671) 649-4353
*Operations/Engineering:*
Telephone    (671) 565-2300
Facsimile    (671) 565-3909
*Dispatch:*
Telephone    (671) 477-2546
Facsimile    (671) 477-3389

Our Reference:    c:\my documents\word\retail\memo\ada contact term.doc

Date:    Friday, December 10, 1999

Subject:    Agency Contract

TO:    Anthony Ada
PO BOX 24608
GMF Guam 96921

Dear: Tony

Your agency contract with Shell Guam Inc. will expire on February 28, 2000, Shell Guam Inc., will exercise our option not to renew our agreement.

It has been pleasure working with you, and we wish you all the best in your future plans. If you wish to use Shell for any future reference, we will be pleased to positively comment on your performance.

I personally have enjoyed working with you, and hope you the best in your future endeavors.

For Shell Guam, Inc.,

Fred Keller
Regional Marketing Manager

DEFENDANT'S DEPOSITION
EXHIBIT
D-42
PENGAD-Bayonne, N.J.