**CIVILLE & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868
FACSIMILE: (671) 477-2511

*Attorneys for Shell Guam, Inc.*



**FILED**
DISTRICT COURT OF GUAM
SEP 15 2005 *nb*
**MARY L.M. MORAN**
**CLERK OF COURT**

## IN THE UNITED STATES DISTRICT COURT OF GUAM

| | |
|---|---|
| ANTHONY J. ADA, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SHELL GUAM, INC., )<br><br>Defendant. )<br>————————————— )<br><br>SHELL GUAM, INC., )<br><br>Counterclaim )<br>Plaintiff, )<br><br>vs. )<br><br>ANTHONY J. ADA, )<br>Counterclaim )<br>Defendant. )<br>————————————— ) | CASE NO. CV00-00012<br><br><br><br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

ORIGINAL

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. LEGAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Count I: Ada was not a Dealer and Shell Properly
        Terminated the Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

          1.   Ada is not a retailer under the express language approach
              because he does not purchase motor fuel or set fuel
              prices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          2.   Ada is not a retailer under the broad totality of the
              circumstances approach: Ada operates free of market risks . . . . . . . . . . 6

    C.   The reference to the PMPA should not be given weight under other
        relevant contract principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          1.   The prior grant of a preliminary injunction does not affect
              the present analysis that the PMPA does not apply . . . . . . . . . . . . . . . 11

          2.   Shell did not violate the PMPA by declining to renew
              Agency Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          3.   The doctrine of "contra preferentum" does not apply in
              this case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    D.   Count VIII: Shell is not Estopped from Denying that Ada is Not a
        Franchisee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    E.   Ada cannot prevail on Shell's affirmative defenses and Count VI of the
        FAAC, and Ada's affirmative defenses . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Automatic Comfort, Corp. v. D & R Service, Inc.,*
620 F. Supp. 1349 (D.C. Conn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 18

*Bank of Guam v. Flores,*
2004 Guam 25, ¶ 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brewer v. Exxon Corp.,*
626 F. Supp. 76 (E.D. Tenn. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Chatila v. Aranco Oil Corp.,*
2003 WL 1145501, * 2 (D.N.H. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Dunlap v. Schrader Oil Co.,*
758 F. Supp. 633 (D. Colo. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 11, 12

*Dunne & Gaston v. Keltner,*
123 Cal.Rptr. 430 (Cal. App. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Farm Stores, Inc. v. Texaco, Inc.,*
763 F.2d 1335 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4-7, 10

*Gelb v. Amoco Oil Co.,*
29 F.3d 1050 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Getty v. Getty,*
232 Cal. Rptr. 603, 608 (Cal. Ct. App.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Getty Petroleum Marketing, Inc. v. Ahmad,*
757 A.2d 494 (Conn. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10

*Hess v. Ford Motor Co.,* 41 P.3d 46, 55 (Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . 19

*Honig v. San Francisco Planning Dept.,*
127 Cal.App.4th 520, 25 Cal.Rptr.3d 649 (Cal. Ct. App. 2005) . . . . . . . . . . . . . . . . 16

*Iizuka Corp. v. Kawasho Intern. (Guam), Inc.,*
1997 Guam 10, ¶ 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Miller,*
253 B.R. 455, 459 n.2 (Bkrtcy. N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Karak v. Bursaw Oil Corp.,*
   147 F.Supp.2d 9 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 18

*Khorenian v. Union Oil Co. of Cal.,*
   761 F.2d 533, 536 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Martin v. American Family Mutual Ins. Co.,*
   157 F.3d 580 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Miller v. W.H. Bristow, Inc.,*
   739 F. Supp. 1044 (D.S.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

*Mobil Oil Guam, Inc. v. Young Ha Lee,*
   2004 Guam 9, ¶ 24 (Guam 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pride v. Exxon Corp.,*
   911 F.2d 251 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Sigmon v. Widenshouse Service, Inc.,*
   638 F. Supp. 808 (M.D.N.C. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-7, 14

*Southern Oregon Barter Fair v. Jackson County, Oregon,*
   372 F.3d 1128 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Thomas v. C.K. Smith Co.,*
   1986 WL 12441, *7 (D. Mass. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Diebold, Inc.,*
   369 U.S. 654, 82 S. Ct. 993, 994 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Valley Paving, Inc. v. Dexter & Chaney, Inc.,*
   Minn.Ct.App. No. C2-00-361,
   2000 WL 1182800, *4 (Minn. App., Aug. 22, 2000) . . . . . . . . . . . . . . . . . . . . . . 15, 16

## **Statutes**

15 U.S.C. § 2801, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
18 GCA § 87105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
18 GCA § 87107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
18 GCA § 87119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
18 GCA § 87120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-14
20 GCA § 3230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
20 GCA § 3233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
California Civil Code § 1654 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# I. INTRODUCTION

There is no dispute that:

- The Agency Agreements between Shell and Ada contained language describing the Agreements as franchise agreements under the PMPA.

- The PMPA language was inserted by Shell, and Shell did so in the mistaken belief that such language was appropriate even though Ada was an agent operator and not a dealer.

- Ada had no idea what the PMPA was when he signed the Agreement, Ada was given ample time to review the Agreements, and he did not ask Shell any questions about the documents and did not request any changes to the documents Shell prepared.

- The Agreements, when read as a whole, describe an agency-operator relationship and not a dealer-operator relationship.

- Shell built, owns and paid for the stations which Ada manages, and Shell installed, paid for and owns the pumps, storage tanks and all fuel related equipment in the stations.

- Shell does not sell fuel to Ada, but delivers the fuel to the stations and retains title to the fuel until the fuel is sold to a consumer. Ada remits to Shell the full amount he collects upon sale of the fuel.

- Shell sets the price for the fuel and pays the gross sales tax on fuel sales.

- Shell reimburses Ada, or pays directly, nearly all expenses associated with operating the stations (other than the convenience store costs).

- Ada bears virtually no entrepreneurial risk with respect to the sale of fuel at the stations.

In short, despite the contractual language incorporating certain portions of the PMPA, there are no material facts in dispute to support Ada's claim that his relationship with Shell is of the type Congress intended to afford protection when it enacted the PMPA. Accordingly, Ada's motion for summary judgment should be denied.

1

## II. LEGAL ARGUMENT

### A.    Summary Judgment Standard

Ada has the burden to prove that the PMPA applies to the Agreements in order to prevail on his various claims alleging a violation of the PMPA. *See Farm Stores, Inc. v. Texaco, Inc.*, 763 F.2d 1335, 1339 -1340 (11th Cir. 1985) ("Congress intended the PMPA to apply only to the franchise relationship between a "refiner," "distributor," or "retailer" of motor fuels under a brand name. Unless the parties meet the statutory definition of one of these terms, there is no coverage under the PMPA and general contractual principles govern."); *Karak v. Bursaw Oil Corp.*, 147 F.Supp.2d 9, 13 (D. Mass. 2001) ("Absent a showing by the plaintiffs that they are within the class Congress intended to protect, there is no coverage under the PMPA, general contract principles govern, and the plaintiffs' motion must be denied."); *Dunlap v. Schrader Oil Co.*, 758 F. Supp. 633, 634 (D. Colo. 1991). Because Ada is the moving party, the Court must view the facts in the manner most favorable to Shell. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962). Applying this standard, Ada cannot establish that he is entitled to judgment on his claims and affirmative defenses, or on Shell's counterclaims and affirmative defenses, as a matter of law. Accordingly, Ada's motion for summary judgment should be denied.

