LAW OFFICES OF BRONZE & TANG, P.C.
BankPacific Building, Suite 201
825 South Marine Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-2001
Facsimile No.: (671) 647-7671

RICHARD A. PIPES, ESQ.
LAW OFFICES OF RICHARD A. PIPES
Orlean Pacific Plaza, Suite 201
865 South Marine Corps Drive
Tamuning, Guam 96913
Telephone No.: (671) 646-1222
Facsimile No.: (671) 646-2203

Attorneys for Plaintiff

**FILED**
DISTRICT COURT OF GUAM
SEP 22 2005
MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| ANTHONY J. ADA, | ) | CIVIL CASE NO. CV00-00012 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHELL GUAM, INC., et al., | ) | |
| | ) | **REPLY MEMORANDUM OF** |
| | ) | **POINTS AND AUTHORITIES IN** |
| Defendants. | ) | **SUPPORT OF PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| SHELL GUAM, INC., | ) | |
| | ) | |
| Counterclaim | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY J. ADA, | ) | |
| | ) | |
| Counterclaim | ) | |
| Defendant. | ) | |

ORIGINAL

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii, iii

I.  THE RELATIONSHIP BETWEEN ADA AND
    SHELL IS SUBJECT TO THE PMPA. ..................................................................... 1-4

II. UNDER RELEVANT CONTRACT PRINCIPLES,
    THE PMPA CANNOT BE IGNORED. ................................................................... 5-17

    A.  The Holdings In The Preliminary Injunction Are
        The Law Of This Case ........................................................................................ 6-8

    B.  Shell Violated The PMPA By Declining To Renew The
        Agreements. ........................................................................................................ 8-9

    C.  Relevant Contract Principles Require Application Of
        The PMPA To The Relationship Between Ada And Shell. ....................... 9-17

III. SHELL IS ESTOPPED FROM DENYING THAT
     ADA IS A FRANCHISEE. ........................................................................................ 17-20

IV. ADA IS ENTITLED TO SUMMARY JUDGMENT ON
    SEVERAL OF SHELL'S DEFENSES AND COUNT VI
    OF THE COUNTERCLAIM. ................................................................................... 20-23

V.  CONCLUSION ........................................................................................................... 23

i

# TABLE OF AUTHORITIES

## CASES

*Castner v. First Nat'l Bank of Anchorage, 278 F. 2d 376, 379-380 (9th Cir. 1960)* ......................................... 7

*Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988)* ........................................... 7

*Coppage v. State of Kansas, 236 U.S. 1, 14 (1915)* ......................................... 9

*Eichman v. Fotomat Corp., 880 F. 2d 149, 157 (9th Cir. 1989)* ........................................ 7

*Farm Stores, Inc. v. Texaco, Inc., 763 F. 2d 1335, 1340-1345 (11th Cir. 1985)* ......................................... 3, 4

*In re Leimer, 724 F. 2d 744 (8th Cir. 1984)* ......................................... 20

*Karak v. Bursaw Oil Corp., 147 F. Supp. 2d 9 (D. Mass. 2001)* ....................................... 5

*Leon Guerrero v. Moylan, 2002 Guam 18, ¶ 6* ......................................... 10

*Mobil Oil Guam, Inc. v. Lee, 2004 Guam 9 ¶ 24* ........................................ 18

*Moore v. Jas. H. Matthews & Co., 682 F. 2d 830, 834-5 (9th Cir. 1982)* ......................................... 7

*U.S. ex. Rel. Sharma v. University of Southern California, 217 F. 3d 1141 (9th Cir. 2000)* ............................ 11

*United States Fidelity & Guaranty Co. v. Stewart's Downtown Motors,*

*336 F. 2d 549 (9th Cir. 1964)* ........................................................ 17

# TABLE OF AUTHORITIES

## STATUTES AND RULES

*15 U.S.C. §2805(f)* ................................................................................................................................. 8

15 U.S.C. §§2801, et seq. ........................................................................................................................... 1

*20 G.C.A. §3230* .................................................................................................................................... 22

*48 U.S.C 1421b(j)* .................................................................................................................................. 10

*C.A. 9 Rule 36-3(b)* ............................................................................................................................... 20

## OTHER AUTHORITIES

*Restatement (Second) Contracts* ...................................................................................................... 15-16

*U.S. Const. Art. 1, §10* .......................................................................................................................... 10

*Williston on Contracts (4th ed.)* .......................................................................................... 10-13, 15, 17-18

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

I.

## THE RELATIONSHIP BETWEEN ADA AND
## SHELL IS SUBJECT TO THE PMPA.

Notwithstanding the clear and unambiguous language in the franchise agreements which indicate that Plaintiff Anthony J. Ada ("Ada") is being granted a franchise under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§2801, et seq., Shell argues that Ada did not have a franchise under the PMPA and that he was an "agent" instead of a dealer. *Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Summary Judgment ("Shell Memo"), filed September 15, 2005.* However, the undisputed facts show otherwise.

