**CIVILLE & TANG, PLLC**
SUITE 200, 330 HERNAN CORTEZ AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 472-8868
FACSIMILE: (671) 477-2511

*Attorneys for Shell Guam, Inc.*

**FILED**
DISTRICT COURT OF GUAM

OCT - 7 2005

MARY L.M. MORAN
CLERK OF COURT

## IN THE UNITED STATES DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| ANTHONY J. ADA, | ) | CASE NO. CV00-00012 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **SHELL GUAM, INC.'S TRIAL BRIEF** |
| SHELL GUAM, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| SHELL GUAM, INC., | ) | |
| | ) | |
| Counterclaim | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ANTHONY J. ADA, | ) | |
| Counterclaim | ) | |
| Defendant. | ) | |
| | ) | |

# TABLE OF CONTENTS

I.    Factual Contentions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      A.    Underlying Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
      B.    Ada's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      C.    Shell's Counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.   Legal Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      A.    Issues of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            1.    Does the PMPA apply to the Agency Agreements? . . . . . . . . . . . . . . . . 9
            2.    If PMPA only applies contractually, can Ada
                  seek punitive damages? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            3.    Ada cannot recover punitive damages on the Breach of
                  the Covenant of Good Faith and Fair Dealing Claim . . . . . . . . . . . . . . . 9
            4.    Ada has not incurred  actual damages . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            5.    Attorneys fees Ada has incurred are not damages
                  for the purpose of determining whether he has
                  suffered actual damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            6.    If Ada has not suffered actual damages he is not entitled
                  to punitive damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            7.    Even if Ada suffered actual damages, there is no
                  evidence to support a finding that Shell has been guilty
                  of oppression , fraud or malice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
      B.    Evidentiary Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
            1.    There is no basis for the opinion by Roger Slater,
                  Ada's expert, that Ada suffered "differential damages"
                  based on the theory that Ada's commission should have
                  increased as the pump price of gasoline increased, and
                  Slater's opinion on this issue should not be admitted . . . . . . . . . . . . . . 14
            2.    Evidence relating to promotional programs is irrelevant,
                  has no probative value regarding any issues in the SAC,
                  and should not be admitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            3.    Evidence of the Shell Group's global earnings is not
                  relevant on the issue of punitive damages . . . . . . . . . . . . . . . . . . . . . . . 17
            4.    Attorney's Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            5.    Abandonment of Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## Cases

*Aero Sales, Inc. v. City of Salem* 200 Or.App. 194, \*196,
  114 P.3d 510, 511 (Or. Ct. App. 2005) (quoting *Jensen v. Miller,*
  280 Or. 225, 228-29, 570 P.2d 375 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Cap Gemini America, Inc. v. Judd,* 597 N.E.2d 1272,
  1286 (Ind. Ct. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Cates Construction, Inc. v. Talbot Partners,*
  980 P.2d 407, 415, 86 Cal.Rptr.2d 855, 864 (Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . 10

*Chavez v. Times-Mirror Co.*, 237 P. 1085,
  1086-87 (Cal. Ct. App. 1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Chevron U.S.A. Inc. v. El-Khoury,*
  2002 WL 31256160, at \*3 (C.D.Cal. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Chodos v. West Publishing Co.*, 292 F.3d 992, 996 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . 10

*Crogan v. Metz*, 303 P.2d 1029, 1033 (Cal. 1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Fleming v. Quigley*, 2003 Guam 4,
  2003 WL 554665 (Guam Feb. 28, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 692-93,
  254 Cal.Rptr. 211, 765 P.2d 373 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Guidroz-Brault v. Missouri Pacific R. Co.,*
  254 F.3d 825,  829 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hangarter v. Provident Life and Acc. Ins. Co.,*
  373 F.3d 998, 1017 (9th Cir, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Kizer v. County of San Mateo,* 806 P.2d 1353, 1357-1358,
  279 Cal.Rptr. 318,322- 23 (Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mitsui Mfrs. Bank v. Superior Court,*
  212 Cal.App.3d 726, 730, 260 Cal.Rptr. 793 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mother Cobb's Chicken Turnovers v. Fox,*
    73 P.2d 1185,1186 (Cal.1937) ............................................ 13

*Park v. Mobil Oil Guam, Inc.,*
    2004 Guam 20, 2004 WL 2595897 (Guam Feb. 16, 2004) .................... 12

*Pension Trust Fund for Operating Engineers v. Federal Ins. Co.*
    307 F.3d 944, 955 (9th Cir. 2002) ..................................... 10

*Pickwick Stages, Northern Division v. Board of Trustees of*
    *City of El Paso De Robles,* 215 P. 558, 558 (Cal. Ct. App. 1921) ............... 13

*Sasser v. Miles & Sons Trucking Service,*
    259 P.2d 488, 490 (Cal. Ct. App. 1953) ............................... 13

*Scott v. Ross,* 140 F.3d 1275, 1285-86 (9th Cir.1998) ......................... 16