### B.    Count I: Ada was not a Dealer and Shell Properly Terminated the Agreement

Ada attempts to establish his claim under the PMPA by relying on that portion of the language in the Agreements describing the parties' relationship as that of a franchise. That language appears in upper case at the beginning of each of the four Agency Sales Agreements, and begins with the sentence "THIS AGREEMENT IS A FRANCHISE [OR TRIAL FRANCHISE] UNDER THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.C.C. [SIC] 2801 ET SEQ." The Termination and Non-Renewal provisions found at ¶ 15 of the Agreements also tracks the language of the PMPA (although this is only evident if one compares the statute to § 15).

2

This language, standing alone, is not sufficient to bring the relationship under the umbrella of the PMPA where the relationship between Shell and Ada, when viewed in its entirety, is not the type of relationship which Congress intended to protect when it enacted the PMPA. Case law uniformly indicates that reference to the PMPA in a contract does not govern whether the PMPA applies, and, consequently, whether the plaintiff states a claim under the PMPA. Rather, the test for whether the PMPA applies is whether the parties' relationship falls within the specific relationships contemplated within PMPA coverage. *See Automatic Comfort, Corp. v. D & R Service, Inc.*, 620 F. Supp. 1349, 1355 (D.C. Conn. 1985).

In *Sigmon v. Widenshouse Service, Inc.*, 638 F. Supp. 808, 813 (M.D.N.C. 1986), the parties' contract similarly referenced the PMPA. The plaintiffs, like Ada in this case, argued that "this reference in the contract to the PMPA is an important revelation as to its relationship with the defendant, and perhaps even dispositive of that relationship." The court disagreed, stating:

> The Court finds this language inconclusive at best, it is the relationship established by the entire contract and the subsequent performance of it that is relevant to the PMPA's application. This provision's inclusion in the contract could have been included due to inadvertence, hard bargaining by the plaintiffs or a variety of other reasons beside evidencing an intent to be governed by the PMPA. The Court did consider this contract reference in determining the PMPA applicability, but however free the parties are to incorporate by reference statutory provisions as terms of their contract, they do not possess the same freedom to create statutory coverage and thus federal jurisdiction.

*Sigmon*, 638 F. Supp. 808, 813 (M.D.N.C. 1986). *See also, Chatila v. Aranco Oil Corp.*, 2003 WL 1145501, * 2 (D.N.H. 2003) ( The court agreed with the defendant that "incorporation by reference of provisions of the PMPA in the lease does not determine whether a cause of action exists under the PMPA.").[1]

---

[1] State courts which have confronted the issue under their analogous franchise statutes have relied on federal authority in employing the same analysis. In *Getty Petroleum Marketing, Inc. v. Ahmad*, 757 A.2d 494, 501 (Conn. 2000), the issue was whether the defendants were "retailers in the business of selling gasoline as independent business operators" and thus "franchisees under the general franchise act." *Id.* The court determined the issue by reviewing the nature of the parties' relationship. *Id.* at 500-501. Importantly, the court noted: "Although the Lessee Supply Contracts attach the label 'franchise' to the arrangements between the plaintiff and Ahmad, the parties' characterizations, under the circumstances of this case, are not determinative of the issues before this court." *Id.* at 501 n.12.

"Congress intended the PMPA to apply only to the franchise relationship between a "refiner," "distributor," or "retailer" of motor fuels under a brand name." *Farm Stores, Inc.*, 763 F.2d at 1339-40. To come within the ambit of the PMPA the parties must come within the relevant statutory definitions. *See id.* ("Unless the parties meet the statutory definition of one of these terms, there is no coverage under the PMPA and general contractual principles govern."); *Sigmun*, 638 F. Supp. at 810. In this case, there is no dispute that Shell Guam, Inc., is a "distributor" as defined in the PMPA. Just as clearly, Ada is not a "refiner" or a "distributor,"[2] nor does he fall within the statutory definition of "retailer." A "retailer" is defined under the PMPA as "any person who purchases motor fuel for sale to the general public for ultimate consumption." 15 U.S.C. § 2801(7). To come within the definition of a "retailer," Ada must be a "purchaser" of motor fuel. *See Sigmon*, 638 F. Supp. at 810 ("What is at issue is whether the plaintiff falls within the statutory definition of a 'retailer.'

To come within the provisions of the PMPA and its definition of a 'retailer' the plaintiffs must be a 'purchaser' of motor fuel. 15 U.S.C. § 2801(7)."). There are two recognized approaches taken by courts to determine whether the party comes within the PMPA.

> The first is one that looks at the express language of the statute and strays only slightly from it. Courts under this analysis have found no congressional intent expressed beyond the clear language stated in the statute--ergo the words mean what they say. . . . The other approach is a broader one that attempts to take a totality of the circumstances test--weighing all relevant factors surrounding the nature and character of relationship to see if the operator is an employee or an independent businessman.

*See Sigmon*, 638 F. Supp. at 810-11. Ada is not a retailer under either approach.

---

[2]Courts have generally considered the term "distributor" to be limited to middlemen rather than dealers selling to the public at retail. *Farm Stores, Inc.*, 763 F.2d at 1341; *Miller v. Bristow*, 739 F. Supp. 1044, 1048-49 (D.S.C. 1990) In *Automatic Comfort Corp. v. D & R Service, Inc.*, 620 F. Supp. 1349, 1354 (D. Conn. 1985), the court explained:

> Defendant is not a distributor. Though it receives gasoline in a narrow sense of the word, as the custodian while the gasoline is stored for retail sale at the station, it does not sell gasoline to its own accounts.. . . The contemplation of Congress was that a distributor was a middle man, a jobber, not an alter ego retailer.

4

1. **Ada is not a retailer under the express language approach because he does not purchase motor fuel or set fuel prices.** Under the express language approach, a party is not a "retailer" if it does not "purchase" the motor fuel from the refiner or distributor. *See Farm Stores; Sigmon, supra.* In *Farm Stores, Inc.*, the court found the following relevant facts to clearly indicate that Farm Stores was not a purchaser of gasoline:

> Farm Stores did *not:* (i) pay for the gasoline inventory until it was sold; (ii) take title; (iii) pay ad valorem taxes on the gasoline inventory; (iv) bear the risk of loss of the gasoline (except for its own carelessness); (v) retain any funds from the sale of the gasoline to motorists; (vi) set the price or assume the market risk in fluctuations in gasoline prices; (vii) pay sales taxes or extend credit to motorists on resale; and (viii) hold a gasoline retailers business license.