Shell admits that each of the four Agreements contained an opening paragraph, in bold language, stating that the contracts were franchise agreements under the PMPA. *Shell Memo at 1.* Ada did not have any input into the preparation of the agreements and Shell understood that Ada was relying upon Shell to prepare the agreements. *Deposition transcript of Philip Stalker, Vol. 2 ("Stalker Depo. 2"), designated representative for Shell Guam, Inc., July 27, 2005, at p. 87, l. 21 through p. 89, l. 23, p. 93, l. 6-12.* (copies of all deposition transcript pages cited herein are attached to the Declaration of Richard A. Pipes). Ada reasonably relied upon Shell to prepare Agreements that were appropriate for their relationship and Ada expected that Shell would have specialized knowledge with respect to the petroleum fuel industry. *Id.* Shell never intended to allow Ada to draft any of the Agreements. *Id.* When each of the Agreements was signed, Shell understood that the terms and conditions in the Agreements would influence Ada's decision about whether or not to sign the Agreements. *Id.* Shell never told Ada before he signed the Agreements that Shell did not intend the PMPA language in the

1

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

Agreements to be effective. *Id. at p. 90, l. 18 through p. 91, l. 15*. At the time the Agreements were presented to Ada, Shell understood that the PMPA provided protections to dealers. *Id.* Shell understood that when the Agreements were presented to Ada the terms were important to him in deciding whether or not to sign the Agreements. At the time Ada signed the Agreements, Ada had no reason to know that the PMPA language in the Agreements was not applicable to him. *Id. at p. 92, l. 15 through p. 93, l. 12*.

While Shell argues that it never "intended" on entering into a franchise relationship under the PMPA with Ada, Shell was completely aware as to the PMPA requirements for dealers as it had been using such language in its agreements for years before contracting with Ada. *See, infra at 13-14*.

Shell argues that Ada could not possibly be subject to the PMPA because he does not buy fuel or set fuel prices. *Shell Memo at 5-6*. However, there are a number of circumstances which show that Ada does, in fact, take title the fuel delivered at the stations, has risk associated with the sale of fuel, and is properly licensed to sell the fuel. Whenever Ada sells fuel at the stations, the money is deposited in Ada's bank account, which is his alone, and commingled with other funds of his, including those from sales at the convenience store. *Declaration of Anthony J. Ada ("Ada Decl.") at ¶ 2, concurrently filed herein*. Funds for fuel sales deposited into Ada's account are later remitted, in part, to Shell. *Id.* With respect to the sale of fuel, Ada bears the risk for "drive aways", meaning customers who pump gas and drive away without paying, sales of fuel to customers on credit accounts who do not pay or whose checks "bounce", risks associated with credit card sales and the costs incurred by Ada for such sales, and risks for any discrepancies related to missing fuel. *Id.* Also, all employees at both of Ada's stations are his employees and he is solely responsible for their

2

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

hiring, retention, and payment. *Id.* Since 1993 to the present, Ada has obtained and maintained the business licenses for both stations for the sale of petroleum products, including motor fuel and oils. *Id.*

In addition to the clear and unambiguous PMPA language at the heading of each Agreement, the Agreements themselves further show the application of the PMPA to the relationship between Ada and Shell. The Agreements provide that Shell may terminate the franchise on any other ground for which termination is provided in the Agreement "or in any related agreements constituting a franchise between Shell and Agent, or is otherwise allowed by the PMPA or other applicable law". *Declaration of Philip Stalker in support of Shell's Motion for Summary Judgment, Exhibit 1a, §15.a. (5)., filed September 1, 2005, ("Stalker Decl.")*. The Agreements typically provide that Ada is "in business independent of Shell" and that neither Ada nor any person performing work at the stations for Ada is "deemed an employee or agent of Shell". *Id. at §17*. Ada is also required to maintain liability insurance, workmen's compensation insurance, and fire insurance with extended coverage and Shell is required to be named as an "additional named insured" on all such policies. *Id. at Exhibit 1d, §14*. One of the agreements between Ada and Shell even makes reference to the "Franchise Period" for the term of the agreement. *Id. at Schedule II, p. 18*.

Whether Ada bears some risk with respect to the sale of motor fuel, operates as an independent businessman, bears risk with other operations, hires and fires his own employees, and is required to maintain insurance for the benefit of both Ada and Shell are factors that must be evaluated in determining whether a franchise relationship under the PMPA exists. *See, Farm Stores, Inc. v. Texaco, Inc., 763 F. 2d 1335, 1340-1345 (11th Cir. 1985)*. Shell heavily relies upon the decision in

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

the *Farm Stores* case. However, that case is distinguishable on its facts because the written agreement between the parties contained a clear and unambiguous statement, in bold letters, which indicated that there was **no** franchise relationship between the parties under the PMPA. *Id. at 1338.*

As discussed above, the undisputed facts show that Ada has risk of loss with respect to the sale of fuel and operates independently.