*Sole Energy Co. v. Petrominerals Corp.,*
    26 Cal. Rptr.3d 798, 817 (Cal. Ct. App. 2005) .......................... 7

*Tomaselli v. Transamerica Ins. Co.,*
    31 Cal.Rptr.2d 433, 442-44 (Cal. Ct. App. 1994) ....................... 18

*Turner v. Burlington Northern Santa Fe R. Co.,*
    338 F.3d 1058, 1061 (9th Cir. 2003) .................................. 16

*United States v. Bestfoods,* 524 U.S. 51, 60,
    118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) ............................... 18

*United Technologies Corp. v. American Home Assur. Co.,*
    118 F.Supp.2d 174, 180-81 (D.Conn. 2000) ............................ 18

*Von Grabe v. Sprint PCS,* 312 F.Supp.2d 1285,
    1308-09 (S.D. Cal. 2003) ............................................. 9

*Westside Center Associates v. Safeway Stores 23, Inc.,*
    49 Cal. Rptr. 2d 793, 802 (Cal Ct. .App. 1996)
    (quoting *Youst v. Longo* (1987) 43 Cal.3d 64,
    71, fn. 6, 233 Cal.Rptr. 294, 729 P.2d 728) .......................... 8

*White v. Ford Motor Co.,* 312 F.3d 998, 1007 (9th Cir.2002) .................... 16

## Statutes

15 U.S.C. § 2801, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 GCA § 87106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

20 G.C.A. § 2120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

20 G.C.A. § 2225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

20 GCA § 3230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

20 GCA § 3233 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

In compliance with LR 16.7, Shell Guam, Inc. ("Shell") submits its trial brief as follows:

## I.     Factual Contentions.

A.     **Underlying Facts**.     Shell Guam, Inc. ("Shell") is a Guam corporation. Among other activities on Guam, Shell operates a network of service stations. Anthony Ada ("Ada") is a resident of Guam, a college graduate with a degree in business and a former vice-president at the Bank of Hawaii. In 1993 Ada was looking to change his career. At the same time, Shell was looking for an operator for one of its stations. In 1993 Shell entered into an Agency Sales Agreement with Anthony Ada ("Ada"), under which Ada became an operator of Shell's station and convenience store in Mangilao, Guam. This Agreement was for one year and was renewed in 1995 for a period of five years. In 1995 Shell also entered into a separate Agency Sales Agreement with Ada for Ada to operate a second station, this one in Barrigada, Guam. The Barrigada Agreement was for a one year period, and was thereafter renewed for a period of five years.

The Agreements between Shell and Ada were intended to create an agent-operator relationship between Shell and Ada, as opposed to a dealer-operator model. At the time of the first Mangilao Agreement, none of the oil companies on Guam, including Shell, were using an agent-operator model. Up until that time, all of Shell's operators were dealers. In drafting the Agency Agreements to be used with Ada, Shell used its dealer agreements as a template and made the changes it felt appropriate to convert the relationship from dealer -operator to agent-operator. Due to a misinterpretation of law on Shell's part, each of the four Agency Agreements contained an opening paragraph, stating that the contract was a franchise agreement under the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.* The language varied slightly from contract to contract, but essentially provided as follows:

THIS AGREEMENT IS A FRANCHISE UNDER THE PETROLEUM MARKETING PRACTICES ACT ("PMPA"), 15 U.S.C. 2801 ET SEQ. THE TERM OF THIS FRANCHISE IS FOR A PERIOD OF NOT MORE THAN FIVE YEARS AS STATED IN SCHEDULE 2(A). SHELL MAY FAIL TO RENEW THE FRANCHISE RELATIONSHIP AT THE CONCLUSION OF THE INITIAL TERM BY NOTIFYING AGENT, IN ACCORDANCE WITH THE PROVISIONS OF 2804 OF THE PMPA, OF SHELL'S INTENTION NOT TO RENEW THE FRANCHISE RELATIONSHIP. THE PROVISIONS OF 2802 OF THE PMPA, LIMITING THE RIGHT OF A FRANCHISOR TO FAIL TO RENEW A FRANCHISE RELATIONSHIP ARE NOT APPLICABLE TO THIS TRIAL FRANCHISE.

As can be seen in the above quoted passage, only a portion of the PMPA was incorporated into the Agreement. The termination provisions of § 2802 were specifically deemed not applicable. There were other changes which evidenced the intention to create an agent-operator relationship. Among other things the two service stations were built by Shell, paid for by Shell and Shell installed, owns and maintains all tanks, pumps, and equipment at the stations relating to the sale of fuel. Stalker MSJ Decl. ¶ 5; Agency Agreements § 7. Shell delivers fuel to the stations, Agreements §4(a); it does not sell the fuel to Ada. Stalker MSJ Decl. ¶ 6; Agreements 4(a). Ada collects the money from the fuel sales and remits the money, in full, to Shell. *Id.* ¶ 7; and Agreements §5(a). Ada is paid a commission for selling fuel.