*Farm Stores, Inc.*, 763 F.2d at 1340. The court found that under these facts, "[i]t seems obvious to us that the consumer is the purchaser of gasoline." *Id.*

The facts of this case, like in *Farm Stores, Inc.*, make it obvious that Ada is not a purchaser of fuel as contemplated under the PMPA. Shell has entered into two distinct types of relationships regarding the retail sale of its fuel, dealerships and agencies. *See* Declaration of Philip Stalker in Support of Motion for Summary Judgment filed September 1, 2005 ("Stalker MSJ Decl.") ¶ 13. A dealer purchases the fuel it sells, either directly from an oil company or from a middleman. *Ibid.* A dealer pays for the fuel delivered to his station, the fuel becomes the dealer's, and he sets the pump price. *Ibid.* In contrast, an agent such as Ada does not buy fuel from Shell. *See* Agency Agreements ¶ 4(a) (stating that Shell will *deliver* fuel). Shell delivers fuel to the stations operated by Ada, but does not charge him for the fuel, and title to the fuel is never transferred to the Ada. Stalker MSJ Decl. ¶ 6. The fuel continues to be carried on Shell's inventory, and the transfer from the tank farm to the stations Ada operates is recorded as a stock transfer, i.e. the movement of Shell's fuel inventory from one Shell location to another. *Ibid.* Ada sells the fuel at a price set by Shell, Agreements ¶ 5(a)(1) ("Agent will charge from price to price for the motor fuel as Shell determines from time to time"), and is required to remit to Shell all proceeds from the sale of the

fuel. Shell pays the tax due on the sale of the fuel at Ada's stations. *See* Agreements ¶ 5(e) ("Shell will pay the Gross Receipts Tax (GRT) due on the sale of its motor fuel."). Ada is paid a commission for the fuel sales, which since March 1996 has consisted of a monthly management fee and reimbursement of agreed upon operational expenses. *Id.*, ¶ 8-11, Ex 2(a) and (b).

Based on the undisputed facts, Ada is an agent operator. He is not a purchaser of the fuel, and as such he is not a retailer under the PMPA, nor can he claim the protections of the PMPA.

**2.     Ada is not a retailer under the broad totality of the circumstances approach: Ada operates free of market risks.**     "Under a broad reading of the act the determination of whether a party/station operator is or is not covered by the PMPA depends on the existence of significant indicia of entrepreneurial responsibility in the station operator and a showing the station operator is at substantial market risk." *Sigmon*, 638 F. Supp. at 811. The risk at issue is the risk on the sale of motor fuel. *See Farm Stores, Inc.*, 763 F.2d at 1344-45.

Ada is not subject to any market risks in the sale of fuel. The two service stations were built by Shell, paid for by Shell and Shell installed, owns and maintains all tanks, pumps, and equipment at the stations relating to the sale of fuel. Stalker MSJ Decl. ¶ 5, Agreements §§ 2 & 7. Ada is paid an agreed upon management fee and reimbursement of operational expenses at each station. *See* Amendment to Agency Sales Agreements, *supra.*     Ada's commission from the sale of fuel does not depend on the volume of fuel he sells, nor is it dependent on the price of the fuel. Stalker MSJ ¶ 12. *See also*, Ada 7/7/05 Depo TR 132:5-13, attached as Ex. A to the Declaration of G. Patrick Civille in Support of Motion for Summary Judgment filed September 1, 2005 ("Civille Decl."). The risk of economic loss due to depressed prices ( admittedly not a current worry) and reduced sales volume also remain with Shell since Shell is only paid as, and at the price that, the gasoline is sold to motorists. *See Farm Stores*, *supra*, at 763 F.2d at 1345. Shell pays the tax due on the sale of the fuel at Ada's stations. *See* Agreements ¶ 5(e) ("Shell will pay the Gross Receipts Tax (GRT) due on the sale of its motor fuel."). The only risk Ada takes with respect to the sale of fuel is liability

for excess losses "of stock." *See* Agency Agreements § 5(a)(5). Ada has never been assessed any charges for excessive stock losses. Stalker MSJ Decl. ¶ 21.

"As in *Farm Stores* here the facts strongly evidence that the defendant not the plaintiffs was the entrepreneur with respect to the sale of the motor fuel and the application of the protective provisions of the PMPA." *Sigmon v. Widenhouse Service, Inc.*, 638 F. Supp. 808, 812 (M.D.N.C. 1986).

Any market risk Ada bears with respect to the convenience store operations is not relevant to determining the applicability of the PMPA. Convenience store and non-fuel sales do not fall within the scope of the PMPA. *Pride v. Exxon Corp.*, 911 F.2d 251, 254 (9th Cir. 1990) (sale of unbranded gasoline); *see also Gelb v. Amoco Oil Co.*, 29 F.3d 1050, 1057 (6th Cir. 1994) (because PMPA only regulates the termination of "motor fuel marketing" franchises, the termination of a non-gas franchise does not implicate the PMPA preemption clause). The court in *Farm Stores* addressed this issue and concluded that "there is absolutely no basis for assuming that Congress intended the PMPA to benefit independent grocers or carwash operators. *Farm Stores, Inc.*, 763 F.2d at 1345 (quoting *Johnson v. Mobil Oil*, 553 F.Supp. at 200) ("[t]he PMPA, which protects franchisees only with respect to the sale of motor fuel".) *See also, Sigmon v. Windenhouse Service, Inc., supra*, in which the plaintiff argued that "profits from the convenience store were affected by the volume of gasoline sales," therefore, it assumed "the economic risk of loss accompanied with the sale of gasoline." *Id.* 638 F. Supp. at 812. The court rejected this argument, holding:

> It is independence and risk bearing with respect to gasoline sales that is germane to application of the PMPA. In determining the application of the PMPA, the convenience store's sales should properly be considered separate from gasoline sales. "If independence is the test, it must be independence with respect to the sale of motor fuel. There is absolutely no basis for assuming that Congress intended the PMPA to benefit independent grocers or carwash operators."

*Id.* (quoting *Farm Stores, Inc.*, 763 F.2d at 1345) (footnote omitted).

7

## C.    The reference to the PMPA should not be given weight under other relevant contract principles

When read as a whole, it is indisputably clear that Ada was an agent operator and not a retailer under the parties' Agreements.    Furthermore, the Agreements in dispute are entitled "Agency Sales Agreement" and throughout the documents Ada is referred to as the "Agent."

Shell's misunderstanding of the law, which led to the inclusion of the PMPA language in the Agency Agreements, does not bring the Agreements within the scope of the PMPA. The language may be significant from a contractual viewpoint, but does not mean the relationship is federally protected.

In *Karak v. Bursaw Oil Corp.*, 147 F.Supp.2d 9 (D. Mass. 2001), the issue was whether the plaintiff was a "retailer" under the PMPA, defined as a party that purchases fuel for sale to the public. *Id.* at 13. The parties' agreement itself stated that "the station operator "purchases" the motor fuel and "title thereto shall then pass" to the operator." *Id.* Moreover, the nature of the relationship was such that there was an actual "purchase" of fuel because there was a transfer of title for a transient amount of time. *Id.* at 14. "The defendants argue[d] that the use of the word "purchase" in the Agreement and the ephemeral passage of title to the fuel to the plaintiffs is insufficient to establish that the plaintiffs actually "purchased" the motor fuel as intended by the Act." *Id.* at 13. The court agreed. *Id.* Notwithstanding this contractual language and the fact that title to the fuel actually passed, the court determined that the plaintiff nonetheless was not a retailer under the PMPA when viewing the parties' relationship in its totality. The court admitted that the passage of title under the contract was enough to gives it "pause," but held that "[c]lose examination of the circumstances in this case makes clear that title passes to the plaintiffs substantially in name only, without most of the true incidences of title." *Id.* at 15. The court held that the limited risk which the plaintiffs bear "does not persuade me that title passes to the plaintiffs to a sufficient degree to tip the balance in the plaintiffs' favor, particularly in view of the other factors . . . that weigh

8

against characterization of the plaintiffs as retailers." *Id.* The court concluded: "Thus, . . . I conclude that the plaintiffs have failed to establish that they "purchase motor fuel." Therefore, the plaintiffs do not fall within the category of persons protected by the PMPA." *Id.*

Similarly, here, the Agency Agreements clearly indicated that Ada was not a retailer as defined under the PMPA. The reference in the Agreements to the contact as a franchise agreement and the references to the PMPA, when compared with the parties' actual relationship as set forth under the remaining provisions of the Agreements, render the question of inapplicability of the PMPA unmistakable. Just as the court in *Karak* held that the reference to "purchase" of fuel and the actual passage of title in the parties' contract did not make the plaintiff a retailer under the PMPA, the obviously erroneous reference to a franchise and to the PMPA in the Agreements here does not render the parties' relationship a franchise when considering the remaining substantive provisions of the contract. Any reference in the Agreements to the relationship being a "franchise" must be considered in light of the incidences attending such title as reflected under the Agreements. Here, there were no indicia of a franchise relationship.