Shell also alleges that Ada operates "free of market risks". *Shell Memo at 6.* However, as shown above, Ada is subject to market risks in the sale of gasoline and other petroleum products. Ada is responsible for any costs associated with "drive aways", which do not depend upon Ada's negligence but upon the intentional criminal act of a third party. Ada bears the costs of selling fuel with respect to credit cards, including the Shell card, and any accounts of credit which Ada extends to customers. These are clearly market risks. Further, Shell has required Ada to implement a promotional program called "Lucky 7" which provides customers with incentives to purchase fuel from Shell stations. *Ada Decl. at ¶ 3.* Under the program, a customer is given a stamp for each five gallons of fuel purchased from a Shell service station, or under special promotions, more than one stamp. *Id.* The customers accumulate stamps on a card and when they have twenty stamps they are entitled to redeem the card at any Shell station for a seven dollar purchase on gas or convenient store items. *Id.* The vast majority of redemptions, in excess of 95%, are used for fuel purchases. *Id.* Shell only reimburses Ada $5.25 per card for those redemptions and Ada, therefore, bears the loss of a $1.75 per card. Those losses are in excess of sixty thousand dollars. *Id.*

//

4

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

## II.

## UNDER RELEVANT CONTRACT PRINCIPLES,
## THE PMPA CANNOT BE IGNORED.

Shell argues that the clear and unambiguous language in the subject Agreements which grants Ada a franchise under the PMPA must simply be ignored because of the application of "relevant contract principles". *Shell Memo at 8-14.* These arguments are without merit.

Shell relies extensively on the decision in *Karak v. Bursaw Oil Corp., 147 F. Supp. 2d 9 (D. Mass. 2001),* to argue that just because there may be language in an agreement which can be interpreted to relate to a "dealer" under the PMPA, which the court in *Karak* found not to be sufficient for purposes of the PMPA then, in this case, the PMPA language in Ada's Agreements must also be ignored. *Id. at 8-11.* However, the *Karak* decision is clearly distinguishable on its facts.

In *Karak*, the only contract provision in the agreement between the parties which gave the District Court any reason to question whether the plaintiff was a "dealer" under the PMPA was a statement in the agreement that the station operator "purchases" motor fuel from the distributer and "title thereto shall then pass" to the operator. *Karak, supra at 10.* Unlike the Agreements in this case, there was no provision in the agreement in *Karak* which incorporated the PMPA or which granted a franchise under the PMPA to the operator. The PMPA was never mentioned in the agreement in the *Karak* case. However, it is important to note that the court in *Karak* the court found that it "must look to the relationship between the parties as set forth in the Agreement." *Id.* Of course, in this case, the Court must do the same.

5

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

When Ada's Agreements are examined, each of them specifically indicates that the relationship between the parties is under the PMPA and that Ada is granted a franchise under the PMPA. It could not be any clearer that a franchise relationship is exactly what Shell intended when it drafted the Agreements in this case.

Next, Shell argues that because the actual working relationship between the parties in this case allegedly does not fit within the statutory definitions provided in the PMPA, then there can be no other conclusion that Ada is not a dealer under the PMPA, notwithstanding the clear and unambiguous contract language to the contrary. *Shell Memo at 9-11*. However, Shell's argument flies in the face of the parties' constitutional right to freedom of contract, which includes the right of the parties to incorporate the protections of the PMPA whether or not the parties strictly qualify under the definitions provided in the PMPA. There is nothing in the PMPA which prohibits private parties from incorporating the rights, privileges, and protections of the PMPA into their private agreements. *See, infra at 9-17*.

## A. The Holdings In The Preliminary Injunction Are The Law Of This Case.

Shell argues that the holdings regarding the applicability of the PMPA to the relationship between the parties made in the preliminary injunction should be ignored because they are "preliminary". *Shell Memo at 11*. However, this argument ignores the issues presented to, and determined by, the Court when it issued its Decision and Order ("Decision") granting the preliminary injunction.

The Decision entered on May 4, 2000, acknowledged the arguments of the parties regarding their relative positions on the application of the PMPA, reviewed the Agreements in the case, and

6

**Anthony J. Ada v. Shell Guam, Inc., et al.**
**Civil Case No. CV00-00012**
**Reply Memorandum of Points and Authorities in Support of**
**Plaintiff's Motion for Summary Judgment**

came to the conclusion that the contracts between the parties clearly define the franchisor to franchisee relationship as being within the protections PMPA and that the parties agreed to bring the relationship within the PMPA. *Decision at 3.* The court held that the PMPA requirements apply to the written Agreements and the relationship between the parties. *Id.*

The Supreme Court has defined the law of the case as a doctrine that requires that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. *Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 816 (1988).* This rule of practice promotes the finality and efficiency of the judicial process by "protecting against the agitation of settled issues." *Id.* Although a court has the power to revisit its own decisions, it should not do so absent extraordinary circumstances showing that the prior decision was clearly wrong and would work a manifest injustice. *Id.*

Because the purpose of the doctrine is to promote judicial finality, it necessarily follows that the law of the case acts as a bar when the issue in question was actually considered and decided by the first court. *See, Moore v. Jas. H. Matthews & Co., 682 F. 2d 830, 834-5 (9ᵗʰ Cir. 1982)* (explaining that law of the case principles are analogous to res judicata). The doctrine applies to a court's "explicit decisions as well as those issues decided by necessary implication". *Eichman v. Fotomat Corp., 880 F. 2d 149, 157 (9ᵗʰ Cir. 1989).* Only where cogent reasons or exceptional circumstances exist may a judge set aside or reverse a prior ruling by another judge in the same case. *See, Castner v. First Nat'l Bank of Anchorage, 278 F. 2d 376, 379-380 (9ᵗʰ Cir. 1960).*

In this case, the Court, in rendering the Decision, considered the arguments of the parties with respect to whether or not the subject Agreements provide for PMPA coverage and the

7

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

Decision determined that since the contracts clearly define the relationship of the parties as being within the protections of the PMPA, the Court concluded that the parties agreed to bring the relationship within the PMPA and that the PMPA requirements apply to the written Agreements and the relationship between Ada and Shell. While Shell argues that the Decision is confined to the granting of a preliminary injunction, it is clear from the Decision itself that the Court determined the relationship of the parties to be within the PMPA. The Decision is the law of the case on that issue.