Initially, Ada was paid a commission on fuel sales of .18 cents per gallon, which in April 1993 was raised .21 cents per gallon. Stalker MSJ Decl. ¶ 8 and Ex.1(a), Amend. #002 to Agency Agr. 2/23/93. In March 1996, Ada and Shell entered into a written agreement to modify Ada's commission for fuel from a cents-per-gallon model to a management fee-plus-reimbursement-model. Stalker MSJ. Decl. ¶ 9, and Exs 2(a) and (b). Under the reimbursement model, Shell agreed to pay Ada an agreed upon fixed sum every month to cover operational expenses for each station[1]. *Id.*, Sheet 1. Ada has been on the reimbursement model since March 1996 and Shell is current to him on payments under the reimbursement model. *Id.*, ¶ 9.

_____

[1]Shell agreed to reimburse Ada as agreed upon amount for staff costs, assistant manager, accountant, bank fees, card fees, insurance, security, licenses, utilities (electricity, water, telephone), uniforms, stationery, maintenance, gardening, trash, cleaning, advertising and 4% gross receipts tax. Utilities are actually billed directly to paid directly by Shell. Stalker MSJ Decl. ¶ 10.

2

Typical of the agent-operator model, Ada also operates a convenience store ("C-store") at each location. *Agreements § 3.* Ada is responsible for the operations of these stores, including the purchase of inventory, and he keeps all proceeds from the C-store sales except for 15% of gross sales[2] which he pays to Shell as rent on the stores.

Beginning in 1996, Ada's performance as an operator began to deteriorate and Shell became dissatisfied. Stalker MSJ Decl. ¶ 14. In early 1999 Shell sought to end the relationship. *Ibid.* Under the Second Mangilao Agreement, the Agency Sales Agreement on the Mangilao station was scheduled to expire in February 1999. *Ibid.* In January 1999, just before the Mangilao agreement expired, James Hammond, a Shell representative, met with Ada and discussed how Shell and Ada could amicably part ways. Among other things, Ada said that he didn't want to be perceived as a failure in the community, and that he wanted time make the transition to a new job. *Ada gave* Shell several options of how their relationship could be brought to a close. Among other things, Ada suggested that Shell could extend the Mangilao agreement one year and shorten Barrigada agreement one year so that the two agreements would terminate at the same time. A handwritten summary of Ada's concerns and suggested solutions was prepared by Mr. Hammond.

Shell accepted Ada's suggestion to extend the Mangilao agreement and shorten the Barrigada agreement by one year each. An agreement captioned Amendment of Agency was drafted by Shell and signed by Ada on March 25, 1999, reflecting the parties' agreement that the Mangilao agreement would be extended and the Barrigada agreement would be shortened so that the two agreements, and Shell's relationship with Ada, would terminate simultaneously on February 29, 2000. *See* Amendment of Agency, *supra*, and Hammond Decl. ¶ 5.

Acting in reliance on the negotiated agreement with Ada to end their relationship, Shell selected a new operator, Delta Management, Inc., and made arrangements for Delta to take over operations of the stations upon the expiration of the Agreements with Ada.

---

[2]This amount varied from 17% to 15%, and appears at slightly different places in the Agreements. Since 1996 the amount has been fixed at 15% as shown on Sheet 2 attached to the 3/1/96 Amendment To Agency Sales Agreements, Stalker MSJ Decl. Exs. 2(a) and (b).

3

In November, 1999, Ada unexpectedly notified Shell that he wanted to renew the agreements on the stations. *See 11/22/99 Ltr from Ada,* Stalker MSJ Decl., Ex 5. Shell responded that it was not going to renew the agreements. *See 12/10/99 Ltr. from Shell,* Stalker MSJ Decl. Ex 6.

On February 2, 2000 Ada filed suit just before the Amendment of Agency Agreement expired. On March 17, 2000, Ada obtained a Preliminary Injunction prohibiting Shell from "terminating the Agency Sales Agreements between the parties...." At all times since entering into the Agency Sales Agreements, Ada has been in possession of the stations and has been compensated in accordance with the Agency Sales Agreements and amendments thereto. Stalker MSJ Decl ¶ 20; Ada Depo 7/18/05 Depo TR 101:16-18.

        **B. Ada's Claims.** Ada has alleged eight counts in his Second Amended Complaint ("SAC"). Ada alleges eight causes of action. Shell has filed a motion for summary judgment on all eight claims and that the decision on that motion was served just as this brief was being finalized. Shell has not had an opportunity to consider the brief in detail, but the readily apparent holdings are set forth herein. It appears that the only claims in the SAC to survive summary judgment are Counts One and Two pertaining to the PMPA, but only to the extent those counts allege breach of contract claims as opposed to statutory causes of action, and Count XI, which alleges a breach of the Duty of Good Faith and Fair Dealing.