"[I]n enacting the PMPA, Congress intended to protect motor fuel marketers who have enough of the indicia of entrepreneurial responsibility to be considered independent businessmen." *Dunlap v. Schrader Oil Co.*, 758 F. Supp. 633, 635 (D. Colo. 1991).

> The Act is directed at protecting the buildup of goodwill by those individuals who have invested time and money into the operation of a franchise, . . . and a court must look for the "indicia of entrepreneurial responsibility and risk" which indicate that an individual is an independent dealer and businessman. The Act is intended to prevent the "appropriation of hard-earned goodwill which occurs when a franchisor arbitrarily takes over a business that the franchisee has turned into a successful going concern."

*Brewer v. Exxon Corp.*, 626 F. Supp. 76, 79-80 (E.D. Tenn. 1985) (citations omitted).

The Court should not construe the language of the statute in derogation of Congressional intent. *See id.* ("The Court must construe the language of the statute in accordance with the purposes behind the statute."). Ada's relationship with Shell as an agent, and not a franchisee, does not fall

9

within the protections of the statute. Finding that the PMPA applies to govern the parties'
relationship would inappropriately extend Congress' intention to protect the legitimate risk takers
from losing their investment at the whims of the petroleum company. *See Brewer v. Exxon
Corp.*, 626 F. Supp. 76, 79-80 (E.D. Tenn. 1985) (citations omitted); *cf. See Getty Petroleum
Marketing, Inc. v. Ahmad*, 757 A.2d 494, 501 (Conn. 2000) (reversing the trial court's extension of
the state franchise statute's protections to an agent because finding that a franchise existed "would
blur the distinction between the entrepreneur and one who acts as an agent for another in selling a
product."). The PMPA's protections do not extend to agents, such as Ada, that have not accepted
entrepreneurial responsibility and have not taken the corresponding risks. *See Brewer v. Exxon
Corp.*, 626 F. Supp. 76, 79-80; *cf. id. Getty Petroleum Marketing, Inc. v. Ahmad*, 757 A.2d 494,
501 (Conn. 2000) (stating that the protections of the state franchise statute evidences the legislative
intent to protect business persons who, unlike the defendants, have been required to make substantial
investment in components of an entrepreneurial business). The PMPA simply cannot be held to
apply in this case.

Whether a party is a retailer is a question of law. *Miller v. W.H. Bristow, Inc.*, 739 F. Supp.
1044, 1049 (D.S.C. 1990) ("Whether a person is a "retailer" or "distributor" entitled to PMPA
protection is a question of law for the court.); *See Farm Stores, Inc. v. Texaco, Inc.*, 763 F.2d 1335,
1342 (11th Cir. 1985) (stating that "the district court's "finding" that it was a "purchaser" of motor
fuel," is a legal conclusion and is subject to our plenary review."). As shown above, Ada is not a
retailer. Because Ada is not a retailer, he is not entitled to protections under PMPA. Accordingly,
Ada's motion for summary judgment on the PMPA claims, Counts I and II, should be denied, and
summary judgment on those claims should be granted in favor of Shell. *See Miller v. W.H. Bristow,
Inc.*, 739 F. Supp. 1044, 1049 (D.S.C. 1990) ("Because this court has determined that plaintiff is
neither a 'retailer' nor a 'distributor' as those terms are defined in the PMPA, he is not entitled to
the protection afforded by that act. For that reason, defendants' motion for summary judgment as to

plaintiff's first cause action alleging a violation of the PMPA is hereby granted."); *Dunlap v. Schrader Oil Co.*, 758 F. Supp. 633, 635 (D. Colo. 1991).

**1. The prior grant of a preliminary injunction does not affect the present analysis that the PMPA does not apply.** Ada argues that in granting the preliminary injunction, the court earlier determined that the requirements of the PMPA apply to the Agreements between the parties. Opposition Memo at p. 7. This argument must be rejected.

"Decisions on preliminary injunctions require the district court to assess the plaintiff's likelihood of success on the merits, not whether the plaintiff has actually succeeded on the merits." *Southern Oregon Barter Fair v. Jackson County, Oregon*, 372 F.3d 1128, 1136 (9th Cir. 2004). Furthermore, "decisions on preliminary injunctions are just that-preliminary-and must often be made hastily and on less than a full record." *Id.* Thus, "decisions on preliminary injunctions 'are not binding at trial on the merits,' *id.*, and do not constitute the law of the case." *Id.* (citations omitted). The test for preliminary injunctive relief when the PMPA is alleged, is more liberal than that required for traditional preliminary injunctions, and favor the party claiming its protections *pendente lite. Khorenian v. Union Oil Co. of Cal.*, 761 F.2d 533, 536 (9th Cir. 1985). Rulings on preliminary injunctions in PMPA cases are therefore deserving of even less preclusive effect than in the case of ordinary preliminary injunctions. The court's prior decision granting a preliminary injunction in this case cannot be relied upon as conclusive on the issue of whether the PMPA applies. *See id.* (rejecting the argument that "because the district court issued a preliminary injunction against enforcement of some of the terms of the permit, the court was bound by the law of the case doctrine to grant summary judgment in the [party's] . . . favor").

**2. Shell did not violate the PMPA by declining to renew Agency Agreements.** Ada argues that it is entitled to summary judgment on the first two counts because Shell's "franchise termination letter", Ada Opp. at 7, to Ada violated the requirements of the PMPA. First, Ada's use of the word "termination" is wrong. In March,1999 Ada and Shell mutually agreed to end their

11

relationship, and to change the expiration dates for both Agency Agreements so that both expired on February 29, 2000. *See* 3/18/99 Amendment of Agency, Stalker MSJ Decl. Ex. 4. In November, 1999, Ada sent Shell a letter stating that he wanted to renew the Agency Agreements when they expired in February, 2000. *See* 11/22/99 Ada Ltr. to Shell, Stalker MSJ Decl. Ex. 5. Shell replied and told Ada that it would exercise its option not to renew the agreements. *See* 12/10/00 Shell Ltr. to Ada, Stalker MSJ Decl. Ex. 6.[3]   The Agency Agreements were not terminated, they were permitted to expire and not renewed by mutual agreement.

Second, to reiterate, the rule is well-established that "[u]nless there was a franchise relationship between the parties, the Act does not apply and the plaintiffs' . . . claim[s] must be dismissed." *Dunlap v. Schrader Oil Co.*, 758 F. Supp. 633, 634 (D. Colo. 1991). Because there was no franchise relationship, the PMPA does not apply here, and Ada's request for summary judgment in his favor on the PMPA claims must be dismissed.