### B. Shell Violated The PMPA By Declining To Renew The Agreements.

Shell argues that because Shell and Ada "mutually agreed" to end their relationship, the subject Agreements expired and were not renewed by "mutual agreement". *Shell Memo at 11-12.* This argument is without merit.

The Amendment of Agency ("Amendment") that Shell cites purported to amend certain provisions of the second Mangilao agreement and second Barrigada agreement to change the terms and to delete certain sections from such Agreements which contained the rights and obligations of the parties with respect to termination and non-renewal, and certain other rights guaranteed by the PMPA. *See, Stalker Decl. Exh. "4".* However, the Amendment itself violates the PMPA. The PMPA prohibits any franchisor, from requiring, as a condition of entering into or renewing the franchise relationship, the franchisee to release or waive any right that the franchisee has under the PMPA. *15 U.S.C. §2805(f).*

Prior to the signing of the Amendment, Shell representatives told Ada that Shell was not going to renew his franchise at the Mangilao station, even though it had no cause to terminate as required under the PMPA. *Ada Decl. at ¶ 4.* Being unaware of his rights under the PMPA, Ada felt

8

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

that he had no other choice than to sign the Amendment, which Shell presented as a "take it or leave it" proposition. *Id.* Shell made it clear to Ada that if he did not sign the Amendment prepared by Shell, the Mangilao franchise would be terminated immediately and would not be extended. *Id.* Ada was unaware, at the time he signed the Amendment, that the PMPA prohibited Shell from conditioning the renewal or extension of the Mangilao station franchise upon a waiver of his rights under the PMPA. *Id.*

As clearly shown above, the Amendment prepared by Shell, which Ada was forced to sign, was in direct violation of the PMPA because it conditioned a renewal or extension of the Mangilao franchise upon a waiver by Ada of his rights under the PMPA. Accordingly, the Amendment is void and cannot be relied upon by Shell to show that Ada did not have any rights regarding termination and non-renewal under the PMPA.

### C. Relevant Contract Principles Require Application Of The PMPA To The Relationship Between Ada And Shell.

Shell argues that the PMPA language in the Agreements must be ignored, the use of the word "agent" in several places in the Agreements is conclusive, the doctrine of "contra preferentum" does not apply, and that any references in the Agreements to a PMPA "franchise" must be rejected because these were "obviously mistaken references". *Shell Memo at 12-14.* These arguments are equally without merit.

Included in the constitutional right of personal liberty and the right of private property is the right to make contracts. *Coppage v. State of Kansas, 236 U.S. 1, 14 (1915).* ("If this right to be struck down or arbitrarily interfered with, there is a substantial impairment of liberty in the long-established

9

**Anthony J. Ada v. Shell Guam, Inc., et al.**
**Civil Case No. CV00-00012**
**Reply Memorandum of Points and Authorities in Support of**
**Plaintiff's Motion for Summary Judgment**

constitutional sense. The right is as essential to laborer as to the capitalist, to the poor as to the rich; for the vast majority of persons have no other honest way to begin acquiring property, saved by working for money."). The Contracts clauses of the Organic Act and the U.S. Constitution prohibit the government from enacting any law that impairs the obligation of contract. *Leon Guerrero v. Moylan, 2002 Guam 18, ¶ 6* (citing *48 U.S.C 1421b(j); U.S. Const. Art. 1, §10*). Accordingly, as in all the other States and territories, parties in Guam have the right to freedom of contract in their affairs.

Inherent in that right is the right of the parties to agree upon the terms and conditions of the contract as well as the protections and rights afforded to each party. In this case, Shell and Ada agreed that Ada was being granted a franchise under the PMPA which provided him with all the rights and protections afforded a franchisee under the PMPA. There is nothing in the PMPA which prohibits private parties from incorporating the protections of the PMPA into their private agreements. Any such prohibition would violate both the Constitution and Organic Act.

Shell admits that the subject Agreements between it and Ada contain language which indicates that the Agreements are "franchise agreements under the PMPA". *Shell Memo at 1.* Shell also admits that the PMPA language was inserted by Shell and that Shell thought that the PMPA language was appropriate. *Id.*

That being said, the object in construing a contract is to ascertain the meaning and intent of the parties as expressed in the language used. *Williston on Contracts (4th ed.) ("Williston"), §31:4.* The primary importance should be placed upon the words of the contract. *Id.* The court should not inquire into the actual mental processes of the parties in entering into the particular contracts; rather the law presumes that the parties understood the import of their contract and that they had the

10

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

intention which its terms manifest. If the language used by the parties is plain, complete, and unambiguous, the intention of the parties must be gathered from that language, and from that language alone, regardless of what the actual or secret intentions of the parties may have been. *Id.* It is clear that it is not the real intent but the intent expressed or apparent in the writing which is sought; it is the objective, not the subjective intent that controls. *Id.; U.S. ex. rel. Sharma v. University of Southern California, 217 F. 3d 1141 (9th Cir. 2000)* (contracts are to be interpreted according to the objective intent of the parties) (construing California law).