        1.     **Counts I & II,(PMPA).** The evidence will not support Ada's burden of establishing that the PMPA applies to the Agreements. At most, the evidence will show that certain portions of the PMPA were contractually adopted by the parties. The termination provision of § 2802 were not incorporated into the contract. The evidence will show that Ada negotiated and exit plan with Shell in which he induced Shell to agree to extend the contract on one station by a year and shorten the contract on the other station so that the Agreements on both stations would

expire at the same time. See, Amendment of Agency Agreement. Ada then reneged on this Agreement and refused to surrender the premises.

                    2.      **Counts III, IV & V (Fraudulent Inducement, Intentional Misrepresentation, and Negligent Misrepresentation).** Dismissed by Order dated 10/7/05.

                    3.      **Count VI (Breach of Duty of Good Faith and Fair Dealing)**. This is a contract claim, which has survived summary judgment. Shell denies that it has violated this duty. Ada is still in possession of the stations and is being paid according to the Agreements. It is Ada who violated the duty of good faith by reneging on the Amendment of Agency Agreement which called for him to surrender the premises on February 29, 2000.

                    4.      **Count VII (Deceptive Trade Practice Act).** Dismissed by Order dated 10/7/05.

                    5.      **Count VIII. Estoppel to deny the applicability of the PMPA.** Dismissed by Order dated 10/7/05.

          **C.**      **Shell's Counterclaims**.

                    1.      **Count 1. Wrongful Occupation of Real Property**. The stations were built, paid for and are owned by Shell. The land under the stations is leased by Shell. Ada has never had a leasehold or other interest in the land. The Agency Agreements have expired. Ada has no right of possession to the stations. The stations are valuable commercial properties. By refusing to vacate the stations, Ada has caused damage to Shell in the amount of the reasonable rental value of the stations

                    2.    **Count 2. Wrongful Possession and Detention of Shell's Personal Property.** All of the personal property and equipment, including buildings, tanks, pumps and

interior fittings are Shell's property. The Agreements expired in February 2000 and Ada has been wrongfully holding and using Shell's property since then.

      3.     **Count 3. Ejectment.** Same proof as for Count 1. Shell owns the leasehold on the stations. The Agreements have expired. Ada has not right of possession. Shell is entitled to a judgment ejecting Ada from the stations.

      4.     **Count 4. Breach of Contract.** (Barrigada). The Agreements impose certain obligations on Ada which he has habitually breached. Ada is required to have an accountant regularly inspect the books and business records for c-store operations. He has not done this. He is required to submit profit an loss statements on a quarterly basis. He has not done this. He is required to maintain adequate merchandising and stock levels at his c-stores. He has not done this.

      5.     **Count 5. Breach of Contract** (Mangilao). Same as Count 4.

      6.     **Count 6. Reformation of Contract.** Reformation under Guam law is allowed pursuant to Title 20 GCA §§ 3230 and 3233, and Title 18 GCA § 87106 which provide, respectively:

> **§ 3230. When contract may be revised.**
> When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

> **§ 3233. Enforcing the revised contract.**
> A contract may be first revised and then specifically enforced.

> **§ 87106**
> When through fraud, mistake, or accident, a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded.

Title 20 GCA §§ 3230, 3233; 18 GCA § 87106. These statutes were taken from California Civil Code sections 3399, 3402, and 1640, respectively. *See id.*, source.

The elements for reformation of contract are, generally: "(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence.'" *Aero Sales, Inc. v. City of Salem* 200 Or.App. 194, *196, 114 P.3d 510, 511 (Or. Ct. App. 2005) (quoting *Jensen v. Miller,* 280 Or. 225, 228-29, 570 P.2d 375 (1977)).

7. **Count 7. Interference with contractual relations.** "The elements of a cause of action for interference with contractual relations are: (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damages." *Sole Energy Co. v. Petrominerals Corp.*, 26 Cal. Rptr.3d 798, 817 (Cal. Ct. App. 2005).

Shell will establish that Ada knew of Shell's contract with Delta Management to take over the operation of the stations, and that Ada intentionally disrupted that contractual relationship by refusing to surrender the premises. As a result, Shell was damaged in that it lost the ability to put into the stations an operator who would operate more efficiently and profitably, and who would do a better job of promoting the Shell brand.

8. **Count 8. Interference with Prospective Economic Advantage.** "The elements of intentional interference with prospective economic advantage have been stated as follows: '(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the

7

relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.'" *Westside Center Associates v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793, 802 (Cal Ct. .App. 1996) (quoting *Youst v. Longo* (1987) 43 Cal.3d 64, 71, fn. 6, 233 Cal.Rptr. 294, 729 P.2d 728.).

Although the elements are slightly different from interference with contractual relations, the evidence will be the same as set forth in the preceding section.

9. **Count 9. Indemnification.** By holding over and refusing to surrender the stations, Ada has made it impossible for Shell to comply with its contractual commitment to install Delta Management as the operator at the stations. Delta has indicated that it may pursue a breach of contract claim against Shell, although it has not yet done so. In the event Delta does sue Shell for breach of contract, Shell is entitled to indemnification from Ada because it has been Ada's wrongful holdover that has prevented Shell from performing its contract with Delta.