**3.      The doctrine of "contra preferentum" does not apply in this case.**    Ada argues that the Agreements are ambiguous and the "contra preferentum" doctrine applies, which states that ambiguities in an agreement should be interpreted against the party causing the uncertainty (i.e., the drafter).    As discussed above, it is the nature of the relationship which determines whether the PMPA applies, not the language of the contract. The contra preferentum doctrine provides no insight into the relationship between Shell and Ada, and is of no analytical value on this motion.

Local statutes governing contract interpretation. Title 18 GCA § 87120 states the "contra preferentum," or "preparer's principle," providing: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party . . . ." *Id.*  The statute

---

[3]Ada is correct that Shell admits that, if this letter was a termination letter, it would not be effective under the PMPA. Ada fails to note that it was not a termination letter at all – it was Shell's response indicating the agreements would not be renewed, as had already been agreed between the parties.

12

does not apply unless the contract is ambiguous, and only after the preceding principles of interpretation does not clarify the meaning of the contract language.

Under Guam law, "[w]hether language of a contract is ambiguous is a question of law." *Iizuka Corp. v. Kawasho Intern. (Guam), Inc.*, 1997 Guam 10, ¶ 12; *see also Bank of Guam v. Flores*, 2004 Guam 25, ¶ 14 ("Regarding potential contract ambiguities, "[i]t is a question of law whether a contractual provision is ambiguous.") (citation omitted). "A contract is ambiguous when, on its face, it is capable of two different reasonable interpretations." *Bank of Guam*, 2004 Guam 25 at ¶ 14 (citation omitted).

The intention of the parties is found in the language of the contact. *See* Title 18 GCA § 87105. When viewed in their entirety, the Agency Agreements clearly define and create an agency relationship. The so-called "preparer principle" only arises if the uncertainty in the contract is "not removed by the preceding rules" of contract interpretation. The preceding rules of interpretation instruct that "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other," and "[w]ords in a contract which are wholly inconsistent with its nature, or with the main intention of the parties are to be rejected," *see* 18 GCA §§ 87107 and 87119, removes any alleged ambiguity in the Agreements. The reference to the Agreements as being a "franchise" cannot be interpreted in isolation, and should be given little effect when viewed in light of the remaining provisions of the Agreements. The obviously mistaken references in the Agreements to "franchise" should be rejected as wholly inconsistent with the intent under the language of the Agreements that Ada be an agent. To give any substantive effect to the term "franchise" under the Agreements would require the court to disregard all other provisions of the Agreements that clearly show that Ada was an agent and not a franchisee.

Section 87120 was borrowed from the California's preparer principle found at California Civil Code § 1654. Courts have determined that "when an agreement is arrived at by negotiating, the 'preparer' principle should not be applied against either party. *Dunne & Gaston v. Keltner*, 123

13

Cal.Rptr. 430, 432, n.3 (Cal. App. 1975); *see also In re Miller*, 253 B.R. 455, 459 n.2 (Bkrtcy. N.D. Cal. 2000) ("California cases do recognize that where contract terms are actively negotiated, neither party should be considered the drafter."). The preparer principle in section 87120 should not be applied against either party in this case. The fact that Ada voluntarily chose to enter into the negotiations without the benefit of an attorney is not the fault of Shell, nor does it change the fact that the Agreements were a product of negotiation by the parties. Accordingly, the Agreements should not be interpreted against Shell.

**D.**     <u>**Count VIII: Shell is not Estopped from Denying that Ada is Not a Franchisee**</u>

Ada argues that Shell is estopped from denying that Ada is a dealer under the PMPA. Ada argues that because the Agreements erroneously refer to the relationship as a franchise under the PMPA, the court must treat the relationship as such and Shell cannot argue what is now clear: Ada is not a dealer, the PMPA does not apply. Ada overlooks the fundamental principle that parties cannot create a federal cause of action by agreement. *Sigmon*, 638 F.Supp. at 813.

Instead, Ada relies on both principles of equitable and promissory estoppel in support of its argument. Ada cannot prevail on its estoppel claim under either principle. Promissory estoppel cannot be used to "establish the *applicability* of the PMPA." *Thomas v. C.K. Smith Co.*, 1986 WL 12441, *7 (D. Mass. 1986). The court in *Thomas v. C.K. Smith Co.* addressed this issue explicitly. There, the plaintiff argued "that defendant should be estopped from denying that plaintiff was a franchisee because plaintiff relied on defendant's alleged promises and repaired, refurnished, and repainted the Dennisport station at his own expense." *Id.* The court rejected the argument, stating: "The doctrine of promissory estoppel has been raised in some PMPA cases in determining whether an existing franchise was properly terminated or not renewed. . . . However, this court finds the doctrine of promissory estoppel may not be invoked to establish the *applicability* of the PMPA. *Id.* Similarly, Ada cannot rely on promissory estoppel to establish the applicability of the PMPA in this case.

Furthermore, to prevail on a claim for promissory estoppel, the plaintiff must reasonably rely on the alleged promise. There was no promise here outside the terms of the Agreements. Reliance by Ada on any alleged representations that Ada would be granted a dealer franchise and the rights attending such a franchise was not justifiable in light of the contract language, negotiated by the parties, specifically delineating provisions for an agency relationship and for non-renewal of the relationship. *Cf. Martin v. American Family Mutual Ins. Co.*, 157 F.3d 580, (8th Cir. 1998) (stating that agents of an insurance company did not carry their burden to prove fraud because "[e]ven if a management official said the agents would have 'lifelong careers'" with the company, "no reasonable jury could find the agents' reliance on the statements was reasonable given the agency contract language, which says the agencies 'may be terminated by either party with or without cause,' the contract may not be modified except by written agreement, and the written contract takes precedence over any inconsistent oral statements").

Ada also cannot prevail under a theory of equitable estoppel. Under Guam law, there are four elements that must be proven in an equitable estoppel analysis:

(1) the party to be estopped must be apprised of the facts;
(2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon;
(3) the party asserting the estoppel must be ignorant of the true state of the facts; and
(4) he must rely upon the conduct to his injury.

*Mobil Oil Guam, Inc. v. Young Ha Lee*, 2004 Guam 9, ¶ 24 (Guam 2004).

The undisputed facts show that Ada was certainly aware that he was not a franchisee, and that any claim that Ada relied on the language in the Agreements to that effect was unreasonable. Under the reliance element of the claim, "the party asserting the estoppel must reasonably rely on the conduct to his or her injury." *Honig v. San Francisco Planning Dept.*, 127 Cal.App.4th 520, 529, 25 Cal.Rptr.3d 649, 655 (Cal. Ct. App. 2005). Where contract language provides to the contrary, reliance on contrary inducements is unreasonable. *See Valley Paving, Inc. v. Dexter &*

15

*Chaney, Inc.*, Minn.Ct.App. No. C2-00-361, 2000 WL 1182800, *4 (Minn. App. Aug. 22, 2000), attached hereto as **Exhibit A.**. Ada testified at his deposition that he did not know what the PMPA was at the time he signed any of the four Agency Agreements, Ada 7/7/05 Depo TR 112:13-16, Civille Decl. Ex. A, he did not pay any particular attention to the PMPA language, *id.*, 112:17-24, and he did not ask Shell any questions about the PMPA language. Ada clearly did not rely on the references or representations regarding the PMPA in making the decision to enter into the Agreements. Furthermore, the language of the Agreements themselves, when viewed in their entirely, as well as the parties' performance under the Agreements, clearly show that Ada was an agent, and not a franchisee. Ada's equitable estoppel claim must therefore fail.