Unless the contract is voidable for causes such as mistake, fraud or unconscionability, the court must enforce it as drafted by the parties, according to the terms employed, and may not make a new contract for the parties or rewrite their contract while purporting to interpret or construe it. *Williston, §31:5.* A court cannot change the words of a written contract so as to make it express the claimed real intention of the parties, or remake a contract to implement an unexpressed intention, if doing so will contradict the clearly expressed language of the contract. *Id.*

The parties' intentions are first and foremost, determined by the language used in their agreement. When the parties express their intentions in writing, the language used by the parties will be construed in an objective, not in a subjective, manner. *Id. at §32:2.* The law presumes that words have an objective meaning and that this is the meaning intended when those words are used in a contract. *Id.*

The law prefers an interpretation which gives effect to all parts of the contract rather than one which leaves a portion ineffective or meaningless. *Id. at §32:9.* But where this is not possible, the court will seek to interpret the contract in a way that will at least effectuate the principal or main

11

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

apparent purpose of the parties. *Id.* In interpreting a contract, the courts will either give preference to the earlier clause when it conflicts with a later clause, the more important or dominant of two conflicting clauses, or the more specific of two clauses that conflict with one another. *Id. at §32:15.*

In the absence of fraud, duress, mutual mistake, or unconscionability, where a party signs a document he is generally held to be bound by its terms, even if he signs in ignorance of those terms. *Id. at §6:43.* The test of the true meaning of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but a reasonable person in the position of the parties would have thought it meant. *Id. at §6:57.* If the offeror of a contract uses language which is ambiguous on its face, he should be bound by whatever reasonable construction the offeree may put upon those words if the offeror knew, or as a reasonable person should have known, of the ambiguity and the offeree did not know of it. *Id. at §6:58.*

In this case, the language in the Agreements prepared by Shell and its attorneys clearly stated that Ada was being granted a franchise under the PMPA. Notwithstanding whatever Shell claims its intent was, the objective intent of the parties must be gleaned from the Agreements themselves. The Court cannot rewrite the Agreements the way Shell now wishes it had done so when they were prepared. The Court cannot construe or interpret the Agreements to excise all of the clear language relating to the PMPA from the Agreements, just because that is what Shell now wants. The objective intention of the parties in this case is easily discerned by the Agreements - the parties intended that Ada be granted franchises under the PMPA.

The principal or main purpose of each of the Agreements is clear from the bold and capitalized language at the top of each Agreement. Ada is clearly being granted a franchise under the

12

**Anthony J. Ada v. Shell Guam, Inc., et al.**
**Civil Case No. CV00-00012**
**Reply Memorandum of Points and Authorities in Support of**
**Plaintiff's Motion for Summary Judgment**

PMPA. The placement of the PMPA language in bold, capitalized letters at the head of each of the Agreements is important in interpreting a contract which contains contradictory clauses. *Id. at §32:15.* In this case, the placement of the bold, capitalized PMPA language at the heading of each agreement should be given preference in interpreting any contradictory or ambiguous clauses later occurring in the Agreements.

As shown above, Ada reasonably relied upon Shell to prepare Agreements that were appropriate for their relationship and Ada expected that Shell would have specialized knowledge with respect to the petroleum fuel industry. Shell never intended to allow Ada to draft any of the agreements. Shell understood that the terms and conditions in the Agreements would influence Ada's decision about whether or not to sign the Agreements. Shell never told Ada before he signed the Agreements that Shell did not intend the PMPA language in the Agreements to be effective. At the time that the Agreements were presented to Ada, Shell knew that the PMPA provided protections to dealers. Shell understood that when the Agreements were presented to Ada the terms were important to him in deciding whether or not to sign the Agreements. At the time Ada signed the Agreements, Ada had no reason to know that the PMPA language in the Agreements was not applicable to him. Prior to the drafting of the Agreements for Ada, Shell had operated stations in Guam through dealers and because Shell started its retail network using dealers, Shell was familiar with operating stations under the PMPA.

From the beginning of its operations, Shell has had a PMPA compliance officer and had one at all times during which the Ada Agreements were being prepared. *Transcript of Deposition of Philip Stalker, designated representative for Shell Guam, Inc., June 30, 2005, Vol. 1 ("Stalker Depo. 1"), p. 14, l. 15 to*

13

**Anthony J. Ada v. Shell Guam, Inc., et al.**
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

*p. 15, l. 8.* If Shell has a PMPA question, its first call would be to its attorneys. *Id. at p. 17, l. 14-21.* Shell representatives never told Ada that he was not a dealer and that there was an agency relationship between Shell and Ada. *Id. at p. 124, l. 20 - p. 125, l. 15.* The PMPA language at the top of each of Ada's Agreements was also included on other dealer agreements. *Id. at p. 128, l. 3 - l. 17.* The Agreements were prepared by Shell's attorney, Steven Zamsky, and the drafts were sent to management personnel in Shell for them to look over, redline, and send back to the attorney. *Id. at p. 129, l. 1 - p. 130, l. 10.*