10. **Count 10 Attorneys fees.** Shell has incurred substantial attorneys fees in connection with this lawsuit. Pursuant to ¶ 19 of the Agreements, is Shell is determined to be the prevailing party, Shell will be entitled to reasonable attorneys fees and court costs.

11. **Count 11. Accounting.** Paragraph 5 (d) of the Agreements requires Ada to submit an unaudited income statement and balance sheet to Shell on the 15th day following the end of each quarter. The evidence will show that, despite repeated demands, Ada has failed to provide Shell with the required financial data, which has made it impossible for Shell to track the actual costs of operating the station.

**II.    Legal Brief.**

8

### A. Issues of Law.

1. **Does the PMPA apply to the Agency Agreements?** It appears that the just received 10/6/05 Order held that the PMPA does not apply statutorily, and Counts I and II were dismissed as federal statutory claims. However, Counts I and II may apply contractually and the Court denied Shell summary judgment on these counts to the extent they allege statutory causes of action. If the PMPA applies contractually, only those provisions of the PMPA which were incorporated into the contract would apply. The termination provision of the PMPA were not adopted into the contract.

2. **If PMPA only applies contractually, can Ada seek punitive damages?** The PMPA provides punitive damages as a statutory remedy. Since the Court has determined that the PMPA does not apply as a statute, but only to the extent it may have been incorporated by contract into the Agreements, shell asserts that Ada does not have a right to punitive damages on Count I. It is well recognized Title 20 GCA § 2120 authorizes punitive damages "[i]n an action for breach of an obligation not arising from contract." Formerly codified as Section 3294 of the Guam Civil Code, see 20 GCA § 2120, Source, this section was borrowed from Section 3294 of the California Civil Code. California courts have held that under Section 3294 punitive damages "may not be granted in an action based on a breach of contract even though the defendant's breach was wilful or fraudulent." Crogan v. Metz, 303 P.2d 1029, 1033 (Cal. 1956); see also Von Grabe v. Sprint PCS, 312 F.Supp.2d 1285, 1308-09 (S.D. Cal. 2003) ("It is well settled that, under California law, a plaintiff may not recover punitive damages for breach of an obligation arising out of a contract.").

3. **Ada cannot recover punitive damages on the Breach of the Covenant of Good Faith and Fair Dealing Claim.** There is no independently cognizable tort

9

claim for breach of the implied covenant of good faith and fair dealing and the tort claim alleged in Count VI should be dismissed.

"By now it is well established that a covenant of good faith and fair dealing is implicit in every contract." *Cates Construction, Inc. v. Talbot Partners*, 980 P.2d 407, 415, 86 Cal.Rptr.2d 855, 864 (Cal. 1999); *see also Chodos v. West Publishing Co.*, 292 F.3d 992, 996 (9th Cir. 2002) ("California law, like the law in most states, provides that a covenant of good faith and fair dealing is an implied term in every contract."). "The essence of the implied covenant is that neither party to a contract will do anything to injure the right of the other party to receive the benefits of the contract." *Cates Construction, supra*. However, "[b]ecause the covenant of good faith and fair dealing essentially is a contract term that aims to effectuate the contractual intentions of the parties, 'compensation for its breach has almost always been limited to contract rather than tort remedies.'" *Cates*, 980 P.2d at 416, 86 Cal.Rptr.2d at 865 (quoting *Foley v. Interactive Data Corp.*, 765 P.2d 373, 389, 254 Cal.Rptr. 211, 227 (Cal. 1988). Currently, California courts "recognize[] only one exception to that general rule: tort remedies are available for a breach of the covenant in cases involving insurance policies." *Ibid.*; *see also Pension Trust Fund for Operating Engineers v. Federal Ins. Co.* 307 F.3d 944, 955 (9th Cir. 2002) ("Generally, no cause of action for the tortious breach of the implied covenant of good faith and fair dealing can arise unless the parties are in a 'special relationship' with 'fiduciary characteristics.' *Mitsui Mfrs. Bank v. Superior Court*, 212 Cal.App.3d 726, 730, 260 Cal.Rptr. 793 (1989) (relying on *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 692-93, 254 Cal.Rptr. 211, 765 P.2d 373 (1988)). Thus, the implied covenant tort is not available to parties of an ordinary commercial transaction where the parties deal at arms' length. *Mitsui*, 212 Cal.App.3d at 733, 260 Cal.Rptr. 793.

10

4.    **Ada has not incurred  actual damages**.   Since entering into the

Agency Agreements, Ada has remained in possession of the stations.    Although Ada agreed in

February, 1999 when he signed the Amendment of Agency Agreement that the Agency Agreements

for both stations would expire on February 29, 2000, he breached that agreement and obtained a

preliminary injunction allowing him to continue to operate the stations during this litigation.   Shell

has faithfully paid Ada the agreed upon amount of reimbursement under this Agreements.