E.    **Ada cannot prevail on Shell's affirmative defenses and Count VI of the FAAC, and Ada's affirmative defenses.**

Ada seeks summary judgment on several of Ada's affirmative defenses, several of Shell's affirmative defenses, and Count VI of the First Amended Answer and Counterclaim ("FAAC.") Ada argues that summary judgment should be granted in his favor on Shell's affirmative defenses that the PMPA does not apply to the Agreements, that a Ada was an "agent" and not a franchise dealer, that Shell did not violate the terms of the PMPA, and that at no time was Ada a franchisee under the agreement. Ada also requests summary judgment on Count VI of Shell's FAAC which seeks a reformation of the Agreements to reflect the clear intent that Ada is an "agent" and the Agreements were not subject to the PMPA. Ada further requests summary judgment on his affirmative defenses alleging that Shells' Counterclaim is barred by laches and estoppel, and that Shell's claim for reformation is barred because the Agreements were prepared by Shell and its attorneys, and that Shell was negligent. These claims for summary judgment should be denied. Aside from the fact

that Ada's arguments were asserted in the most cursory fashion and without extensive analysis or citation to legal authority, Ada's arguments fail on their merits.[4]

Ada claims that Shell is guilty of laches in having never disputed the applicability of the PMPA, and the specific language contained in the Agreements, until this dispute arose. This argument should be summarily rejected by the Court. The applicability of the PMPA was not in issue until Ada sued Shell. Thus, Shell had no reason to assert the inapplicability of the PMPA beforehand. To establish laches, Ada must demonstrate "(1) an omission to assert a right; (2) a delay in the assertion of the right for some appreciable period; and (3) circumstances which would cause prejudice to an adverse party if assertion of the right is permitted." *Getty v. Getty,* 232 Cal. Rptr. 603, 608 (Cal. Ct. App.1986). In asserting that the PMPA does not apply, Shell is not asserting a right. The PMPA's inapplicability is a defense specifically to Ada's suit claiming that Shell violated the terms of the PMPA. Furthermore, there was no delay, and, in any event, any delay in asserting that the PMPA does not apply was clearly excusable; *to wit,* Shell had no reason or occasion to contest the applicability of the PMPA in this case until Ada sued Shell for a violation of the Act.

Shell's affirmative defenses and Count VI of the FAAC are grounded on the position that the PMPA does not apply in this case. In challenging these defenses and Shell's claim, Ada again refers to the references in the Agreements to the PMPA. Contrary to Ada's assertion, however, this language does not evidence an intent that Ada be granted a franchise under the PMPA. Rather, as discussed at length previously, the Agreements, when construed in compliance with the well-

---

[4] In Section VI of his memorandum in support of summary judgment, Ada seeks summary judgment on six affirmative defenses raised in his Reply to Counterclaim. These affirmative defenses include: Third (Shell violated the PMPA), Fifth (Estoppel), Sixth (Estoppel and Ratification), Seventh (Laches), Sixteenth (Count VI of Shell's Counterclaim Barred because Shell Prepared Agreements), and Twenty-Fourth (Count VI of Shell's Counterclaim Barred because Shell was Negligent in Preparing Agreements). However, in Section VI of Ada's memorandum, Ada only addresses the defenses claiming a violation of the PMPA, laches with regard to claiming the PMPA's inapplicability, and Shell's involvement and alleged negligence in preparing the Agreements. Ada does not discuss or make any argument pertaining to his Fifth and Sixth affirmative defenses, nor does he make any arguments of laches other than with regard to Shell's dispute of the PMPA's applicability. This lack of argumentation not only fails to meet the established burdens imposed on any party seeking summary judgment, which require, at *a minimum,* an argument, but also unfairly requires Shell to articulate an opposition without the benefit of an argument to oppose. Ada's request for summary judgment on these affirmative defenses in which he fails to present any argument or analysis should be denied.

established rules governing contract interpretation, clearly show that Ada was an agent, and not a franchisee. The Agreements simply do not show an intent that Ada be granted a franchise. "The PMPA provides that a 'franchise relationship' only can exist between a 'refiner and a distributor,' a 'refiner and retailer,' a 'distributor and another distributor,' or a 'distributor and a retailer' of motor fuels." *Karak v. Bursaw Oil Corp.*, 147 F. Supp. 2d 9, 13 (D. Mass. 2001) (citing 15 U.S.C. §§ 2801(1)(A)(i)-(iv)). As indicated earlier, looking to the substance of the parties' Agreements, Ada was neither a refiner, distributor, nor retailer; therefore, there was no franchise relationship in this case. Ada cannot prevail on Shell's affirmative defenses that the PMPA does not apply in this case because Ada was an agent.

It is well-established that applicability of the PMPA depends on the character and nature of the parties' relationship. *See Automatic Comfort, Corp. v. D & R Service, Inc.*, 620 F. Supp. 1349, 1355 (D.C. Conn. 1985) ("[A]pplicability of the PMPA to plaintiff's arrangement with defendant must be assessed according to the nature and character of the relationship. Thus, against the backdrop of the parties' recitations with respect to their relationship, the question is whether the characteristics of that relationship require defendant to be deemed entitled to the rights and privileges of PMPA."). Reliance on isolated references to a "franchise" and other references to the PMPA cannot defeat Shell's claims and defenses that the PMPA does not apply in light of the nature of the relationship as evidenced by the Agreements viewed as a whole and the parties' performance under those agreements.

Ada further argues that the Agreements should not be reformed to delete references to the PMPA because the references to the PMPA were prepared by Shell and were due to Shell's alleged negligence. Ada cannot prevail on these affirmative defenses, nor can he prevail on Shell's claim for reformation, as a matter of law. Reformation under Guam law is allowed pursuant to Title 20 GCA §§ 3230 and 3233 which provide, respectively:

18

**§ 3230. When contract may be revised.**
When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

**§ 3233. Enforcing the revised contract.**
A contract may be first revised and then specifically enforced.

Title 20 GCA §§ 3230, 3233. These statutes were taken from California Civil Code sections 3399 and 3402. *See id.*, source. The California Supreme Court succinctly explained their law governing reformation:

> [W]e have long held that ordinary negligence will not bar a claim of mutual mistake because "[t]here is an element of carelessness in nearly every case of mistake. . . ." . . . Only gross negligence or "preposterous or irrational" conduct will preclude a finding of mutual mistake. . . . Thus, "[t]he fact that the party seeking relief has read the instrument and knows its contents does not prevent a court from finding that it was executed under a mistake.". . . Likewise, representation by counsel does not preclude a finding of mutual mistake. (See *Renshaw v. Happy Valley Water Co.* (1952) 114 Cal.App.2d 521, 523, 524-525, 250 P.2d 612 [affirming reformation for mutual mistake even though the aggrieved party's counsel made the mistake].) Here, the contracting parties . . . mistakenly used a boilerplate form with overly broad language to memorialize their agreement. Under these facts, [the plaintiff] . . . is, at most, guilty of ordinary negligence and not the gross negligence necessary to preclude relief.

*Hess v. Ford Motor Co.*, 41 P.3d 46, 55 (Cal. 2002) (citations omitted).