While Ada may not have understood the PMPA language at the heading of the Agreements, Ada assumed that all of the terms and conditions contained in the Agreements were important and were to be relied upon by both parties. *Ada Decl. at ¶ 5.* Ada relied upon Shell to prepare the Agreements because it had specialized knowledge in the petroleum fuel industry. *Id.* Had Ada known that there were provisions in the Agreements which Shell felt were not applicable to him, Ada would never have entered into any of the Agreements. *Id.* Ada did not have any "mistake" as to the applicability of the PMPA to the Agreements and his relationship with Shell. Ada felt that all of the terms and conditions the Agreements were binding as to the rights and obligations of the parties. *Id.* All of the Agreements were prepared by Shell and Ada had no input into the drafting of the Agreements. *Id.* Ada did not negotiate any of the terms of the Agreements and the Agreements were presented to Ada, in their final form, for signing by Ada. *Id.* Ada made no amendments to any of the Agreements. *Id.*

Accordingly, as shown above, contract principles require that the PMPA language in the Agreements, drafted by Shell and its attorneys, be enforceable.

14

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

Shell argues that the doctrine of contra preferentum does not apply to Shell in this case because the Agreements were "a product of negotiation by the parties." *Shell Memo at 14.* Shell does not cite to any portions of the record herein in any attempt to prove this point.

As shown above, the Agreements were not a product of "negotiation by the parties" and the agreements were presented to Ada in final form after having been reviewed by Shell management and its attorneys. If there is any ambiguity in the Agreements, as alleged by Shell, that ambiguity must be interpreted against the drafter of the Agreements, which is Shell. The doctrine of contra preferentum provides that since the language is presumptively within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter. *Williston at §32:12.*

Finally, Shell argues that because it made a "mistake" inserting the PMPA language into the Agreements, it is entitled to reformation of the Agreements to delete the PMPA language. *Shell Memo at 13-14.* This argument is also without merit. A mistake is a belief that is not in accord with the facts. *Restatement (Second) Contracts, §151.* Mistake alone has no legal consequences. *Id. at Comment a.* In order to avoid a contract, the mistake of both parties must be **mutual** at the time the contract was made, unless the party requesting reformation bears the risk of the mistake. *Id. at §152.* A party bears the risk of a mistake when he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so. *Id. at §154.*

15

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

As shown above, in this case there was no "mutual" mistake. Even assuming that Shell was mistaken as to the applicability of the PMPA, which Ada denies, Shell was the only party mistaken. It is undisputed that, as far as Ada knew, all of the terms and conditions contained in the Agreements were appropriate and were applicable to both parties. Ada had no "mistake" as to the application of the PMPA to the Agreements. Since Shell was the only party "mistaken", as it alleges, then it is not entitled to reform the Agreements on the grounds of mutual mistake.

Further, even assuming there was some "mutual" mistake by the parties, which Ada denies, Shell bore the risk of mistake because it drafted the Agreements with the assistance of counsel and, admittedly, only had limited knowledge with respect to the application of the PMPA when the Agreements were prepared but, nevertheless, decided to treat that limited knowledge as sufficient for purposes of preparing Agreements with Ada. Specifically, Shell admits it was attempting to write an agency agreement or put a contractual basis under an agency model and that the PMPA language was copied from old dealer agreements because the "agency agreements mimic the dealer agreements to a large extent". *Stalker Depo. 1 at p. 126, l. 7-21.* Shell felt the language was appropriate for a dealer setting up a franchise and the PMPA language was put into the Ada agreements and "just survived". *Id. at p. 126, l. 23 - p. 127, l. 1.* Shell prepared the Agreements out of ignorance because non-U.S. personnel, without experience in the United States market, but with an understanding that there was something called the PMPA, inserted the PMPA language and drafted the Agreements. *Id. at p. 127, l. 1 - 11.*

Under these undisputed facts, Shell bears the risk of any mistake in the Agreements because it was aware, at the time the contracts were made, that Shell had only limited knowledge with respect

16

**Anthony J. Ada v. Shell Guam, Inc., et al.**
**Civil Case No. CV00-00012**
**Reply Memorandum of Points and Authorities in Support of**
**Plaintiff's Motion for Summary Judgment**

to the PMPA but treated that limited knowledge as sufficient and went forward in drafting the Agreements. Further, it is appropriate to allocate the risk of mistake to Shell by this Court because it is reasonable, under the circumstances described above, to do so.

Accordingly, there is no mutual mistake and Shell is not entitled to a reformation and, even if there was mutual mistake, Shell bore the risk of such mistake because it proceeded with limited knowledge and, under the circumstances, it is reasonable to require Shell to bear the risk of mistake.

## III.

## SHELL IS ESTOPPED FROM DENYING THAT ADA IS A FRANCHISEE.

Shell argues that Ada cannot prevail on any claim of estoppel against Shell because promissory estoppel cannot be used to "establish the applicability of the PMPA" and because Ada was aware that "he was not a franchisee" and that Ada could not rely upon the bold, unambiguous PMPA language in the agreements because such reliance would be "unreasonable". *Shell Memo at 14-16.* These arguments are without merit.