> Q.    Is  Shell  current  in  its  payments  to  you  under  the
> reimbursement agreement?
>
> A.    Under that reimbursement agreement, yes.

Ada Tr., 7/18/05 at 101.  In light of this admission, Ada has not been damaged.  *See Chevron U.S.A.*

*Inc. v. El-Khoury*,  2002 WL 31256160, at *3 (C.D.Cal. 2002) ("Defendant cannot logically claim

actual damages on the basis of PMPA violations, since, by virtue of the parties' 'standstill agreement

and the stay order issued by this Court, Defendant has remained in possession at all times and his

franchise has not actually been terminated.").

5.    **Attorneys fees Ada has incurred are not damages for the purpose**

**of determining whether he has suffered actual damages.**   Ada may have a claim for attorneys fees

if he prevails on his lawsuit, but such a claim is not for damages.  Attorneys fees are not damages.

20 G.C.A. § 2225, formerly Guam Civil Code § 3333, provides that:

> For the breach of an obligation not arising from contract, the measure of
> damages, except where otherwise expressly provided by Titles 13, 14, 18, 19 20 and
> 21 of this Code, is the amount which will compensate for all the detriment
> proximately caused thereby, whether it could have been anticipated or not.

In *Fleming v. Quigley*, 2003 Guam 4, 2003 WL 554665 (Guam Feb. 28, 2003), the Guam

Supreme Court found that under Section 2225 attorney's fees are not recoverable as damages

proximately caused by a defendant's tortious acts. The Court stated that 20 G.C.A. 2225 "mirrors California Civil Code § 3333," 2003 Guam 4, ¶ 23, 2003 WL 554665, at *7, and that "[w]e find persuasive the cases in which California courts have held that attorneys' fees cannot be awarded as an element of damages under their identical statute." *Ibid.* After reviewing California precedent and the American Rule regarding attorneys' fees, *see* 2003 Guam 4, ¶¶ 24-26, 2003 WL 554665, at ** 7-8, the Court held that "we interpret 20 G.C.A. § 2225 consistently with the American Rule, and hold that the statute does not authorize the award of attorney's fees to Fleming as compensatory damages." 2003 Guam 4, ¶ 26, 2003 WL 554665, at *8.

6. **If Ada has not suffered actual damages he is not entitled to punitive damages.** Ada asserts that punitive or exemplary damages can suffice as damages for the requirement that the plaintiff sustain actual damages. He is mistaken. Title 20 G.C.A. § 2120, formerly Guam Civil Code § 3294, provides that:

> In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [Emphasis added]

In interpreting the language in this section to the effect that punitive damages may be assessed against "a defendant" only if the defendant is guilty of oppression, fraud or malice, the Guam Supreme Court in *Park v. Mobil Oil Guam, Inc.*, 2004 Guam 20, 2004 WL 2595897 (Guam Feb. 16, 2004), stated that "[t]his language is identical to the pre-1980 version of California Civil Code section 3294 and therefore, cases construing the prior version of section 3294 lend guidance to our consideration of whether punitive damages may be assessed against Mobil under the facts of this case." 2004 Guam 20, ¶ 22, 2004 WL 2595897, at *5. Similarly, 20 G.C.A. § 2120 is identical, in whole to Section 3294(a) as it is currently written and Section 3294 as it existed before

12

subdivision designations were inserted and new subdivisions added. *See* Cal. Civ. Code Ann. ,

§ 3294, Historical and Statutory Notes (West, WESTLAW through Ch. 234 of 2005 Reg.Sess.

urgency legislation & Governor's Reorganization Plans No. 1 & 2 of 2005).

California courts have long held that under Civil Code § 3294 that "exemplary damages are

not recoverable in any case, unless plaintiff establishes his right to compensatory damages." *Chavez*

*v. Times-Mirror Co.*, 237 P. 1085 , 1086-87 (Cal. Ct. App. 1925 ). This is based on the language

of the statute which provides, like the Guam statute, that "in addition to actual damages" a plaintiff

may recover punitive damages where the defendant has been guilty of oppression, fraud or malice.

*See Pickwick Stages, Northern Division v. Board of Trustees of City of El Paso De Robles*, 215 P.

558, 558 (Cal. Ct. App. 1921); *see also Sasser v. Miles & Sons Trucking Service*, 259 P.2d 488, 490

(Cal. Ct. App. 1953).

As stated in *Mother Cobb's Chicken Turnovers v. Fox*, 73 P.2d 1185,1186 (Cal.1937):

> The rule is stated in *Gilham v. Devereaux*, 67 Mont. 75, 214 P. 606, 33
> A.L.R. 381, with annotation at page 384, as follows: 'The foundation for the recovery
> of punitive or exemplary damages rests upon the fact that substantial damages have
> been sustained by the plaintiff. Punitive damages are not given as a matter of right,
> nor can they be made the basis of recovery independent of a showing which would
> entitle the plaintiff to an award of actual damages. Actual damages must be found as
> a predicate for exemplary damages.