The parties in the present case intended from the outset that Ada act as an agent and not a franchisee as those terms are defined under the PMPA. This agency relationship was discussed by Shell and Ada during the negotiations. *See* Ada 7/7/05 Depo TR 33:19-25, 34:8-18, attached as Ex. A to the Declaration of G. Patrick Civille in Support of Shell Guam, Inc.'s Opposition to Plaintiff's Motion for Summary Judgment filed herewith. Ada did not attach any significance to reference in the Agreements to the PMPA or the franchise language. Ada Depo TR 112:13-24, Civille Decl. Ex A. Shell at all times considered Ada to be an agent. Stalker MSJ Decl. ¶¶ 4, 13. Moreover, Ada is an agent and not a franchisee under the substantive terms of the Agreements. These undisputed facts show that inclusion of the PMPA and franchise language was a result of mutual mistake.

19

Shell's actions in no way amount to "gross negligence or 'preposterous or irrational' conduct" necessary to preclude relief, nor is Shell's claim for reformation defeated by the fact that Shell was represented by an attorney. In accordance with the legal principles governing reformation cited above, Shell is entitled to reformation of the contracts to delete the boilerplate PMPA language that was mistakenly included.

The Court should deny Ada's request for summary judgment on his third, fifth, sixth, seventh, sixteenth, and twenty fourth affirmative defenses in the Reply to Counterclaim, on Shell's first, ninth, twelfth, and fifteenth affirmative defenses in the FAAC, and on Count VI of the FAAC.

## III. CONCLUSION

For the foregoing reasons, Shell respectfully requests that this Court deny Plaintiff's motion for summary judgment.

Respectfully submitted this 15th day of September, 2005.

CIVILLE & TANG, PLLC

By:

**G. PATRICK CIVILLE**
*Attorneys for Shell Guam, Inc.*

# EXHIBIT A

## Westlaw.

Not Reported in N.W.2d                                    Page 1
Not Reported in N.W.2d, 2000 WL 1182800 (Minn.App.), 42 UCC Rep.Serv.2d 433
**(Cite as: 2000 WL 1182800 (Minn.App.))**

**C**

NOTICE: THIS OPINION IS DESIGNATED AS UNPUBLISHED AND MAY NOT BE CITED EXCEPT AS PROVIDED BY MINN. ST. SEC. 480A.08(3).

Court of Appeals of Minnesota.
VALLEY PAVING, INC., Appellant,
v.
DEXTER & CHANEY, INC., a foreign business
corporation, Respondent.
**No. C2-00-361.**

Aug. 22, 2000.

John M. Harens, Holly J. Newman, Moore, Costello & Hart, PLLP, Minneapolis, MN, for appellant.

David Bradley Olsen, Henson & Efron, PA, Minneapolis, MN, for respondent.

Considered and decided by RANDALL, Presiding Judge, LANSING and WILLIS, Judges.

UNPUBLISHED OPINION

WILLIS

*1 Appellant Valley Paving, Inc., challenges the district court's grant of partial summary judgment to respondent Dexter & Chaney, Inc ., arguing that (1) respondent breached implied and express warranties; (2) appellant asserted its right to a refund within the limited-warranty period; (3) respondent's promises to repair tolled the limited-warranty period; (4) the exclusive remedies provision in the parties' agreement failed of its essential purpose; and (5) appellant properly revoked acceptance of the software. We affirm.

FACTS

In October 1996, appellant purchased computer software from respondent for its construction contracting business. Appellant had difficulty using the software and found that it did not meet its particular business needs. Respondent attempted to remedy the alleged problems and added customized programming. Appellant was dissatisfied and demanded a refund. Respondent refused, citing expiration of the six-month limited-warranty period described in the parties' written sales and license agreement.

Appellant sued to recover its purchase price, and respondent counterclaimed to collect the balance due for the custom-programming work. The district court granted respondent's motion for partial summary judgment and dismissed appellant's claim with prejudice. This appeal follows.

DECISION

On appeal from summary judgment, we determine whether there are genuine issues of material fact and whether the district court erred in its application of the law. State by Cooper v. French, 460 N .W.2d 2, 4 (Minn.1990). The evidence must be viewed in the light most favorable to the party against whom judgment was granted. Fabio v. Bellomo, 504 N.W.2d 758, 761 (Minn.1993).

I. Disclaimer of Warranties

Appellant argues that the district court erred in concluding that respondent properly disclaimed all implied and express warranties.

A. Implied Warranties

A warranty of merchantability is implied in a contract for the sale of goods "[u]nless excluded or modified." Minn.Stat. § 336.2-314(1) (1998). For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." Id. (2)(c). A warranty of fitness for a particular purpose is implied "unless excluded or modified" when a seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on [the] seller's skill or judgment to select or furnish suitable goods." Minn.Stat. § 336.2-315 (1998).

Appellant argues that the district court erred in concluding that respondent properly disclaimed the implied warranties of merchantability and fitness. To exclude or modify an implied warranty of merchantability, the contract language must mention merchantability, and, if there is a writing, the exclusion or modification must be conspicuous. Minn.Stat. § 336.2-316(2) (1998). To exclude or modify an implied warranty of fitness, the exclusion must be in writing and must be conspicuous. Id. A contract term or clause is "conspicuous"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color \* \* \*. Whether a term or clause is "conspicuous" or not is for decision by the court. Minn.Stat. § 336.1-201(10) (1998).

The construction and effect of an unambiguous contract are questions of law, which this court reviews de novo. *See Wolfson v.. City of St. Paul, 535 N.W.2d 384, 386 (Minn.App.1995)*, *review denied* (Minn. Sept. 28, 1995). The relevant portion of the sales and license agreement reads:

DISCLAIMER OF RESPONSIBILITY FOR DAMAGES: In no event will DCI have any obligation or liability for damages, including but not limited to consequential damages, arising out of or in connection with the use or performance of the SOFTWARE. There are no warranties which extend beyond the description of the face hereof, either express or implied, including the implied warranties of merchantability or fitness for a particular purpose.

And "[l]anguage to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' " Minn.Stat. § 336.2-316(2) (1998); *Dubbe v. A.O. Smith Harvestore Prods., Inc.,* 399 N.W.2d 644, 647 (Minn.App.1987), *review denied* (Minn. Mar. 13, 1987). The agreement here has a clause containing this language. And the comments to the Uniform Commercial Code (the Code) state that the definition of conspicuous "is intended to indicate some of the methods of making a term attention-calling \* \* \* the test is whether attention can reasonably be expected to be called to it." Minn.Stat.Ann. § 336.1-201 U.C.C. cmt. 10 (West 1966). "Courts have considered capitalization, typeface, contrasting color, and location of the clause in determining whether it is conspicuous." *Agristor Leasing v. Guggisberg,* 617 F.Supp. 902, 909 (D.Minn.1985) (citation omitted). Here, the disclaimer of warranties is not all in capital letters or in contrasting typeface or color. But as the district court noted, the disclaimer "was not hidden in an obscure part of a long, complicated document." The disclaimer is the last section on the first page of a two-page contract and is signaled by a heading that includes the term "DISCLAIMER." Therefore, we conclude that the district court did not err in concluding that the disclaimer of warranties is conspicuous and properly disclaims the implied

warranties of merchantability and fitness for a particular purpose.

B. Express Warranties

Appellant argues that the district court erred in finding that any express warranties, other than the limited warranty provided for in the parties' agreement, were validly disclaimed. An express warranty arises from

[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain.