There is no reason to suppose that the ordinary principles of estoppel do not apply to the formation of contracts. *Williston, supra, at §6:62.* If either party misrepresents an element of fact essential to the existence or non-existence of a contract, and the other party justifiably relies upon this representation and takes detrimental action inconsequence, it will not be open to the party making the representation to show his error. *Id.; also see, United States Fidelity & Guaranty Co. v. Stewart's Downtown Motors, 336 F. 2d 549 (9th Cir. 1964).* It is generally required for the creation of an equitable estoppel that there should be a misrepresentation of existing fact. *Williston, supra, at §6:62.*

17

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

The issue of equitable estoppel was previously addressed by this Court in a ruling on Shell's motion to dismiss Ada's First Amended Complaint in the Court's Order of April 16, 2002, the Court determined that Ada had asserted a claim for equitable estoppel "which is permitted under the PMPA". *See, Order, filed April 16, 2002, at 6.* The Court has previously determined that a claim for equitable estoppel is viable and this has become the law of the case.

Under Guam law, the four elements that must be proven under equitable estoppel are (1) the party to be estopped must be apprised of the facts, (2) he must intend that his conduct will be acted upon, or act in such a manner that the party asserting the estoppel could reasonably believe that he intended his conduct to be acted upon, (3) the party asserting the estoppel must be ignorant of the true state of the facts, and (4) he must rely upon the conduct to his injury. *See, Mobil Oil Guam, Inc. v. Lee, 2004 Guam 9 ¶ 24.*

As shown above, Shell had operated for years under agreements with dealers and knew that the PMPA was applicable to dealers. Shell had attorneys that prepared the Agreements for Ada and such Agreements were reviewed by Shell management personnel. Shell presented the Agreements to Ada and understood that he relied upon Shell, with its expertise and knowledge with the fuel industry, to prepare the Agreements that were appropriate for the relationship between the parties. Further, Shell understood that Ada was relying upon Shell to prepare the Agreements that were appropriate under the circumstances. Ada was unaware that Shell did not intend the PMPA language in each of the Agreements to be applicable and Ada felt that all of the terms and conditions contained in the Agreements were applicable to both parties. Had Ada known that Shell would later assert that portions of the Agreements were not applicable to Ada, he never would have entered into

18

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

the Agreements with Shell. Ada relied upon the Agreements to accurately reflect the terms, conditions, and relationship, of the parties, including the termination and non-renewal of the franchise agreements. Clearly, Ada's reliance on Shell, as described above, has resulted in injury to Ada because Shell is now trying to terminate the Agreements, in violation of the PMPA language, to Ada's detriment and injury. Finally, Shell admits that the termination letter which it gave to Ada does not comply with the PMPA. *Transcription of Deposition of James Hammond, designated representative for Shell Guam, Inc., June 29, 2005, p. 155, l. 1 - 13.*

The undisputed facts, as shown above, support all four elements required under equitable estoppel analysis. Shell argues that Ada could not reasonably rely upon the bold, conspicuous PMPA language in each of the Agreements because there were references in the Agreements to Ada as an "agent". However, under the contract interpretation principles discussed above, the specific prevails over the general, and the bold over the subdued. Ada was completely justified and reasonable in relying upon the bold, conspicuous and capitalized language representing that he was a franchisee under the PMPA instead of focusing on the less specific, general references to Ada as an agent.

Finally, Shell argues that in order to prevail on a claim for promissory estoppel, Ada must reasonably rely on the alleged promise. The promise that Ada relied upon is the representation in the Agreements by Shell that at the time the Agreements were executed, and for the term of the Agreements, Ada was a franchisee under the PMPA with all its rights and privileges. In light of the clear and unambiguous PMPA language in each of the Agreements, it was not unreasonable for Ada to rely upon the representations made by Shell that Ada was a franchisee under the PMPA at the

19

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

time the Agreements were executed, and would continue to be such a franchisee throughout the

term of the Agreements. Ada was further entitled to reasonably rely upon the representations in the

Agreements with respect to the non-termination and non-renewal rights Ada would have under the

PMPA.

Ada is entitled to prevail on his motion for summary judgment on his claim for estoppel.[1]

## IV.

## ADA IS ENTITLED TO SUMMARY JUDGMENT ON SEVERAL OF SHELL'S DEFENSES AND COUNT VI OF THE COUNTERCLAIM.

Shell argues that Ada is not entitled to summary judgment on his affirmative defense raised

in his Reply to Shell's Counterclaim based on laches because there was no delay or because any delay

in asserting that the PMPA does not apply to the relationship between Ada and Shell was "clearly

excusable". *Shell Memo at 16-17*. Shell asserts that it had no reason to know of the issue relating to

the applicability of the PMPA to the subject Agreements until Ada sued Shell for a violation of the

PMPA. *Id. at 17*.

However, as shown above, Shell had every reason to know that if it intended Ada to be an

agent, instead of a dealer, that the bold, conspicuous PMPA language in each of the Agreements

---

[1] In support of its arguments, Shell has, once again, cited to unpublished decisions. *Shell Memo at 14-15*. Shell cites to the unpublished decision from a District Court in Massachusetts and a state appeals court in Minnesota. *Id.* In this Circuit, unpublished decisions of the Ninth Circuit "shall not be cited to or by the Court's of this Circuit". *C.A. 9 Rule 36-3(b)*. If the Ninth Circuit prohibits citation of its own unpublished decisions, it is fair to assume that it would look with disfavor upon citation to unpublished decisions in the District Court from another Circuit and from an appellate court in another State. Ada objects to the citation of unpublished authority by Shell. Since unpublished memoranda and opinions usually fail to disclose fully the rationale of the Court's decision, are not uniformly available to all litigants, and are not published because they are deemed "not to be of precedential value", many Courts of Appeals prohibit the citation of unreported decisions in the briefs presented in unrelated cases. *See, In re Leimer, 724 F. 2d 744 (8th Cir. 1984)*.