*See also Kizer v. County of San Mateo*, 806 P.2d 1353, 1357-1358, 279 Cal.Rptr. 318,322- 23 (Cal.

1991) ("In California, as at common law, actual damages are an absolute predicate for an award of

exemplary or punitive damages.") (citations omitted). Ada is not entitled to punitive damages

because he has suffered no actual damages as shown above. Because Ada cannot prove actual

damages, he will not be entitled to punitive damages. *See id.*

7.    **Even if Ada suffered actual damages, there is no evidence to**

**support a finding that Shell has been guilty of oppression , fraud or malice**. Title 20 GCA §§

2120 (1992). Specifically, section 2120 provides:

> In an action for the breach of an obligation not arising from contract, where the defendant
> has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition
> to the actual damages, may recover damages for the sake of example and by way of
> punishing the defendant.

The evidence will show that Shell has always treated Ada fairly.    In drafting the

Agreements, Shell believed that some language regarding the PMPA was required even though Ada

was going to be an agent-operator.    Shell renegotiated the Agreements to make adjustments for

Ada's under performance, and it eventually agreed to put Ada on a reimbursement + management

fee model, which over the years has paid him substantially more than he would have been paid on

had he remained on the cents per gallon commission model. He is the only operator in the Shell

Guam network to be on this model. There is no basis for finding that Shell has acted with oppression

, fraud or malice.

B.    **Evidentiary Problems.**

1.    **There is no basis for the opinion by Roger Slater, Ada's expert,**

**that Ada suffered "differential damages" based on the theory that Ada's commission should**

**have increased as the pump price of gasoline increased, and Slater's opinion on this issue**

**should not be admitted.** FRE 702 & 703.    The reimbursement model, which has been in effect

since 1996, is a mutually agreed upon change in the manner in which Ada is compensated for fuel

sales.  Instead of being paid on a cents-per-gallon basis, and paying the costs of operating the

stations out of his own pocket, Shell and Ada agreed in writing that Shell would pay Ada a monthly

management fee and either directly pay or reimburse Ada for the costs of operating the station.  *See,*

14

Amendment to Agency Sales Agreements, 8/19/05 Stalker Decl. **Ex. 2(a) and (b)**. Shell has faithfully paid Ada the agreed upon amount of reimbursement under this agreement.

> Q.  Is Shell current in its payments to you under the reimbursement agreement?
>
> A.  Under that reimbursement agreement, yes.

Ada Tr., 7/18/05 at 101.

Although not alleged in the SAC, Ada's expert claims Ada was injured in relation to the commission on fuel sales by a "dollar differential claim," which Slater values at about $375,000. This is an utterly baseless claim. Slater's theory is that, if Ada had stayed on a cents-per-gallon commission model instead of switching to a reimbursement model, and if the cents per gallon commission had gone up proportionally to the rise in the pump price of fuel, Ada would have received more money. There are no facts to support this opinion, and Slater should not be permitted to offer this opinion into evidence. First, Ada agreed to switch to the reimbursement model, so there has been no breach of contract based on a failure to pay him on a cents per gallon basis. Second, even when the fuel commission Shell paid to Ada was based on the cents-per-gallon model, it was never linked to the pump price of the fuel. Stalker Supp. Decl. ¶ 5; 7/18/05 Ada Depo Tr. at 106:14-17. Ada was initially paid a commission of .18 cents per gallon, which later went up to .21 cents per gallon. The cents per gallon was based on an estimate of how much it would cost to provide Ada with a certain level of income per station. The amount of the commission did not rise or fall with the pump price, and the pump price was not a consideration in setting the commission. Stalker Supp. Decl. ¶ 5.

Rule 702 of the Federal Rules of Evidence 'allows admission of 'scientific, technical, or other specialized knowledge' by a qualified expert if it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d

15

998, 1017 (9th Cir, 2004). "The scope of Rule 702 "require that the judge apply his gatekeeping role ... to all forms of expert testimony, not just scientific testimony." *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir.2002)." The court must consider four factors in determining if the expert testimony will assist the trier of fact: "(i) whether the expert is qualified; (ii) whether the subject matter of the testimony is proper for the jury's consideration; (iii) whether the testimony conforms to a generally accepted explanatory theory; and (iv) whether the probative value of the testimony outweighs its prejudicial effect." *Scott v. Ross*, 140 F.3d 1275, 1285-86 (9th Cir.1998). Under *Daubert* the court has gatekeeper responsibility to ensure that the expert testimony is relevant and reliable. *Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).