**\*3** Minn.Stat. § 336.2-313(1)(a) (1998). Appellant contends that respondent orally warranted that the software would meet appellant's particular business needs and that such warranty became the basis of the bargain. But the parties' written agreement contains a disclaimer of all warranties. And unless a contract is ambiguous, a clause stating that the "written agreement is a complete and exclusive statement of the terms of the agreement" will be sufficient to exclude any evidence of an oral warranty. *St. Croix Printing Equip., Inc. v. Rockwell Int'l Corp.,* 428 N.W.2d 877, 880 (Minn.App.1988) (quotation omitted), *review denied* (Minn. Nov. 16, 1988). Here, the integration clause in the parties' agreement unambiguously states that the agreement and schedules

are the final expression of the agreement of the parties, and the complete and exclusive statement of the terms agreed upon, all prior agreements and understandings being merged herein, and that there are no representations, warranties, or stipulations, either oral or written, not herein contained. No modification of this agreement may be made except by a like signed agreement.

Therefore, we conclude that the district court did not err in concluding that the parties' written agreement validly disclaims any express warranties not provided for in the agreement.

II. Limited Warranty

Appellant argues that the district court erred in concluding that appellant did not assert its right to a refund within the six-month limited-warranty period provided for in the agreement. Appellant further argues that the limited-warranty period never started because appellant did not receive all of the software and manuals that it contracted to buy. Under the Code, "receipt" means "taking physical possession of [goods]." Minn.Stat. § 336.2-103(1)(c) (1998).

The software was delivered to appellant on October

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14, 1996. Although appellant had numerous exchanges with respondent regarding appellant's dissatisfaction with the software, it did not demand a refund until May 27, 1997, which is more than six months after the date of its receipt of the software. [FN1] It is unclear from the record whether one instruction manual, which was on back order, was ever delivered. It also appears that some customized programming that was later completed by respondent was not delivered by October 14, but the written agreement provides only for delivery of a standard software package. Nevertheless, appellant had six months from the date it took possession of the software to return what was delivered to it for a refund. Because appellant waited until May 27, 1997, it is not entitled to a refund. The district court did not err in concluding that appellant failed to assert its right to a refund within the six-month limited-warranty period.

> FN1. Appellant argues that its letter to respondent dated March 25, 1997, constituted a demand for a refund, but the letter merely advised respondent of appellant's intention to demand a refund if necessary.

### III. Equitable Estoppel

Appellant argues that respondent's repeated efforts to repair the software and assurances of appellant's satisfaction estop it from asserting that expiration of the six-month limited-warranty period bars appellant's claim. *See generally Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919-20 (Minn.1990) (assuming for sake of argument that promises to repair could provide basis for application of equitable estoppel to toll statute of limitations). Appellant claims that because material facts are in dispute regarding its claim of equitable estoppel, the district court erred in granting partial summary judgment to respondent. A party seeking to invoke the doctrine of equitable estoppel must prove that: (1) promises or inducements were made; (2) it reasonably relied on the promises; and (3) it will be harmed if estoppel is not applied. *Hydra-Mac*, 450 N.W.2d at 919.

**\*4** But the sales and license agreement specifically states that "[n]o modification of this agreement may be made except by a like signed agreement." Therefore, even if respondent made an oral promise or inducement that appellant relied on, the underlying agreement between the parties provides that it can be modified only in writing. In *Martin v. American Family Mut. Ins. Co.*, the Eighth Circuit rejected an

equitable-estoppel claim that was based on an oral promise where the parties' written contract provided that their agreement could not be modified except by a writing. 157 F.3d 580, 582 (8th Cir.1998). The court concluded that, in light of the contract language, reliance on the statements was not reasonable. *Id.; cf. Rooney v. Dayton Hudson Corp.*, 310 Minn. 256, 266-67, 246 N.W.2d 170, 175-76 (1976) (holding that where offer of sale in option agreement could not be extended except by a writing, equitable-estoppel claim could not avoid bar of statute of frauds). Similarly, here, any reliance by appellant on any oral promises or inducements by respondent was not reasonable.

The district court did not err in concluding that there were no factual issues for trial regarding appellant's reliance on any inducements by respondent.

### IV. Exclusive-Remedy Provision

Appellant claims that the district court erred in concluding that the exclusive-remedy provision in the parties' agreement did not fail of its essential purpose. The agreement provides that

[t]he Customer's exclusive remedy shall be either (a) return of the price paid or, (b) repair or replacement of the SOFTWARE, at the Customer's option. This remedy represents DCI's entire liability.

The Code provides that a contract may limit or alter the damages recoverable, but where circumstances cause an exclusive or limited remedy to fail of its essential purpose, any remedies provided for in the Code may be pursued. Minn.Stat. § 336.2-719(1), (2) (1998).

An exclusive remedy fails of its essential purpose if circumstances arise to deprive the limiting clause of its meaning or one party of the substantial value of its bargain.

*Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349, 356 (Minn.1977) (holding that repair-and-replacement clause in automobile owner's manual failed of its essential purpose when car could not or would not be placed in reasonably good operating condition) (citation omitted). So long as the seller repairs the goods each time a defect arises, a repair-and-replacement clause does not fail of its essential purpose. *Id.*

Here, appellant argues that respondent failed to correct defects in the computer software, rendering the repair-and-replacement clause in the parties' agreement ineffective. But even if that clause failed,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

appellant also had the option of returning the goods within the limited-warranty period. Appellant argues that because one remedy failed, respondent's attempted limitation of remedies is entirely ineffective. But where one remedy fails of its essential purpose, "other clauses in the contract which limit remedies for breach may be left to stand or fall independently of the stricken clause." *International Fin. Servs., Inc. v. Franz,* 534 N.W.2d 261, 267 (Minn.1995) (quotation omitted). Thus, the remedy allowing for return of the purchase price remained valid and did not fail of its essential purpose simply because appellant did not timely exercise its rights under the parties' agreement. The district court did not err in concluding that the exclusive-remedy provision did not fail of its essential purpose.

V. Revocation of Acceptance

**\*5** Appellant also claims that genuine issues of material fact exist regarding whether appellant validly revoked acceptance of the software. A buyer may revoke acceptance of goods whose

> nonconformity substantially impairs its value to [the buyer] if [it was accepted] (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or (b) without discovery of such nonconformity if the acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

Minn.Stat. § 336.2-608(1) (1998). "Goods * * * are 'conforming' * * * when they are in accordance with the obligations under the contract." Minn.Stat. § 336.2-106(2) (1998). Thus, goods are nonconforming when they are not in accordance with the obligations under the contract. A buyer must revoke acceptance of nonconforming goods within a reasonable time after the buyer discovers or should have discovered the ground for the revocation. Minn.Stat. § 336.2-608(2) (1998). A seller's attempts to remedy the defect toll the time within which the buyer must revoke acceptance. *Federal Motor Truck Sales Corp. v. Shanus,* 190 Minn. 5, 11, 250 N.W. 713, 715 (1933).

But the district court found that "there is no evidence in the record showing that the standard software package was defective" and that appellant "purchased a standard software package that did not perform exactly as [appellant] would have liked." We agree. Appellant has presented no evidence to support its theory that the software delivered by respondent is nonconforming.

The district court did not err in granting partial summary judgment to respondent.

Affirmed.

Not Reported in N.W.2d, 2000 WL 1182800 (Minn.App.), 42 UCC Rep.Serv.2d 433

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.