Anthony J. Ada v. Shell Guam, Inc., et al.
Civil Case No. CV00-00012
Reply Memorandum of Points and Authorities in Support of
Plaintiff's Motion for Summary Judgment

prepared by Shell was inconsistent with Shell's professed intent that Ada only be an agent. Shell had been operating through dealers years before it drafted the first Agreement with Ada and Shell was familiar with the operation of the PMPA under dealers. Further, at all relevant times, Shell had a PMPA compliance officer responsible for PMPA issues within the Shell organization. Also, each of the Agreements with Ada was prepared by Shell's attorneys and reviewed by management personnel within Shell to make sure that the Agreements were appropriate for the relationship.

Additionally, in May, 1995, Paul Tissot, Vice President and Marketing Manager of Shell Guam, and also the PMPA compliance officer for Shell, wrote a letter to one of Shell's dealers, Tom Torres, advising him that Shell intended to terminate his dealer agreement because Shell intended on converting its dealer stations into agent stations. *Declaration of William J. Blair, Exhibit "A" ("Blair Decl.")*. In his letter, Tissot outlines the differences between dealers and agents and acknowledges the applicability of the PMPA to the dealer relationship. *Id.* Tissot even offers Torres a "sample agency agreement" for his review in the event Torres wished to continue as an agent, instead of a dealer. *Id.* In response, Torres hired counsel who sent a letter to Tissot on September 11, 1995, advising Shell that the grounds asserted by Shell as the basis for non-renewal of Torres dealer agreement were inadequate and were in direct violation of the provisions of the PMPA. *Id., Exhibit "B"*.

Accordingly, as of September, 1995, at the latest, and surely earlier, Shell clearly knew or reasonably should have known that the PMPA applied to dealers and the PMPA did not apply to "agents". Notwithstanding this knowledge, Shell, nevertheless, prepared the second Barrigada agreement some five months later which represented to Ada that he was being granted a franchise

21

**Anthony J. Ada v. Shell Guam, Inc., et al.**
**Civil Case No. CV00-00012**
**Reply Memorandum of Points and Authorities in Support of**
**Plaintiff's Motion for Summary Judgment**

under the PMPA, even though, at the time, Shell clearly understood that there was a difference between dealers and agents under the application of the PMPA. Since 1995, Shell's own documents show that Shell knew, or reasonably should have known, that its Agreements with Ada did not accurately reflect its professed intent that Ada be an agent, instead of a dealer. Notwithstanding this knowledge, Shell did not bring this inconsistency to Ada's attention until after Ada filed suit in February, 2000, some five years later. Shell is clearly guilty of laches and Ada is entitled to summary judgment on this affirmative defense.

Next, Shell argues that Ada is not entitled to summary judgment on Shell's Fifth, Ninth, Twelfth, and Fifteenth Affirmative Defenses in the First Amended Answer and Counterclaim ("FAAC"), and Count VI of the FAAC, because of the "well-established rules governing contract interpretation" which show that Ada was an agent and not a franchisee. *Shell Memo at 17-20.* These "contract" arguments have previously been addressed herein, supra at 5-17, and will not be addressed further.

However, it is important to review the claims made by Shell with regard to whether the Agreements between the parties should be "reformed". Guam law requires that before a contract may be reformed there must be "a mutual mistake of the parties" or "a mistake of one party, which the other at the time knew or suspected". *See, 20 G.C.A. §3230.* As clearly shown above, there was no "mutual mistake" of the parties. If there was any mistake, which Ada denies, the mistake was unilateral on the part of Shell. It is undisputed that Ada had no reason to know that the PMPA did not apply to the Agreements and that Shell never told Ada that the PMPA language in the Agreements did not apply to him. Accordingly, Ada had no way of knowing or suspecting that Shell

22

**Anthony J. Ada v. Shell Guam, Inc., et al.**
**Civil Case No. CV00-00012**
**Reply Memorandum of Points and Authorities in Support of**
**Plaintiff's Motion for Summary Judgment**

had purportedly made a "mistake" in inserting the bold and conspicuous PMPA language in each of the Agreements and misrepresenting to Ada that he was being granted a franchise under the PMPA. Since it is undisputed that Shell cannot prove the "mutual mistake" and the knowledge of Ada with respect to Shell's alleged mistake, then Shell cannot prevail on its Counterclaim for reformation of the Agreements. Further, there is certainly a question of fact as to whether or not Shell's intentional conduct or negligence, in inserting PMPA language in agreements which Shell purportedly intended not to have any application to the PMPA, amounts to "gross negligence" to preclude the relief of reformation and mutual mistake. *See, Shell Memo at 19.*

## V.

## CONCLUSION

For the reasons stated herein and in the previous and subsequent pleadings filed herein, summary judgment should be granted to Ada as requested in his Motion.

Dated this 22nd day of September 2005.

LAW OFFICES OF RICHARD A. PIPES
Attorneys for Plaintiff

By: _____
        RICHARD A. PIPES

RAP/fdm

23