Rule 703 requires a court to ask two questions when evaluating otherwise inadmissable evidence. "The first question is "whether the facts are of a type reasonably relied on by experts in the particular field. . . . The second question is whether the probative value of the underlying data substantially outweighs its prejudicial effect. Fed.R.Evid. 703." *Turner v. Burlington Northern Santa Fe R. Co.*, 338 F.3d 1058, 1061 (9th Cir. 2003). Here, Slater's dollar differential claim is speculative and not linked to any agreement between the parties. While it has no probative value, it does carry a high risk of prejudice and confusion and should not be admitted.

    2. **Evidence relating to promotional programs is irrelevant, has no probative value regarding any issues in the SAC, and should not be admitted.** FRE 401, 402 and 403. In his report on damages, Ada's expert, Mr. Slater, opines that Ada was damaged because he was not properly compensated by Shell for his participation in the Lucky 7, Shell Serve and Citibank promotional programs. These promotional programs are not mentioned by name, or even alluded to, in the SAC. In fact, these programs were in existence at the time Ada filed suit. Shell submits that Ada does not have valid claims regarding the promotional programs, and that the only

reason he may not have been fully compensated for some of these programs is that Ada has repeatedly refused to submit the documentation required to support his claims for reimbursement.

The promotional program claims are not in any manner related to Ada's PMPA claims (Counts I & II), his fraud claims (Counts II, IV & V), his breach of the duty of good faith and fair dealing claim (Count VI), his Deceptive Trade Practice violation claim (Count VII) or his estoppel claim (Count VIII). Each of those claims is specifically directed to Shell's alleged misconduct relating to the inclusion of the PMPA language on the Agreements.

In August, 2005 Ada attempted to add these breach of contract claims to his complaint. His motion to amend his complaint was denied, and Ada has indicated that he intends to pursue these case in the Superior Court.

FRE 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evidence regarding the promotional programs is not in any manner related to Ada's claims as alleged in the SAC. Thus, the evidence regarding the promotional programs must be excluded under FRE 402 because it does not make any fact relevant to Ada's claims more or less probative without the evidence.

Furthermore, evidence relating to the promotional programs are inadmissible under FRE 403, which provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FRE 403. The evidence regarding the promotional claims are insufficiently probative in relation to its tendency to delay the trial and confuse the issues for the jury.

**3.     Evidence of the Shell Group's global earnings is not relevant on the issue of punitive damages.** Shell Guam, Inc. is a corporation organized under the laws of Guam. It is

17

a subsidiary of a member of the Royal Dutch Shell Group of Companies. Shell Guam, Inc. operates as a separate corporation and there is no evidence that it is merely an alter ego of its parent company. Where a plaintiff seeks punitive damages against a subsidiary corporation, evidence of the wealth of the parent corporation is irrelevant and inadmissible unless the plaintiff can prove that the corporate veil should be pierced because the subsidiary was but an alter ego or mere instrument of the parent. *See Tomaselli v. Transamerica Ins. Co.*, 31 Cal.Rptr.2d 433, 442-44 (Cal. Ct. App. 1994) (annual report of Transamerica Insurance Group could not be used to support punitive damages when alter ego relationship not established); *see also Cap Gemini America, Inc. v. Judd,* 597 N.E.2d 1272, 1286 (Ind. Ct. App. 1992) ("Generally, evidence of the wealth of the parent corporation is irrelevant and inadmissible in assessing punitive damages against a subsidiary corporation," unless the subsidiary "was merely an instrumentality of the parent corporation"); *United Technologies Corp. v. American Home Assur. Co.*, 118 F.Supp.2d 174, 180-81 (D.Conn. 2000) (improper to use parent corporation's value as a measure of exemplary damages) (quoting *United States v. Bestfoods,* 524 U.S. 51, 60, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), for proposition that "'[i]It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation... is not liable for the acts of its subsidiaries'").

## 4. Attorney's Fees.

¶ 19 of the Agreements provides that, if any suit is brought for enforcement of the Agreements, or because of any alleged dispute, breach of default of any provision of the Agreements, "the successful or prevailing party shall be entitled to recover reasonable attorneys fees and Court costs..."

**5. Abandonment of Issues.** Shell has abandoned its claim that Ada's failure to support the Lucky 7 promotional program (Counterclaim Counts IV & V) because participation in this program was, and is, voluntary.

18

Respectfully submitted this __7__ day of October, 2005.

CIVILLE & TANG, PLLC

By    **G. PATRICK CIVILLE**
      *Attorneys for Shell Guam, Inc.*

## CERTIFICATE OF SERVICE

I, G. Patrick Civille, hereby certify that on October 7, 2005, I caused a copy of the foregoing

document to be served via hand-delivery on the following:

> Richard A. Pipes, Esq.
> Law Offices of Richard A. Pipes
> Orlean Pacific Plaza, Suite 201
> 865 South Marine Corps Drive
> Tamuning, Guam 96913

DATED at Hagåtña, Guam, this 7th day of October, 2005.

**CIVILLE & TANG, PLLC**

By: _____
**G. PATRICK CIVILLE**
*Attorneys for Defendant/Counterclaimant*
*Shell Guam, Inc.*